IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| RED REEF ALTERNATIVE INVESTMENTS, LLC and EMERGENT CAPITAL, INC.,[1] | ) ) ) | Case No. 20-12602 (___) |
| Debtors. | ) ) ) | |

## DEBTOR EMERGENT CAPITAL, INC.'S
## CHAPTER 11 PLAN OF REORGANIZATION

Dated: October 15, 2020

PACHULSKI STANG ZIEHL & JONES LLP
Richard M. Pachulski (CA Bar No. 90073)
Maxim B. Litvak (CA Bar No. 215852)
Colin R. Robinson (DE Bar No. 5524)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Tel:  (302) 652-4100
Fax:  (302) 652-4400
E-mail: rpachulski@pszjlaw.com
          mlitvak@pszjlaw.com
          crobinson@pszjlaw.com

Proposed Counsel for Emergent Capital, Inc.,
Debtor and Debtor-in-Possession

---

[1]  The last four digits of each Debtor's taxpayer identification number are:  Red Reef Alternative Investments, LLC (0302) and Emergent Capital, Inc. (3473).  The location of the Debtors' service address for purposes of these cases is 1200 North Federal Highway, Suite 200, Boca Raton, FL 33432.

For the avoidance of doubt, the Plan does not apply to Debtor Red Reef Alternative Investments, LLC.  All alternatives continue to be evaluated with respect to this entity, pending expiration of the bar date.

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME, AND DEFINED TERMS ..................................................................................... 1

    A.    Rules of Interpretation and Computation of Time ................................. 1

    B.    Defined Terms ......................................................................................... 2

ARTICLE II. ADMINISTRATIVE AND PRIORITY TAX CLAIMS ..................................... 17

    A.    Administrative Expense Claims ............................................................ 17

    B.    Priority Tax Claims ............................................................................... 18

ARTICLE III. CLASSIFICATION AND TREATMENT OF  CLASSIFIED CLAIMS AND EQUITY INTERESTS ................................................................... 18

    A.    Summary ............................................................................................... 18

    B.    Separate Classification of Other Secured Debt Claims ...................... 18

    C.    Elimination of Vacant Classes ............................................................. 19

    D.    Voting; Presumptions; Solicitation in Good Faith .............................. 19

    E.    Cramdown ............................................................................................. 19

    F.    Classification and Treatment of Claims and Equity Interests ............. 19

    G.    Special Provision Governing Unimpaired Claims ............................... 23

    H.    Discharge of Claims .............................................................................. 23

    I.    Subordinated Claims ............................................................................. 23

ARTICLE IV. ACCEPTANCE OR REJECTION OF THE PLAN ......................................... 24

    A.    Presumed Acceptance of Plan .............................................................. 24

    B.    No Presumed Rejection of Plan ............................................................ 24

    C.    Voting Classes ...................................................................................... 24

    D.    Acceptance by Impaired Classes of Claims and Equity Interests ....... 24

    E.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code ... 24

DOCS_SF:102519.9 23629/001

ACTIVE.125207870.02

**Page**

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN ....................................... 24

    A.    General Settlement of Claims ............................................................. 24

    B.    Restructuring Transactions ................................................................. 25

    C.    Corporate Existence .......................................................................... 26

    D.    Vesting of Assets in the Debtor ........................................................ 27

    E.    New Indenture Documents; New Series A Notes; New Series B Notes; New PPNs; New PPN Warrants; New PPN SARs; Sources of Cash for Plan Distributions .................................................................................. 28

    F.    Creation of Grantor Trust; Grantor Trust Certificates; New Unvested Warrants; New SARs ......................................................................... 28

    G.    Distribution of New Series A Notes, New Series B Notes, New PPNs, Grantor Trust Certificates, New Unvested Warrants, New PPN Warrants, New SARs and New PPN SARs and Related Documentation .......... 28

    H.    Release of Liens, Claims and Equity Interests ................................... 29

    I.    Organizational Documents ................................................................. 29

    J.    Post-Effective Date Management ...................................................... 30

    K.    Corporate Action ............................................................................... 30

    L.    Cancellation of Notes, Certificates and Instruments .......................... 31

    M.    Cancellation of Existing Instruments Governing Security Interests ................... 32

    N.    Restructuring Transactions ................................................................. 32

    O.    Treatment of Vacant Classes ............................................................. 32

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................................................................................... 32

    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ................................................................................................. 32

**Page**

B.      Assumption and Assignment of Executory Contracts or Unexpired
        Leases...............................................................................................33

C.      Claims on Account of the Rejection of Executory Contracts or
        Unexpired Leases...............................................................................34

D.      Cure of Defaults for Assumed Executory Contracts and Unexpired
        Leases...............................................................................................34

E.      Assumption of Director and Officer Insurance Policies ....................................35

F.      Indemnification Provisions ...................................................................35

ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS...........................................35

A.      Dates of Distributions .........................................................................35

B.      Distribution Agent ..............................................................................36

C.      Cash Distributions...............................................................................37

D.      Rounding of Payments..........................................................................37

E.      Distributions on Account of Claims Allowed After the Effective Date .............37

F.      General Distribution Procedures..............................................................37

G.      Address for Delivery of Distributions.......................................................38

H.      Undeliverable Distributions and Unclaimed Property ....................................38

I.      Withholding Taxes...............................................................................38

J.      Setoffs ..............................................................................................38

K.      Surrender of Cancelled Instruments or Securities ........................................39

L.      Lost, Stolen, Mutilated or Destroyed Securities ..........................................39

ARTICLE VIII. PROCEDURES FOR RESOLVING CONTINGENT,
        UNLIQUIDATED AND DISPUTED CLAIMS............................................39

A.      Disputed Claims..................................................................................39

**Page**

    B.      Procedures Regarding Disputed Claims ............................................................... 40

    C.      Allowance of Claims ........................................................................................... 40

ARTICLE IX. CONDITIONS PRECEDENT TO  THE EFFECTIVE DATE ......................... 41

    A.      Conditions Precedent to the Effective Date ........................................................ 41

    B.      Waiver of Conditions ......................................................................................... 43

    C.      Substantial Consummation ................................................................................. 43

    D.      Effect of Non-Occurrence of Conditions to Consummation .............................. 43

ARTICLE X. RELEASE, INJUNCTION AND RELATED PROVISIONS ............................ 43

    A.      General ................................................................................................................ 43

    B.      Release ................................................................................................................ 43

ARTICLE XI. THIRD PARTY RELEASE BY HOLDERS OF CLAIMS AND
                 EQUITY INTERESTS ......................................................................... 45

    A.      Discharge of Claims ........................................................................................... 46

    B.      Exculpation ......................................................................................................... 46

    C.      Injunction ........................................................................................................... 46

ARTICLE XII. BINDING NATURE OF PLAN ....................................................................... 47

ARTICLE XIII. RETENTION OF JURISDICTION ................................................................. 47

ARTICLE XIV. MISCELLANEOUS PROVISIONS ................................................................ 49

    A.      Dissolution of the Committee ............................................................................. 49

    B.      Payment of Statutory Fees ................................................................................. 49

    C.      Payment of Fees and Expenses of Senior Secured Notes Trustee and
          Convertible Unsecured Notes Trustee ................................................................ 49

    D.      Modification of Plan .......................................................................................... 49

**Page**

E.      Revocation of Plan .........................................................................................49

F.      Entire Agreement ............................................................................................50

G.      Closing of Chapter 11 Case ...........................................................................50

H.      Successors and Assigns...................................................................................50

I.      Reservation of Rights......................................................................................50

J.      Further Assurances..........................................................................................51

K.      Nonseverability ..............................................................................................51

L.      Service of Documents .....................................................................................51

M.      Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code........................................................................................52

N.      Consent Rights ...............................................................................................52

O.      Governing Law ...............................................................................................52

P.      Tax Reporting and Compliance ......................................................................52

Q.      Schedules ........................................................................................................52

R.      Conflicts ..........................................................................................................53

S.      Controlling Document .....................................................................................53

T.      Confirmation Request ....................................................................................53

ACTIVE.125207870.02

## DEBTOR EMERGENT CAPITAL, INC.'S
## CHAPTER 11 PLAN OF REORGANIZATION

EMERGENT CAPITAL, INC., as a debtor and debtor in possession in the above-captioned case (the "Debtor"), proposes the following chapter 11 plan of reorganization (the "Plan") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtor.

Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of the Plan.  The Debtor is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.  Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtor's history, business, results of operations, historical financial information, accomplishments leading up to Solicitation of the Plan, projections and properties, and for a summary and analysis of this Plan and the treatment provided for herein.  There also are other agreements and documents that will be Filed with the Bankruptcy Court that are referenced in this Plan, the Plan Supplement, or the Disclosure Statement as Exhibits and Plan Schedules.  All such Exhibits and Plan Schedules are incorporated into and are a part of this Plan as if set forth in full herein.  Subject to the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor reserves the right to alter, amend, modify, revoke or withdraw this Plan prior to its Consummation.

The Debtor intends to seek confirmation of the Plan pursuant to the "cram down" provisions contained in section 1129(b) of the Bankruptcy Code with respect to any non-accepting Class of Claims or Equity Interests that is Impaired as set forth in Article III hereof.

## ARTICLE I.
## RULES OF INTERPRETATION, COMPUTATION OF TIME, AND DEFINED TERMS

### A.    Rules of Interpretation and Computation of Time

For purposes hereof:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Schedules" are references to Articles, Sections, Exhibits and Plan Schedules hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy

Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America.

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

## B.    **Defined Terms**

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.      "*Accrued Professional Compensation*" means, with respect to a particular Professional, an Administrative Expense Claim of such Professional for compensation for services rendered to the Debtor or the Estate or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date on behalf of the Debtor or the Estate.

2.      "*Administrative Expense Claim*" means any Claim against the Debtor for costs and expenses of administration of the Chapter 11 Case that is Allowed pursuant to sections 327, 328, 330, 365, 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; (b) the Accrued Professional Compensation; (c) the Senior Secured Notes Trustee Fees; (d) the Convertible Unsecured Notes Trustee Fees; (e) the Restructuring Expenses; and (f) all fees and charges assessed against the Estate pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

3.       "*Affiliate*" means an "affiliate" as defined in section 101(2) of the Bankruptcy Code.

4.      "*Allowed*" means, with respect to any Claim, except as otherwise provided herein:  (a) a Claim that has been allowed by a Final Order; (b) a Claim that is allowed: (i) in any stipulation of amount and nature of Claim executed by the Debtor prior to the Effective Date and approved by the Bankruptcy Court; (ii) in any stipulation of amount and nature of Claim executed by the Debtor on or after the Effective Date; (iii) in accordance with the Debtor's books and records or as set forth in the Schedules, to the extent Filed, subject to any limitations on allowance imposed by section 502 of the Bankruptcy Code; (c) a Claim relating to a rejected executory contract or unexpired lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order, in either case only if a Proof of Claim has been timely Filed by the Claimant before the applicable bar date for such claim or has otherwise been deemed timely Filed under applicable law; or (d) a Claim that is Allowed pursuant to the terms of this Plan.  For the avoidance of doubt, notwithstanding anything to the contrary contained herein, there shall be no requirement that either the Senior Secured Notes Trustee or the Convertible Unsecured Notes Trustee File a Proof of Claim on behalf of the Holders of the Senior Secured Notes Claims or the Convertible Unsecured Notes Claims in respect of the Senior Secured Notes Claims or the Convertible Unsecured Notes Claims, respectively; *provided*, that each of the Senior Secured Notes Trustee and the Convertible Unsecured Notes Trustee is authorized, but not directed, in its

sole discretion to File in the Chapter 11 Case, a single master Proof of Claim on behalf of itself and the Holders of the Senior Secured Notes Claims or the Convertible Unsecured Notes Claims on account of any and all Claims arising under the Senior Secured Notes Indenture or the Convertible Unsecured Notes Indenture, respectively.

5.     "*Allowed Claim or Equity Interest*" means a Claim or Equity Interest of the type that has been Allowed.

6.     "*Assets*" means all of the right, title, and interest of the Debtor in and to property of whatever type or nature (including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property).

7.     "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, actions or remedies arising under sections 502, 510 or 542-553 of the Bankruptcy Code.

8.     "*Ballots*" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims and Equity Interests entitled to vote shall, among other things, indicate their acceptance or rejection of this Plan, which includes the Master Ballots and Beneficial Holder Ballots.

9.     "*Bankruptcy Code*" means Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Case.

10.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

11.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, in each case as amended from time to time and as applicable to the Chapter 11 Case.

12.     "*Beneficial Holder*" means, as of the applicable date of determination, a beneficial owner of the Senior Secured Notes, the Convertible Unsecured Notes, or the Equity Interests as reflected in the records maintained by the Senior Secured Notes Registrar, Registered Record Owner, or Intermediary Record Owner, as applicable.

13.     "*Beneficial Holder Ballots*" means the Ballots accompanying the Disclosure Statement upon which Beneficial Holders of the Senior Secured Notes Claims, the Convertible Unsecured Notes Claims, or the Equity Interests entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process.

14.     "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

15.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

16.     "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  For the avoidance of doubt, Cause of Action includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any claims under any state or foreign law, excluding Avoidance Actions which are released and relinquished under this Plan.

17.     "*Chapter 11 Case*" means the Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court.

18.     "*Claim*" means any "claim" against the Debtor as defined in section 101(5) of the Bankruptcy Code.

19.     "*Claims Register*" means the official register of Claims maintained by the Voting Agent.

20.     "*Class*" means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

21.     "*Collateral*" means any property or interest in property of the Debtor's Estate that is subject to a valid and enforceable Lien to secure a Claim.

22.     "*Committee*" means any committee of unsecured creditors in the Chapter 11 Case appointed pursuant to section 1102 of the Bankruptcy Code.

23.     "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

24.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to sections 1128 and 1129 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

25.     "*Confirmation Order*" means the order of the Bankruptcy Court both confirming this Plan pursuant to section 1129 of the Bankruptcy Code and approving the Disclosure Statement, consistent in all material respects with the Restructuring Support Agreements and/or otherwise in form and substance acceptable to the Debtor and the Requisite Parties.

26.     "*Consummation*" or "*Consummated*" means the occurrence of the Effective Date.

27.     "*Convertible Unsecured Notes*" means, collectively, the 5.00% Senior Unsecured Convertible Notes due 2023 issued by the Debtor pursuant to the Convertible Unsecured Notes Indenture.

28.     "*Convertible Unsecured Notes Charging Lien*" means any Lien or other priority in payment arising prior to the Effective Date to which the Convertible Unsecured Notes Trustee is entitled, pursuant to the Convertible Unsecured Notes Indenture, against Plan Distributions to be made to Beneficial Holders of Allowed Convertible Unsecured Notes Claims for payment of any Convertible Unsecured Notes Trustee Fees.

29.     "*Convertible Unsecured Notes Claims*" means all Claims against the Debtor arising under or relating to (a) the Convertible Unsecured Notes and/or the Convertible Unsecured Notes Indenture, and (b) all agreements and instruments relating to the foregoing (including, but not limited to, any guarantees with respect thereto).

30.     "*Convertible Unsecured Notes Indenture*" means that certain *Indenture* dated as of July 28, 2017, pursuant to which the Convertible Unsecured Notes were issued, as amended, supplemented, or as otherwise modified from time to time, by and between the Debtor, as issuer, and the Convertible Unsecured Notes Trustee.

31.     "*Convertible Unsecured Notes RSA*" means the *Restructuring Support Agreement (Convertible Notes)* dated October 14, 2020, by and between the Debtor and certain Holders of the Convertible Unsecured Notes, as may be amended from time to time in accordance with the terms thereof.

32.     "*Convertible Unsecured Notes Trustee*" means U.S. Bank, National Association, in its capacity as indenture trustee, paying agent, registrar, primary registrar, securities custodian and conversion agent under the Convertible Unsecured Notes Indenture, or any successor to U.S. Bank, National Association in any such capacities.

33.     "*Convertible Unsecured Notes Trustee Fees*" means the reasonable compensation, fees, expenses, disbursements and indemnity claims, including without limitation, attorneys' and agents' fees, expenses and disbursements, incurred by the Convertible Unsecured Notes Trustee, whether prior to or after the Petition Date and whether prior to or after Consummation, including, for the avoidance of doubt, any and all fees and expenses incurred as a Distribution Agent under the Plan, which shall be payable without the requirement for the filing of any retention applications, fee applications, or any other applications in the Chapter 11 Case.

34.     "*Debtor*" means Emergent Capital, Inc., in its capacity as debtor and debtor in possession in the Chapter 11 Case and, from and after the Effective Date, as reorganized pursuant to the Plan.

35.     "*Debtor in Possession*" means the Debtor, as a debtor in possession in the Chapter 11 Case as of the Petition Date.

36.    "*Disallowed*" means, with respect to any Claim, a Claim that is not Allowed.

37.    "*Disclosure Statement*" means that certain *Disclosure Statement for Debtor Emergent Capital, Inc.'s Chapter 11 Plan of Reorganization*, as amended, supplemented, or modified from time to time and describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan, consistent in all material respects with the Restructuring Support Agreements and/or otherwise in form and substance acceptable to the Debtor and the Requisite Parties.

38.    "*Disputed*" means, with respect to a Claim, (a) any Claim, which Claim is disputed under Article VIII of this Plan or as to which the Debtor has interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order; (b) any Claim, proof of which was required to be Filed by order of the Bankruptcy Court but as to which a Proof of Claim was not timely or properly Filed; (c) any Claim that is listed in the Schedules, if any are Filed, as unliquidated, contingent or disputed, and as to which no request for payment or Proof of Claim has been Filed; or (d) any Claim that is otherwise disputed by the Debtor in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order.  To the extent the Debtor disputes only the amount of a Claim, such Claim shall be deemed Allowed in the amount the Debtor does not dispute, if any, and Disputed as to the balance of such Claim.

39.    "*Distribution Agent*" means any party designated by the Debtor to serve as distribution agent under this Plan.

40.    "*Distribution Record Date*" means the date for determining which Holders of Claims and Equity Interests are eligible to receive distributions hereunder, as such date shall be fixed by order of the Bankruptcy Court.

41.    "*D&O Liability Insurance Policies*" means all insurance policies for directors' and officers' liability maintained by the Debtor as of the Petition Date, including tail coverage with a term of at least six (6) years from and after the termination of any such policies and containing the same coverage that exists under such policies as of the Effective Date.

42.    "*DTC*" means The Depository Trust Company.

43.    "*Effective Date*" means, with respect to the Plan, the date that is the first Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article IX.A have been satisfied or waived (in accordance with Article IX.B); and (c) the Plan is declared effective.

44.    "*Entity*" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

45.    "*Equity Interest*" means any Equity Security in the Debtor, including, without limitation, all issued, unissued, authorized or outstanding shares of stock or limited company interests, together with (i) any options, warrants (including the Unvested Warrants) or contractual rights (including rights under the Omnibus Plan) to purchase or acquire any such Equity Securities at any time with respect to the Debtor, and all rights arising with respect

thereto and (ii) the rights of any Entity to purchase or demand the issuance of any of the foregoing and shall include:  (1) conversion (but not any right of conversion associated with the Convertible Unsecured Notes), exchange, voting, participation, and dividend rights; (2) liquidation preferences; (3) options, warrants, and put rights; and (4) stock-appreciation rights.  The term "Equity Interest" also includes the Unvested Warrants and any Claim that has been subordinated to the status of an Equity Security.

46.     "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

47.     "*Estate*" means the bankruptcy estate of the Debtor created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

48.     "*Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.*, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder, and any similar federal, state or local law.

49.     "*Exculpated Parties*" means, collectively:  (a) the Debtor, (b) the Plan Agent, and (c) the respective Related Persons of each of the foregoing Entities.

50.     "*Exculpation*" means the exculpation provision set forth in Article XI.B hereof.

51.     "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

52.     "*Exhibit*" means an exhibit annexed hereto, to the Plan Supplement or as an appendix to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

53.     "*Existing SARs*" means outstanding stock appreciation rights issued pursuant to the Debtor's 2010 Omnibus Incentive Plan.

54.     "*File*" or "*Filed*" or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

55.     "*Final Order*" means an order of the Bankruptcy Court, which is in full force and effect and has not been reversed, modified or amended, that is not stayed, and to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, no stay pending appeal has been granted or such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the

Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

56.     "*General Unsecured Claim*" means any Claim against the Debtor that is not a/an:  (a) Administrative Expense Claim; (b) Priority Tax Claim; (c) Other Priority Claim; (d) Other Secured Debt Claim; (e) Senior Secured Notes Claim; (f) Convertible Unsecured Notes Claim, or (g) Equity Interest.

57.     "*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

58.     "*Grantor Trust*" means the trust established pursuant to the Grantor Trust Agreement.  The Grantor Trust will be a Cayman Islands-domiciled trust company.

59.     "*Grantor Trust Agreement*" means that certain agreement made by and among the Debtor, as grantor, and the Grantor Trust Trustee, setting forth the terms of the Grantor Trust Certificates, to be governed by Cayman Islands law, and establishing and delineating the terms and conditions of the Grantor Trust.  The Grantor Trust Agreement will be included in the Plan Supplement and will be in form and substance consistent in all material respects with the Restructuring Support Agreements and/or otherwise in form and substance acceptable to the Debtor and the Requisite Parties.

60.     "*Grantor Trust Certificates*" means the pass-through certificates representing the New PPNs held in the Grantor Trust, the form of which will be included in the Plan Supplement and will be consistent in all material respects with the Restructuring Support Agreements and/or otherwise in form and substance acceptable to the Debtor and the Requisite Parties.  Each Grantor Trust Certificate shall represent one New PPN.

61.     "*Grantor Trust Trustee*" means that Person selected by the Debtor to act as the trustee of the Grantor Trust or any of his, hers, or its successors.  The Grantor Trust Trustee will be acceptable to the Requisite Parties.

62.     "*Holder*" means an Entity holding a Claim against, or Equity Interest in, the Debtor and any Beneficial Holder thereof as of the applicable date of determination or any authorized agent of such Entity.

63.     "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

64.     "*Indemnification Provisions*" means each of the indemnification provisions currently in place (whether in the bylaws, certificates of incorporation, board resolutions, employment contracts or otherwise) for the current and former directors, officers, employees, attorneys, other professionals and agents of the Debtor who served in such capacity on or any time before or after the Petition Date.

65.     "*Initial Distribution Date*" means, subject to the "Treatment" sections in Article III hereof, the date that is as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims and Equity Interests.

66.     "*Intermediary Record Owners*" means, as of the applicable date of determination, the banks, brokerage firms, or the agents thereof as the Entity through which Beneficial Holders hold Convertible Unsecured Notes or Equity Interests.

67.     "*Issuer*" means Lamington, as issuer of New PPN(s), New Series A Notes, New Series B Notes, New PPN Warrants and/or New PPN SARs, and/or the Grantor Trust, as co-issuer, as applicable, of the Grantor Trust Certificates, the New Warrants and/or the New SARs.

68.     "*Lamington*" means Lamington Road Designated Activity Company, an Irish indirect wholly-owned subsidiary of the Debtor.

69.     "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

70.     "*Local Rules*" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

71.     "*Master Ballot*" means any Ballot distributed to the Registered Record Owners or Intermediary Record Owners, as applicable, of the Senior Secured Notes, Convertible Unsecured Notes, and Equity Interests to record the votes of the Beneficial Holders of the Senior Secured Notes, Convertible Unsecured Notes, and Equity Holders as of the Voting Record Date.

72.     "*New Board*" shall mean the board of directors of Lamington as of the Effective Date as set forth in the Plan Supplement.

73.     "*New Indenture Documents*" means the indenture agreement between Lamington, as issuer, and the New Indenture Trustee, and the related notes, pursuant to which the New Series A Notes, the New Series B Notes, and the New PPNs will be issued. The form of the New Indenture Documents will be included in the Plan Supplement and will be in form and substance consistent in all material respects with the Restructuring Support Agreements and/or otherwise in form and substance acceptable to the Debtor and the Requisite Parties.

74.     "*New Indenture Trustee*" means the indenture trustee under the New Indenture Documents. The New Indenture Trustee will be a U.S.-domiciled trust company (or its affiliate) acceptable to the Requisite Parties.

75.     "*New PPN(s)*" means the profit participating notes to be issued by Lamington on or after the Effective Date and to be held by the Grantor Trust, the form of which shall be included in the Plan Supplement and shall be consistent in all material respects with the Restructuring Support Agreements and/or otherwise in form and substance acceptable to the Debtor and the Requisite Parties.

76.     "*New PPN Warrants*" means warrants to purchase the New PPNs to be issued upon exercise of the New Unvested Warrants, the terms of which shall be conformed with those of the existing provisions of the Unvested Warrants to the extent possible, and the form of which shall be included in the Plan Supplement and shall be consistent in all material respects

ACTIVE.125207870.02

with the Restructuring Support Agreements and/or otherwise in form and substance acceptable to the Debtor and the Requisite Parties.

77.     "*New PPN SAR(s)*" means appreciation rights exercisable for New PPNs, the terms of which shall be conformed with those of the Existing SARs to the extent possible, and the form of which shall be included in the Plan Supplement and shall be consistent in all material respects with the Restructuring Support Agreements and/or otherwise in form and substance acceptable to the Debtor and the Requisite Parties.

78.     "*New SAR(s)*" means appreciation rights exercisable for Grantor Trust Certificates, the terms of which shall be conformed with those of the Existing SARs to the extent possible, and the form of which shall be included in the Plan Supplement and shall be consistent in all material respects with the Restructuring Support Agreements and/or otherwise in form and substance acceptable to the Debtor and the Requisite Parties.

79.     "*New Series A Notes*" means the Series A Notes that will be issued by Lamington and distributed by the Debtor to the Holders of the Senior Secured Notes Claims upon the Effective Date, subject to the right of the Senior Secured Notes Trustee to exercise its Senior Secured Notes Charging Lien against such distribution for any unpaid Senior Secured Notes Trustee Fees.  The form of the New Series A Notes will be included in the Plan Supplement and will be consistent in all material respects with the Restructuring Support Agreements and/or otherwise in form and substance acceptable to the Debtor and the Requisite Parties.

80.     "*New Series B Notes*" means the Series B Notes that will be issued by Lamington and distributed by the Debtor to the Holders of the Convertible Unsecured Notes Claims upon the Effective Date, subject to the right of the Convertible Unsecured Notes Trustee to exercise its Convertible Unsecured Notes Charging Lien against such distribution for any unpaid Convertible Unsecured Notes Trustee Fees.  The form of the New Series B Notes will be included in the Plan Supplement and will be consistent in all material respects with the Restructuring Support Agreements and/or otherwise in form and substance acceptable to the Debtor and the Requisite Parties.

81.     "*New Unvested Warrants*" means unvested warrants to purchase Grantor Trust Certificates, the terms of which New Unvested Warrants will be conformed to the extent possible to the Unvested Warrants, and the form of which shall be included in the Plan Supplement and shall be consistent in all material respects with the Restructuring Support Agreements and/or otherwise in form and substance acceptable to the Debtor and the Requisite Parties.

82.     "*Omnibus Plan*" means the Debtor's 2010 Omnibus Incentive Plan, as amended.

83.     "*Ordinary Course Professionals Order*" means any Order approving the motion to employ ordinary course professionals to be Filed on or after the Petition Date in the Chapter 11 Case.

84.     "*Other Priority Claim*" means any Claim against the Debtor accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Expense Claim.

85.     "*Other Secured Debt Claim*" means any Secured Claim against the Debtor other than an Administrative Expense Claim or Senior Secured Notes Claim.

86.     "*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, corporation, general or limited partnership, limited liability company, firm, trust, association, government, governmental agency or other Entity, whether acting in an individual, fiduciary or other capacity.

87.     "*Petition Date*" means October 15, 2020,  the date on which the Debtor commenced the Chapter 11 Case.

88.     "*Plan*" means this *Debtor Emergent Capital, Inc.'s Chapter 11 Plan of Reorganization*, including the Exhibits and Plan Schedules and all supplements, appendices, and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time in accordance with the terms of the Restructuring Support Agreements.

89.     "*Plan Agent*" means the Person designated to wind up and liquidate the Debtor's affairs following consummation of the Restructuring Transactions, the identity of which shall be acceptable to the Requisite Parties and shall be identified in the Plan Supplement.

90.     "*Plan Distribution*" means the payment or distribution of consideration to holders of Allowed Claims and Equity Interests under this Plan.

91.     "*Plan Documents*" means any of the documents, other than this Plan, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, including, without limitation, the documents to be included in the Plan Supplement in each case, subject to the approval of the Requisite Parties.

92.     "*Plan Schedule*" means a schedule annexed to either the Plan Supplement or as an appendix to the Disclosure Statement (as amended, modified or otherwise supplemented from time to time), or Filed as part of the Plan Supplement.

93.     "*Plan Supplement*" means, collectively, the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments referred to therein, ancillary or otherwise, including, without limitation, the Exhibits, Plan Documents and Plan Schedules, all of which are incorporated by reference into, and are an integral part of, this Plan, as all of the same may be amended, modified, replaced and/or supplemented from time to time, which shall be Filed with the Bankruptcy Court on or before five (5) Business Days prior to the Voting Deadline.  The Plan Supplement shall comprise, among other documents and unless otherwise agreed by the Debtor and the Requisite Parties, the following: (a) Grantor Trust Agreement, (b) Grantor Trust Certificate, (c) New Indenture Documents, (d) New PPN(s), (e) New PPN Warrants, (f) New PPN SAR(s), (g) New SAR(s), (h) New Series A Notes, (i) New Series B Notes, (j) New Unvested Warrants, (k) identity of the Plan Agent, (l) the identity of the members of the New Board, (m) the Schedule of assumed contracts,

if any, and (l) any and all other documentation, which shall be consistent in all material respects with the Restructuring Support Agreements and/or otherwise in form and substance acceptable to the Debtors and the Requisite Parties, necessary to effectuate the Restructuring Transactions or that is contemplated by the Plan. The Debtor, with the consent of the Requisite Parties, shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date.

94.     "*Postpetition*" means the time period beginning immediately upon the filing of the Chapter 11 Case and ending on the Effective Date.

95.     "*Priority Tax Claim*" means any Claim of a Governmental Unit against the Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code.

96.     "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim or Equity Interest in a particular Class (or several Classes taken as a whole) bears to (b) the aggregate Allowed amount of all Claims or Equity Interests in such Class (or several Classes taken as a whole), unless this Plan provides otherwise.

97.     "*Professional*" means (a) any Entity employed in the Chapter 11 Case pursuant to section 327, 363, or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to section 503(b)(4) of the Bankruptcy Code.

98.     "*Professional Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code for Accrued Professional Compensation.

99.     "*Proof of Claim*" means a proof of Claim or Equity Interest Filed against the Debtor in the Chapter 11 Case.

100.     "*Registered Record Owners*" means, as of the applicable date of determination, (i) the Holders of Convertible Unsecured Notes and Equity Interests, as applicable, on the books and records of DTC, and (ii) the Holders of Senior Secured Notes reflected on the register maintained by the Senior Secured Notes Registrar.

101.     "*Reinstated*" means, with respect to any Claim, (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the holder of such Claim in accordance with Section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a non-monetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim (other than the Debtor or an insider of the Debtor) for any actual pecuniary loss

incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

102. "*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns and present and former Affiliates (whether by operation of law or otherwise) and subsidiaries, and each of their respective current and former officers, directors, principals, employees, employers, shareholders, members (including *ex officio* members), general partners, limited partners, agents, managers, managing members, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, in each case acting in such capacity at any time, and any Person claiming by or through any of them.

103. "*Release*" means the release given by the Releasing Parties to the Released Parties as set forth in Article X.B hereof.

104. "*Released Party*" means, collectively, each in its capacity as such:  (a) the Debtor, (b) the Debtor's current and former directors and officers, (c) the Senior Secured Notes Trustee, (d) the Convertible Unsecured Notes Trustee, (e) the Supporting Senior Secured Noteholders, (f) the Supporting Convertible Unsecured Noteholders, (g) the Holders of Claims and Equity Interests who vote in favor of the Plan; and (h) the Related Persons of each of (a) through (g) of the foregoing.

105. "*Releasing Party*" means the Debtor, in its individual capacity and as debtor-in-possession, as also set forth in Article X.B hereof.

106. "*Requisite Parties*" means, as of any date of determination, each of the (a) Supporting Senior Secured Noteholders who collectively own or control at least a majority of the aggregate principal amount of the Senior Secured Notes owned or controlled by all of the Supporting Senior Secured Noteholders and (b) Supporting Convertible Unsecured Noteholders who collectively own or control at least a majority of the aggregate principal amount of the Convertible Unsecured Notes owned or controlled by all of the Supporting Convertible Unsecured Noteholders, *provided that*, (a) if the Senior Secured Notes RSA has terminated pursuant to its terms, the "Requisite Parties" shall not include the Supporting Senior Secured Noteholders and (b) if the Convertible Unsecured Notes RSA has terminated pursuant to its terms, the "Requisite Parties" shall not include the Supporting Convertible Unsecured Noteholders.

107. "*Restructuring*" means the financial restructuring of the Debtor, the principal terms of which are set forth in this Plan, the Disclosure Statement, and the Plan Supplement.

108. "*Restructuring Expenses*" means the documented reasonable fees and expenses incurred by the Supporting Senior Secured Noteholders and/or the Supporting Convertible Unsecured Noteholders in connection with the Restructuring and any documentation relating thereto, payable without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Case, which shall be Allowed in full as Administrative Expense Claims upon incurrence and shall not be subject to any offset, defense, counterclaim, reduction, or credit.

109.    "*Restructuring Securities*" means the Series A Notes, the Series B Notes, the New PPNs, the Grantor Trust Certificates, the New Unvested Warrants, the New PPN Warrants, the New SARs and the New PPN SARs.

110.    "*Restructuring Support Agreements*" means the each of the Convertible Unsecured Notes RSA and the Senior Secured Notes RSA.

111.    "*Restructuring Transactions*" means one or more transactions pursuant to section 1123(a)(5)(D) of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including (a) the execution and delivery of appropriate agreements or other documents containing terms that are consistent with or reasonably necessary to implement the terms of this Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and the Plan Documents; and (c) all other actions that the Debtor determines are necessary or appropriate and consistent with the Plan and the Plan Documents.

112.    "*Schedules*" means the schedules of Assets and liabilities, statements of financial affairs, lists of holders of Claims and Equity Interests and all amendments or supplements thereto Filed by the Debtor with the Bankruptcy Court.

113.    "*SEC*" means the U.S. Securities and Exchange Commission, or any successor agency.

114.    "*Secured Claim*" means a Claim that is secured by a Lien on property in which the Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

115.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77c-77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder, and any similar federal, state or local law.

116.    "*Security*" or "*security*" means any security as such term is defined in section 101(49) of the Bankruptcy Code.

117.    "*Senior Secured Notes*" means, collectively, the 8.5% Senior Secured Notes due 2021 issued by the Debtor pursuant to the Senior Secured Notes Indenture.

118.    "*Senior Secured Notes Charging Lien*" means any Lien or other priority in payment arising prior to the Effective Date to which the Senior Secured Notes Trustee is entitled, pursuant to the Senior Secured Notes Indenture, against Plan Distributions to be made to Beneficial Holders of Allowed Senior Secured Notes Claims for payment of any Senior Secured Notes Trustee Fees.

119.    "*Senior Secured Notes Claims*" means all Claims against the Debtor arising under or relating to (a) the Senior Secured Notes and/or the Senior Secured Notes Indenture, and (b) all agreements and instruments relating to the foregoing (including, but not limited to, any guarantees with respect thereto).

120.    "*Senior Secured Notes Indenture*" means that certain *Amended and Restated Indenture*, dated as of July 28, 2017, pursuant to which the Senior Secured Notes were issued, as amended, supplemented, or otherwise modified to date and from time to time, by and between the Debtor, as issuer, and the Senior Secured Notes Trustee.

121.    "*Senior Secured Notes Registrar*" means the Senior Secured Notes Trustee in its capacity as registrar for the Senior Secured Notes under the Senior Secured Notes Indenture.

122.    "*Senior Secured Notes RSA*" means the *Restructuring Support Agreement (Senior Notes)* dated October 14, 2020, by and between the Debtor and certain Holders of the Senior Secured Notes, as may be amended from time to time in accordance with the terms thereof.

123.    "*Senior Secured Notes Trustee*" means Wilmington Trust, National Association, in its capacity as indenture trustee, collateral agent, paying agent, securities custodian, and Senior Secured Notes Registrar under the Senior Secured Notes Indenture, or any successor to Wilmington Trust, National Association in any such capacities.

124.    "*Senior Secured Notes Trustee Fees*" means the reasonable compensation, fees, expenses, disbursements and indemnity claims, including without limitation, attorneys' and agents' fees, expenses and disbursements, incurred by the Senior Secured Notes Trustee, whether prior to or after the Petition Date and whether prior to or after Consummation, including, for the avoidance of doubt, any and all fees and expenses incurred as a Distribution Agent under the Plan, which shall be payable without the requirement for the filing of any retention applications, fee applications, or any other applications in the Chapter 11 Case.

125.    "*Solicitation*" means the solicitation of votes of those parties entitled to vote to accept or reject the Plan.

126.    "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

127.    "*Supporting Convertible Unsecured Noteholders*" means the Holders of the Convertible Unsecured Notes that are parties to the Convertible Unsecured Notes RSA.

128.    "*Supporting Convertible Unsecured Noteholder Professionals*" means Stroock & Stroock & Lavan LLP, Young Conaway Stargatt & Taylor, LLP and any other advisor to Supporting Convertible Unsecured Noteholders as approved by the Debtor, such approval not to be unreasonably withheld or delayed.

129.    "*Supporting Senior Secured Noteholders*" means the Holders of the Senior Secured Notes that are parties to the Senior Secured Notes RSA.

130.    "*Supporting Senior Secured Noteholder Professionals*" means Faegre Drinker Biddle & Reath LLP and any other advisor to Supporting Senior Secured Noteholders as approved by the Debtor, such approval not to be unreasonably withheld or delayed.

131.    "*Transfer*" means, with respect to any security or the right to receive a security or to participate in any offering of any security, (i) the sale, transfer, pledge, hypothecation, encumbrance, assignment, constructive sale, participation in, or other disposition of such security or right or the beneficial ownership thereof, (ii) the offer to make such a sale, transfer, constructive sale, or other disposition, and (iii) each option, agreement, arrangement, or understanding, whether or not in writing and whether or not directly or indirectly, to effect any of the foregoing.  The term "constructive sale" for purposes of this definition means (i) a short sale with respect to such security or right, (ii) entering into or acquiring an offsetting derivative contract with respect to such security or right, (iii) entering into or acquiring a futures or forward contract to deliver such security or right, or (iv) entering into any transaction that has substantially the same effect as any of the foregoing.  The term "beneficially owned" or "beneficial ownership" as used in this definition shall include, with respect to any security or right, the beneficial ownership of such security or right by a Person and by any direct or indirect subsidiary of such Person.

132.    "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

133.    "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

134.    "*Unvested Warrants*" means any and all unvested warrants to purchase the Debtor's existing common stock.

135.    "*Voting Agent*" means Kurtzman Carson Consultants LLC and any successor.

136.    "*Voting Classes*" means Classes 3, 4, and 6 under this Plan.

137.    "*Voting Deadline*" means the deadline set by the Bankruptcy Court for submitting a Ballot for the purpose of voting on the Plan.

138.    "*Voting Record Date*" means the date for determining which Holders of Claims and Equity Interests are entitled to receive the Disclosure Statement and vote to accept or reject this Plan, which date shall be set by the Bankruptcy Court.

## ARTICLE II.
## ADMINISTRATIVE AND PRIORITY TAX CLAIMS

### A.    Administrative Expense Claims

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) payment in full in Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor and such Holder; *provided, however*, that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  All Administrative Expense Claims must be Filed within thirty (30) days after the Effective Date, and served on the Debtor and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court.

*Professional Fee Claims*.  Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must File, within thirty (30) days after the Effective Date, and serve on the Debtor and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim; *provided* that the Debtor will pay Professionals in the ordinary course of business, for any work performed after the Effective Date, including those fees and expenses incurred by Professionals in connection with the implementation and consummation of the Plan, in each case without further application or notice to or order of the Bankruptcy Court in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order(s) relating to or allowing any such Fee Claim; *provided, further*, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order.

Objections to any Professional Fee Claim must be Filed and served on the Debtor and the requesting party fourteen (14) days after the Filing of the applicable request for payment of the Professional Fee Claim.  Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor in Cash within five (5) Business Days of entry of the order approving such Allowed Professional Fee Claim.

*Restructuring Expenses, Senior Secured Notes Trustee Fees, and Convertible Unsecured Notes Trustee Fees*.  The Senior Secured Notes Trustee Fees and the Convertible Unsecured Noted Trustee Fees and the fees and expenses incurred by the Supporting Senior Secured Noteholder Professionals and the Supporting Convertible Unsecured Noteholder Professionals shall be paid on or by the Effective Date.  Nothing herein shall require such professionals (or the Senior Secured Notes Trustee or the Convertible Unsecured Notes Trustee) to file applications with, or otherwise seek approval of, the Bankruptcy Court as a condition to the payment of such fees and expenses.

**B.**      **Priority Tax Claims**

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; or (b) such other less favorable treatment as agreed to in writing by the Debtor and such Holder.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF**
**CLASSIFIED CLAIMS AND EQUITY INTERESTS**

**A.**      **Summary**

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are placed in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified as described in Article III, Section B of the Plan.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date.

**Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Debt Claims | Unimpaired | Deemed to Accept |
| 3 | Senior Secured Notes Claims | Impaired | Entitled to Vote |
| 4 | Convertible Unsecured Notes Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| 6 | Equity Interests in the Debtor | Impaired | Entitled to Vote |

**B.**      **Separate Classification of Other Secured Debt Claims**

Although all Other Secured Debt Claims have been placed in one Class for purposes of nomenclature within this Plan, each Other Secured Claim, to the extent secured by a Lien on Collateral different from the Collateral securing a different Other Secured Claim, shall be treated

as being in a separate sub-Class for the purposes of voting to accept or reject this Plan and receiving Plan Distributions.

## C.     Elimination of Vacant Classes

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from this Plan for purposes of voting to accept or reject this Plan, and disregarded for purposes of determining whether this Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

## D.     Voting; Presumptions; Solicitation in Good Faith

Only Holders of Allowed Claims in Classes 3 and 4 and Equity Interests in Class 6 are entitled to vote to accept or reject this Plan.  An Impaired Class of Claims shall have accepted this Plan if (i) the Holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept this Plan and (ii) the Holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept this Plan. An Impaired Class of Equity Interests shall have accepted the Plan if Holders of at least two-thirds (2/3) in amount of Allowed Equity Interests actually voting in such Class have voted to accept this Plan.  Holders of Claims and Equity Interests in the Voting Classes will receive Ballots containing detailed voting instructions.

The Debtor will solicit votes on the Plan from the Voting Classes in good faith and in compliance with the applicable provisions of the Bankruptcy Code.  Accordingly, the Debtor and each of its Related Persons shall be entitled to, and upon the Confirmation Date will be granted, the protections of section 1125(e) of the Bankruptcy Code.

## E.     Cramdown

If any Class of Claims or Equity Interests is deemed to reject this Plan or is entitled to vote on this Plan and does not vote to accept this Plan, the Debtor intends to (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## F.     Classification and Treatment of Claims and Equity Interests

      1.    Class 1 – Other Priority Claims

- *Classification*:  Class 1 consists of the Other Priority Claims.

- *Treatment*:  The legal, equitable and contractual rights of the Holders of Class 1 Claims are unaltered by the Plan.  With respect to each Allowed Class 1 Claim, on or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 1 Claim is an Allowed Class 1 Claim on the Effective Date

or (ii) the date on which such Class 1 Claim becomes an Allowed Class 1 Claim, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor:  (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code.

- *Impairment and Voting*:  Class 1 is an Unimpaired Class, and the Holders of Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims will not be entitled to vote to accept or reject the Plan and will not be solicited.

2.    Class 2 – Other Secured Debt Claims

- *Classification*:  Each Class 2 Claim is an Other Secured Debt Claim against the Debtor.  This Class will be further divided into subclasses designated by letters of the alphabet (Class 2A, Class 2B and so on), so that each holder of any Allowed Other Secured Debt Claim against the Debtor is in a Class by itself, except to the extent that there are Other Secured Debt Claims that are substantially similar to each other and may be included within a single Class.

- *Treatment*:  The legal, equitable and contractual rights of the Holders of Class 2 Claims are unaltered by the Plan.  With respect to each Allowed Class 2 Claim, on or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 2 Claim is an Allowed Class 2 Claim on the Effective Date or (ii) the date on which such Class 2 Claim becomes an Allowed Class 2 Claim, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim, at the election of the Debtor (with the consent of the Requisite Parties):  (A) Cash equal to the amount of such Allowed Class 2 Claim; (B) return of the collateral securing such Allowed Class 2 Claim; (C) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 2 Claim will have agreed upon in writing; (D) any defaults shall be cured and shall be paid or satisfied in accordance with and pursuant to the terms of the applicable agreement between the Debtor and the Holder of the Allowed Class 2 Claim; or (E) Reinstatement or such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code.

- *Impairment and Voting*:  Class 2 is an Unimpaired Class, and the Holders of Class 2 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 2 Claims will not be entitled to vote to accept or reject the Plan and will not be solicited.

3.    Class 3 – Senior Secured Notes Claims

- *Classification*:  Class 3 consists of the Senior Secured Notes Claims.

- *Allowance*:  On the Effective Date, the Senior Secured Notes Claims shall be Allowed, without offset, counterclaim or defense of any kind, in the aggregate principal amount of Forty Eight Million Seven Hundred Fifty Eight Thousand Eight Hundred Eighty Seven Dollars and Fifty Cents ($48,758,887.50), plus any accrued and unpaid interest, fees, costs and expenses and other amounts.

- *Treatment*:  On the Effective Date, (i) each and every Holder of an Allowed Senior Secured Notes Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim, shall receive its Pro Rata share of the New Series A Notes in accordance with the ratios, payment priorities, and descriptions set forth on **Exhibit A** and **Exhibit B** attached hereto and (ii) the Debtor shall pay in full in Cash all outstanding Senior Secured Notes Trustee Fees.

- *Impairment and Voting*:  Class 3 is an Impaired Class, and Holders of Class 3 Claims are entitled to vote to accept or reject the Plan.

4.    Class 4 – Convertible Unsecured Notes Claims

- *Classification*:  Class 4 consists of the Convertible Unsecured Notes Claims.

- *Allowance*:  On the Effective Date, the Convertible Unsecured Notes Claims shall be Allowed, without offset, counterclaim or defense of any kind, in the aggregate principal amount of Sixty Seven Million Eight Hundred Thirty Six Thousand Nine Hundred Sixty Six Dollars ($67,836,966.00) plus any accrued and unpaid interest, fees, costs and expenses and other amounts.

- *Treatment*:  On the Effective Date, (i) each and every Holder of an Allowed Convertible Unsecured Notes Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim, shall receive its Pro Rata share of:  (a) the New Series B Notes and (b) those Grantor Trust Certificates delivered in connection with the New Series B Notes in accordance with the

ratios, payment priorities, and descriptions set forth on **Exhibit A** and **Exhibit B** attached hereto and (ii) the Debtor shall pay in full in Cash all outstanding Convertible Unsecured Notes Trustee Fees.

- *Impairment and Voting*: Class 4 is an Impaired Class, and Holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

5. Class 5 – General Unsecured Claims

- *Classification*: Class 5 consists of the General Unsecured Claims.

- *Treatment*: The legal, equitable and contractual rights of the Holders of Class 5 Claims are unaltered by the Plan. With respect to each Allowed Class 5 Claim, on or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 5 Claim is an Allowed Class 5 Claim on the Effective Date or (ii) the date on which such Class 5 Claim becomes an Allowed Class 5 Claim, each Holder of an Allowed Class 5 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 5 Claim, at the election of the Debtor (with the consent of the Requisite Parties): (A) Cash equal to the amount of such Allowed Class 5 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 5 Claim will have agreed upon in writing; or (C) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code.

- *Impairment and Voting*: Class 5 is an Unimpaired Class, and the Holders of Class 5 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 5 Claims will not be entitled to vote to accept or reject the Plan and will not be solicited.

6. Class 6 – Equity Interests in the Debtor

- *Classification*: Class 6 consists of the Equity Interests in the Debtor.

  - *Treatment*: On the Effective Date, each and every Holder of an Equity Interest in the Debtor, in full satisfaction, settlement, discharge and release of, and in exchange for, such Equity Interest, shall receive its Pro Rata share of the Grantor Trust Certificates in accordance with the ratios and payment priorities set forth on **Exhibit A** attached hereto, *provided that* (i) New Unvested Warrants to purchase Grantor Trust Certificates shall be distributed to Holders of Unvested Warrants and (ii) (x) equity awards of restricted stock under the Omnibus Plan shall be deemed vested as of the Effective Date and treated the same as the other Equity Interests in the Debtor and (y) New SARs exercisable for Grantor

Trust Certificates will be distributed to Holders of Existing SARs. The existing Equity Interests in the Debtor shall be canceled and extinguished as of the Effective Date.

- *Impairment and Voting*:  Class 6 is an Impaired Class, and Holders of Class 6 Claims are entitled to vote to accept or reject the Plan.

**G.    Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims, including the right to cure any arrears or defaults that may exist with respect to contracts to be assumed under the Plan.

**H.    Discharge of Claims**

Except as otherwise provided in the Plan and effective as of the Effective Date:  (i) the rights afforded herein and the treatment of all Claims and Equity Interests will be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtor or any of its Assets, property, or Estate; (ii) the Plan will bind all Holders of Claims and Equity Interests, notwithstanding whether any such Holders abstained from voting to accept or reject the Plan or voted to reject the Plan; (iii) all Claims and Equity Interests will be satisfied, discharged, and released in full, and the Debtor's liability with respect thereto will be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (iv) all Entities will be precluded from asserting against the Debtor, the Debtor's Estate, each of their successors and assigns, and each of their Assets and properties, any other Claims or Equity Interests based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

**I.    Subordinated Claims**

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtor reserves the right to re-classify, or to seek to subordinate, any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.  Unless the Confirmation Order provides otherwise, no distributions under the Plan shall be made on account of any subordinated Claim.

## ARTICLE IV.
## ACCEPTANCE OR REJECTION OF THE PLAN

**A.**      **Presumed Acceptance of Plan**

Classes 1, 2, and 5 are Unimpaired under the Plan, and are, therefore, presumed to have accepted the Plan pursuant to section 1126 of the Bankruptcy Code.

**B.**      **No Presumed Rejection of Plan**

No Classes of Claims or Equity Interests are Impaired such that they receive no distribution under the Plan on account of such Claims and Equity Interests.  Therefore, no Classes of Claims or Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

**C.**      **Voting Classes**

Each Holder of an Allowed Claim or Equity Interest as of the applicable Voting Record Date in the Voting Classes (Classes 3, 4, and 6) will be entitled to vote to accept or reject the Plan.

**D.**      **Acceptance by Impaired Classes of Claims and Equity Interests**

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.  An Impaired Class of Equity Interests has accepted the Plan if Holders of at least two-thirds in amount of Allowed Equity Interests actually voting in such Class have voted to accept the Plan.

**E.**      **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

The Debtor shall seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class or Equity Interest that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtor reserves the right to modify the Plan or any Exhibit thereto or Plan Schedule in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

## ARTICLE V.
## MEANS FOR IMPLEMENTATION OF THE PLAN

**A.**      **General Settlement of Claims**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan will constitute a good-faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Equity Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry

of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtor and its Estate.

## B.  <u>Restructuring Transactions</u>

Upon the Effective Date, the Debtor shall cause the following Restructuring Transactions to be consummated, in addition to such other transactions and events as the officers of the Debtor deem necessary, advisable, or appropriate in connection with the consummation of the Plan, regardless of the order in which they occur:

   i.   The Debtor shall cause (and shall cause its subsidiaries to cause) Lamington to recapitalize, such that all of Lamington's currently issued profit participating notes are converted into (a) the New Series A Notes, (b) the New Series B Notes, (c) the New PPNs, (d) the New PPN Warrants to purchase the New PPNs, and (e) the New PPN SARs exercisable for New PPNs;

   ii.  The Debtor shall cause (and shall cause its subsidiaries to cause) (a) Lamington to dividend to Markley Asset Portfolio, LLC, an indirect wholly-owned subsidiary of the Debtor, the New Series A Notes, the New Series B Notes, the New PPNs, the New PPN Warrants and the New PPN SARs, (b) Markley Asset Portfolio, LLC to dividend or otherwise transfer to OLIPP IV, LLC, a direct wholly-owned subsidiary of the Debtor, the New Series A Notes, the New Series B Notes, the New PPNs, the New PPN Warrants and the New PPN SARs and (c) OLIPP IV, LLC to dividend to the Debtor, the New Series A Notes, the New Series B Notes, the New PPNs, the New PPN Warrants and the New PPN SARs.

   iii. The Debtor shall (a) form the Grantor Trust and cause the Grantor Trust to issue the Grantor Trust Certificates, the New Unvested Warrants and the New SARs and (b) contribute the New PPNs, the New PPN Warrants and the New PPN SARs into the Grantor Trust in exchange for the Grantor Trust Certificates, the New Unvested Warrants (so that upon exercise of any New Unvested Warrants the proceeds thereof would be used to exercise the New PPN Warrants) and the New SARs (so that upon exercise of any New SARs the proceeds thereof would be used to exercise the New PPN SARs);

   iv.  The Debtor shall cause (and shall cause its subsidiaries to cause) to have the New Series A Notes, the New Series B Notes, the New PPNs, and the Grantor Trust Certificates listed on a stock exchange deemed suitable for such purpose by the Debtor;

   v.   The Debtor shall dispose of certain of its assets other than its securities of Lamington in a tax-efficient manner, which disposition may occur prior to or during the winding up of the Debtor and may be subsequent to the distributions to be made pursuant to subsection (vi) below;

vi.    Subject to the right of (a) the Convertible Unsecured Notes Trustee to exercise the Convertible Unsecured Notes Charging Lien and (b) the Senior Secured Notes Trustee to exercise the Senior Secured Notes Charging Lien, the Debtor shall distribute (x) the New Series A Notes to Holders of Senior Secured Notes Claims; (y) the New Series B Notes and a portion of the Grantor Trust Certificates to Holders of the Convertible Unsecured Notes Claims, and (c) a portion of the Grantor Trust Certificates to Holders of Equity Interests in the Debtor, all in accordance with the ratios and payment priorities set forth on **Exhibit A** attached hereto, in each case, in accordance with the terms of this Plan and the Restructuring Support Agreements (but not a Restructuring Support Agreement that has been terminated); *provided that*, (i) New Unvested Warrants to purchase Grantor Trust Certificates will be distributed to Holders of Unvested Warrants and (ii) equity awards of (x) restricted stock under the Omnibus Plan shall be deemed vested as of the Effective Date and treated the same as the other Equity Interests in the Debtor and (y) New SARs exercisable for Grantor Trust Certificates will be distributed to Holders of Existing SARs, in each case, in accordance with the terms of this Plan and the Restructuring Support Agreements (but not a Restructuring Support Agreement that has been terminated).  In consideration of such distributions, the existing Senior Secured Notes, the Convertible Unsecured Notes, and the Equity Interests in the Debtor shall be canceled and extinguished in accordance with Article V.L of the Plan;

vii.    On the Effective Date (or as soon as practicable thereafter), the Debtor shall terminate, or cause to be terminated, (i) the listing of the Equity Interests in the Debtor on the OTCQX Marketplace and (ii) the reporting obligations of the Debtor under the Exchange Act, and file such other statements, forms, schedules or reports pursuant to the Exchange Act or other federal or state securities laws as the officers of the Debtor deem necessary, advisable or appropriate; and

viii.    The Debtor shall wind up its remaining operations and affairs, which may include the sale or other disposition of remaining assets in a tax-efficient manner, and shall take such other actions the Plan Agent deems necessary or advisable to accomplish the purposes of the Plan and consummate the liquidation and winding up of the Debtor thereunder.  At the conclusion of the liquidation and following the discharge of any remaining liabilities of the Debtor, the Plan Agent shall cause the Debtor to distribute any remaining liquidation proceeds and any Cash held by the Debtor to Lamington.

## C.    **Corporate Existence**

Pending consummation of the Restructuring Transactions and until such time that the Debtor has fulfilled its obligations under the Plan, the Debtor will continue to exist after the Effective Date, with all of the powers of a corporation pursuant to the applicable law in its state of incorporation, and in accordance with its certificate of incorporation and bylaws, except as modified hereby or through the Confirmation Order.

On the Effective Date or as soon thereafter as is reasonably practicable, and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any

Entity or any director, stockholder, securityholder, manager, member, or partner (or board thereof) of any Entity, the Debtor may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate this Plan, including, without limitation:  (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase or liquidation containing terms that are consistent with the terms of the Plan, the Plan Documents, the Restructuring Support Agreements (but not a Restructuring Support Agreement that has been terminated) and that satisfy the requirements of applicable law and any other terms to which the applicable entities and Requisite Parties may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan and the Restructuring Support Agreements (but not a Restructuring Support Agreement that has been terminated) and having other terms to which the applicable parties and Requisite Parties agree; (iii) the filing of appropriate certificates or articles of incorporation and amendments thereto, reincorporation, merger, consolidation, conversion, amalgamation or dissolution pursuant to applicable law; (iv) the Restructuring Transactions; and (v) all other actions that the applicable Entities determine to be necessary or appropriate, including, without limitation, making filings or recordings that may be required by applicable law in connection with the Plan.  The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.  On the Effective Date or as soon as reasonably practicable thereafter, the applicable Entities shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring Transactions.

**D.**     **Vesting of Assets in the Debtor**

Except as otherwise provided in the Plan, in any agreement, instrument, or other document incorporated in the Plan, or the Confirmation Order, on or after the Effective Date, all property and Assets of the Estate (including, without limitation, Causes of Action) and any property and Assets acquired by the Debtor pursuant to the Plan will vest in the Debtor, free and clear of all Liens, Claims, charges or other encumbrances.  Notwithstanding the foregoing, Avoidance Actions shall be deemed released and relinquished as of the Effective Date.

Except as may be otherwise provided in the Plan, on and after the Effective Date, the Debtor may manage its affairs and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.  Without limiting the foregoing, the Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

Any proceeds realized by the Debtor from the liquidation of its Assets will be disposed of in a tax-efficient manner.

E.    **New Indenture Documents; New Series A Notes; New Series B Notes; New PPNs; New PPN Warrants; New PPN SARs; Sources of Cash for Plan Distributions**

(a)    *New Indenture Documents.*  On the Effective Date, the Debtor will cause Lamington to execute and deliver the New Indenture Documents, the New Series A Notes, the New Series B Notes, the New PPNs, the New PPN Warrants and the New PPN SARs to the Debtor (which will immediately thereafter contribute such New PPNs, New PPN Warrants and New PPN SARs to the Grantor Trust), and any related instruments and documents, amendments to the foregoing, or agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any director, stockholder, securityholder, manager, member, or partner (or board thereof) of any Entity and Confirmation of the Plan shall be deemed approval of all such documents.  The material terms of the New Series A Notes, the New Series B Notes, and the New PPNs are summarized in **Exhibit B** attached hereto.

(b)    *Sources of Cash for Plan Distributions.*  Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Debtor to make payments required pursuant to the Plan will be obtained from Cash on hand at the Debtor or through its direct or indirect wholly-owned subsidiaries.

F.    **Creation of Grantor Trust; Grantor Trust Certificates; New Unvested Warrants; New SARs**

On the Effective Date, the Debtor shall establish the Grantor Trust pursuant to the Grantor Trust Agreement for the purpose of holding the New PPNs, the New PPN Warrants and the New PPN SARs and the Debtor will cause the Grantor Trust to issue and deliver the Grantor Trust Certificates, the New Unvested Warrants and the New SARs to the Debtor.  The Grantor Trust will be managed and administered by the Grantor Trust Trustee, without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any director, stockholder, securityholder, manager, member, or partner (or board thereof) of any Entity.  The identity of the Grantor Trust Trustee will be disclosed prior to the Confirmation Hearing as part of the Plan Supplement in accordance with Section 1129(a)(5) of the Bankruptcy Code.  The expenses of the Grantor Trust, including the fees of the Grantor Trust Trustee, shall be borne by Lamington.

G.    **Distribution of New Series A Notes, New Series B Notes, New PPNs, Grantor Trust Certificates, New Unvested Warrants, New PPN Warrants, New SARs and New PPN SARs and Related Documentation**

On the Effective Date, the Debtor will be authorized to distribute the New Series A Notes, the New Series B Notes, the Grantor Trust Certificates, the New Unvested Warrants, and the New SARs and contribute the New PPNs, the New PPN Warrants and the New PPN SARs, in accordance with the Plan and the Restructuring Support Agreements (but not a Restructuring Support Agreement that has been terminated) without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any director, stockholder, securityholder, manager, member, or partner (or board thereof) of any Entity.  From and after the Effective Date, the Debtor will cease to be under any

ACTIVE.125207870.02

disclosure or other obligations in connection with the Senior Secured Notes Indenture, the Convertible Unsecured Notes Indenture, or the Equity Interests.

The Restructuring Securities to be issued and distributed pursuant to the Plan will be exempt from the registration requirements of federal, state or local securities laws to the fullest extent permitted by Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder, and/or Section 1145(a) of the Bankruptcy Code. Without limiting the effects of such provisions, all financing documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan, including, without limitation, the New Series A Notes, the New Series B Notes, the New PPNs, the Grantor Trust Certificates, the New Unvested Warrants, the New PPN Warrants, the New SARs and the New PPN SARs, and any other agreement or document related to or entered into in connection with any of the foregoing, will become effective and binding in accordance with their respective terms and conditions upon execution and delivery by the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any director, stockholder, securityholder, manager, member, or partner (or board thereof) of any Entity (other than as expressly required by such applicable agreement).

## H.    Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any director, stockholder, securityholder, manager, member, or partner (or board thereof) of any Entity. Any Entity holding such Liens or Interests will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor. For the avoidance of doubt, nothing in this provision shall impair the right of (i) the Convertible Unsecured Notes Trustee to exercise the Convertible Unsecured Notes Charging Lien, or (ii) the Senior Secured Notes Trustee to exercise the Senior Secured Notes Charging Lien.

## I.    Organizational Documents

On the Effective Date, the organizational documents of Lamington shall be revised consistent with the provisions of the Plan and the Restructuring Support Agreements (but not a Restructuring Support Agreement that has been terminated) and the organizational documents of the Debtor shall be deemed revised consistent with the provisions of the Plan and the Restructuring Support Agreements (but not a Restructuring Support Agreement that has been terminated). Specifically, on the Effective Date, the organizational documents of the Debtor shall be deemed revised to (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of additional non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code and (ii) to the

extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein.  After the Effective Date, Lamington may amend and restate its operating agreement and other applicable organizational documents, as permitted by applicable law.

## J.      Post-Effective Date Management

On the Effective Date, Lamington shall have a board of directors consisting of five (5) members, including (a) two (2) designated by the ad hoc committee of the Supporting Senior Secured Noteholders, (b) one (1) designated by the ad hoc committee of the Supporting Convertible Unsecured Noteholders, (c) one (1) designated by the non-conflicted equity members of the Debtor's Board of Directors, and (d) one (1) Irish citizen acceptable to the other four (4) director designees. Each such designee may be removed and replaced by his or her designator(s).  The duration of such designation rights and other rights of such directors, including voting rights and restrictions, will be contained in the New Indenture Documents. Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtor will disclose, prior to the Confirmation Hearing, the identity and affiliations of any Person proposed to serve on the initial board of directors of Lamington or as an officer of Lamington and, to the extent such Person is an insider other than by virtue of being a director or officer, the nature of any compensation for such Person.  Each such director, and officer will serve from and after the Effective Date pursuant to applicable organizational documents of Lamington and the New Indenture Documents.

The directors and officers of the Debtor will be deemed to have resigned as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any other Person or any director, stockholder, securityholder, manager, member, or partner (or board thereof) of any Entity.

On the Effective Date, the Plan Agent shall be appointed as the sole director, sole manager, sole managing member and sole officer of the Debtor.  From and after the Effective Date, and until the Debtor is wound up and liquidated, the Debtor shall be managed by the Plan Agent, pursuant to the terms of the Plan and the Confirmation Order, which shall provide that the Plan Agent will be compensated on an hourly basis out of the Debtor's revested assets.  The Plan Agent shall act for the Debtor in the same fiduciary capacity as applicable to a board of directors, board of managers, managing members and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).

## K.      Corporate Action

From and after the Effective Date, the Debtor may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the liquidation of the Debtor's Assets and distribution of the securities to be issued pursuant hereto and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or

other action by any Entity or any other Person or any director, stockholder, securityholder, manager, member, or partner (or board thereof) of any Entity (except for those expressly required pursuant to the Plan) and all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects.

From and after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of any stockholders, securityholders, directors, managers, members or partners of the Debtor (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further notice to or any vote, consent, authorization, approval, ratification or other action by the stockholders, directors, managers or members of such Debtor, or the need for any notice to or any vote, consent, authorization, approval, ratification or other, action by any Person and all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects.

Upon the Effective Date, all matters provided for in the Plan involving the legal or corporate structure of the Debtor, and any legal or corporate action required by the Debtor in connection with the Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any other Person or any director, stockholder, manager, member, or partner (or board thereof) of any Entity and all matters provided for in the Plan involving the legal or corporate structure of the Debtor shall be deemed authorized and approved by the Bankruptcy Court in all respects.  On the Effective Date, the appropriate officers of the Debtor are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in the Plan in the name of and on behalf of the Debtor without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or other Person or any director, stockholder, manager, member, or partner (or board thereof) of any Entity.  The secretary and any assistant secretary of the Debtor will be authorized to certify or attest to any of the foregoing actions.

## L.    Cancellation of Notes, Certificates and Instruments

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim against, or Equity Interest in, the Debtor and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect; *provided, however,* that (i) the Convertible Unsecured Notes and the Convertible Unsecured Notes Indenture and (ii) the Senior Secured Notes and the Senior Secured Notes Indenture shall continue in effect solely for the purposes of (a) allowing the Holders of Convertible Unsecured Notes and Senior Secured Notes (as applicable) to receive their Plan Distributions, (b) preserving the Convertible Unsecured Notes Trustee and the Senior Secured Notes Trustee's respective right to payment of the Convertible Unsecured Notes Trustee Fees and the Senior Secured Notes Trustee Fees, respectively, (c) permitting the Convertible Unsecured Notes Trustee and the Senior Secured Notes Trustee to exercise the Convertible Unsecured Notes Charging Lien and the Senior Secured Notes Charging Lien, respectively, and ,

(d) allow the Convertible Unsecured Notes Trustee and the Senior Secured Notes Trustee to enforce their rights, claims and interests vis-à-vis any other parties other than the Debtor and to appear in  the Chapter 11 Case and (e) maintaining the right to indemnification, contribution or subrogation or any other claim or entitlement they may have from the Debtor pursuant to and subject to the respective terms of the Convertible Unsecured Notes Indenture and the Senior Secured Notes Indenture.  Except for the foregoing with respect to such other rights of the Convertible Unsecured Notes Trustee and the Senior Secured Notes Trustee that survive the applicable indentures, the Convertible Unsecured Notes Trustee and the Senior Secured Notes Trustee and their respective agents shall be relieved of all further duties and responsibilities related to the applicable Indentures and the Plan.

**M.**     **Cancellation of Existing Instruments Governing Security Interests**

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtor any Collateral or other property of the Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

**N.**     **Restructuring Transactions**

On the Effective Date or as soon as reasonably practicable thereafter, and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or other Person or any director, stockholder, manager, member, or partner (or board thereof) of any Entity, the Debtor may take all actions consistent with this Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with this Plan and the Restructuring Support Agreements (but not a Restructuring Support Agreement that has been terminated).

**O.**     **Treatment of Vacant Classes**

Any Claim or Interest in a Class that is considered vacant under Article III.C of this Plan shall receive no Plan Distribution.

**ARTICLE VI.**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**A.**     **Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtor will be deemed rejected in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts and Unexpired Leases that:

1.    have previously expired or terminated pursuant to their own terms or by agreement of the parties thereto;

2.      have been assumed by order of the Bankruptcy Court;

3.      are the subject of a motion to assume or motion to reject pending on the Effective Date;

4.      are identified on a schedule of assumed contracts in the Plan Supplement; or

5.      are assumed pursuant to the terms of the Plan.

Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan (including, without limitation, any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Debtor's assumption of such Executory Contract or Unexpired Lease, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Each Executory Contract and Unexpired Lease assumed pursuant to this Article of the Plan will revest in and be fully enforceable by the Debtor in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

## B.      Assumption and Assignment of Executory Contracts or Unexpired Leases

In the event of an assumption and assignment of an Executory Contract or Unexpired Lease, at least twenty-one (21) days prior to the Confirmation Hearing, the Debtor will serve upon counterparties to such Executory Contracts and Unexpired Leases a notice of the proposed assumption and assignment that will:  (a) list the applicable cure amount, if any; (b) identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court; additionally, the Debtor will file with the Bankruptcy Court a list of such Executory Contracts and Unexpired Leases to be assigned and the proposed cure amounts.  Any applicable cure amounts will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assignment or any related cure amount must be Filed, served and actually received by the Debtor at least five (5) Business Days prior to the Confirmation Hearing.  Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assignment or cure amount will be deemed to have consented to such assignment of its Executory Contract or Unexpired Lease.  The Confirmation Order will constitute an order of the Bankruptcy Court approving any proposed assignments of Executory Contracts or Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Unless otherwise indicated, all assumptions, assumptions and assignments, and rejections of Executory Contracts and Unexpired Leases in the Plan will be effective as of the Effective Date.

Notwithstanding the foregoing paragraph or anything contrary herein, the Debtor reserves the right, with the consent of the Requisite Parties, to alter, amend, modify, or supplement the Executory Contracts and Unexpired Leases identified for assumption, assumption and assignment, or rejection in the Plan Supplement prior to the Effective Date.

In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assigned or (c) any other matter pertaining to assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assignment.  If an objection to assignment or cure amount is sustained by the Bankruptcy Court, the Debtor, in its sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming and assigning it.

## C.    Claims on Account of the Rejection of Executory Contracts or Unexpired Leases

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court on the later of (a) the applicable bar date; (b) within thirty (30) days after service of the applicable rejection order; and (c) any other date set by an order of the Court.  The Debtor will provide notice of such rejection and specify the appropriate deadline for the filing of such Proof of Claim.

Any Entity that is required to File a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so will be forever barred, estopped and enjoined from asserting such Claim, and such Claim will not be enforceable, against the Debtor or the Estate, and the Debtor and its Estate and property will be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan.  All such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in Article XI.C of the Plan.  All claims arising from the rejection of any Executory Contract or Unexpired Lease shall be treated as General Unsecured Claims, subject to any applicable limitation or defense under the Bankruptcy Code and applicable law.

## D.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree.  Following the Petition Date, the Debtor may serve a notice on parties to executory contracts and unexpired leases to be assumed reflecting the Debtor's intention to assume the contract or lease in connection with this Plan and setting forth the proposed Cure Amount (if any).  If a counterparty to any executory contract or unexpired lease that the Debtor intends to assume does not receive such a notice, the proposed Cure Amount for such executory contract or unexpired lease shall be deemed to be zero dollars ($0).

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption must be Filed, served and actually received by the Debtor at least three (3)

Business Days prior to the Confirmation Hearing.  Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption will be deemed to have assented and will be deemed to have forever released and waived any objection to the proposed assumption.  In the event of a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.  If an objection to cure is sustained by the Bankruptcy Court, the Debtor, in its sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

E.      **Assumption of Director and Officer Insurance Policies**

        Upon the Effective Date, the Debtor shall be deemed to assume all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code.  Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtor's foregoing assumption of each of the D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan will not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtor under the Plan as to which no Proof of Claim need be Filed.  Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan will not impair or otherwise modify any rights of the Debtor under the D&O Liability Insurance Policies.

F.      **Indemnification Provisions**

        On the Effective Date, all Indemnification Provisions (whether in the by-laws, operating agreements, certificate of incorporation or organization, board resolutions, member consents, contracts, or otherwise) will be Reinstated (or assumed, as the case may be), and will survive effectiveness of the Plan.  No such Reinstatement or assumption shall in any way extend the scope or term of any Indemnification Provision beyond that contemplated in the underlying contract or document as applicable.

**ARTICLE VII.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

A.      **Dates of Distributions**

        Except as otherwise provided in the plan, on the Effective Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtor shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided herein.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent there are Disputed Claims, distributions on account of any such Disputed

Claims shall be made pursuant to the provisions provided in the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Debts of the Debtor shall be deemed fixed and adjusted pursuant to the Plan and the Debtor shall have no liability on account of any Claims or Equity Interests except as set forth in the Plan and in the Confirmation Order. All payments and all distributions made by the Distribution Agent under the Plan shall be in full and final satisfaction, settlement and release of all Claims against the Debtor.

At the close of business on the Distribution Record Date, the transfer ledgers for the Senior Secured Notes, the Convertible Unsecured Notes, and the Equity Interests shall be closed, and there shall be no further changes in the record holders of such indebtedness and Equity Interests. The Debtor, the Distribution Agent, the Senior Secured Notes Trustee, the Convertible Unsecured Notes Trustee, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Senior Secured Notes, Convertible Unsecured Notes, or Equity Interests occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under the Plan to such Persons or the date of such distributions.

Notwithstanding the foregoing, the Debtor, the Distribution Agent, and the Convertible Unsecured Notes Trustee shall be entitled to recognize and deal for all purposes under the Plan with Holders of Convertible Unsecured Notes Claims to the extent consistent with the customary practices of DTC, and all Plan Distributions to be made to Holders of Convertible Unsecured Notes Claims shall be eligible to be distributed through the facilities of DTC.

## B.   Distribution Agent

Except as provided therein, all distributions under the Plan shall be made by the Debtor as Distribution Agent, or by such other Entity designated by the Debtor as a Distribution Agent on the Effective Date or thereafter.

Except as otherwise provided in the Plan or reasonably requested by the applicable indenture trustee, all distributions to Holders of the Convertible Unsecured Notes and the Senior Secured Notes shall be made to and deemed completed when received by the applicable indenture trustee; provided, however, that at such applicable indenture trustee's written election, the applicable distributions shall not be distributed to Holders of the Convertible Unsecured Notes or the Senior Secured Notes in the name of the applicable indenture trustee. Upon such written election, the Convertible Unsecured Notes Trustee and/or the Senior Secured Notes Trustee Unsecured, as applicable, shall hold or direct such distributions and shall arrange to deliver such distributions to or on behalf of such Holders of the Convertible Unsecured Notes and the Senior Secured Notes, subject to the applicable indenture trustee's charging liens. If the Convertible Unsecured Notes Trustee and/or the Senior Secured Notes Trustee is unable to make such distributions or consents to the Distribution Agent making such distributions in writing, the Distribution Agent, with the cooperation of the applicable indenture trustee, shall make such distributions to the extent practicable to do so (provided that until such distributions are made,

the applicable charging liens shall attach to the property to be distributed in the same manner as if such distributions were made through the applicable indenture trustee).

The Debtor, or such other Entity designated by the Debtor to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals, transfer agents and registrars to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

## C.     Cash Distributions

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Debtor, except that Cash payments made to foreign creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

## D.     Rounding of Payments

Whenever payment or distribution of a fraction of a dollar of value whether in the form of Cash or Securities would otherwise be called for, the actual payment or distribution shall reflect a rounding down of such fraction to the nearest whole dollar or zero if the amount is less than one-half of one dollar and a rounding up of such fraction to the nearest whole dollar if the amount is one-half or more of one dollar.

## E.     Distributions on Account of Claims Allowed After the Effective Date

Except as otherwise agreed by the Holder of a particular Claim or as provided in the Plan, all distributions shall be made pursuant to the terms of the Plan and the Confirmation Order. Distributions to any Holder of an Allowed Claim shall be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).  Whenever any payment of a fraction of a dollar would otherwise be called for, the actual distribution shall reflect a rounding of such fraction down to the nearest dollar.

## F.     General Distribution Procedures

The Debtor, or any other duly appointed Distribution Agent, shall make all distributions of Cash or other property required under the Plan, unless the Plan specifically provides otherwise.  All Cash and other property held by the Debtor for distribution under the Plan shall not be subject to any claim by any Person, except as provided under the Plan.

## G.       Address for Delivery of Distributions

Distributions to Holders of Allowed Claims, to the extent provided for under the Plan, shall be made (1) at the address set forth on any proofs of claim Filed by such Holders (to the extent such proofs of claim are Filed in the Chapter 11 Case), (2) at the addresses set forth in any written notices of address change delivered to the Debtor, or (3) at the addresses in the Debtor's books and records. Notwithstanding the foregoing, distributions to Beneficial Holders of each of the Senior Secured Notes Claims and Convertible Unsecured Notes Claims shall be made to, or deemed made to, the Senior Secured Notes Trustee, the Convertible Unsecured Notes Trustee, or their respective designees, as applicable, for further distribution in accordance with the Senior Secured Notes Indenture and the Convertible Unsecured Notes Indenture and subject to the right of the Senior Secured Notes Trustee and the Convertible Unsecured Notes Trustee to enforce the Senior Secured Notes Charging Lien and the Convertible Unsecured Notes Charging Lien, as applicable.

## H.       Undeliverable Distributions and Unclaimed Property

If the distribution to the Holder of any Allowed Claim is returned to the Debtor as undeliverable, no further distribution shall be made to such Holder, and the Debtor shall have no obligation to make any further distribution to the Holder, unless and until the Debtor is notified in writing of such Holder's then current address.

Any Entity that fails to claim any Cash or Securities within one year from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under the Plan. Entities that fail to claim Cash or Securities under the Plan shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor or against any Holder of an Allowed Claim to whom distributions are made by the Debtor.

## I.       Withholding Taxes

In connection with the Plan, to the extent applicable, the Debtor shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. The Debtor shall be entitled to deduct any U.S. federal, state or local withholding taxes from any payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under the Plan, the Debtor may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to the Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Debtor to comply with applicable tax reporting and withholding laws. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. In connection with any distribution under the Plan, the Debtor may take whatever actions are necessary to comply with applicable U.S. federal, state, local and non-U.S. tax withholding obligations.

## J.       Setoffs

The Debtor may, to the extent permitted under applicable law, setoff against any Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, the claims, rights and Causes of Action of any nature that the Debtor may hold against the

Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor of any such claims, rights and Causes of Action that the Debtor possesses against such Holder.

### K.    Surrender of Cancelled Instruments or Securities

As a condition precedent to receiving any distribution pursuant to the Plan on account of an Allowed Claim or Equity Interest evidenced by the instruments, securities, notes, or other documentation canceled pursuant to the Plan, the Holder of such Claim or Equity Interest shall be deemed to have surrendered the applicable instruments, securities, notes or other documentation evidencing such Claim or Equity Interest.

### L.    Lost, Stolen, Mutilated or Destroyed Securities

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by the Plan, deliver to the Debtor and other applicable Distribution Agent: (x) evidence reasonably satisfactory to the Debtor and other applicable Distribution Agent of such loss, theft, mutilation, or destruction; and (y) such security or indemnity as may be required by the Debtor and other applicable Distribution Agent to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Allowed Equity Interest.  Upon compliance with Article VII.K of the Plan as determined by the Debtor by a Holder of a Claim or Equity Interest evidenced by a security or note, such Holder will, for all purposes under the Plan, be deemed to have surrendered such security or note to the Debtor and other applicable Distribution Agents.

## ARTICLE VIII.
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED AND DISPUTED CLAIMS

### A.    Disputed Claims

The Debtor may, in its discretion, file with the Bankruptcy Court an objection to the allowance of any Disputed Claim or any other appropriate motion or adversary proceeding with respect thereto.  All such objections shall be litigated to Final Order, *provided, however*, that the Debtor may compromise, settle, withdraw or resolve any objections to Claims without further order of the Bankruptcy Court.  Unless otherwise provided in the Confirmation Order, the Debtor is authorized to settle, or withdraw any objections to, any Disputed Claim following the Effective Date without further notice to creditors or authorization of the Bankruptcy Court, in which event such Claim shall be deemed to be an Allowed Claim in the amount compromised for purposes of the Plan.  Under no circumstances will any distributions be made on account of Disallowed Claims.  The Debtor is under no obligation to object to the allowance of any Claim to the extent that there are no assets available to make a distribution to the Holder of such Claim or such Class of Claims under the Plan.

**B.**     **Procedures Regarding Disputed Claims**

No payment or other distribution or treatment shall be made on account of a Disputed Claim, even if a portion of the Claim is not disputed, unless and until such Disputed Claim becomes an Allowed Claim and the amount of such Allowed Claim is determined by a Final Order or by stipulation between the Debtor and the Holder of the Claim.  No distribution or other payment or treatment shall be made on account of a Disallowed Claim at any time.

The Debtor may, at any time and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously Filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to such objection. Any Final Order of the Bankruptcy Court that estimates a Disputed Claim pursuant to the Plan shall irrevocably constitute and be a conclusive and final determination of the maximum allowable amount of Claim, should it become an Allowed Claim.  Accordingly, the Holder of a Disputed Claim that is estimated by the Bankruptcy Court pursuant to the Plan will not be entitled to any subsequent reconsideration or upward adjustment of the maximum allowable amount of such Claim as a result of any subsequent adjudication or actual determination of the allowed amount of such Disputed Claim or otherwise, and the Holder of such Claim shall not have recourse to the Debtor in the event the allowed amount of the Claim of such Holder is at any time later determined to exceed the estimated maximum allowable amount.

**C.**     **Allowance of Claims**

Following the date on which a Disputed Claim becomes an Allowed Claim after the Distribution Date, the Debtor shall pay directly to the Holder of such Allowed Claim the amount provided for under the Plan, as applicable, and in accordance therewith.

1.     Allowance of Claims

Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Debtor will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim or Equity Interest immediately before the Effective Date, except with respect to any Claim or Equity Interest deemed Allowed under the Plan or by orders of the Bankruptcy Court.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim unless and until such Claim or Equity Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

2.     Prosecution of Objections to Claims and Equity Interests

From and after the Effective Date, the Debtor will have the exclusive authority to File objections to Claims and settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims or Equity Interests are in an Unimpaired Class

or otherwise.  From and after the Effective Date, the Debtor may settle or compromise any Disputed Claim or Equity Interest without any further notice to or action, order or approval of the Bankruptcy Court.  The Debtor will have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

> 3.      Estimation

The Debtor may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Equity Interest pursuant to applicable law and (b) any contingent or unliquidated Claim or Equity Interest pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C.  §§ 157 and 1334 to estimate any Disputed Claim or Equity Interest, contingent Claim or Equity Interest or unliquidated Claim or Equity Interest, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection.  All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation proceeding.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO  THE EFFECTIVE DATE

**A.**      **Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B of the Plan:

> a.      At least one of the Restructuring Support Agreements shall remain in full force and effect and shall not have been terminated by the Debtor or the Requisite Parties (as applicable).

> b.      All Restructuring Expenses shall have been paid in full in Cash.

> c.      The Bankruptcy Court will have entered a Final Order in form and in substance satisfactory to the Debtor and the Requisite Parties approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

> d.      The Plan and Plan Supplement and all schedules, documents, supplements and exhibits to the Plan will have been Filed in form and substance consistent with the Restructuring Support Agreements (but not a Restructuring Support Agreement that has been terminated) in all material respects and otherwise acceptable to the Debtor and the Requisite Parties.

> e.      All agreements, contracts, indentures, and instruments necessary to issue or distribute the Restructuring Securities shall be in full force and effect (with all

conditions precedent thereto having been satisfied or waive), subject to any applicable post-closing execution and delivery requirements.

f.    The Confirmation Order, in form and substance acceptable to the Debtors and Requisite Parties, shall have been entered and in full force and effect, shall be a Final Order, and shall not have been reversed, stayed, modified or vacated on appeal.  The Confirmation Order will provide that, among other things, (a) the Debtor is authorized to take all actions necessary or appropriate to consummate the Plan and the Restructuring Transactions; (b) the implementation of the Plan in accordance with its terms is authorized; and (c) pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under the Plan, shall not be subject to any Stamp or Similar Tax.

g.    The Debtor shall have implemented the Restructuring Transactions in a manner consistent with the Plan, the Confirmation Order, and the Restructuring Support Agreements (but not a Restructuring Support Agreement that has been terminated) pursuant to the documentation acceptable to the Debtor and the Requisite Parties.

h.    All conditions precedent to the effectiveness of the New Indenture Documents shall have been satisfied or waived.

i.    All conditions precedent to the issuance of the New Series A Notes, the New Series B Notes, the New PPNs, the New PPN Warrants, the New PPN SARs, the New SARs, and the New Unvested Warrants shall have occurred and the New Series A Notes, the New Series B Notes, the New PPNs, the New PPN Warrants, the New PPN SARs, the New SARs, and the New Unvested Warrants shall have been issued.

j.    With respect to all other documents and agreements necessary to implement the Plan: (1) all conditions precedent to such documents and agreements (other than any conditions precedent related to the occurrence of the Effective Date) shall have been satisfied or waived pursuant to the terms of such documents or agreements; (2) such documents and agreements shall have been tendered for delivery to the required parties and have been approved by any required parties and, to the extent required, filed with and approved by the applicable authorities in the relevant jurisdiction; and (3) such documents and agreements shall have been effected or executed.

k.    There shall be no ruling, judgment or order issued by any governmental unit making illegal, enjoining, or otherwise preventing or prohibiting the consummation of the Plan, unless such ruling, judgment or order has been stayed, reversed or vacated within three (3) Business Days after such issuance.

B.      **Waiver of Conditions**

The conditions to Consummation of the Plan set forth in this Article IX may be waived by the Debtor, with written consent of the Requisite Parties, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan. The failure to satisfy or waive a condition to Consummation may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time.

C.      **Substantial Consummation**

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

D.      **Effect of Non-Occurrence of Conditions to Consummation**

If the Consummation of the Plan does not occur, the Plan will be null and void in all respects and nothing contained in the Plan, the Disclosure Statement or Restructuring Support Agreements will: (a) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtor; (b) prejudice in any manner the rights of the Debtor, any Holders or any other Entity; (c) constitute an Allowance of any Claim or Equity Interest; or (d) constitute an admission, acknowledgment, offer or undertaking by the Debtor, any Holders, or any other Entity in any respect.

**ARTICLE X.**
**RELEASE, INJUNCTION AND RELATED PROVISIONS**

A.      **General**

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

In accordance with the provisions of the Plan and pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date (1) the Debtor may, in its sole and absolute discretion, compromise and settle Claims against it and (2) the Debtor may, in its sole and absolute discretion, compromise and settle Causes of Action against other Entities.

B.      **Release**

EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, THE ADEQUACY OF WHICH IS HEREBY ACKNOWLEDGED AND CONFIRMED, THE

DEBTOR, IN ITS INDIVIDUAL CAPACITY AND AS DEBTOR-IN-POSSESSION (COLLECTIVELY, THE "RELEASING PARTY") WILL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER PROVIDED A FULL DISCHARGE, WAIVER AND RELEASE TO THE RELEASED PARTIES (AND EACH SUCH RELEASED PARTY SO RELEASED SHALL BE DEEMED FOREVER RELEASED, WAIVED AND DISCHARGED BY THE RELEASING PARTY) AND THEIR RESPECTIVE PROPERTIES FROM ANY AND ALL CLAIMS, CAUSES OF ACTION, AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING AS OF THE EFFECTIVE DATE OR THEREAFTER ARISING, IN LAW, AT EQUITY, WHETHER FOR TORT, CONTRACT, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY IN WHOLE OR IN PART TO THE DEBTOR, THE CHAPTER 11 CASE, THE DISCLOSURE STATEMENT, THE PLAN, OR THE SOLICITATION OF VOTES ON THE PLAN THAT THE RELEASING PARTY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR EQUITY INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT FOR OR ON BEHALF OF THE DEBTOR, ITS ESTATE, OR THE DEBTOR (WHETHER DIRECTLY OR DERIVATIVELY) AGAINST ANY OF THE RELEASED PARTIES; *PROVIDED, HOWEVER*, THAT THE FOREGOING PROVISIONS OF THIS RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE (I) ANY OFFSET, DEFENSE, COUNTERCLAIM, REDUCTION, OR CREDIT THAT THE DEBTOR MAY HAVE WITH REGARD TO ANY CLAIM ASSERTED AGAINST IT BY A RELEASED PARTY, (II) ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT; (III) ANY CAUSES OF ACTION ARISING FROM ACTUAL FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT AS DETERMINED BY FINAL ORDER OF THE BANKRUPTCY COURT OR ANY OTHER COURT OF COMPETENT JURISDICTION; AND/OR (IV) THE RIGHTS OF THE RELEASING PARTY TO ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, INDENTURES, AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN OR ASSUMED PURSUANT TO THE PLAN OR ASSUMED PURSUANT TO FINAL ORDER OF THE BANKRUPTCY COURT.  THE FOREGOING RELEASE SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE AND WITHOUT NEED FOR ANY NOTICE TO OR ANY VOTE, CONSENT, AUTHORIZATION, APPROVAL, RATIFICATION, OR OTHER ACTION BY ANY ENTITY OR OTHER PERSON OR ANY DIRECTOR, STOCKHOLDER, SECURITY HOLDER, MANAGER, MEMBER, OR PARTNER (OR BOARD THEREOF) OF ANY ENTITY AND THE CONFIRMATION ORDER WILL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, OR LIABILITIES RELEASED PURSUANT TO THIS RELEASE.

## ARTICLE XI.
## THIRD PARTY RELEASE BY HOLDERS OF CLAIMS AND EQUITY INTERESTS

AS OF AND SUBJECT TO THE OCCURRENCE OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THIS PLAN AND THE PLAN DOCUMENTS, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, INCLUDING, WITHOUT LIMITATION, THE SERVICE OF THE RELEASED PARTIES TO FACILITATE THE REORGANIZATION OF THE DEBTOR AND THE IMPLEMENTATION OF THE RESTRUCTURING AND THE RESTRUCTURING TRANSACTIONS, AND EXCEPT AS OTHERWISE PROVIDED IN THIS PLAN OR IN THE CONFIRMATION ORDER, THE RELEASED PARTIES ARE DEEMED FOREVER RELEASED AND DISCHARGED BY THE (I) THE HOLDERS OF ALL CLAIMS AND EQUITY INTERESTS WHO VOTE TO ACCEPT THIS PLAN, (II) HOLDERS OF CLAIMS THAT ARE UNIMPAIRED UNDER THIS PLAN, (III) HOLDERS OF CLAIMS OR EQUITY INTERESTS WHOSE VOTE TO ACCEPT OR REJECT THIS PLAN IS SOLICITED BUT WHO DO NOT VOTE EITHER TO ACCEPT OR TO REJECT THIS PLAN, (IV) HOLDERS OF CLAIMS OR EQUITY INTERESTS WHO VOTE TO REJECT THIS PLAN BUT DO NOT OPT OUT OF GRANTING THE RELEASES SET FORTH HEREIN, (V) THE SENIOR SECURED NOTES TRUSTEE, AND (VI) THE CONVERTIBLE UNSECURED NOTES TRUSTEE, FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, LOSSES, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT SUCH HOLDERS OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTOR, THE CHAPTER 11 CASE, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTOR, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THIS PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING, THE RESTRUCTURING OF ANY CLAIM OR EQUITY INTEREST BEFORE OR DURING THE CHAPTER 11 CASE, THE RESTRUCTURING TRANSACTIONS, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE DISCLOSURE STATEMENT, THIS PLAN, AND RELATED AGREEMENTS, INSTRUMENTS, AND OTHER DOCUMENTS (INCLUDING THE PLAN DOCUMENTS), THE SOLICITATION OF VOTES WITH RESPECT TO THIS PLAN, OR ANY OTHER ACT OR OMISSION, OTHER THAN CLAIMS OR CAUSES OF ACTION ARISING OUT OF OR RELATED TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT IS A CRIMINAL ACT OR CONSTITUTES ACTUAL FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY RESTRUCTURING TRANSACTIONS, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT EXECUTED TO IMPLEMENT THE PLAN.

## A.    <u>Discharge of Claims</u>

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests.  Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

## B.    <u>Exculpation</u>

Without affecting or limiting the releases in Article X.B or XI of the Plan, the Exculpated Parties will neither have nor incur any liability to any Entity for any claims or Causes of Action arising before, on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or Postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtor, the approval of the Disclosure Statement or confirmation or Consummation of the Plan; *provided, however*, that the foregoing provisions will have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted actual fraud, gross negligence or willful misconduct; *provided, further*, that each Exculpated Party will be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above-referenced documents, actions or inactions; *provided, further*, however that the foregoing provisions will not apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by the Plan or the Plan Supplement.

## C.    <u>Injunction</u>

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY SUIT, ACTION OR OTHER PROCEEDING, OR CREATING, PERFECTING OR ENFORCING ANY LIEN OF ANY KIND, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.  BY ACCEPTING DISTRIBUTIONS PURSUANT TO THE PLAN, EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST WILL BE

DEEMED TO HAVE SPECIFICALLY CONSENTED TO THIS INJUNCTION.  ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASE UNDER SECTION 105 OR 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, WILL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.

## ARTICLE XII.
## BINDING NATURE OF PLAN

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, ALL HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTOR AND SUCH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASE OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR AFFIRMATIVELY VOTED TO REJECT THE PLAN.

## ARTICLE XIII.
## RETENTION OF JURISDICTION

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Debtor, and this Plan as legally permissible, including, without limitation, jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

2.      grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Confirmation Date; *provided*, *however*, that, from and after the Effective Date, the Debtor shall pay Professionals in the ordinary course of business for any work performed after the Effective Date and such payment shall not be subject to the approval of the Bankruptcy Court;

3.      resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, those matters related to any amendment to this Plan after the Effective Date to add Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed;

4.      resolve any issues related to any matters adjudicated in the Chapter 11 Case;

5.      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

6.      decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Debtor after the Effective Date, *provided* that the Debtor shall reserve the right to commence actions in all appropriate forums and jurisdictions;

7.      enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with this Plan, the Plan Supplement, or the Disclosure Statement;

8.      resolve any Case, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

9.      hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

10.     issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of this Plan, except as otherwise provided in this Plan;

11.     enforce the terms and condition of this Plan and the Confirmation Order;

12.     resolve any cases, controversies, suits or disputes with respect to the Release, the Exculpation, the Indemnification Provisions and other provisions contained in Article X and XI hereof and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

13.     enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

14.     resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

15.     enter an order concluding or closing the Chapter 11 Case.

ACTIVE.125207870.02

## ARTICLE XIV.
## MISCELLANEOUS PROVISIONS

**A.**     **Dissolution of the Committee**

On the Effective Date, the Committee (if any) and any other statutory committee formed in connection with the Chapter 11 Case shall dissolve automatically and all members thereof shall be released and discharged from all rights, duties and responsibilities arising from, or related to, the Chapter 11 Case.

**B.**     **Payment of Statutory Fees**

All outstanding fees payable pursuant to 28 U.S.C. § 1930 shall be paid on the Effective Date. All such fees payable after the Effective Date shall be paid prior to the closing of the Chapter 11 Case when due or as soon thereafter as practicable.

**C.**     **Payment of Fees and Expenses of Senior Secured Notes Trustee and Convertible Unsecured Notes Trustee**

On the Effective Date, the Debtor shall pay in full in Cash all outstanding Senior Secured Notes Trustee Fees and Convertible Unsecured Notes Trustee Fees subject to the terms of the Senior Secured Notes Indenture and the Convertible Unsecured Notes Indenture, respectively.

**D.**     **Modification of Plan**

Effective as of the date hereof and subject to the limitations and rights contained in this Plan: (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules to amend or modify this Plan prior to the entry of the Confirmation Order, with the consent of the Requisite Parties; and (b) after the entry of the Confirmation Order, the Debtor may, with the consent of the Requisite Parties, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan. Subject to the terms of the Restructuring Support Agreements (but not a Restructuring Support Agreement that has been terminated), a Holder of a Claim or Equity Interest that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of such Claim or Equity Interest of such Holder.

**E.**     **Revocation of Plan**

Subject to the terms of the Restructuring Support Agreements (but not a Restructuring Support Agreement that has been terminated), the Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date and to File subsequent chapter 11 plans. If the Debtor revokes or withdraws this Plan, or if confirmation of this Plan or Consummation of this Plan does not occur, then: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the

Bankruptcy Court; and (3) nothing contained in this Plan shall:  (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

**F.      Entire Agreement**

Except as otherwise described herein, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**G.      Closing of Chapter 11 Case**

The Debtor shall, promptly after the full administration of the Chapter 11 Case, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

**H.      Successors and Assigns**

This Plan shall be binding upon and inure to the benefit of the Debtor and its successors and assigns.  The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

**I.      Reservation of Rights**

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and this Plan is Consummated. Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtor or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of:  (1) the Debtor with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Supplement, nor anything contained in this Plan, will constitute an admission by the Debtor that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtor or its affiliates have any liability thereunder.

Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtor under any executory or non-executory contract or unexpired or expired lease.

Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor under any executory or non-executory contract or unexpired or expired lease.

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under this Plan, the Debtor shall have thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

## J.      Further Assurances

The Debtor, all Holders of Claims or Equity Interests receiving distributions hereunder, and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.  On or before the Effective Date, the Debtor shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

## K.      Nonseverability

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms, (2) integral to the Plan and may not be deleted or modified without the Debtor's and Requisite Parties' consent, as applicable, and (3) nonseverable and mutually dependent.

## L.      Service of Documents

All notices, requests, and demands to or upon the Debtor to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by email transmission, when received, addressed as follows:

> Emergent Capital, Inc.
> 1200 North Federal Highway, Suite 200
> Boca Raton, FL 33432
> Attn:   Miriam Martinez, Chief Financial Officer
> Email:  mmartinez@emergentcapital.com
>
> **with copies to:**

Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
Wilmington, DE 19899-8705 (Courier 19801)
Attn:   Richard M. Pachulski, Esq. (rpachulski@pszjlaw.com)
        Maxim B. Litvak, Esq. (mlitvak@pszjlaw.com)
        Colin R. Robinson, Esq. (crobinson@pszjlaw.com)

**M.      Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code**

To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forego the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment.

**N.      Consent Rights**

Notwithstanding anything herein to the contrary, any and all consent rights of the parties to the Restructuring Support Agreements (but not a Restructuring Support Agreement that has been terminated) set forth in the Restructuring Support Agreements with respect to the form and substance of the Plan, all exhibits to the Plan, and the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.B) and be fully enforceable as if stated in full herein.

**O.      Governing Law**

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

**P.      Tax Reporting and Compliance**

The Debtor is hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtor are for all taxable periods ending after the Petition Date through, and including, the Effective Date.

**Q.      Schedules**

All exhibits and schedules to this Plan, including the Exhibits and Plan Schedules, are incorporated and are a part of this Plan as if set forth in full herein.

**R.**     <u>**Conflicts**</u>

In the event that a provision of the Disclosure Statement conflicts with a provision of this Plan, the terms of this Plan shall govern and control to the extent of such conflict.

**S.**     <u>**Controlling Document**</u>

In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control unless otherwise specified in such Plan Supplement document.  In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control.  The provisions of this Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any provision of this Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern.

**T.**     <u>**Confirmation Request**</u>

The Debtor requests that the Bankruptcy Court confirm the Plan and that it do so, if applicable, pursuant to section 1129(b) of the Bankruptcy Code notwithstanding any rejection of the Plan by an Impaired Class.

*[Remainder of Page Intentionally Blank]*

Dated:  October 15, 2020

Respectfully submitted,

*/s/ Miriam Martinez*
Miriam Martinez
Chief Financial Officer
EMERGENT CAPITAL, INC.

**FILED BY**:

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Colin R. Robinson*
Richard M. Pachulski (CA Bar No. 62337)
Maxim B. Litvak (CA Bar No. 215852)
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:     rpachulski@pszjlaw.com
            mlitvak@pszjlaw.com
            crobinson@pszjlaw.com

Proposed Counsel for Emergent Capital, Inc.,
Debtor and Debtor-in-Possession

**[Signature Page to Debtor Emergent Capital, Inc.'s Chapter 11 Plan of Reorganization]**

**EXHIBIT A**

**Ratios of Notes and Grantor Trust Certificates to be Issued Under Plan**

| SECURITIES TO BE CANCELED UNDER PLAN | SECURITIES TO BE DISTRIBUTED UNDER PLAN | | |
|---|---|---|---|
| Debtor Security | New Series A Notes | New Series B Notes | Grantor Trust Certificates |
| Senior Secured Notes<br><br>For each $100.00 of the Augmented Principal Amount of the Senior Secured Notes (as defined in Exhibit B): | $100 principal amount | -- | -- |
| Convertible Unsecured Notes<br><br>For each $100.00 of Aggregate Principal Amount of the Convertible Notes (as defined in Exhibit B): | -- | $100 principal amount | 10 |
| Equity Interests (other than Unvested Warrants)<br><br>For each share (subject, in the case of the vested warrants, to adjustment for a cashless exercise thereof): | -- | -- | 1 |

**EXHIBIT B**

**Description of Securities to be Issued Under Plan**


## NEW SERIES A NOTES

| | |
|---|---|
| **Ranking:** | With respect to payments of interest and rights upon liquidation, Deemed Liquidation (as defined below), winding up or dissolution (whether voluntary or involuntary) or sale of the Issuer of all or substantially all of its assets, the Series A Notes will rank senior to each of the Series B Notes and the PPNs. |
| **Security:** | None. |
| **Initial Principal Amount:** | The existing principal amount of the 8.5% Senior Secured Notes is $48,758,887.50.  On the Closing Date and immediately before the exchange occurs, any Available Funds shall be used to pay any accrued but unpaid interest on the 8.5% Senior Secured Notes. If insufficient Available Funds exist to make such payment, the remainder of any accrued but unpaid interest shall be capitalized and added to the existing principal of the 8.5% Senior Secured Notes (the "Existing Senior Secured Note Principal") (the sum of the Existing Senior Secured Note Principal and any capitalized accrued but unpaid interest, the "Aggregate Principal Amount of the Senior Secured Notes"). The Series A Notes initial principal amount shall be equal to the Aggregate Principal Amount of the Senior Secured Notes increased by a factor of 1.04 (the "Augmented Principal Amount of the Senior Secured Notes"). |
| **Exchange Ratio:** | Each $100 of the Augmented Principal Amount of the Senior Secured Notes shall be exchanged on the Closing Date into $100 of Series A Notes. |
| **Interest:** | The Series A Notes initially will be entitled to interest in cash at a rate of 8.5% per annum compounded and payable semi-annually, subject to increase as described below. At the Issuer's election, and subject to the Payment Priority Waterfall, the Issuer may pay all or a portion of interest in the form of additional Series A Notes in lieu of cash ("PIK Interest"). If the Issuer so elects, any PIK Interest initially shall accrue and be paid at a rate of 11.5% per annum compounded and payable semi-annually, and subject to increase as described below.  Interest will be payable semi-annually in arrears and will be computed on the basis of a 360-day year. |
| | With respect to any Series A Notes that remain outstanding on or after July 15, 2021, the Series A Notes will be entitled to interest in cash at a rate of 9.75% per annum compounded and payable semi-annually, or PIK Interest, at the Issuer's election, at a rate of 14% per annum compounded |

and payable semi-annually.

Upon and during the existence of any Events of Default (defined below), the applicable interest rate will increase by 2% per annum during the continuation of the default.

**Final Maturity:** The Series A Notes shall mature 100 years from the Closing Date (the "<u>Final Maturity Date</u>"). The Issuer shall be obligated to repay the unpaid principal balance of the Series A Notes, together with all accrued and unpaid interest thereon (including all PIK Interest), on the Final Maturity Date.

**Mandatory Redemption:** The Issuer shall redeem the outstanding Series A Notes for cash at a price equal to the unpaid principal balance thereof plus all accrued and unpaid interest, upon the earlier of: (i) the Final Maturity Date; (ii) the acceleration of all obligations under the Series A Notes following the occurrence of an Event of Default; and (iii) a Deemed Liquidation.[2]

**Optional Redemption:** The Series A Notes may be repaid at the option of the Issuer, in whole and not in part, at any time before the Final Maturity Date, at a price equal to the then outstanding principal amount plus all accrued and unpaid interest thereon.

**Conversion:** Each $100.00 principal amount of Series A Notes is convertible at any time into Trust Certificates representing 100 PPNs at the discretion of the Series A Noteholder.

**Events of Default:** (a) the Company shall fail to pay any interest, in cash or in kind, on the Series A or Series B Notes after the same shall become due and payable, (b) the Company shall fail to redeem the Restructuring Securities in accordance with the Payment Priority Waterfall, or (c) any proceeding shall be instituted by or against the Company under any law relating to bankruptcy, insolvency, or reorganization.

**Financial Covenants:** None.

**Periodic Reporting:** On a semi-annual basis, the Company shall provide detailed interim and annual financial reports to all holders of Series A Notes, including without

---

[2] Deemed Liquidation shall mean, in substance but not necessarily in form, (a) a sale, transfer, lease or other disposition, in a single transaction or series of related transactions, of all or substantially all of the assets of (i) the Company or (ii) White Eagle Asset Portfolio, LP or (b) the consummation of any transaction (including any merger or consolidation or whether by operation of law or otherwise), the result of which is that any one third party purchaser (or group of affiliated third party purchasers) becomes the beneficial owner, directly or indirectly, of more than fifty percent (50%) of the then outstanding Trust Certificates issued pursuant to the Grantor Trust Agreement (as discussed below in the section "Trust Certificates") or of the surviving entity of any such merger or consolidation.

limitation information regarding any redemptions of Restructuring Securities pursuant to the "Payment Priority" section above.

| | |
|---|---|
| **Amendments and Waivers:** | Any amendment, modification or other change to, or waiver of, the terms and conditions of the Series A Notes that is adverse to the holders of the Series A Notes, as reasonably determined by them, or that changes the director designation rights, or that changes the Priority Payment Waterfall, must be approved in writing by the holders of at least 75% of the aggregate outstanding amount of the Series A Notes.   All other amendments, modifications, waivers relating to the Series A Notes shall be approved in writing by the holders of at least 50% of the aggregate outstanding amount of the Series A Notes. |

## NEW SERIES B NOTES

| | |
|---|---|
| **Ranking:** | With respect to payments of interest and rights upon liquidation, winding up or dissolution (whether voluntary or involuntary) or sale of the Issuer of all or substantially all of its assets, the Series B Notes will rank senior to the New PPNs, but junior to the Series A Notes.  This ranking will be reflected in the New Indenture Documents. |
| **Security:** | None. |
| **Initial Aggregate Principal Amount:** | The existing principal amount of the 5.0% Convertible Notes is $67,836,966.  On the Closing Date and immediately before the exchange occurs, but subject to payment in full of any accrued but unpaid interest on the 8.5% Senior Secured Notes, any Available Funds shall be used to pay any accrued but unpaid interest on the 5.0% Convertible Notes. If insufficient Available Funds exist to make such payment, the remainder of any accrued but unpaid interest shall be capitalized and added to the existing principal of the 5.0% Convertible Notes (the "Existing Convertible Note Principal") (the sum of the Existing Convertible Note Principal and any capitalized accrued but unpaid interest, the "Aggregate Principal Amount of the Convertible Notes"). |
| **Exchange Ratio:** | Each $100 of the Aggregate Principal Amount of the Convertible Notes shall be exchanged on the Closing Date into (a) $100 of Series B Notes and (b) Grantor Trust Certificates representing 10 PPNs. |
| **Interest:** | The Series B Notes initially will be entitled to interest in cash at the rate of 5.0% per annum compounded semi-annually, subject to increase as described below. At the Issuer's election, the Issuer may pay all or a portion of interest in the form of additional Series B Notes in lieu of cash ("PIK Interest").  The aggregate amount of PIK Interest that is capitalized as principal under the Series B Notes from and after the Closing Date shall be referred to as the "Accrued Series B PIK Interest".   If the Issuer so |

elects, any PIK Interest initially shall accrue and be paid at a rate of 7.0% per annum compounded semi-annually. Interest will be payable semi-annually in arrears and will be computed on the basis of a 360-day year.

With respect to any Series B Notes that remain outstanding after February 15, 2023, the cash interest rate shall increase to 6.0% and the PIK Interest Rate shall increase to 8.0%.

Upon and during the existence of any Events of Default (defined below), the applicable interest rate will increase by 2.0% per annum during the continuation of the default.

To the extent that the Company does not elect to pay interest on the Series B Notes as PIK Interest, any such accrued and unpaid cash interest shall be paid to holders of the Series B Notes before the Issuer uses any funds to redeem the Series A Notes;

|  |  |
|---|---|
| **Final Maturity:** | The Series B Notes shall mature on the Final Maturity Date. The Issuer shall be obligated to repay the unpaid principal balance of the Series B Notes, together with all accrued and unpaid interest thereon (including all PIK Interest), on the Final Maturity Date. |
| **Mandatory Redemption:** | The Issuer shall redeem the outstanding Series B Notes for cash at a price equal to the unpaid principal balance thereof plus all accrued and unpaid interest, upon the earlier of (i) the Final Maturity Date; (ii) the acceleration of all obligations under the Series B Notes following the occurrence of an Event of Default; and (iii) a Deemed Liquidation. |
| **Optional Redemption:** | The Series B Notes may be repaid at the option of the Issuer, in whole and not in part, at any time before the Final Maturity Date, at a price equal to the then outstanding principal amount plus accrued and unpaid interest thereon. |
| **Conversion:** | Each $100.00 principal amount of Series B Notes is convertible at any time into Trust Certificates representing 200 PPNs at the discretion of the Series B Noteholder. |
| **Events of Default:** | (a) the Company shall fail to pay any interest, in cash or in kind, on the Series A or Series B Notes after the same shall become due and payable, (b) the Company shall fail to redeem the Restructuring Securities in accordance with the Payment Priority Waterfall, or (c) any proceeding shall be instituted by or against the Company under any law relating to bankruptcy, insolvency, or reorganization. |
| **Financial Covenants:** | None. |

| | |
|---|---|
| **Periodic Reporting:** | On a semi-annual basis, the Company shall provide detailed interim and annual financial reports to all holders of Series B Notes, including without limitation information regarding any redemptions of Restructuring Securities pursuant to the "Payment Priority' section above. |
| **Amendments and Waivers** | Any amendment, modification, or other change to, or waiver of, the terms and conditions of the Series A Notes or the Series B Notes that is adverse to the holders of the Series B Notes, as reasonably determined by them, or that changes the director designation rights, or that changes the Priority Payment Waterfall, must be approved in writing by the holders of at least 75% of the aggregate outstanding amount of the Series B Notes. All other amendments, modifications, waivers relating to the Series B Notes shall be approved in writing by the holders of at least 50% of the aggregate outstanding amount of the Series B Notes. |

## NEW PPNS

| | |
|---|---|
| **Ranking:** | With respect to payments of interest and rights upon liquidation, winding up or dissolution (whether voluntary or involuntary) or sale of the Issuer of all or substantially all of its assets, the New PPNs (which underlie the Grantor Trust Certificates) will rank junior to each of the Series A Notes and the Series B Notes. |
| **Security:** | None. |
| **Exchange Ratio:** | Each existing share of the Debtor's common stock and vested warrants will be exchanged on a one-for-one basis for one New PPN (subject, in the case of the vested warrants, to adjustment for a cashless exercise thereof). Each such New PPN will be deposited by the Company with the Grantor Trust Trustee, which will issue an equal number of Grantor Trust Certificate(s) to the holders thereof. |
| **Interest:** | Funds shall be distributed to holders of the New PPNs only in the limited circumstances set forth in "Payment Priority" below.<br><br>If funds are distributed to holders of the New PPNs (in the limited circumstances set forth in "Payment Priority" section above), the paying agent in respect of the Grantor Trust Certificates will declare distributions on the Grantor Trust Certificates on a pro rata basis in an amount equal to the distributions received in respect of the New PPNs, after deducting reasonable fees and expenses applicable to the Grantor Trust. |
| **Final Maturity:** | The New PPNs shall mature on the Final Maturity Date. The Issuer shall be obligated to repay the unpaid principal balance of the New PPNs, together with any applicable distributions thereon, on the Final Maturity Date. |

The Grantor Trust Certificates shall mature on the Final Maturity Date. Upon receipt of the proceeds of the Grantor PPNs on the Final Maturity Date, the paying agent in respect of the Grantor Trust Certificates will pay holders of the Grantor Trust Certificates the cash receipts and other distributions it receives in respect of the New PPNs, after deducting fees and expenses applicable to the Grantor Trust.

| | |
|---|---|
| **Mandatory Redemption:** | The Issuer shall redeem the outstanding New PPNs on a pro rata basis for cash at a price equal to the unpaid principal balance thereof, plus any applicable distributions thereon, plus any call premium associated with such redemption, upon the earlier of (i) the Final Maturity Date; (ii) the acceleration of all obligations under the New PPNs following the occurrence of an Event of Default; and (iii) a Deemed Liquidation. Upon receipt of such redemption proceeds, the paying agent in respect of the Grantor Trust Certificates will redeem a pro rata portion of the Grantor Trust Certificates and pay holders of such Grantor Trust Certificates the cash receipts and other distributions it receives in respect of the redemption of the New PPNs, after deducting fees and expenses applicable to the Grantor Trust. |
| **Events of Default:** | (a) The Company shall fail to redeem the Restructuring Securities in accordance with the Payment Priority Waterfall or (b) any proceeding shall be instituted by or against the Issuer under any law relating to bankruptcy, insolvency, or reorganization. |
| **Financial Covenants:** | None. |

## GRANTOR TRUST CERTIFICATES

| | |
|---|---|
| **Issuance of Trust Certificates:** | The Grantor Trust Certificates shall be issued pursuant to a Grantor Trust Agreement between the Debtor, as grantor, and Grantor Trust Trustee. Each Grantor Trust Certificate will represent one New PPN having a principal amount equal to the greater of (i) the closing price of the Debtor's common stock immediately preceding the Petition Date or (ii) the closing price of the Debtor's common stock immediately preceding the Effective Date. The Grantor Trust Trustee will hold the New PPNs underlying the Grantor Trust Certificates and the holders of the New PPNs will have rights as provided in the Grantor Trust Agreement. |
| **Grantor Trust Agreement:** | The agreement between Lamington and the Grantor Trust Trustee setting forth the terms of the Grantor Trust Certificates, to be governed by Cayman Islands law. |
| **Grantor Trust Trustee:** | A Cayman Islands-domiciled trust company (or its affiliate) acceptable to the holders of a majority of Series B Notes. |

## PAYMENT PRIORITY

**Payment Priority:**

Lamington shall retain a minimum cash balance of at least $5,000,000 (the "Minimum Cash Balance") until such time that all of the Series A Notes and Series B Notes are retired or repurchased following the Effective Date to fund operating expenses and contingencies and a nominal profit amount; provided that the Board of Directors of Lamington may reduce the Minimum Cash Balance, (a) by $1,000,000 no more often than once every six (6) months through December 31, 2022 until the Minimum Cash Balance reaches $3,000,000, acting by majority vote, and (b) if additional reduction is desired after December 31, 2022, to $2,000,000, acting by Defined Majority Approval (as will be defined in the New Indenture Documents). The Minimum Cash Balance shall be reported as of June 15 and December 15 of each year, and shall be certified by a director, manager or officer of Lamington as true and correct. Falling below the Minimum Cash Balance will not constitute an event of default under any of the Restructuring Securities.

On any date up to and including December 31, 2022, the Company may, at its option, but subject to approval by the Company's Board of Directors (without requiring a Defined Majority Approval), repurchase the Series A Notes and/or the Series B Notes in the open market, provided that the Minimum Cash Balance is maintained immediately following such repurchasing transaction ("Open Market Repurchases").

For so long as the Minimum Cash Balance is maintained, any funds held by the Company in excess of the Minimum Cash Balance and remaining after any Open Market Repurchases ("Available Funds") shall be distributed to the holders of the Restructuring Securities in accordance with the following payment priority waterfall outlined below (the "Payment Priority Waterfall").

Cash interest on the Series A Notes and Series B Notes shall be paid only to the extent of Available Funds, as detailed in the Payment Priority Waterfall.

Payment Priority Waterfall:

1) First, holders of the Series A Notes shall receive, on a semi-annual basis[3], all accrued and unpaid interest in full, including any arrears, and for the avoidance of doubt such interest payment shall not include a catch-up cash interest payment for any PIK interest that has been previously capitalized as principal, but shall include any increase in cash interest payable as a result of such PIK

---

[3] June 30 and December 31 of each year.

Interest capitalization on the previous payment dates. If insufficient Available Funds exist to pay interest on the Series A Notes, in full, such Available Funds shall be used to make cash interest payments on a *pro rata* basis to holders of the Series A Notes, and any remaining interest owed shall be paid as PIK Interest and capitalized as principal.

2) Second, holders of the Series B Notes shall receive, on a semi-annual basis[4], all accrued and unpaid interest in full, including any arrears, and for the avoidance of doubt such interest payment shall not include a catch-up cash interest payment for any PIK Interest that has been previously capitalized as principal, but shall include any increase in cash interest payable as a result of such capitalization on the previous payment dates. If insufficient Available Funds exist to pay interest on the Series B Notes, in full, such Available Funds shall be used to make cash interest payments on a *pro rata* basis to holders of the Series B Notes, and any remaining interest owed shall be paid as PIK Interest and capitalized as principal.

3) Third, after December 31, 2022, the retirement of Class D Units outstanding in White Eagle Asset Portfolio, LP ("White Eagle") until all such Class D Units are retired.

4) Fourth, after December 31, 2022, until all Series A Notes have been redeemed or repaid in full, the Company shall redeem any and all of the Series A Notes at a price equal to the outstanding principal amount of the Series A Notes being redeemed plus accrued and unpaid interest thereon on a semi-annual basis that is substantially contemporaneous with its semi-annual Board of Directors' meeting and/or reporting obligations, provided that the Minimum Cash Balance is maintained immediately following such redemption.

5) Fifth, after December 31, 2022, until sufficient Series B Notes, including Accrued Series B PIK Interest, such that the outstanding principal amount of Series B Notes (including Accrued Series B PIK Interest) does not exceed $30 million have been redeemed or repaid, the Company shall redeem any and all of the Series B Notes at a price equal to the outstanding principal amount of the Series B Notes being redeemed plus accrued and unpaid interest thereon on a semi-annual basis that is substantially contemporaneous with Lamington's semi-annual meeting of the Board of Directors and/or reporting obligations, provided that the Minimum Cash Balance is maintained immediately following

---

[4] June 30 and December 31 of each year.

such redemption.

6) Sixth, after December 31, 2022, 50% of the Available Funds shall be used by Lamington to redeem any and all of the Series B Notes at a price equal to the outstanding principal amount of the Series B Notes being redeemed plus accrued and unpaid interest thereon, and 50% of the Available Funds shall be paid to the holders of the New PPNs, in each case on a semi-annual basis that is substantially contemporaneous with Lamington's semi-annual Board of Directors' meeting and/or reporting obligations, provided that the Minimum Cash Balance is maintained immediately following such redemption and payment.

7) Seventh, after December 31, 2022, after all Series B Notes have been redeemed or repaid in full, any remaining Available Funds shall be paid to the holders of the New PPNs on an annual basis.

For the avoidance of doubt, prior to December 31, 2022, only Sections 1 and 2 will apply (and Sections 3-7 will not apply).