## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RED REEF ALTERNATIVE INVESTMENTS, LLC and EMERGENT CAPITAL, INC.,[1] | ) | Case No. 20-12602 (BLS) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| IMPERIAL PREMIUM FINANCE, LLC,[2] | ) | Case No. 20-12694 (BLS) |
| | ) | |
| Debtor. | ) | |

**DECLARATION OF MIRIAM MARTINEZ, CHIEF FINANCIAL OFFICER, IN SUPPORT OF MOTION OF DEBTORS EMERGENT CAPITAL, INC. AND IMPERIAL PREMIUM FINANCE, LLC PURSUANT TO 11 U.S.C. §§ 502(c) AND 105(a) TO ESTIMATE POHL LITIGATION CLAIMS FOR DISTRIBUTION PURPOSES**

I, Miriam Martinez, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am the Chief Financial Officer of Emergent Capital, Inc., one of the above-captioned debtors and debtors in possession ("Emergent").  In my capacity as an officer of Emergent, I oversee many aspects of Emergent's business.  I joined Emergent in 2010 and currently manage Emergent and its direct and indirect subsidiaries, including Debtor Imperial Premium Finance, Inc. ("Imperial Premium" and together with Emergent, the "Debtors").

---

[1]  The last four digits of each Debtor's taxpayer identification number are:  Red Reef Alternative Investments, LLC (0302) and Emergent Capital, Inc. (3473).  The location of the Debtors' service address for purposes of these cases is 1200 North Federal Highway, Suite 200, Boca Raton, FL 33432.

[2]  The last four digits of the Debtor's taxpayer identification number are:  Imperial Premium Finance, LLC (4007).  The location of the Debtors' service address for purposes of these cases is 1200 North Federal Highway, Suite 200, Boca Raton, FL 33432.

2.     I submit this declaration (the "Declaration") in support of the *Motion of Debtors Emergent Capital, Inc. and Imperial Premium Finance, LLC Pursuant to 11 U.S.C. §§ 502(c) and 105(a) to Estimate Pohl Litigation Claims for Distribution Purposes* (the "Motion"),[3] filed concurrently herewith.  Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtors' books and records, relevant documents, and other information prepared or collected by the Debtors' representatives, or my opinion based on my experience with the Debtors' operations and financial condition.  In making my statements based on my review of the Debtors' books and records, relevant documents, and other information prepared or collected by the Debtors' representatives, I have relied upon these representatives accurately recording, preparing, or collecting such documentation and other information.  I am authorized to submit this Declaration on behalf of the Debtors.

3.     By the Motion, the Debtors seek to estimate the allowed amount of the Pohl Litigation Claims at $0 for purposes of distributions in these cases.

4.     Emergent is a holding company with ownership interests in certain subsidiaries.  As such, Emergent does not have any employees or vendor relationships, and Emergent is not directly involved in the purchase or sale of insurance policies or any premium financing transactions.  Hence, Emergent did not commit the alleged wrongs that are the subject of the Pohl Litigation.

5.     Emergent has filed the Plan that proposes to satisfy allowed general unsecured claims in full.  In order to implement the Plan, Emergent needs to know how much, if anything, to reserve and pay on account of the Pohl Litigation Claims.  Further, Emergent's other

---

[3]  Capitalized terms used but not defined herein shall have the meanings set forth in the Motion.

DOCS_SF:104419.3

stakeholders, consisting mainly of noteholders and equity holders, are entitled to appropriate

disclosure as to the allowed amount, if any, of the Pohl Litigation Claims.

6.      Imperial Premium previously was involved in the business of insurance

premium financing.  However, Imperial Premium currently has no operations or assets.

7.      On January 14, 2019, the Pohl Litigation Claimants commenced the Pohl

Litigation against the Insurer, Wilmington Trust, National Association, as securities intermediary

for the Policy (the "Securities Intermediary"), certain individuals who are alleged wrongdoers,

and an entity called Imperial and Trading, LLC (which entity does not exist in Emergent's

organizational structure).  In March 2019, the Pohl Litigation Claimants amended their complaint

to add Emergent as a defendant.  In June 2020, the Pohl Litigation Claimants further amended

their complaint to add Imperial Premium as a defendant.  A true and correct copy of the Second

Amended Complaint is attached hereto as **Exhibit A**.  Some relevant background to the lawsuit

is set forth below.

8.      On March 12, 2008, the Pohl Trust (through its two trustees, Mr. Mahoney

and Bank of Utah) executed a Loan Application and Agreement (the "Loan Agreement") with

Imperial Premium, for the purpose of financing premium payments due under the Policy.  Under

the Loan Agreement, Imperial Premium agreed to loan the Pohl Trust a total of $442,739.33 (the

"Loan").  Mrs. Pohl and Harvey Pohl warranted that they had read and understood the terms of

the Loan Agreement.  A true and correct copy of the Loan Agreement is attached hereto as

**Exhibit B**.

9.      Together with the Loan Agreement, the Pohl Trust executed a Promissory

Note in favor of Imperial Premium in the amount of $442,739.33, and pledged the Policy as

collateral for the Loan.  A true and correct copy of the Promissory Note is attached hereto as

**Exhibit C**.

10.     Mrs. Pohl also personally guaranteed repayment of the Loan by executing

a Guaranty.  A true and correct copy of the Guaranty is attached hereto as **Exhibit D**.

11.     Allan Pohl and Kimberly Sheris granted Imperial Premium a first-priority

security interest in the Pohl Trust and its assets, including the Policy, pursuant to a Security

Agreement.  A true and correct copy of the Security Agreement is attached hereto as **Exhibit E**.

12.     On March 14, 2008, Imperial Premium funded the Loan in the initial

amount of $252,506, which was wired to the Pohl Trust.  Imperial Premium subsequently funded

the Loan by an additional $190,333.33, which was wired to the Pohl Trust on January 20, 2009.

13.     The Loan Agreement had a maturity date on or about March 7, 2010.  On

or about March 19, 2010, the Pohl Litigation Claimants elected to tender ownership of the Policy

to Imperial Premium in exchange for a discharge of their obligations under the Loan Agreement

and the other agreements.  To accomplish this, each of the Pohl Litigation Claimants entered into

the Release Agreement with Imperial Premium.  A true and correct copy of the Release

Agreement is attached hereto as **Exhibit F**.

14.     Since the time that the Pohl Litigation Claimants executed the Release

Agreement, premium payments under the Policy have totaled approximately $1.6 million.  The

premiums under the Policy are currently approximately $30,000 per month and will continue to

increase in subsequent years.  After the Securities Intermediary took ownership of the Policy in

2013, the premiums under the Policy were paid by the Securities Intermediary, which payments

were funded by White Eagle Asset Portfolio, LP ("White Eagle").  Emergent retains an indirect

4

27.5% interest in the Policy through its interests in White Eagle.  In sum, the total amount of premiums paid toward the Policy since its issuance is in excess of $1.9 million, none of which was paid by the Pohl Litigation Claimants.  Similarly, the Pohl Litigation Claimants have failed to pay anything to Imperial Premium.

15.     For these reasons and those set forth in the Motion, I believe that the Pohl Litigation Claims should be estimated at $0 and the Debtors should not be required to reserve or pay any amounts on account of the Pohl Litigation Claims.

*[remainder of page intentionally blank]*

I declare under penalty of perjury under the United States of America that the foregoing is true and correct.

Executed this 26th day of October 2020 at Boca Raton, Florida.


*/s/ Miriam Martinez*
Miriam Martinez

## Exhibit A

**Second Amended Complaint**

IN THE CIRCUIT COURT OF THE FIFTEENTH
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA.

CASE NO.  50-2019-CA-000521-XXXX-MB

PHYLLIS POHL, ALLAN J. POHL,
Individually and as Trustee of the
Phyllis Pohl Irrevocable Trust, and
KIMBERLY SHERIS,

      Plaintiffs,

vs.

LINCOLN BENEFIT LIFE COMPANY,
WILMINGTON TRUST NATIONAL
ASSOCIATION, IMPERIAL PREMIUM
FINANCE, LLC, ERNEST MADERA,
and EMERGENT CAPITAL, INC.,

      Defendants.

_____/

## SECOND AMENDED COMPLAINT

Plaintiffs, PHYLLIS POHL, ALLAN J. POHL, individually and as Trustee of the Phyllis

Pohl Irrevocable Trust, and KIMBERLY SHERIS (collectively, "Plaintiffs"), by and through

undersigned counsel, hereby sue Defendants, LINCOLN BENEFIT LIFE COMPANY,

WILMINGTON TRUST NATIONAL ASSOCIATION, IMPERIAL PREMIUM FINANCE,

LLC, ERNEST MADERA, and EMERGENT CAPITAL, INC. (collectively, "Defendants"), and

allege:

## NATURE OF ACTION, PARTIES, JURISDICTION AND VENUE

1.    Plaintiffs bring this action for a declaration of their rights and to recover damages

they sustained in purchasing a life insurance policy from Defendant Lincoln Benefit as a

consequence of the Defendants' fraud, fraudulent inducement, misrepresentations and omissions, negligence, and breach of their common law duties to Plaintiffs.

2.      Plaintiff Phyllis Pohl ("Mrs. Pohl") is an 82-year-old widow and a resident and citizen of Palm Beach County, Florida.

3.      Plaintiff Allan Pohl ("Allan") is the adult son of Mrs. Pohl and a resident and citizen of California.  Allan Pohl is also the Trustee of the Phyllis Pohl Irrevocable Trust ("Pohl Trust"), a trust sited in Palm Beach County, Florida.

4.      Plaintiff Kimberly Sheris ("Kimberly") is the adult daughter of Mrs. Pohl and a resident and citizen of New Jersey.

5.      Defendant Lincoln Benefit Life Company ("Lincoln Benefit") is a foreign for-profit Nebraska corporation that is authorized to conduct insurance business in Florida and which transacts usual, customary and substantial business in Palm Beach County, Florida.

6.      Defendant Wilmington Trust National Association ("Wilmington Trust") is a federally chartered bank and a citizen of Delaware and which transacts usual, customary and substantial business in Palm Beach County, Florida.

7.      Defendant Imperial Premium Finance, LLC ("IPF") is a Florida limited liability company with its principal place of business in Boca Raton, Florida and which transacts usual, customary and substantial business from its principal place of business in Palm Beach County, Florida.

8.      Defendant Earnest Madera ("Madera") is a resident and citizen of Florida.  At all material times, Defendant Madera was agent of Lincoln Benefit, Emergent and/or IPF, and acting within the course and scope of his actual and apparent agency with Lincoln Benefit, Emergent and IPF.

9.      Defendant Emergent Capital, Inc. ("Emergent") is a Florida for profit corporation with its principal place of business in Boca Raton, Florida and which transacts usual, customary and substantial business from its principal place of business in Palm Beach County, Florida. Emergent was formerly known as Imperial Holdings, Inc.  Emergent is the parent company and the sole managing member of Defendant IPF.  At all times material to this action, Emergent controlled and directed the actions and inactions of IPF.

10.     Jurisdiction is proper in this Court pursuant to Section 48.193, Florida Statutes, because the Defendants each operate, conduct or engage in business and/or have an office in Palm Beach County, Florida, and because each Defendant committed a tortious act within Palm Beach County, Florida.  Jurisdiction in this Court is further proper because Plaintiffs assert causes of action herein seeking damages in excess of $15,000.00, exclusive of interest, costs and attorneys' fees.

11.     Venue is proper in Palm Beach County, Florida pursuant to Section 47.011, Florida Statutes, because the events giving rise to this action occurred in this county and the causes of action accrued in this county.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

12.     In 2007, Plaintiff Phyllis Pohl and her late husband, Harvey Pohl ("Harvey" or "Mr. Pohl"), were senior citizens who had been married to each other for over 40 years.  After raising their family and concluding very successful careers in New York as an educator and accountant, respectively, Mrs. Pohl and her late husband retired to Palm Beach County in 1999.

13.     In or about 2007, Mrs. Pohl and her husband Harvey were solicited by Defendant Madera and representatives and/or affiliates of Emergent and IPF to purchase a large insurance policy issued by Defendant Lincoln Benefit.

14.     At all material times, Defendant Madera was a licensed insurance agent who were authorized to and did in fact transact in insurance sales on behalf of Defendant Lincoln Benefit in the State of Florida and in Palm Beach County, Florida.

15.     Lincoln Benefit is registered to conduct insurance business in the State of Florida, including specifically the life insurance policy at issue in the action.

16.     Defendants Emergent and IPF acted as unlicensed specialty or premium finance companies in Florida and purportedly financed the premiums for the policy that is the subject matter of this action.

17.     At all material times, Defendant Lincoln Benefit established and maintained a list of premium financing companies that were approved by Lincoln Benefit to participate in the purchase and financing of Lincoln Benefit insurance policies.  On information and belief, Defendants Emergent and/or IPF were among a small group of life insurance premium financing companies approved by Lincoln Benefit.

18.     Harvey Pohl was in failing health in 2007, and as part of the Pohl's estate planning, he and Mrs. Pohl desired to leave a legacy and inheritance for their adult children, Allan and Kimberly.  At this time, Mr. and Mrs. Pohl were solicited and encouraged by Defendants Madera, IPF, Emergent and Lincoln Benefit to apply for and purchase a life insurance policy from Lincoln Benefit in the face about of $9,000,000.

19.     On or about June 21, 2007, Mrs. Pohl signed and submitted an application for life insurance to Lincoln Benefit.  Mrs. Pohl was inexperienced and naïve about life insurance at the time she signed the application, and she relied upon Defendants IPF and Emergent to instruct and guide her in executing the necessary paperwork to apply for and purchase the insurance policy. Defendants directed and instructed Mrs. Pohl to sign the Lincoln Benefit life insurance

application and all policy-related documents in "blank", and represented and assured Mrs. Pohl that she could trust Madera, IPF and Emergent to properly and legally complete the application and policy-related documents.

20.     In connection with the application for the life insurance policy, Defendants IPF and Emergent directed, caused and instructed Mrs. Pohl to create the Phyllis Pohl Irrevocable Trust ("the Pohl Trust") to serve as the owner and intended beneficiary of the insurance policy. In turn, Defendants IPF and Emergent represented and assured Mrs. Pohl that her children, Allan and Kimberly, would be named the beneficiaries of the Pohl Trust and would inherit the insurance policy's death benefit upon Mrs. Pohl's passing.  Defendants IPF and Emergent paid for and caused the creation of the Pohl Trust and preparation of the trust agreement.

21.     Defendants IPF and Emergent directed and caused the appointment of Thomas Mahoney as the original trustee of the Pohl Trust, and thereafter directed and caused the appointment of the Bank of Utah as a co-trustee of the Pohl Trust.  At all materials times, Defendants IPF and Emergent controlled and directed the actions and inactions of the trustees of the Pohl Trust.

22.     At the time Mrs. Pohl signed the life insurance application on June 21, 2007, and at all times thereafter, she was physically located and residing in Palm Beach County, Florida. Conversely, Mrs. Pohl has never resided in Georgia and she was not located in Savannah, Georgia at the time she signed the life insurance application, any of the policy-related documents, or the Pohl Trust agreement.  Defendants IPF and Emergent, however, falsely misrepresented that the application was signed by Mrs. Pohl in Georgia, rather than Florida.

23.     On January 7, 2008, Lincoln Benefit Lincoln Benefit approved and issued a life insurance policy with a face amount of $9 million, Policy No. 01N1364514 ("the Policy"), with

Mrs. Pohl as the insured and the Pohl Trust as the owner of the Policy.  A true and correct copy of the Policy is attached hereto as **Exhibit A**.  The policy was delivered to Mrs. Pohl at her Florida residence.

24.     At the time the application for the Policy was signed and at the time the Policy was issued, Mrs. Pohl, the Pohl Trust and the Trust's beneficiaries (Allan and Kimberly) had valid insurable interests in the life of Phyllis Pohl.

25.     Mrs. Pohl and the Pohl Trust applied for and procured the Policy in good faith for estate planning purposes.

26.     Defendants Madera, IPF, Emergent and Lincoln Benefit engaged in a series of misrepresentations and omissions in connection with the purchase and sale of the Policy. Defendants Madera, IPF, Emergent and Lincoln Benefit represented to Mrs. Pohl and the Pohl Trust and led them to believe that (a) the Pohl Trust purchased and owned the Policy insuring her life in the face amount of $9,000,000; (b) Mrs. Pohl's children, Allan and Kimberly, were irrevocably named as the beneficiaries of the Pohl Trust and thus entitled to receive the Policy's death benefit; and (c) IPF and Emergent would pay the premiums due on the Policy until Mrs. Pohl passed and the death benefit was paid to the Pohl Trust, at which time IPF's loan would mature and be repaid from the proceeds of the Policy.

27.     Defendants Madera, IPF, Emergent and Lincoln Benefit, however, omitted and failed to disclose to Plaintiffs that they were engaged in a fraudulent scheme whereby they (a) caused the formation of the Pohl Trust and its purchase of the Policy insuring Mrs. Pohl's life, (b) fraudulently induced the Pohls and the Pohl Trust to enter into a loan application and agreement for a limited period of time with the intent to circumvent the applicable contestability regulations, while concealing from Plaintiffs that the loan was not for the duration of the Pohl

6

Policy and that Defendants IPF and Emergent were not licensed in Florida to act as premium

finance companies; (c) appointed, compensated, controlled and directed the trustees of the Pohl

Trust to facilitate Defendants' fraudulent scheme to and misappropriate the Policy; (d) caused

the purported execution of a fraudulent and forged Release and Relinquishment Agreement; and (e)

utilized the fraudulent and forged Release and Relinquishment Agreement to thereafter transfer

ownership of the Policy to Defendants IPF and Wilmington Trust in exchange for valuable

consideration and monies, all of which were concealed and withheld from Plaintiffs.   The

conduct of Defendants Madera, IPF, Emergent and Lincoln Benefit was deceitful, dishonest and

fraudulent, not to mention a breach of these Defendants' duties of care and fiduciary duties to

Plaintiffs.

28.     Defendants Madera, IPF, Emergent and Lincoln Benefit accomplished this

fraudulent scheme by developing a relationship of trust and confidence with the Plaintiffs, and

then intentionally and knowingly exploiting that trust.   At all material times, Plaintiffs placed

their complete faith and trust in these Defendants, as well as in the trustees of the Pohl Trust who

were appointed and controlled by Defendants IPF and Emergent, to place Plaintiffs' own best

interests above the Defendants and to refrain from self-dealing and fraud.

29.     Plaintiffs justifiably relied on the misrepresentations and information as conveyed

to them by Defendants Madera, IPF, Emergent and Lincoln Benefit, who had superior

knowledge regarding the Policy, and who intended for the Plaintiffs to rely upon the Defendants'

representations and omissions in connection with the purchase and financing of the Policy.

Importantly, significant aspects and details of the Policy and the transaction relating to the

purchase of the Policy were not readily understandable or observable by the Plaintiffs, who had

the right to rely and did in fact rely upon the representations made to them by the Defendants.

30.     Subsequent to the purchase and issuance of the Policy, Mrs. Pohl received an unexpected visit from a representative and/or affiliate of Defendants IPF and Emergent at her residence in Palm Beach County. Upon entering her home, the representative acted in a very threatening and hostile manner towards Mrs. Pohl and demanded that she locate her original papers relating to the Policy.   When Mrs. Pohl located the papers, the representative of Defendants IPF and Emergent ripped the papers out of Mrs. Pohl's hands, making contact with her body and causing Mrs. Pohl immediate and severe apprehension and emotional distress.

31.     At all material times from the date the Policy was issued and through the present date, Mrs. Pohl (a) never knowingly or willingly removed or authorized the removal of the Pohl Trust as the named beneficiary of the Policy; (b) never knowingly or willingly removed or authorized the removal of Allan and/or Kimberly as the named beneficiaries of the Pohl Trust; (c) never knowingly or willingly authorized the change or addition of new named beneficiaries of the Pohl Trust; and (d) never knowingly or willingly authorized the change, sale or transfer of the owner of the Policy or beneficiary of the Policy to any other person or entity.

32.     Unbeknown to Plaintiffs and without their approval or consent, and in furtherance of their unlawful scheme, Defendants Emergent and Imperial fraudulently procured a Release and Relinquishment Agreement pursuant to which Plaintiffs purportedly agreed to transfer ownership of the Policy to Imperial and relinquish any right or claim to the process of the Policy.  In truth, the alleged signatures of Plaintiffs Allan Pohl, Phyllis Pohl and Kimberly Pohl, as well as the signature of Harvey Pohl, on the Release and Relinquishment Agreement are all forgeries and not their true or authentic signatures.

33.     Plaintiffs had no knowledge of the Release and Relinquishment Agreement and (a) had never seen it until it was produced by Defendants in this action; (b) never had any

discussions or meetings with Emergent or IPF relating to the Release; (c) had no knowledge of, and never consented to, the alleged relinquishment of the Pohl Trust's ownership of the Policy or any of their rights as a beneficiary; and (d) never consented or authorized the co-trustees of the Pohl Trust – who were appointed and controlled by Emergent and IPF at all material times – to execute and sign the Release or to consent to the Trust's relinquishment of its ownership of the Policy.

34.     On or about December 3, 2010, Defendants IPF and Emergent prepared, directed and/or caused the submission to Lincoln Benefit of a Change of Owner Request and a Change of Beneficiary Request, naming IPF as the new owner and beneficiary of the Policy, thereby replacing the Pohl Trust as owner and terminating Allan and Kimberly as the beneficiaries of the Policy.

35.     On December 7, 2010, Lincoln Benefit acknowledged that the owner and beneficiary of the Policy had been changed to Emergent's affiliated entity, and subsequently continued thereafter to accept premium payments relating to the Policy.

36.     On or about February 26, 2013, and again without the knowledge or consent of Plaintiffs, the owner and beneficiary of the Policy was changed to Wilmington Trust, N.A., as Securities Intermediary on behalf of beneficial owner Defendant Emergent.

37.     As the securities intermediary, Wilmington Trust holds ownership title to the Policy purely as a ministerial matter and on behalf of the beneficial owners, which include Defendant Emergent.  Defendant Emergent knew of and authorized the fraudulent scheme conducted by its agents and affiliates; Emergent agreed to participate in and materially aid and abet the scheme; and Emergent was complicit in the fraudulent scheme as a co-conspirator with Defendants Madera and IPF.

38.     As the issuer and seller of the Policy, Defendant Lincoln Benefit owed a duty to the Plaintiffs to scrutinize these transactions and ensure that they were authorized by and consented to by Plaintiffs.  Lincoln Benefit, however, failed to contact the Plaintiffs to alert or inform them of these extremely material changes to the record owner and beneficiaries of the Policy.  Defendant Lincoln Benefit further failed to contact Plaintiffs to verify and confirm that Mrs. Pohl and the Pohl Trust had knowledge of, and consented to and approved, the changes to the owner and beneficiaries of the Policy in 2010 and 2013.  The change of ownership and beneficiaries to the Policy twice within several years of its issuance was a significant red-flag that did in fact place, or should have placed, Lincoln Benefit on notice that the Plaintiffs' personal and financial interests in the Policy were being violated.  Lincoln Benefit thereby breached its duties of care that it owed to the Plaintiffs.

39.     Lincoln Benefit further breached its duties of care that it owed to the Plaintiffs because Lincoln Benefit had actual or constructive knowledge at the time of the change of the ownership and beneficiaries in 2010 and 2013 that Defendants IPF and Emergent and/or their affiliated entities were engaged in a fraudulent scheme to misappropriate and swindle the Plaintiffs out of their financial interests in the Policy.

40.     Indeed, Lincoln Benefit knew or should have known of the fraudulent scheme as a consequent of its prior and existing complaints, disputes and litigation with individuals and entities affiliated with Defendants IPF and Emergent involving other insurance policies issued by Lincoln Benefit under similar circumstances.  At all material times, however, Lincoln Benefit failed to contact or alert Plaintiffs of the fraudulent scheme or to take any action to protect Plaintiffs' personal and financial interests in the Policy.

41.     Plaintiffs did not discover the fraudulent scheme or any of the material misrepresentations and omissions by the Defendants until approximately 2016.

42.     As a direct result of Defendants' actions, Plaintiffs have suffered and continue to suffer actual and significant damages, including but not limited to loss of appreciation of their retirement funds and other economic damages, emotional distress, and mental anguish.

43.     Plaintiffs have retained the law firm of Ciklin Lubitz to represent them and are obligated to pay for their counsel's services.

**COUNT I**
**DECLARATORY JUDGMENT**
**(Plaintiffs Against Defendants Lincoln Benefit, Wilmington Trust and Emergent)**

44.     Plaintiffs incorporate and restate Paragraphs 1 through 43 as if fully set forth herein.

45.     This is cause of action for declaratory judgment pursuant to Chapter 86, Florida Statutes, brought by all Plaintiffs against Defendants Lincoln Benefit, Wilmington Trust and Emergent.

46.     The Pohl Trust and Lincoln Benefit entered into an insurance contract that is valid and enforceable. The Pohl Trust purchased and held the Policy as part of Phyllis and Harvey Pohl's estate planning and in trust for their children and beneficial owners, Allan and Kimberly Pohl.

47.     Plaintiffs never knowingly or willingly removed or authorized the removal of the Pohl Trust as the owner and named beneficiary of the Policy; never knowingly or willingly authorized the change or addition of new named beneficiaries of the Pohl Trust; and never knowingly or willingly authorized the change, sale or transfer of the owner of the Policy or beneficiary of the Policy to any other person or entity.

11

48.      Wilmington Trust and the beneficial owner of the Policy, Emergent, acquired ownership of the Policy through a fraudulent scheme and under circumstances that would render it unjust and inequitable to permit them to benefit as owners and/or beneficiaries of the Policy. As a consequence of their fraud and unclean hands, any and all changes to the ownership and/or beneficiaries to the Policy are null and void; Wilmington Trust and its beneficial owner Emergent lack a legal right to or interest in the Policy; and any claim of ownership to the Policy by Defendants Wilmington Trust and/or Emergent is null and void or voidable as a matter of law and equity.

49.      Defendant Lincoln Benefit, however, has recognized and acknowledged Defendant Wilmington Trust as both the owner of record of the Policy and the sole designed beneficiary of the Policy.  The actions of Lincoln Benefit, Wilmington Trust and Emergent have created doubt in Plaintiffs as to their rights and obligations under the Policy and Plaintiffs desire that this doubt be removed by judicial decree.

50.      There is a substantial controversy between Plaintiffs and Defendants Lincoln Benefit, Wilmington Trust and Emergent, having adverse legal interests in the Pohl Policy, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

51.      Consequently, there is therefore a *bona fide* need for a declaration from the Court concerning these matters.  Such a declaration is necessary and proper at this time in order that all parties may determine their rights and obligations among themselves.

52.      Under the circumstances, Plaintiffs are entitled to a declaration that:

(a)      the Policy is a valid and enforceable contract upon Lincoln Benefit;

(b)      the Pohl Trust is the rightful and sole owner of the Policy, with the right and authority to designate the beneficiaries of the Policy;

(c)     Defendants Wilmington Trust and Emergent have no contractual or legal claim or right of ownership as to the Policy; and

(d)     Defendants Wilmington Trust and Emergent be deemed to have forfeited any claim or entitlement to return or disgorgement of the premiums paid towards the Policy to their fraud, unclean hands and other tortious conduct as alleged herein.

**WHEREFORE**, Plaintiffs demand declaratory judgment in their favor and against Defendants Lincoln Benefit, Wilmington Trust and Emergent, as well as supplemental relief pursuant to Chapter 86, Florida Statutes, and such other relief as the Court deems just and proper.

## COUNT II
## UNJUST ENRICHMENT
### (Plaintiffs Against Defendants Lincoln Benefit, Wilmington Trust and Emergent)

53.     Plaintiffs incorporate and restate Paragraphs 1 through 43 as if fully set forth herein.

54.     Defendants Lincoln Benefit, Wilmington Trust and Emergent, by and through the actions and misconduct of their agents, predecessors and assigns as alleged herein, obtained a financial benefit in the form of the death benefits, surrender value and premiums arising under the Policy.

55.     Defendants Lincoln Benefit, Wilmington Trust and Emergent have retained these benefits despite Plaintiffs' damages and have refused to disgorge or return such benefits.

56.     The circumstances are such that it would be inequitable for these Defendants to retain these benefits without having to compensate Plaintiffs for their damages.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against Defendants Lincoln Benefit, Wilmington Trust and Emergent, jointly and severally, for compensatory damages, including all incidental and consequential damages, and for such further damages or relief as the Court or jury deems to be just and proper.

## COUNT III
## CONSTRUCTIVE TRUST
### (Plaintiffs Against Defendant Lincoln Benefit)

57.     Plaintiffs restate the allegations set forth in Paragraphs 1 through 43 above, as fully set forth herein.

58.     As alleged in Paragraphs 25 through 28 herein, Defendant Lincoln Benefit, by and through its agents, made express representations and omissions to Plaintiffs, including representations that the Pohl Trust had purchased and owned the Policy insuring her life in the face amount of $9,000,000; and (b) that Mrs. Pohl's children, Allan and Kimberly, were irrevocably named as the beneficiaries of the Pohl Trust and thus entitled to receive the Policy's death benefit.

59.     Plaintiffs reasonably relied upon these representations and omission in purchasing the Policy and from refraining from taking further action to protect their personal and financial interests in the Policy.

60.     A relationship of confidence and trust existed between the parties at the time of the representations and all other material times.

61.     Defendant Lincoln Benefit would be unjustly enriched unless a constructive trust is imposed upon the death benefit and/or surrender value of the Policy for the benefit of Mrs. Pohl and the Pohl Trust's beneficiaries, Alan and Kimberly.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against Defendant Lincoln Benefit imposing a constructive trust upon the Policy for the benefit of Plaintiffs and for such other relief as the Court deems just and proper.

**COUNT IV**
**EQUITABLE ESTOPPEL**
**(Plaintiffs Against All Defendants)**

62.    Plaintiffs incorporate and restate Paragraphs 1 through 43 as if fully set forth herein.

63.    As alleged herein, Defendants, individually and/or by and through the actions and misconduct of their agents, principals, beneficial owners, co-conspirators, predecessors and assigns as alleged herein, made misrepresentations of material fact that are contrary to their later-asserted positions, including that the Pohl Trust had purchased and owned the Policy insuring her life in the face amount of $9,000,000 and that Mrs. Pohl's children, Allan and Kimberly, were irrevocably named as the beneficiaries of the Pohl Trust and thus entitled to receive the Policy's death benefit.

64.    Plaintiffs changed their position to their detriment in justified reliance upon the representations.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against the Defendants, jointly and severally, for compensatory damages, including all incidental and consequential damages, and for such further damages or relief as the Court or jury deems to be just and proper.

**COUNT V**
**PROMISSORY ESTOPPEL**
**(Plaintiffs Against All Defendants)**

65.    Plaintiffs incorporate and restate Paragraphs 1 through 43 as if fully set forth herein.

15

66.     As alleged herein, Defendants, individually and/or by and through the actions and misconduct of their agents, principals, beneficial owners, co-conspirators, predecessors and assigns as alleged herein, made misrepresentations of material fact that are contrary to their later-asserted positions, including that the Pohl Trust had purchased and owned the Policy insuring her life in the face amount of $9,000,000 and that Mrs. Pohl's children, Allan and Kimberly, were irrevocably named as the beneficiaries of the Pohl Trust and thus entitled to receive the Policy's death benefit.

67.     Plaintiffs changed their position to their detriment in justified reliance upon the representations.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against Defendants, jointly and severally, for compensatory damages, including all incidental and consequential damages, and for such further damages or relief as the Court or jury deems to be just and proper.

**COUNT VI**
**FRAUDULENT INDUCEMENT**
**(Plaintiffs Phyllis Pohl and Alan Pohl, as Trustee of the Pohl Trust,**
**Against All Defendants)**

68.     Plaintiffs incorporate and restate Paragraphs 1 through 43 as if fully set forth herein.

69.     In connection with the solicitation, application, sale, and purchase of the Policy, Defendants Madera, IPF, Emergent and Lincoln Benefit intended for prospective customers such as Plaintiffs Phyllis Pohl and the Pohl Trust to rely upon the representations of selling agents.

70.     As alleged herein, Defendants Madera, IPF, Emergent and Lincoln Benefit, acting individually and on behalf of each other as profiteers in concert with one another, knowingly misrepresented and omitted crucial information from Plaintiffs Phyllis Pohl and the Pohl Trust in order to induce them to apply for and purchase the Policy, to provide personal financial and

health information, and to submit to intrusive and painful medical examinations and tests necessary to procure the Policy.  At the time of the misrepresentations and omissions, Defendants Madera, IPF, Emergent and Lincoln Benefit, knew or should have known of their falsity.

71.     Defendants Madera, IPF, Emergent and Lincoln Benefit intended that Plaintiffs Phyllis Pohl and the Pohl Trust rely upon the misrepresentations and omissions regarding the Policy.

72.     As a result of the Defendants' fraudulent misrepresentations and omissions and deceptive tactics, Phyllis Pohl and the Pohl Trust have been damaged. But for Defendants' misrepresentations and omissions, which constitute independent acts outside of actual performance on the Policy, Phyllis Pohl and the Pohl Trust would not have applied for or purchased the Policy or provided any of the personal financial and health information or medical examinations and tests necessary to procure the Policy.

73.     Plaintiffs Phyllis Pohl and the Pohl Trust were induced to rely, and in fact justifiably relied on Defendants' misrepresentations and omissions.

74.     The intentional and exploitative conduct of defendants was so outrageous as to go beyond all bounds of decency, making it reasonably foreseeable that emotional distress would, and did, result.

75.     As a direct and proximate result of Defendants' fraudulent acts and omissions, Plaintiffs Phyllis Pohl and the Pohl Trust have suffered and will continue to suffer general and special damages, including, but not limited to, economic damages, emotional distress, mental anguish, humiliation and loss of enjoyment of life.

**WHEREFORE**, Plaintiffs Phyllis Pohl and Alan Pohl, in his capacity as the Trustee of the Pohl Trust, demand judgment in their favor and against Defendants, jointly and severally, for compensatory damages, including all incidental and consequential damages, and for such further damages or relief as the Court or jury deems to be just and proper.

**COUNT VII**
**FRAUDULENT MISREPRESENTATION AND OMISSIONS**
**(Plaintiffs Phyllis Pohl and Allan Pohl, as Trustee of the Pohl Trust,**
**Against All Defendants)**

76.    Plaintiffs incorporate and restate Paragraphs 1 through 43 as if fully set forth herein.

77.    As alleged herein, Defendants Madera, IPF, Emergent and Lincoln Benefit, acting individually and on behalf of each other as profiteers in concert with one another, knowingly misrepresented and omitted crucial information from Plaintiffs Phyllis Pohl and the Pohl Trust in order to induce them to apply for and purchase the Policy, to provide personal financial and health information, and to submit to intrusive and painful medical examinations and tests necessary to procure the Policy. At the time of the misrepresentations and omissions, Defendants Madera, IPF, Emergent and Lincoln Benefit, knew or should have known of their falsity.

78.    Defendants Madera, IPF, Emergent and Lincoln Benefit intended that Plaintiffs rely upon the misrepresentations and omissions regarding the Policy.

79.    As a result of the Defendants' fraudulent misrepresentations and omissions and deceptive tactics, Plaintiffs Phyllis Pohl and the Pohl Trust have been damaged. But for Defendants' misrepresentations and omissions, which constitute independent acts outside of actual performance on the Policy, Plaintiffs Phyllis Pohl and the Pohl Trust would not have applied for or purchased the Policy or provided any of the personal financial and health information or medical examinations and tests necessary to procure the Policy.

18

80.    Plaintiffs Phyllis Pohl and the Pohl Trust were induced to rely, and in fact justifiably relied on Defendants' misrepresentations and omissions.

81.    The intentional and exploitative conduct of defendants was so outrageous as to go beyond all bounds of decency, making it reasonably foreseeable that emotional distress would, and did, result.

82.    As a direct and proximate result of Defendants' fraudulent acts and omissions, Plaintiffs Phyllis Pohl and the Pohl Trust have suffered and will continue to suffer general and special damages, including, but not limited to, economic damages, emotional distress, mental anguish, humiliation and loss of enjoyment of life.

**WHEREFORE**, Plaintiffs Phyllis Pohl and Allan Pohl, in his capacity as the Trustee of the Pohl Trust, demand judgment in their favor and against Defendants, jointly and severally, for compensatory damages, including all incidental and consequential damages, and for such further damages or relief as the Court or jury deems to be just and proper.

## COUNT VIII
## COMMON LAW FRAUD
### (Plaintiffs Against All Defendants)

83.    Plaintiffs incorporate and restate Paragraphs 1 through 43 as if fully set forth herein.

84.    Defendants Madera, IPF, Emergent and Lincoln Benefit engaged in common law fraud by virtue of the misconduct alleged herein.

85.    As a direct and proximate consequence of Defendants' fraud, Plaintiffs suffered damages.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against Defendants, jointly and severally, for compensatory damages, including all incidental and consequential damages, and for such further damages or relief as the Court or jury deems to be just and proper.

### COUNT IX
### NEGLIGENCE
**(Plaintiffs Against Defendant Lincoln Benefit)**

86.     Plaintiffs incorporate and restate Paragraphs 1 through 43 as if fully set forth herein.

87.     Defendant Lincoln Benefit owed a duty to the Plaintiffs to exercise reasonable care in the Lincoln's selection, retention and supervision of its selling agent, Defendant Madera.

88.     Defendant Lincoln Benefit owed a duty to the Plaintiffs to exercise reasonable care in the Lincoln's selection, retention and supervision of its approved premium financing company, Emergent and its affiliated entities including Defendant IPF.

89.     Defendant Lincoln Benefit breached its foregoing duties to Plaintiffs as more fully alleged herein, including but not limited to Lincoln Benefit failure to determine Defendant Madera's qualifications to act as its selling agent; its failure to determine Emergent's qualifications to act as a premium financing company; it's failure to supervise Madera and Emergent and thereby prevent them from making numerous misrepresentations and omissions as alleged herein, and its failure to deter and prevent Madera and Emergent's role and participation in the fraudulent scheme alleged herein.

90.     As a direct and proximate result of Defendant Lincoln Benefit's breach of its duties, Plaintiffs have suffered damages.

**WHEREFORE**, Plaintiffs demand judgment against the Defendant Lincoln Benefit for damages, including all incidental and consequential damages, and for such further damages or relief as the Court or jury deems to be just and proper.

**COUNT X**
**BREACH OF FIDUCIARY DUTY**
**(Plaintiffs Phyllis Pohl and Allan Pohl, as Trustee of the Pohl Trust,**
**Against All Defendants)**

91.     Plaintiffs restate the allegations set forth in Paragraphs 1 through 43 above, as fully set forth herein.

92.     Plaintiffs Phyllis Pohl and the Pohl Trust and Defendants Madera, IPF, Emergent and Lincoln Benefit maintained a relationship in which these Plaintiffs reposed trust and confidence in these Defendants.

93.     In acquiring and accepting Plaintiffs' trust and confidence, Defendants Madera, IPF, Emergent and Lincoln Benefit owed Plaintiffs the highest degree of fiduciary duty, care and responsibility

94.     Through the acts and conduct described more fully *supra*, Defendants Madera, IPF, Emergent and Lincoln Benefit systemically pursued and ultimately acquired and abused the trust and confidence of Plaintiffs Phyllis Pohl and the Pohl Trust.

95.     As a result of Defendant Madera, IPF, Emergent and Lincoln Benefit's breaches of their fiduciary duties, Plaintiffs Phyllis Pohl and the Pohl Trust have suffered and will continue to suffer general and special damages, including, but not limited to, economic damages, emotional distress, humiliation and loss of enjoyment of life.

96.     By operation of law, Defendant Lincoln Benefit agreed to be and is legally bound by Defendant Madera's acts and omissions with regard to the purchase, sale and transfer of

ownership of the Policy.   Accordingly, Lincoln Benefit is liable for Madera's breaches of fiduciary duties to Plaintiffs Phyllis Pohl and the Pohl Trust.

97.    Defendants' breaches of duty constituted independent acts outside of actual performance on the Policy.

98.    The exploitive conduct of Defendants was so outrageous as to go beyond all bounds of decency, making it reasonably foreseeable that emotional distress would, and did, result.

**WHEREFORE**, Plaintiffs Phyllis Pohl and Allan Pohl, in his capacity as Trustee of the Pohl Trust, demand judgment in their favor and against Defendants, jointly and severally, for compensatory damages, including all incidental and consequential damages, and for such further damages or relief as the Court or jury deems to be just and proper.

## COUNT XI
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (BY PHLYISS POHL AGAINST ALL DEFENDANTS)

99.    Plaintiffs restate the allegations set forth in Paragraphs 1 through 43 above, as fully set forth herein.

100.    The actions and conduct of Defendants Madera, IPF, Emergent and Lincoln Benefit as alleged *supra* was intentional and reckless, as they knew or should have known that their actions and conduct behavior was likely to result in emotional distress to Mrs. Pohl.

101.    The actions and conduct of Defendants Madera, IPF, Emergent and Lincoln Benefit was outrageous and beyond all bounds of decency, atrocious and utterly intolerable in a civilized community.

102.    The actions and conduct of Defendants caused severe emotional distress to Mrs. Pohl, who has been damaged as a direct and proximate result of the actions and conduct of these Defendants.

**WHEREFORE**, Plaintiff Phyllis Pohl demands judgment against Defendants jointly and severally, for compensatory damages, including all incidental and consequential damages, and for such further damages or relief as the Court or jury deems to be just and proper.

## COUNT XII
## CIVIL CONSPIRACY
### (Plaintiffs Against All Defendants)

103.    Plaintiffs restate the allegations set forth in Paragraphs 1 through 43 above, as fully set forth herein.

104.    Defendants Madera, IPF, Emergent and Lincoln Benefit embarked on a civil conspiracy whereby they each entered into an express or tacit agreement with each other to participate in the fraudulent scheme and to engage in the unlawful acts and means more fully described in detail herein.

105.    Defendants Madera, IPF, Emergent and Lincoln Benefit each committed an overt act in furtherance of the conspiracy and materially aided and abetted the conspiracy.

106.    The tortious conduct and overt acts committed by Defendants Madera, IPF, Emergent and Lincoln Benefit have caused Plaintiffs substantial damages.

107.    As a matter of law, Defendants Madera, IPF, Emergent and Lincoln Benefit, as co-conspirators, are jointly and severally liable for the damages caused by the conduct of the other members of the conspiracy occurring at any time prior to and after its joinder of the conspiracy, and continuing until the time that such co-conspirator unequivocally withdraws from the conspiracy.

108.    The tortious and wrongful conduct committed by Defendants Madera, IPF, Emergent and Lincoln Benefit as co-conspirators has caused Plaintiffs to become embroiled in litigation with parties to this action, requiring Plaintiffs to incur actual attorneys' fees and expenses in protecting their interests.   Pursuant to the third-party litigation exception to the American Rule of attorneys' fees, Plaintiffs are entitled to recover from each co-conspirator the actual attorneys' fees and costs incurred in protecting Plaintiffs' interests as additional compensatory damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendants Madera, IPF, Emergent and Lincoln Benefit, jointly and severally, for compensatory damages, including all incidental and consequential damages, attorney's fees and costs, and for such further damages or relief as the Court or jury deems to be just and proper.

**COUNT XIII**
**<u>VICARIOUS LIABILITY</u>**
**(All Plaintiffs against Defendant Lincoln Benefit)**

109.    Plaintiffs restate the allegations set forth in Paragraphs 1 through 43 above, as fully set forth herein.

110.    This is a claim for vicarious liability against Defendant Lincoln Benefit for the unlawful conduct of its agent, Defendant Madera.

111.    As alleged herein, Defendant Madera committed fraud, fraudulent misrepresentations and omissions, fraudulent inducement, and breaches of fiduciary duty conversion in connection with the Policy.

112.    As a direct and proximate result of the foregoing actions and inactions of Defendant Madera, Plaintiffs have suffered damages.

113.    At all material times, Defendant Madera was acting in his capacity as an agent of Lincoln Benefit and within the course and scope of his actual or apparent agency on behalf of Lincoln Benefit.  Defendant Lincoln Benefit authorized and held out Defendant Madera as an actual agent of Lincoln Benefit.  Defendant Lincoln Benefit further acknowledged and represented to Plaintiffs that Defendant Madera was acting on Lincoln Benefit's behalf; Madera accepted the undertaking to act as agents for Lincoln Benefit; and Lincoln Benefit controlled, or had the right and ability to control, the actions of Madera with respect to the Policy.

114.    Based on the foregoing, Defendant Lincoln Benefit is vicariously liable for the damages suffered by Plaintiffs as consequence of the actions and inactions of Defendant Madera.

WHEREFORE, Plaintiffs demand judgment against Defendant Lincoln Benefit for damages, including all incidental and consequential damages, and for such further damages or relief the Court or jury determines to be just and proper.

## COUNT XIV
## VICARIOUS LIABILITY
### (All Plaintiffs against Defendant Emergent and IPF)

115.    Plaintiffs restate the allegations set forth in Paragraphs 1 through 43 above, as fully set forth herein.

116.    This is a claim for vicarious liability against Defendants Emergent and IPF for the unlawful conduct of its agents, representatives and affiliates.

117.    As alleged herein, Defendants Emergent and IPF's agents, representatives and affiliates – whose identity has been concealed from Plaintiffs by Defendants – committed fraud, fraudulent misrepresentations and omissions, fraudulent inducement, and breaches of fiduciary duty conversion in connection with the Policy.

118.    As a direct and proximate result of the foregoing actions and inactions, Plaintiffs have suffered damages.

119.    At all material times, Defendants Emergent and IPF's representatives were acting in their capacity as an agent of Emergent and IPF and within the course and scope of their actual or apparent agency on behalf of Emergent and IPF.  Defendants Emergent and IPF authorized and held out their representatives as acting on Emergent and IFP's behalf; and Emergent and IPF controlled, or had the right and ability to control, the actions of their representatives and agents with respect to the Policy and the underlying premium financing arrangement.

120.    Based on the foregoing, Defendants Emergent and IPF are vicariously liable for the damages suffered by Plaintiffs as consequence of the actions and inactions of their representatives and agents.

WHEREFORE, Plaintiffs demand judgment against Defendants Emergent and IPF for damages, including all incidental and consequential damages, and for such further damages or relief the Court or jury determines to be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury on all issues so triable as a matter of right.

> CIKLIN LUBITZ
> *Counsel for Plaintiffs*
> 515 N. Flagler Drive – 20th Floor
> West Palm Beach, Florida 33401
> Tel:  (561) 832-5900
> Fax:  (561) 833-4209
> Primary Email:  service@ciklinlubitz.com
> Secondary:    jbutler@ciklinlubitz.com
>                      dfogarty@ciklinlubitz.com
> By: */s/ Jonathan B. Butler*
>          Jonathan B. Butler
>          Florida Bar No. 056197

26

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 16th day of June, 2019, I electronically filed the foregoing document with the Clerk of Court using the Florida Courts E-Filing Portal.  I also certify that the foregoing document is being served this day on all counsel of record and interested parties via transmission generated by the Florida Courts E-Filing Portal or by U.S. Mail and by Facsimile Transmission, pursuant to Rule 2.516, Florida Rules of Judicial Administration.

By: */s/ Jonathan B. Butler*
      Jonathan B. Butler

# Lincoln Benefit Life Company

A Stock Company

Home Office: 2940 South 84th Street, Lincoln, Nebraska 68506-4142

*Flexible Premium Adjustable Life Insurance Policy*

| | | | |
|---|---|---|---|
| Insured: | PHYLLIS POHL | | |
| Payment Class: | NON-SMOKER | | |
| Issue Age: | 71 | Face Amount: | $9,000,000 |
| Sex: | FEMALE | Issue Date: | 01/07/2008 |
| Policy Number: | 01N1364514 | Monthly Activity Day: | 7th Day of the Month |

## THIS IS A LEGAL CONTRACT--READ IT CAREFULLY

Lincoln Benefit Life Company promises to pay the death benefit on death of the insured upon receipt of due proof of death of the insured, subject to the terms and conditions of this policy.  Minimum initial payment is required to issue this policy.  Premium payments are flexible for life. This policy does not pay dividends.

Please examine the application.  We issued this policy based upon the answers in the application (copy included).  If all answers are not complete and true, the policy may be affected.

**Right To Cancel Your Policy**
You may cancel this policy by returning it to Lincoln Benefit Life Company, or our agent, within **20 days** after you receive it.  Return of the policy by mail is effective on being postmarked, properly addressed and postage prepaid.  We will return all payments, less any policy debt and/or withdrawals, made for this policy to you.



Michael J. Velotta
Secretary

Lawrence W. Dahl
President



# Table of Contents

Policy Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 3
Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 7
Death Benefit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 8
Beneficiary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 9
Ownership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 9
Premium Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 10
Policy Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 11
Surrender Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 12
Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 13
Other Terms of Your Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 14
Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Insert
Riders (if any) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Insert

# Policy Data

| | |
|---|---|
| Insured: | PHYLLIS POHL |
| Payment Class: | NON-SMOKER |
| Issue Age: | 71 |
| Sex: | FEMALE |
| Policy Number: | 01N1364514 |

| | |
|---|---|
| Face Amount: | 9,000,000 |
| Issue Date: | 01/07/2008 |
| Monthly Activity Day: | 7th Day of the Month |

## Benefit Description

| | Year of Expiry or Maturity |
|---|---|
| Flexible Premium Adjustable Life | |
| Insurance - Death Benefit Option 1 | Life |
| Coverage Protection Rider (See page 6A & 6B for details.) | Life |

## Payment Information

| | |
|---|---|
| Minimum Initial Payment | $51,594.00 |
| Planned QUARTERLY Payment | 66,384.55 |

The payment of a monthly safety net premium of $17,198.00, on or before each monthly activity day, is guaranteed to keep this policy in force for five years, assuming no loans or withdrawals are taken.

This page intentionally left blank.

Pohl/LBL 000714

## Interest Rates

**Annual Interest Rates:**

| | |
|---|---|
| Minimum Guaranteed Annual Interest Rate | 3.00% |
| Loan Credited Rate | 4.00% |
| Loan Interest Rate Charge | 5.00% |

## Expense and Surrender Charges

**Expense Charges:**

| | |
|---|---|
| Maximum Monthly Policy Fee | $10.00 |
| Premium Expense Charge | 6.00% |
| Monthly Administrative Expense Charge (per $1000 of initial face amount) | |
|     Policy Year 1-6 | $0.30 |
|     Policy Year 7+ | $0.00 |
| Partial Withdrawal Service Fee | $25.00 |

**Surrender Charges:**

| Policy Year | Amount of Charge | Policy Year | Amount of Charge | Policy Year | Amount of Charge |
|---|---|---|---|---|---|
| 1 | $495,270.00 | 8 | $336,783.60 | 15 | $198,108.00 |
| 2 | 470,506.50 | 9 | 316,972.80 | 16 | 158,486.40 |
| 3 | 445,743.00 | 10 | 297,162.00 | 17 | 118,864.80 |
| 4 | 420,979.50 | 11 | 282,303.90 | 18 | 79,243.20 |
| 5 | 401,168.70 | 12 | 262,493.10 | 19 | 39,621.60 |
| 6 | 376,405.20 | 13 | 247,635.00 | 20 | 0.00 |
| 7 | 356,594.40 | 14 | 232,776.90 | | |

This page intentionally left blank.

Pohl/LBL 000716

## Surrender Charge Factors

| Issue Age | Female PE | Female P-NS | Female Std.NS | Female P-SM | Female Std.SM | Issue Age | Female PE | Female P-NS | Female Std.NS | Female P-SM | Female Std.SM |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 18 | 7.32 | 7.83 | 8.91 | 10.59 | 12.84 | 64 | n/a | 48.87 | 48.01 | 56.51 | 56.51 |
| 19 | 7.50 | 8.04 | 9.15 | 10.86 | 13.17 | 65 | n/a | 50.50 | 50.07 | 56.02 | 56.02 |
| 20 | 7.74 | 8.28 | 9.42 | 11.19 | 13.56 | 66 | n/a | 52.70 | 52.27 | 55.95 | 55.95 |
| 21 | 8.01 | 8.58 | 9.75 | 11.58 | 14.04 | 67 | n/a | 55.03 | 54.60 | 55.87 | 55.87 |
| 22 | 8.34 | 8.94 | 10.14 | 12.06 | 14.61 | 68 | n/a | 56.62 | 56.19 | 55.77 | 55.77 |
| 23 | 8.73 | 9.36 | 10.62 | 12.60 | 15.27 | 69 | n/a | 56.51 | 56.09 | 55.67 | 55.67 |
| 24 | 9.18 | 9.84 | 11.16 | 13.26 | 16.05 | 70 | n/a | 55.56 | 55.13 | 54.29 | 54.29 |
| 25 | 9.69 | 10.41 | 11.79 | 14.01 | 16.95 | 71 | n/a | 55.45 | 55.03 | 54.20 | 54.20 |
| 26 | 9.84 | 10.56 | 11.97 | 14.22 | 17.22 | 72 | n/a | 55.36 | 54.94 | 54.12 | 54.12 |
| 27 | 10.05 | 10.77 | 12.21 | 14.52 | 17.58 | 73 | n/a | 55.28 | 54.85 | 54.05 | 54.05 |
| 28 | 10.29 | 11.04 | 12.51 | 14.88 | 18.03 | 74 | n/a | 55.20 | 54.78 | 54.00 | 54.00 |
| 29 | 10.59 | 11.37 | 12.90 | 15.33 | 18.57 | 75 | n/a | 53.02 | 53.02 | 53.10 | 53.10 |
| 30 | 10.98 | 11.76 | 13.35 | 15.87 | 19.23 | 76 | n/a | 52.94 | 52.94 | 53.04 | 53.04 |
| 31 | 11.43 | 12.24 | 13.89 | 16.53 | 20.01 | 77 | n/a | 52.85 | 52.85 | 52.97 | 52.97 |
| 32 | 11.97 | 12.81 | 14.52 | 17.28 | 20.94 | 78 | n/a | 52.75 | 52.75 | 52.89 | 52.89 |
| 33 | 12.57 | 13.47 | 15.27 | 18.18 | 22.02 | 79 | n/a | 52.65 | 52.65 | 52.80 | 52.80 |
| 34 | 13.29 | 14.22 | 16.14 | 19.20 | 22.60 | 80 | n/a | 48.37 | 48.37 | 48.52 | 48.52 |
| 35 | 14.25 | 15.30 | 17.31 | 20.52 | 23.01 | 81 | n/a | n/a | 48.29 | n/a | 48.44 |
| 36 | 14.46 | 15.54 | 17.58 | 20.88 | 23.61 | 82 | n/a | n/a | 48.23 | n/a | 48.38 |
| 37 | 14.76 | 15.84 | 17.94 | 21.39 | 24.26 | 83 | n/a | n/a | 48.18 | n/a | 48.36 |
| 38 | 15.12 | 16.23 | 18.39 | 22.05 | 24.94 | 84 | n/a | n/a | 48.15 | n/a | 48.34 |
| 39 | 15.57 | 16.71 | 18.96 | 22.86 | 25.65 | 85 | n/a | n/a | 48.11 | n/a | 48.32 |
| 40 | 16.11 | 17.31 | 19.65 | 23.85 | 26.40 | | | | | | |
| 41 | 16.77 | 18.03 | 20.46 | 25.02 | 27.20 | | | | | | |
| 42 | 17.55 | 18.87 | 21.39 | 26.40 | 28.03 | | | | | | |
| 43 | 18.45 | 19.83 | 22.50 | 28.02 | 28.92 | | | | | | |
| 44 | 19.50 | 20.94 | 23.76 | 29.85 | 29.85 | | | | | | |
| 45 | 21.27 | 22.86 | 25.43 | 30.84 | 30.84 | | | | | | |
| 46 | 21.60 | 23.22 | 26.18 | 31.88 | 31.88 | | | | | | |
| 47 | 22.05 | 23.70 | 26.98 | 32.98 | 32.98 | | | | | | |
| 48 | 22.65 | 24.33 | 27.82 | 34.13 | 34.13 | | | | | | |
| 49 | 23.37 | 25.11 | 28.70 | 35.33 | 35.33 | | | | | | |
| 50 | 24.24 | 26.04 | 29.45 | 36.43 | 36.43 | | | | | | |
| 51 | 25.29 | 27.15 | 30.43 | 37.76 | 37.76 | | | | | | |
| 52 | 26.52 | 28.47 | 31.44 | 39.14 | 39.14 | | | | | | |
| 53 | 27.96 | 30.00 | 32.52 | 40.59 | 40.59 | | | | | | |
| 54 | 29.61 | 31.77 | 33.64 | 42.11 | 42.11 | | | | | | |
| 55 | 33.24 | 34.83 | 34.40 | 43.26 | 43.26 | | | | | | |
| 56 | 33.78 | 35.91 | 35.64 | 44.92 | 44.92 | | | | | | |
| 57 | 34.53 | 36.72 | 36.96 | 46.67 | 46.67 | | | | | | |
| 58 | 35.49 | 37.74 | 38.34 | 48.50 | 48.50 | | | | | | |
| 59 | 36.69 | 39.00 | 39.79 | 50.41 | 50.41 | | | | | | |
| 60 | 38.13 | 40.53 | 40.89 | 51.99 | 51.99 | | | | | | |
| 61 | n/a | 42.36 | 42.52 | 54.12 | 54.12 | | | | | | |
| 62 | n/a | 44.52 | 44.24 | 56.36 | 56.36 | | | | | | |
| 63 | n/a | 46.93 | 46.07 | 56.56 | 56.56 | | | | | | |

UL0610GA

This page intentionally left blank.

Pohl/LBL 000718

# Surrender Charge Percentages

**Female Preferred Elite**

| Age | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 | Year 13 | Year 14 | Year 15 | Year 16 | Year 17 | Year 18 | Year 19 | Year 20+ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 18-45 | 100 | 100 | 100 | 100 | 100 | 93 | 86 | 80 | 73 | 66 | 60 | 53 | 46 | 40 | 33 | 26 | 20 | 13 | 6 | 0 |
| 46-54 | 100 | 100 | 100 | 100 | 100 | 93 | 86 | 80 | 73 | 66 | 60 | 53 | 46 | 40 | 33 | 26 | 20 | 13 | 6 | 0 |
| 55-60 | 100 | 100 | 100 | 99 | 97 | 93 | 86 | 80 | 73 | 66 | 60 | 53 | 46 | 40 | 33 | 26 | 20 | 13 | 6 | 0 |

**Female Preferred Non-Smoker**

| Age | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 | Year 13 | Year 14 | Year 15 | Year 16 | Year 17 | Year 18 | Year 19 | Year 20+ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 18-45 | 100 | 100 | 100 | 100 | 100 | 93 | 86 | 80 | 73 | 66 | 60 | 53 | 46 | 40 | 33 | 26 | 20 | 13 | 6 | 0 |
| 46-54 | 100 | 100 | 100 | 100 | 98 | 93 | 86 | 80 | 73 | 66 | 60 | 53 | 46 | 40 | 33 | 26 | 20 | 13 | 6 | 0 |
| 55-64 | 100 | 97 | 95 | 92 | 89 | 87 | 84 | 80 | 73 | 66 | 60 | 53 | 46 | 40 | 33 | 26 | 20 | 13 | 6 | 0 |
| 65-73 | 100 | 95 | 91 | 86 | 82 | 78 | 74 | 70 | 66 | 62 | 58 | 53 | 46 | 40 | 33 | 26 | 20 | 13 | 6 | 0 |
| 74-80 | 100 | 94 | 88 | 83 | 78 | 74 | 69 | 65 | 61 | 57 | 53 | 49 | 44 | 40 | 34 | 28 | 21 | 15 | 9 | 0 |

**Female Standard Non-Smoker**

| Age | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 | Year 13 | Year 14 | Year 15 | Year 16 | Year 17 | Year 18 | Year 19 | Year 20+ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 18-24 | 100 | 100 | 100 | 100 | 100 | 93 | 86 | 80 | 73 | 66 | 60 | 53 | 46 | 40 | 33 | 26 | 20 | 13 | 6 | 0 |
| 25-34 | 100 | 100 | 100 | 100 | 100 | 93 | 86 | 80 | 73 | 66 | 60 | 53 | 46 | 40 | 33 | 26 | 20 | 13 | 6 | 0 |
| 35-45 | 100 | 98 | 97 | 96 | 94 | 93 | 86 | 80 | 73 | 66 | 60 | 53 | 46 | 40 | 33 | 26 | 20 | 13 | 6 | 0 |
| 46-54 | 100 | 98 | 96 | 94 | 92 | 90 | 86 | 80 | 73 | 66 | 60 | 53 | 46 | 40 | 33 | 26 | 20 | 13 | 6 | 0 |
| 55-64 | 100 | 96 | 93 | 90 | 87 | 84 | 81 | 77 | 74 | 67 | 60 | 53 | 47 | 40 | 33 | 26 | 20 | 13 | 6 | 0 |
| 65-75 | 100 | 95 | 90 | 85 | 81 | 76 | 72 | 68 | 64 | 60 | 57 | 53 | 50 | 47 | 40 | 32 | 24 | 16 | 8 | 0 |
| 76-80 | 100 | 94 | 88 | 83 | 78 | 74 | 69 | 65 | 61 | 57 | 53 | 49 | 44 | 40 | 34 | 28 | 21 | 15 | 9 | 0 |
| 81-85 | 100 | 93 | 88 | 82 | 77 | 71 | 66 | 60 | 54 | 47 | 41 | 34 | 27 | 21 | 17 | 13 | 8 | 4 | 0 | |

**Female Preferred Smoker**

| Age | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 | Year 13 | Year 14 | Year 15 | Year 16 | Year 17 | Year 18 | Year 19 | Year 20+ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 18-25 | 100 | 100 | 100 | 100 | 100 | 93 | 86 | 80 | 73 | 66 | 60 | 53 | 46 | 40 | 33 | 26 | 20 | 13 | 6 | 0 |
| 26-35 | 100 | 100 | 100 | 100 | 100 | 93 | 86 | 80 | 73 | 66 | 60 | 53 | 46 | 40 | 33 | 26 | 20 | 13 | 6 | 0 |
| 36-45 | 100 | 98 | 96 | 94 | 93 | 91 | 86 | 80 | 73 | 66 | 60 | 53 | 46 | 40 | 33 | 26 | 20 | 13 | 6 | 0 |
| 46-54 | 100 | 97 | 95 | 93 | 91 | 89 | 87 | 82 | 75 | 68 | 61 | 54 | 48 | 41 | 34 | 27 | 20 | 13 | 6 | 0 |
| 55-64 | 100 | 96 | 93 | 90 | 87 | 84 | 81 | 77 | 74 | 71 | 68 | 63 | 55 | 47 | 39 | 31 | 23 | 15 | 7 | 0 |
| 65-74 | 100 | 95 | 91 | 86 | 82 | 78 | 74 | 70 | 66 | 63 | 59 | 56 | 53 | 50 | 42 | 34 | 24 | 16 | 9 | 0 |
| 75-80 | 100 | 94 | 89 | 84 | 79 | 75 | 71 | 67 | 63 | 59 | 55 | 51 | 46 | 42 | 35 | 29 | 22 | 16 | 9 | 0 |

**Female Standard Smoker**

| Age | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 | Year 13 | Year 14 | Year 15 | Year 16 | Year 17 | Year 18 | Year 19 | Year 20+ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 18-25 | 100 | 100 | 100 | 100 | 100 | 93 | 86 | 80 | 73 | 66 | 60 | 53 | 46 | 40 | 33 | 26 | 20 | 13 | 6 | 0 |
| 26-35 | 100 | 98 | 97 | 96 | 95 | 93 | 86 | 80 | 73 | 66 | 60 | 53 | 46 | 40 | 33 | 26 | 20 | 13 | 6 | 0 |
| 36-44 | 100 | 98 | 96 | 95 | 93 | 92 | 90 | 83 | 76 | 69 | 62 | 55 | 48 | 41 | 34 | 27 | 20 | 13 | 6 | 0 |
| 45-54 | 100 | 97 | 95 | 93 | 91 | 89 | 87 | 84 | 82 | 80 | 73 | 65 | 57 | 49 | 41 | 32 | 24 | 16 | 8 | 0 |
| 55-64 | 100 | 96 | 93 | 90 | 87 | 84 | 81 | 77 | 74 | 71 | 68 | 65 | 62 | 55 | 46 | 37 | 27 | 18 | 9 | 0 |
| 65-74 | 100 | 95 | 91 | 86 | 82 | 78 | 74 | 70 | 66 | 63 | 59 | 55 | 51 | 46 | 42 | 34 | 25 | 17 | 9 | 0 |
| 75-80 | 100 | 94 | 89 | 84 | 79 | 75 | 71 | 67 | 63 | 59 | 55 | 51 | 46 | 42 | 35 | 29 | 22 | 16 | 9 | 0 |
| 81-85 | 100 | 94 | 88 | 83 | 78 | 73 | 67 | 61 | 55 | 49 | 42 | 34 | 28 | 22 | 18 | 13 | 9 | 4 | 0 | |

UL0610GA

This page intentionally left blank.

Pohl/LBL 000720

## Table of Guaranteed Values

| End of Year | Annual Planned Premium | Policy Value | Surrender Value | Death Benefit |
|---|---|---|---|---|
| 1 | $265,538 | $46,427 | $0 | $9,000,000 |
| 2 | 265,538 | 78,267 | 0 | 9,000,000 |
| 3 | 265,538 | 93,341 | 0 | 9,000,000 |
| 4 | 265,538 | 88,808 | 0 | 9,000,000 |
| 5 | 265,538 | 61,537 | 0 | 9,000,000 |
| 6 | 265,538 | 7,850 | 0 | 9,000,000 |
| 7 | 265,538 | 0 | 0 | 9,000,000 |
| 8 | 265,538 | 0 | 0 | 9,000,000 |
| 9 | 265,538 | 0 | 0 | 9,000,000 |
| 10 | 265,538 | 0 | 0 | 9,000,000 |
| 11 | 265,538 | 0 | 0 | 9,000,000 |
| 12 | 265,538 | 0 | 0 | 9,000,000 |
| 13 | 265,538 | 0 | 0 | 9,000,000 |
| 14 | 265,538 | 0 | 0 | 9,000,000 |
| 15 | 265,538 | 0 | 0 | 9,000,000 |
| 16 | 265,538 | 0 | 0 | 9,000,000 |
| 17 | 265,538 | 0 | 0 | 9,000,000 |
| 18 | 265,538 | 0 | 0 | 9,000,000 |
| 19 | 265,538 | 0 | 0 | 9,000,000 |
| 20 | 265,538 | 0 | 0 | 9,000,000 |
| Age 100 | 265,538 | 0 | 0 | 9,000,000 |
| Age 121 | 265,538 | 0 | 0 | 9,000,000 |

The values above are calculated assuming payment of Annual Planned Premiums (as shown above), the benefits shown on page 3 at time of issue, the guaranteed cost of insurance, the maximum charges for these benefits and the minimum guaranteed interest rate.

In the first five policy years, if a guaranteed death benefit is shown above and the surrender value indicates zero, the policy is in force as provided by the Safety Net Premium provision of your policy. In any other policy year in which the guaranteed death benefit is shown above and the surrender value indicates zero, the policy is in force as provided by the Coverage Protection Rider. See the Coverage Protection Rider for details.

*UL0610GA*

This page intentionally left blank.

Pohl/LBL 000722

## Guaranteed Maximum Monthly Cost of Insurance

| Policy Year | Rate Per $1000 | Policy Year | Rate Per $1000 |
|---|---|---|---|
| 1 | 1.60917 | | |
| 2 | 1.76417 | | |
| 3 | 1.93333 | | |
| 4 | 2.12083 | | |
| 5 | 2.32667 | | |
| 6 | 2.55250 | | |
| 7 | 2.80250 | | |
| 8 | 3.07500 | | |
| 9 | 3.37417 | | |
| 10 | 3.74583 | | |
| 11 | 4.20250 | | |
| 12 | 4.68583 | | |
| 13 | 5.19333 | | |
| 14 | 5.75917 | | |
| 15 | 6.33250 | | |
| 16 | 7.01000 | | |
| 17 | 7.84667 | | |
| 18 | 8.72917 | | |
| 19 | 9.60750 | | |
| 20 | 10.25417 | | |
| 21 | 10.87250 | | |
| 22 | 11.89750 | | |
| 23 | 13.28667 | | |
| 24 | 15.01667 | | |
| 25 | 16.89917 | | |
| 26 | 18.75333 | | |
| 27 | 19.95667 | | |
| 28 | 20.61000 | | |
| 29 | 21.96583 | | |
| 30 | 23.72833 | | |
| 31 | 25.64333 | | |
| 32 | 27.75333 | | |
| 33 | 30.05833 | | |
| 34 | 32.57083 | | |
| 35 | 35.22583 | | |
| 36 | 37.94333 | | |
| 37 | 40.70583 | | |
| 38 | 43.51583 | | |
| 39 | 46.41917 | | |
| 40 | 49.32917 | | |
| 41 | 52.13417 | | |
| 42 | 54.81333 | | |
| 43 | 57.56500 | | |
| 44 | 61.00417 | | |
| 45 | 64.27833 | | |
| 46 | 67.69583 | | |
| 47 | 71.32500 | | |
| 48 | 74.71500 | | |
| 49 | 78.25500 | | |
| 50 | 83.33333 | | |

*UL0610GA*

This page intentionally left blank.

Pohl/LBL 000724

**Coverage Protection Rider**
**Coverage Protection Account (CPA) Rates and Charges**

The CPA is a reference account for determining whether the benefit provided by this rider is in effect.   The CPA does not represent an amount available to you and has no impact on the policy value or surrender value of your policy.

**CPA Expense Charges:**

| | |
|---|---|
| CPA Premium Expense Charge | 12.00% |
| Monthly CPA Policy Fee | $5.00 |

**Annual CPA Interest Crediting Rates:**

| | |
|---|---|
| CPA Base Interest Rate | 5.01% |
| CPA Bonus Interest Rate | 7.74% |
| CPA Tier Interest Rate | 5.97% |
| CPA Interest on Loaned Values Rate | 4.00% |
| CPA Tiered Threshold Per $1000 of Face Amount | $19.78 |

*UL0610GA*

This page intentionally left blank.

Pohl/LBL 000726

**Coverage Protection Rider**
**Guaranteed Monthly Cost of Insurance**

| Policy Year | Rate Per $1000 | Policy Year | Rate Per $1000 |
|---|---|---|---|
| 01 | 0.33356 | | |
| 02 | 0.40180 | | |
| 03 | 0.45323 | | |
| 04 | 0.53726 | | |
| 05 | 0.65540 | | |
| 06 | 0.80716 | | |
| 07 | 0.99406 | | |
| 08 | 1.21711 | | |
| 09 | 1.47683 | | |
| 10 | 1.77372 | | |
| 11 | 2.10779 | | |
| 12 | 2.48005 | | |
| 13 | 2.89254 | | |
| 14 | 3.19758 | | |
| 15 | 3.51841 | | |
| 16 | 3.88762 | | |
| 17 | 4.28432 | | |
| 18 | 4.72177 | | |
| 19 | 5.19232 | | |
| 20 | 5.70818 | | |
| 21 | 6.27447 | | |
| 22 | 6.89830 | | |
| 23 | 7.58935 | | |
| 24 | 8.35017 | | |
| 25 | 9.18280 | | |
| 26 | 11.46016 | | |
| 27 | 12.19552 | | |
| 28 | 12.59477 | | |
| 29 | 13.42332 | | |
| 30 | 14.50038 | | |
| 31 | 15.67064 | | |
| 32 | 16.96006 | | |
| 33 | 18.36865 | | |
| 34 | 19.90403 | | |
| 35 | 21.52650 | | |
| 36 | 23.18717 | | |
| 37 | 24.87533 | | |
| 38 | 26.59252 | | |
| 39 | 28.36675 | | |
| 40 | 30.14506 | | |
| 41 | 31.85919 | | |
| 42 | 33.49643 | | |
| 43 | 35.17797 | | |
| 44 | 37.27965 | | |
| 45 | 39.28049 | | |
| 46 | 41.36892 | | |
| 47 | 43.58671 | | |
| 48 | 45.65834 | | |
| 49 | 47.82163 | | |
| 50 | 50.92500 | | |

*UL0610GA*

This page intentionally left blank.

Pohl/LBL 000728

# Definitions

When these words are used in this policy, they have the meaning stated:

**Application** - The application which was signed by you requesting this policy.

**Company (we, us, our)** - Lincoln Benefit Life Company.

**Face Amount** - The initial death benefit, shown on the Policy Data pages, adjusted for any changes in accordance with the terms of this policy.

**In Force** - The coverage provided by this policy is in effect.

**Increase Age** - The age of the insured as of the effective date of an increase in face amount, determined by the insured's last birthday.

**Insured** - The person whose life is covered by this policy as shown on the Policy Data pages.

**Issue Age** - The age of the insured at the time this policy was issued (issue date) determined by this insured's last birthday.

**Issue Date** - The date the policy is issued, as shown on the Policy Data pages. It is used to determine policy years and policy months in the policy.

**Minimum Initial Payment** - The minimum payment which must be paid to issue the policy.

**Monthly-Automatic Payment** - A method of making payments each month automatically; for example, by bank draft or salary deduction.

**Monthly Activity Day** - The day of the month on which deductions are made. This date is shown on the Policy Data pages. If a month does not have that day, the deduction will be made on the last day of that month.

**Net Premium** - The premium paid less the premium expense charge.

**Net Surrender Value** - The amount you would receive upon surrender of this policy, equal to the surrender value less any policy debt.

**Payment Class** - The class into which the insured is placed, determined by our guidelines for providing insurance coverage.

**Policy Anniversary** - The same day and month as your issue date for each subsequent year your policy remains in force.

**Policy Data** - The pages of this policy which identify specific information about the insured and the benefits.

**Policy Debt** - The sum of all unpaid policy loans and accrued interest.

**Policy Month** - A one month period beginning on the same day of the month as the issue date of the policy.

**Policy Year** - A twelve month period beginning on a policy anniversary.

**Rider** - An additional benefit we are providing.

UL0610GA

**Surrender Value -** The policy value less any applicable surrender charges.

**You, Your -** The person(s) having the rights of ownership defined in the policy.

## Death Benefit

If the insured dies while this policy is in force, we will pay the death benefit when we have received due proof of death, subject to the terms and conditions of this policy. The death benefit will be reduced by any outstanding policy debt.

### Death Benefit Option

While the insured is alive you may choose between two death benefit options:

If you select Option 1, the death benefit will be the greater of:

    a.    The face amount on the date of death; or

    b.    The percentage of the policy value shown in the Compliance with Federal Laws provision.

If you select Option 2, the death benefit will be the greater of:

    a.    The face amount plus the policy value on the date of death; or

    b.    The percentage of the policy value shown in the Compliance with Federal Laws provision.

The initial death benefit option selected by you is stated in the application. If no death benefit option is selected at the time of application, the death benefit option will be Option 1.

### Change of Death Benefit Option

At any time after the first policy year, you may request to change the death benefit option by writing to us. If you ask to change from Option 2 to Option 1, the face amount will be increased by the amount of the policy value. If you ask to change from Option 1 to Option 2, the face amount will be decreased by the amount of the policy value.

The change will take effect on the monthly activity day after the date we receive the written request. We will provide to you an endorsement showing the actual start date of the death benefit option change and the new face amount. We reserve the right to limit the frequency of the death benefit option changes made under this policy.

If this policy is in force on the policy anniversary following the insured's 100th birthday and Option 2 has been selected, the death benefit option will change to Option 1.

### Change of Face Amount

At any time after the first policy year, you may request either of the following changes by writing us. The change will take effect on the monthly activity day after the date we approve the request:

1.    Increasing the face amount. You must submit a new application for an increase in face amount. We will require due proof that the insured is still insurable. An increase will take effect on the monthly activity day after the date we approve the increase. We reserve the right to limit the amount of any increases made under this policy. The minimum increase amount is $10,000. An increase is not allowed after the maximum issue age. The face amount may not be increased more than once in any 12 month period.

2.   Decreasing the face amount.  A decrease will take effect on the monthly activity day after the date we approve the request.  A decrease in face amount will first be applied against the most recent increase successively and finally to the initial face amount.  The face amount in effect after any decrease must be at least $100,000 for attained ages 18-60, and $50,000 for all other attained ages.

## Beneficiary

Subject to the terms and conditions of this policy, the beneficiary will receive the death benefit when the insured dies and we have received due proof of death.  The beneficiary is as stated in the application unless changed.

The two classes of beneficiaries are primary beneficiaries and contingent beneficiaries.  Primary and contingent beneficiaries are individually and collectively referred to in this policy as "beneficiaries."  The beneficiaries will receive the death benefit in the following order:

1.   Primary beneficiary

2.   Contingent beneficiary.

The primary beneficiary is the beneficiary(ies) who is first entitled to receive benefits under this policy upon the death of the insured.  In order to receive the death benefit, the beneficiary must be living on the earlier of:

1.   The day we receive due proof of the insured's death, or

2.   The 15th day past the insured's death.

If the beneficiary does not survive the insured in accordance with these requirements, we will pay the death benefit as if the beneficiary were not living when the insured dies.  If none of the named beneficiaries are living when the insured dies, the death benefit will be paid to you, if living, otherwise to your estate.

We will pay the death benefit to the beneficiaries according to the most recent written instructions we have accepted from you.  We will pay the death benefit in equal shares to the named beneficiaries in the same class who are to share the funds if we do not receive any written instructions.  If there is more than one beneficiary in a class and one of the beneficiaries predeceases the insured, the death benefit will be paid in equal shares to the surviving beneficiaries in that class.

You may change or add beneficiaries during the insured's lifetime by written request in a form satisfactory to us, unless you have designated an irrevocable beneficiary.  You must file the request with us.  Upon acceptance, the change will take effect on the date you signed the request, subject to any action we have taken before we accepted the change.

If you name one or more irrevocable beneficiaries, no change in the beneficiaries and no changes which affect policy values may be made without their consent.  Inadvertent acceptance by us of beneficiary changes not consented to by the irrevocable beneficiaries shall not change the irrevocable beneficiaries.

No beneficiary has any rights in this policy until the insured dies.

## Ownership

The insured is the owner if no other person is named in the application as owner.  The owner controls the policy during the lifetime of the insured.  Unless you provide otherwise, as owner, you may exercise all rights granted by the policy without the consent of anyone else.  If the last named owner dies before the insured, then any contingent owner is the new owner.  If no owner named in this policy is living, then the owner will be the estate of the last named owner.

You may name a new owner by written request in a form satisfactory to us.  We may establish a limit on the maximum number of owners.  You must file the request with us. Upon acceptance, it is effective as of the date you signed the request, subject to any action we have taken before we accepted it.

**Assignment**

You may assign this policy or an interest in it to another. You must do so in writing and file the assignment with us. No assignment is binding on us until we accept it. When we accept it, your rights and those of the beneficiary will be subject to the assignment. We are not responsible for the validity of any assignment you make.

# Premium Payment

### Payments

Premiums for this policy are referred to as payments. The planned payment and minimum initial payment are shown on the Policy Data pages.

Payments are flexible. This means you may change the amount of planned payments and the time between payments. This policy will not be in force before the first payment is received and all underwriting requirements have been completed.

We will send you a reminder notice if you pay annually, semi-annually or quarterly. You may also make a monthly-automatic payment.

Payments are payable to us. The amount you pay will affect the policy value. If you pay too little, the policy will lapse subject to the grace period.

### Grace Period

Except as provided in the Safety Net Premium provision below, if on any monthly activity day the net surrender value is less than the monthly deduction for the current policy month, you will be given a grace period of 61 days. This policy will be in force during the grace period. If you do not make sufficient payment by the end of the grace period, the policy will lapse. If the insured dies during the grace period, we will deduct any due and unpaid monthly deductions and policy debt owed from the death benefit.

We will send a written notice to the most recent address we have for you at least 30 days prior to the day coverage lapses.

### Safety Net Premium

If total payments, less any partial withdrawals and policy debt, are greater than or equal to the monthly safety net premium multiplied by the number of months elapsed since the issue date, then the policy is guaranteed to stay in force for five years, even if the net surrender value becomes insufficient to cover monthly deductions.

If at any time the total payments, less any partial withdrawals and policy debt, are less than the monthly safety net premium multiplied by the number of months elapsed, the policy will continue in force only so long as its net surrender value is sufficient to pay the monthly deductions and for any corresponding grace period.

Increases, decreases, partial withdrawals, death benefit option changes, policy loans, and additions or deletions of benefit riders, may affect the monthly safety net premium.

### Reinstatement

If this policy terminates prior to the death of the insured and if this policy has not been surrendered, this policy may be reinstated provided you:

1.   Make your request within five years of the date the policy entered the grace period;

2.   Give us the proof we require that the insured is still insurable in the same payment class that the policy was issued;

3.   Make a payment sufficient to cover the unpaid monthly deductions for the grace period, and to keep the policy in force for three policy months from the date of reinstatement; and

4.   Pay or ask us to reinstate any policy debt as described in the Loan Interest provision.

The policy value on the reinstatement date will reflect the policy value at the time of termination and payments applied at the time of reinstatement. The policy debt on the reinstatement date will equal the policy debt at the time of termination. Surrender charges will continue to be based on the original policy date.

The effective date of reinstatement will be the date we approve the request for reinstatement. When this policy is reinstated, a new two year contestable period will apply with respect to statements made in the application for reinstatement. The contestable period is explained in the Incontestability provision of this policy.

## Policy Value

The policy value is an accumulation with interest of premiums paid less charges and withdrawals. Interest is credited to the policy value daily. Charges, other than the premium expense charge, are deducted on monthly activity days.

The issue date is the first monthly activity day. The policy value on the issue date is equal to the net premium received on that date. On each monthly activity day after the issue date, the policy value is:

1.   The policy value as of the prior monthly activity day, minus

2.   The monthly deduction for the prior policy month, plus

3.   One month's interest on item 1 minus item 2 above, plus

4.   Net premiums received since the prior monthly activity day with interest, minus

5.   Partial withdrawals taken since the prior monthly activity day with interest.

On any other day after issue that is not a monthly activity day, the policy value is a daily accumulation with interest of the prior monthly activity day's policy value, less the monthly deduction for the current month, plus net premiums, less withdrawals.

### Interest Rate

Interest is credited daily. The guaranteed minimum interest rate used to compute policy values is shown on the Policy Data pages. The guaranteed minimum interest rate is an effective annual rate compounded daily. We may credit an interest rate greater than the minimum stated. During policy years 15 and later, in any period in which the current interest rate exceeds the guaranteed minimum interest rate, the policy will receive an additional 0.50% annual interest.

### Premium Expense Charge

Upon receipt of each payment, we will deduct a premium expense charge. This charge, shown on the Policy Data pages, is a percentage of the premium received.

### Administrative Expense Charge

The monthly administrative expense charge is equal to the administrative expense charge rate shown on the Policy Data pages for the appropriate policy year, multiplied by the initial face amount, divided by 1000. The applicable charge varies by issue age, sex and payment class of the insured.

*UL0610GA*

A monthly administrative expense charge will also be assessed for each increase in face amount for the first six policy years following the effective date of each increase. The applicable charge is equal to the amount of increase multiplied by a rate that varies based on the attained age, sex and payment class of the insured, divided by 1000. The applicable charge will be stated on the endorsement sent to you when your policy's face amount is increased.

## Monthly Deductions

The monthly deduction is the sum of:

1.  A monthly policy fee, not to exceed the maximum monthly policy fee shown on the Policy Data pages;

2.  The monthly administrative expense charge;

3.  The monthly cost of insurance for the policy; and

4.  The monthly cost of any riders attached to the policy.

The monthly deduction is zero on and following the policy anniversary following the insured's attained age 121.

## Cost of Insurance

The cost of insurance is determined as follows:

1.  Divide the death benefit as of the prior monthly activity day by 1.0032737.

2.  Subtract the policy value as of the prior monthly activity day.

3.  Multiply the result by the current cost of insurance rate divided by 1000. The cost of insurance rate is based on multiple factors, including, but not limited to, the insured's sex, issue age, policy year, payment class and face amount. We may change the cost of insurance rates for any reason at any time, but they will never be more than the guaranteed maximum rates shown on the Policy Data pages.

The cost of insurance charge is zero on and following the policy anniversary following the insured's attained age 121.

## Surrender Value

The net surrender value of this policy is the amount we will pay you if you ask us to terminate this policy. It is equal to the policy value less the surrender charge less any policy debt. If the surrender charge is greater than the policy value, the surrender value is zero. We may defer the payment of the net surrender value for up to six months after your request.

## Surrender Charge

The maximum surrender charges we will assess, based on the face amount at issue, are shown on the Policy Data pages. An additional surrender charge will apply to an elective increase in face amount. From the effective date of the increase, the new additional surrender charge will continue for nineteen years or to the anniversary following the insured's 100th birthday, if sooner. The additional surrender charge on an increase is calculated as follows:

1.  The surrender charge factor, multiplied by

2.  The increase in face amount divided by 1,000, multiplied by

3.  The surrender charge percentage.

The surrender charge factor and surrender charge percentage, shown in the tables on the Policy Data pages, vary by sex, increase payment class and increase age.

### Continuation of Coverage

If you stop making payments, this policy and any riders will remain in effect as long as the net surrender value covers the monthly deductions or the policy is still in force as defined in the Safety Net Premium provision. This provision does not continue any riders beyond their scheduled termination dates.

### Partial Withdrawal

You may request a partial withdrawal of your net surrender value by writing to us. Partial withdrawals are not allowed after the policy anniversary following the insured's attained age 121. The partial withdrawal service fee, as shown on the Policy Data pages, will be assessed on each partial withdrawal.

The policy value will be reduced by the amount of any partial withdrawal and the partial withdrawal service fee. If your policy has Death Benefit Option 1, the face amount will also be reduced by the amount of any partial withdrawal. The minimum partial withdrawal amount is $250 and the maximum partial withdrawal amount may not reduce the net surrender value below $500.

We may defer the payment of any partial withdrawal for up to six months after your request. We will continue to credit interest during this time.

### Basis of Values

Minimum surrender values are based on the 2001 CSO Mortality Table, age last birthday, male or female, smoker or nonsmoker, as applicable. The minimums are not less than those required by the state in which the application is signed. The surrender value at all times reflects the payments which you have made and the time elapsed in the policy year.

## Loans

You may have a loan if you assign this policy to us as sole security. Policy debt on this policy has priority over the claims of any other person. Any new loan that you request, when added to any outstanding policy debt, may not decrease the net surrender value to an amount less than $500.

If your policy debt exceeds the surrender value, this policy will terminate except as provided in the Grace Period provision. We must mail a notice to you at least 30 days before the policy terminates.

We reserve the right to defer the payment of any loan for six months after your request, unless the loan is to pay a premium to us.

### Loan Interest

The annual loan interest rate is shown on the Policy Data pages. Interest on policy loans accrues daily and is due at the end of each policy year. Any interest not paid when due becomes part of the policy loan and will bear interest at the rates described in this provision. The amount of the policy value equal to the policy loan will be credited interest at the annual rate shown on the Policy Data pages, regardless of the rate credited to the unloaned policy value.

### Loan Repayment

As long as the policy remains in force, the policy debt may be repaid in whole or in part without penalty at any time while the insured is living. If you do not repay the policy debt, we will deduct the policy debt from the amounts we pay pursuant to the terms of this policy.

# Other Terms of Your Policy

**Our Contract With You**

This policy, including any endorsements and riders, and the signed application are your entire contract with us. We issued it based upon your application and the payment made by you. A copy of the application is included.

We will not use any statements, except those made in the application to challenge any claim or to void any liability under this policy. The statements made in the application will be treated as representations and not as warranties.

Only our officers have authority to change this policy. No agent may do this. Any change must be written.

**When Protection Starts**

The issue date is the date when this policy becomes effective if the insured is then living, all underwriting requirements have been completed, and the first payment has been made.

**Termination**

This policy will terminate upon the earliest of the following events:

1.   Surrender of the policy; or

2.   End of the grace period; or

3.   Death of the insured.

**Misstatement of Age or Sex**

If the insured's age or sex shown on the application has been misstated, we will adjust the death benefit to the amount which the most recent cost of insurance charge made would have purchased at the correct age and sex.

**Incontestability**

We will not contest this policy after it has been in force during the lifetime of the insured for two years from the issue date unless one of the following exceptions occurs:

1.   Any increase in face amount:  This contestable period with respect to the increase amount will be measured during the lifetime of the insured for two years from the effective date of the increase.

2.   Reinstatement of this policy or any riders:  This contestable period will be measured during the lifetime of the insured for two years from the reinstatement date.

3.   An attached or subsequently issued rider has a separate incontestability provision.  This contestable period will be measured in accordance with the incontestability provision provided in the rider.

We may contest this policy at any time for the failure to make sufficient payments to cover the monthly deductions required to keep this policy and its riders in force.

### Suicide or Self-Destruction

If the insured dies by suicide while sane or by intentional self-destruction while insane within two years from the issue date of the policy:

1.   We will only pay an amount equal to the payments made less any policy debt and partial withdrawals; and

2.   The policy will terminate.

If the insured dies by suicide while sane or by intentional self-destruction while insane within two years of the effective date of any increase in face amount, our liability with respect to the increase will be limited to the cost of insurance for the increase.

### Annual Report

Each year we will send you an annual report following the policy anniversary. Each report will provide information on various transactions that took place during the policy year just completed, as well as information on the current status of the policy. This information will include items such as:

1.   The policy value as of the end of the current and prior year.

2.   Payments and withdrawals made during the year.

3.   The monthly deductions and expense charges made during the year.

4.   Interest credited to the policy value during the year.

5.   The current death benefit.

6.   The current surrender value.

7.   The amount of policy debt.

### Policy Projections

You may request an additional policy projection of values report at any time during the policy year. We may charge you for this extra report, not to exceed $25. We will inform you of the current charge before sending the report.

### Conformity With State Law

This policy is subject to the laws of the state where the application was signed. If any part of the policy does not comply with the law, we will consider that part of the policy modified to comply with applicable state law.

### Nonparticipating

This policy does not share in our profits or surplus earnings. We will pay no dividends on this policy.

### Compliance With Federal Laws

The two requirements below are intended to maintain the status of this policy as life insurance under the current Internal Revenue Code:

First, the amount of payments that you may pay is limited by law. We will conduct a test no less frequently than annually, and return any excess payments, with interest, within 60 days of the end of the policy year in which the excess payments were paid.

Second, the death benefit payable may not be less than the applicable percentage of your policy value. This percentage is based on the attained age as shown in the table below:

| Attained Age | Applicable Percentage | Attained Age | Applicable Percentage |
|---|---|---|---|
| 0 to 40 | 250 | 61 | 128 |
| 41 | 243 | 62 | 126 |
| 42 | 236 | 63 | 124 |
| 43 | 229 | 64 | 122 |
| 44 | 222 | 65 | 120 |
| 45 | 215 | 66 | 119 |
| 46 | 209 | 67 | 118 |
| 47 | 203 | 68 | 117 |
| 48 | 197 | 69 | 116 |
| 49 | 191 | 70 | 115 |
| 50 | 185 | 71 | 113 |
| 51 | 178 | 72 | 111 |
| 52 | 171 | 73 | 109 |
| 53 | 164 | 74 | 107 |
| 54 | 157 | 75 to 90 | 105 |
| 55 | 150 | 91 | 104 |
| 56 | 146 | 92 | 103 |
| 57 | 142 | 93 | 102 |
| 58 | 138 | 94 to 99 | 101 |
| 59 | 134 | 100 and above | 100 |
| 60 | 130 | | |

We will conduct a test monthly and increase the death benefit, subject to our then current underwriting limits, to be equal to the applicable percentage of your policy value, if necessary. If we cannot increase the death benefit due to underwriting limits, we will return that amount of payments necessary so that the death benefit will be equal to the applicable percentage of your policy value after returning the amount.

If it is necessary for us to return payments to you under the preceding paragraph, we will return them within 60 days of the end of the policy year in which they were paid.

We reserve the right to amend the policy to comply with:

1.  Requirements of the Internal Revenue Code;

2.  Any regulations or rulings issued under the Internal Revenue Code; and

3.  Any other requirements imposed by the Internal Revenue Service.

We will give you a copy of any such amendment.

Settlement

The net death benefit, or the net surrender value in the event you withdraw it, will be paid in one sum or applied to any settlement option we then provide. The one sum payment may be paid by a single payment or to a Secure Access account, if available. When we pay the proceeds, we may ask that this policy be returned to us. No surrenders or partial withdrawals are permitted after payments under a settlement option have started.

Settlement options will include:

1.  We will pay a selected monthly income until the proceeds, with interest, are exhausted.

2.  We will pay a monthly income, based upon the amount of proceeds, interest rate and the age and sex of the person or persons receiving the funds, for a selected period or the lifetime of the person or persons to whom the funds are being paid.

We guarantee that the rate of interest will not be less than 2%. We may pay interest in excess of the guaranteed rate. We will issue a supplementary contract setting forth the benefits to be paid and the rights of the beneficiary. Each election must include at least $5,000 of policy proceeds and must result in installment payments of not less than $50.

The tables shown below contain the guaranteed monthly payment per $1,000 of policy proceeds applied, which were calculated using the Annuity 2000 Mortality Tables and an annualized effective interest rate of 2%. For ages, guaranteed payment periods, combinations of sex, payment frequencies and annualized effective interest rates not shown in these examples, payment factors will be calculated on a basis consistent with the factors shown. The adjusted age of the beneficiary is used to determine the appropriate monthly payment factor to apply for the selected settlement option. The adjusted age is the actual age of the beneficiary(ies) on the settlement date, subtracted by two, reduced by one year for each six full calendar years between January 1, 2000 and the settlement date.

Life Income with Guaranteed Payment Period:

| Beneficiary's Adjusted Age | Monthly Installment | | | | | |
| | 10 Year Certain | | 15 Year Certain | | 20 Year Certain | |
| | Male | Female | Male | Female | Male | Female |
|---|---|---|---|---|---|---|
| 55 | $3.86 | $3.58 | $3.80 | $3.55 | $3.70 | $3.49 |
| 56 | 3.95 | 3.65 | 3.88 | 3.62 | 3.77 | 3.56 |
| 57 | 4.04 | 3.73 | 3.96 | 3.69 | 3.84 | 3.62 |
| 58 | 4.13 | 3.82 | 4.04 | 3.77 | 3.90 | 3.69 |
| 59 | 4.23 | 3.90 | 4.13 | 3.85 | 3.97 | 3.76 |
| 60 | 4.34 | 4.00 | 4.22 | 3.93 | 4.04 | 3.83 |
| 61 | 4.45 | 4.09 | 4.31 | 4.02 | 4.11 | 3.90 |
| 62 | 4.56 | 4.20 | 4.41 | 4.11 | 4.18 | 3.98 |
| 63 | 4.69 | 4.31 | 4.51 | 4.21 | 4.25 | 4.05 |
| 64 | 4.82 | 4.42 | 4.61 | 4.31 | 4.31 | 4.13 |
| 65 | 4.95 | 4.54 | 4.71 | 4.41 | 4.38 | 4.20 |
| 66 | 5.09 | 4.67 | 4.81 | 4.52 | 4.45 | 4.28 |
| 67 | 5.24 | 4.80 | 4.92 | 4.63 | 4.51 | 4.35 |
| 68 | 5.39 | 4.95 | 5.03 | 4.74 | 4.57 | 4.42 |
| 69 | 5.54 | 5.10 | 5.13 | 4.85 | 4.62 | 4.49 |
| 70 | 5.71 | 5.26 | 5.24 | 4.97 | 4.68 | 4.56 |
| 71 | 5.87 | 5.42 | 5.34 | 5.09 | 4.73 | 4.62 |
| 72 | 6.04 | 5.60 | 5.44 | 5.20 | 4.77 | 4.68 |
| 73 | 6.22 | 5.78 | 5.54 | 5.32 | 4.81 | 4.74 |
| 74 | 6.39 | 5.96 | 5.63 | 5.43 | 4.85 | 4.79 |
| 75 | 6.57 | 6.16 | 5.72 | 5.54 | 4.88 | 4.83 |
| 76 | 6.75 | 6.36 | 5.80 | 5.65 | 4.91 | 4.87 |
| 77 | 6.93 | 6.56 | 5.88 | 5.75 | 4.94 | 4.90 |
| 78 | 7.11 | 6.77 | 5.96 | 5.84 | 4.96 | 4.93 |
| 79 | 7.29 | 6.97 | 6.02 | 5.92 | 4.98 | 4.95 |
| 80 | 7.46 | 7.17 | 6.08 | 6.00 | 4.99 | 4.97 |
| 81 | 7.63 | 7.37 | 6.14 | 6.07 | 5.00 | 4.99 |
| 82 | 7.79 | 7.57 | 6.18 | 6.13 | 5.01 | 5.00 |
| 83 | 7.95 | 7.75 | 6.23 | 6.18 | 5.02 | 5.01 |
| 84 | 8.09 | 7.93 | 6.26 | 6.23 | 5.03 | 5.02 |
| 85 | 8.23 | 8.09 | 6.29 | 6.27 | 5.03 | 5.03 |
| 86 | 8.35 | 8.24 | 6.32 | 6.30 | 5.04 | 5.03 |
| 87 | 8.47 | 8.37 | 6.34 | 6.33 | 5.04 | 5.04 |
| 88 | 8.57 | 8.49 | 6.36 | 6.35 | 5.04 | 5.04 |
| 89 | 8.67 | 8.60 | 6.38 | 6.37 | 5.04 | 5.04 |
| 90 | 8.76 | 8.70 | 6.39 | 6.38 | 5.04 | 5.04 |

UL0610GA

Guaranteed Payment Period:

| No. of Years | Monthly Payment | No. of Years | Monthly Payment |
|---|---|---|---|
| 1 | $84.09 | 11 | $8.42 |
| 2 | 42.46 | 12 | 7.80 |
| 3 | 28.59 | 13 | 7.26 |
| 4 | 21.65 | 14 | 6.81 |
| 5 | 17.49 | 15 | 6.42 |
| 6 | 14.72 | 16 | 6.07 |
| 7 | 12.74 | 17 | 5.77 |
| 8 | 11.25 | 18 | 5.50 |
| 9 | 10.10 | 19 | 5.26 |
| 10 | 9.18 | 20 | 5.04 |

# LINCOLN BENEFIT LIFE COMPANY

## Coverage Protection Rider

### General

This rider is made a part of the policy and becomes effective on the policy issue date. This rider is subject to all terms and conditions of the policy, except as provided in this rider. There is no charge for this rider.

### Benefit

The benefit provided by this rider begins in the sixth policy year. During the first five policy years, protection from lapse due to insufficient policy value is provided by the Safety Net Premium provision of your policy.

Beginning in the sixth policy year, the policy will not lapse as long as the coverage protection account (CPA) value, less policy debt, is greater than zero, even if the net surrender value under the policy is less than the monthly deduction for the current policy month.

If the CPA value, less policy debt, is not greater than zero, this rider does not terminate, but the benefits provided by this rider will not be available at that time. If additional payments result in a positive CPA value, the benefits provided by this rider will be available.

The policy will enter the grace period as described in the policy if the CPA value, less policy debt, is not greater than zero and the net surrender value under the policy is less than the monthly deduction for the current policy month.

### Coverage Protection Account (CPA) Value

The CPA value is a reference value for determining whether the benefit provided by this rider is in effect. The CPA value does not represent an amount available to you and has no impact on the policy value or surrender value of your policy. All interest rates and charges used to determine CPA values are determined on the issue date and are not subject to change on the initial death benefit.

The CPA value on the issue date is equal to the payments received minus the CPA premium expense charge and minus the CPA monthly deduction for the first policy month. The CPA premium expense charge is shown on the Policy Data pages.

On any monthly activity day after the issue date, the CPA value is:

1. The CPA value on the prior monthly activity day, plus

2. Interest on item 1 above, calculated using the interest rates shown on the Policy Data pages, plus

3. Payments received since the prior monthly activity day, less the CPA premium expense charge, minus

4. Partial withdrawals taken since the prior monthly activity day, minus

5. The CPA monthly deduction for the current month.

### CPA Monthly Deduction

The CPA monthly deduction is the sum of:

1. A monthly CPA policy fee shown on the Policy Data pages;

2. The monthly CPA cost of insurance; and

3. The monthly CPA cost of riders.

*UL0611*

**Monthly CPA Cost of Insurance**

The monthly CPA cost of insurance is determined as follows:

1.    Divide the CPA death benefit as of the monthly activity day by 1.0032737.

2.    Subtract the CPA value as of the monthly activity day, prior to the CPA monthly deduction.

3.    Multiply the result of item 1 and item 2 above, or zero if greater, by the monthly CPA cost of insurance rate, divided by 1000.

The monthly CPA cost of insurance rate is based on the insured's sex, issue age, policy year, payment class and face amount. These rates are shown on the Policy Data pages. A new set of CPA cost of insurance rates will apply to any future increases in face amount under the policy.

**CPA Death Benefit**

The CPA death benefit is a reference value only. It is used to determine the monthly CPA cost of insurance, but does not change the amount payable upon the death of the insured.

If the death benefit option, as described in the Death Benefit provision of the policy, is currently option 1, the CPA death benefit is equal to the greater of:

1.    The current face amount of the policy, and

2.    The CPA value on the monthly activity day, prior to the CPA monthly deduction.

If the death benefit option is currently option 2, the CPA death benefit is equal to the face amount of the policy plus the CPA value on the monthly activity day, prior to the CPA monthly deduction.

**Interest Credited on CPA**

The interest rate applied to unloaned CPA values will be as follows:

The CPA base interest rate shown on the Policy Data pages will apply in policy years 1 through 9.

Beginning in policy year 10, the CPA bonus interest rate shown on the Policy Data pages will apply to all or a portion of the unloaned CPA value. In the interest calculation each month, the CPA value will be grouped into one of two tiers. Unloaned CPA values below the CPA tier threshold will receive the CPA bonus interest rate. Unloaned CPA values in excess of the CPA tier threshold will receive the CPA tier interest rate shown on the Policy Data pages.

The CPA tier threshold in any period will equal:

1.    The CPA tier threshold per $1000 of face amount shown on the Policy Data pages,

2.    Multiplied by the face amount divided by 1000, and

3.    Multiplied by the policy year.

Beginning on policy year 25, all unloaned CPA values will be credited with the CPA bonus interest rate.

In all policy years, loaned values will be credited with the CPA interest on loaned values rate shown on the Policy Data pages.

**Effects of an Accelerated Death Benefit on CPA Value**

If an accelerated death benefit claim is paid in accordance with the terms of any attached rider, the policy's death benefit and policy value are reduced proportionally. Therefore, the CPA death benefit and CPA value will also be proportionally reduced after any accelerated death benefit claim is paid, and these CPA values will be calculated according to the methods described in this rider using the reduced amounts.

**Termination**

This rider will terminate when the policy is terminated. If the policy terminates according to the terms of the Grace Period provision of the policy, this rider may be reinstated at the time the policy is reinstated, subject to conditions in the Reinstatement provision of the policy. The CPA value at the time of reinstatement will reflect the CPA value at the time of termination and premiums applied at the time of reinstatement. Any unpaid CPA charges that were incurred during the grace period will be deducted from the CPA value.

**Coverage After Age 121**

If the CPA value on the policy anniversary following the insured's attained age 121, less policy debt, is greater than zero, the death benefit provided by the policy is guaranteed to remain in effect for the remainder of the insured's lifetime, as long as the death benefit exceeds the policy debt. The amount payable upon death will be reduced by any outstanding policy debt.

Michael J. Velotta
Secretary

Lawrence W. Dahl
President

Pohl/LBL 000744

# Lincoln Benefit Life Company

## Amendatory Endorsement

### NOTICE

The laws of the State of Georgia prohibit insurers from unfairly discriminating against any person based upon his or her status as a victim of family violence.

*[signature]*

Lawrence W. Dahl
President

*SA-8271*

Pohl/LBL 000745

This page intentionally left blank.

Pohl/LBL 000746

**LINCOLN BENEFIT LIFE COMPANY**
A Member of Allstate Financial Group
P.O. Box 80469, Lincoln, Nebraska 68501

PART I - APPLICATION FOR LIFE INSURANCE

## Section A – PRIMARY PROPOSED INSURED

| | | | | Birthdate (M/D/Y) | Height and Weight |
|---|---|---|---|---|---|
| 1. Name (First, Middle, Last) | | | | 06/11/1936 | 5 Ft. 1 In. 125 Lbs. |
| Phyllis Pohl | | | | | Social Security No. |
| Age | Sex | Birth State | Marital Status | Driver's License #/State | 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 |
| 71 | F | NY | M | P400660367110/FL | |

| Home Address | City | State | Zip | How Long? |
|---|---|---|---|---|
| 10510 Laurel Estates Lane | Lakeworth | FL | 33467 | 10+ |

| 2. Employer Name | Home Phone | Work Phone |
|---|---|---|
| N/A | | |

| Employer Address | City | State | Zip | How Long? |
|---|---|---|---|---|
| N/A | | | | |

| Occupation and Job Duties | Annual Income |
|---|---|
| N/A | $ |

3. Tobacco or nicotine products currently used:  ☒ None  ☐ Cigarettes  Packs/day____  ☐ Other____

Used in past 3 years other than above?  ☒ No  ☐ Yes-Type?____  When Quit?____

| 4. (a) Primary Beneficiary(ies)** | | | Address | | |
|---|---|---|---|---|---|
| Phyllis Pohl Irrevocable Trust | | | 110 Olgethorpe Ave East - PO Box 786 | | |
| Relationship | Age | SSN/Tax ID # | City | State | Zip |
| Trust | 6/6/07 | 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 | Savannah | GA | 31401 |

| (b) Contingent Beneficiary(ies)** | | | Address | | |
|---|---|---|---|---|---|
| Relationship | Age | SSN/Tax ID # | City | State | Zip |

**Surviving beneficiaries in the same class (primary or contingent) share equally unless otherwise stated.

## Section B – ADDITIONAL OR JOINT INSURED  (If more than one, submit additional copies of Section B.)

| | | | | Birthdate (M/D/Y) | Height and Weight |
|---|---|---|---|---|---|
| 1. Name (First, Middle, Last) | | | | | Ft. In. Lbs. |
| Age | Sex | Birth State | Marital Status | Driver's License #/State | Social Security No. |

| Home Address | City | State | Zip | How Long? |
|---|---|---|---|---|

| 2. Employer Name | Home Phone | Work Phone |
|---|---|---|

| Employer Address | City | State | Zip | How Long? |
|---|---|---|---|---|

| Occupation and Job Duties | Annual Income |
|---|---|
| | $ |

3. Tobacco or nicotine products currently used:  ☐ None  ☐ Cigarettes  Packs/day____  ☐ Other____

Used in past 3 years other than above?  ☐ No  ☐ Yes-Type?____  When Quit?____

| 4. (a) Primary Beneficiary(ies)** | | | Address | | |
|---|---|---|---|---|---|
| Relationship | Age | SSN/Tax ID # | City | State | Zip |

| (b) Contingent Beneficiary(ies)** | | | Address | | |
|---|---|---|---|---|---|
| Relationship | Age | SSN/Tax ID # | City | State | Zip |

**Surviving beneficiaries in the same class (primary or contingent) share
equally unless otherwise stated.

LA 2000

Pohl/LBL 000747

## Section C – CHILDREN PROPOSED FOR COVERAGE UNDER CPR
(Must be Insured's children, adopted children, or stepchildren age 17 or less)

| 1. Name (First, Middle, Last) | Birthdate (M/D/Y) | Age | Sex |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

## Section D – OWNER IF OTHER THAN THE FIRST NAMED INSURED

| 1. Owner Name (if other than Primary Insured) | Relationship | Home Phone |
|---|---|---|
| Phyllis Pohl Irrevocable Trust | Trust |  |

| Address | City | State | Zip | SSN/Tax ID # |
|---|---|---|---|---|
| 110 Olgethorpe Ave East PO Box 786 | Savannah | GA | 31401 | 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 |

2. ☐ Joint Owner**    ☐ Contingent Owner**    Relationship _____    Home Phone _____

| Address | City | State | Zip | SSN/Tax ID # |
|---|---|---|---|---|
|  |  |  |  |  |

**Check only one. Joint owners have right of survivorship. Contingent owner succeeds to ownership if Primary Owner dies.

## Section E – THE POLICY

| 1. Plan of Insurance | 2. Face Amount | 3. Planned Premium | 4. Death Benefit Option: |
|---|---|---|---|
| Legacy Secure | $ 9,000,000.00 | $ 68,384.55 | ☒1  ☐2 |

5. Premium Mode:  ☐ Single  ☐ Annual  ☐ Semiannual  ☒ Quarterly Direct  ☐ Quarterly BOM  ☐ Monthly BOM

6. Optional Coverage:

☐ Accidental Death Benefit on (Name) _____    ☐ WP or COP $ _____

☐ CPR - ☐ 1 Unit ($5,000)   ☐ 2 Units ($10,000)   ☐ Other: _____

☐ PTR $ _____   ☐ AIR $ _____   on (Name) _____

## Section F – OTHER INSURANCE / REPLACEMENT INFORMATION

| 1. Does anyone proposed for this insurance now have any life insurance or annuity: | Yes | No |
|---|---|---|
| a.  In force or application(s) pending in any company? | ☐ | ☒ |
| b.  which will be replaced, changed or borrowed against because of this application?  *(Circle applicable policy numbers.)* | ☐ | ☒ |
| c.  which will be part of a 1035 exchange because of this application?  *(Do not 1035 exchange an annuity to life insurance.)* | ☐ | ☒ |

If a, b, or c is answered "Yes," give details below and submit appropriate replacement and/or 1035 exchange form(s) and policy illustrations.

| Person Covered |  | | Person Covered |  | |
|---|---|---|---|---|---|
| Company Name |  | | Company Name |  | |
| Face Amt. | ADB Amt. | Date Applied (M/D/Y) | Face Amt. | ADB Amt. | Date Applied (M/D/Y) |
| Policy Number | Plan Type | | Policy Number | Plan Type | |
| Person Covered |  | | Person Covered |  | |
| Company Name |  | | Company Name |  | |
| Face Amt. | ADB Amt. | Date Applied (M/D/Y) | Face Amt. | ADB Amt. | Date Applied (M/D/Y) |
| Policy Number | Plan Type | | Policy Number | Plan Type | |

LA 2000

Pohl/LBL 000748

## Section G – NONMEDICAL DATA AND TEMPORARY INSURANCE QUALIFIERS

1. In the past 3 years has anyone proposed for insurance:    Explain any "yes" answers in Details section on Page 4.

|  |  | Yes | No |
|---|---|---|---|
| a. | had 3 or more traffic tickets, been arrested for driving under the influence of drugs or alcohol, or had their driver's license suspended or revoked? | ☐ | ☒ |
| b. | flown as pilot or crew member of any aircraft? | ☐ | ☒ |
| c. | engaged in sky or scuba diving, vehicle racing or mountain climbing? | ☐ | ☒ |

2. Has anyone proposed for insurance EVER had an application for life insurance declined, postponed, rated or modified?  ☐  ☒

3. Are there any proposed insureds who have lived in the U.S. less than 3 years, plan to travel outside the U.S. in the next 2 years or are not U.S. citizens?  ☐  ☒

4. In the past 10 years, has anyone proposed for insurance:

|  |  | Yes | No |
|---|---|---|---|
| a. | been charged with a felony? | ☐ | ☒ |
| b. | used, or been arrested for possession, sale or delivery of, illegal drugs? | ☐ | ☒ |
| c. | sought or received treatment or advice for use of cocaine, heroin, narcotics, hallucinogens or other mind altering substances not prescribed by a physician? | ☐ | ☒ |
| d. | sought or received treatment or advice for coronary artery disease, stroke, AIDS (Acquired Immune Deficiency Syndrome), or been told they have had any of these disorders? | ☐ | ☒ |
| e. | been treated for or diagnosed with cancer other than basal cell skin cancer? | ☐ | ☒ |

Do not submit payment with application if any of questions 4(a) through 4(e) are answered "yes" or not answered.

## Section H – HEALTH AND MEDICAL HISTORY

All questions apply to all proposed insureds including children proposed for coverage under CPR. Circle applicable conditions. Explain any "yes" answers in Details section on Page 4.

1. Has anyone proposed for insurance EVER been treated for, had any sign or symptom of, or been told that he/she had:

| | | Yes | No |
|---|---|---|---|
| a. | High blood pressure or any disorder of heart or blood vessels? | ☐ | ☒ |
| b. | cancer or tumor? | ☐ | ☒ |
| c. | dependency on or addiction to alcohol or any drug? | ☐ | ☒ |

2. In the past 10 years, has anyone proposed for insurance been treated for, had any sign or symptom of, or been told that he/she had:

| | | Yes | No |
|---|---|---|---|
| a. | epilepsy or seizures, disorder of brain or nervous system, mental or nervous disorder? | ☐ | ☒ |
| b. | diabetes, thyroid or glandular disorder? | ☐ | ☒ |
| c. | asthma, emphysema or other lung disorder? | ☐ | ☒ |
| d. | any disorder of digestive tract, liver or pancreas? | ☐ | ☒ |
| e. | anemia or other disorder of blood or blood cells? | ☐ | ☒ |

2. Continued

| | | Yes | No |
|---|---|---|---|
| f. | disorder of kidneys, bladder or reproductive organs? | ☒ | ☐ |
| g. | arthritis or disorder of bones, skin or muscle? | ☐ | ☒ |

3. Other than above, in the past 5 years, has anyone proposed for insurance:

| | | Yes | No |
|---|---|---|---|
| a. | had a checkup, consultation, hospitalization, illness, surgery, or medical or diagnostic test? | ☒ | ☐ |
| b. | been advised to have a medical consultation, diagnostic test, or surgery which has not been done? | ☐ | ☒ |

4. Other than above, is anyone proposed for insurance currently taking any prescription medication?  ☒  ☐

5. Does anyone proposed for insurance have a family history of heart disorder or cancer beginning before age 60 in any natural parent or sibling? (If "Yes," complete table below.)  ☒  ☐

| Relative | Disorder | Age at Onset | Age at Death | Age if Living |
|---|---|---|---|---|
| Father | Heart Attack | 48 | 48 | |

6. Primary Physician (Name, First and Last)    Date last seen    Reason                         Result
Dr. Simmins  SIMONS

| Address | City | State | Zip | Phone Number |
|---|---|---|---|---|
| 5401 S Congress Ave | Atlantis | FL | 33462 | |

LA 2000                                                                                          Page 3

Pohl/LBL 000749

DETAILS of "Yes" answers in Sections G and H.

| Ques. # | Date | Proposed Insured | Symptoms, Diagnosis, Treatment | Physician/Facility Name, Address and Phone |
|---------|------|------------------|-------------------------------|--------------------------------------------|
| 2f. | | Hysterectomy – bladder & Colon Issues from surgery. | | |

**REMARKS**

AGENT REMARKS / ADDITIONAL INFORMATION

FOR HOME OFFICE ENDORSEMENTS ONLY
If office corrections have been made, they may be found on the page immediately following the application.

LA 2000

Page 4

Pohl/LBL 000750

## SUPPLEMENTAL OTHER INSURANCE / REPLACEMENT INFORMATION

| Person Covered | | | Person Covered | | |
|---|---|---|---|---|---|
| Company Name | | | Company Name | | |
| Face Amt. | ADB Amt. | Date Applied (M/D/Y) | Face Amt. | ADB Amt. | Date Applied (M/D/Y) |
| Policy Number | Plan Type | | Policy Number | Plan Type | |

## SUPPLEMENTAL BENEFICIARY INFORMATION

| (c) Primary Beneficiary(ies)** | | | Address | | |
|---|---|---|---|---|---|
| Relationship | Age | SSN/Tax ID # | City | State | Zip |
| (a) Primary Beneficiary(ies)** | | | Address | | |
| Relationship | Age | SSN/Tax ID # | City | State | Zip |
| (b) Contingent Beneficiary(ies)** | | | Address | | |
| Relationship | Age | SSN/Tax ID # | City | State | Zip |
| (b) Contingent Beneficiary(ies)** | | | Address | | |
| Relationship | Age | SSN/Tax ID # | City | State | Zip |

## SUPPLEMENTAL MEDICAL DETAILS

LA 2000

Page 5

Pohl/LBL 000751

## FRAUD WARNINGS

For Applicants in Arkansas, District of Columbia, Kentucky, Louisiana, Ohio, and Pennsylvania: Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

For Applicants in Colorado: It is unlawful to knowingly provide false, incomplete or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the Company. Penalties may include imprisonment, fines, denial of insurance, or civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policy holder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado division of insurance within the department of regulatory agencies.

## PERMIT TO OBTAIN AND DISCLOSE CERTAIN DATA

A. Lincoln Benefit Life Company, its reinsurers, and consumer reporting agencies may get data about my (our) health, occupation, mode of living (except as may be related directly or indirectly to sexual orientation), avocations and any other non-medical information. I understand that the information obtained by use of this authorization will be used to determine eligibility for insurance and/or benefits, or for Lincoln Benefit Life Company to determine its obligations under the policy issued in connection with this application.

B. Any doctor, practitioner, medical or medically related facility, the Veterans Administration, the Medical Information Bureau, Inc. (MIB, Inc.), viatical settlement company, employer, consumer reporting agency, insurance company or any other person or entity which has such data about me or my children may give such data to Lincoln Benefit Life Company when this permit or a copy of it is shown. All sources but the MIB, Inc., may give such data to agencies Lincoln Benefit Life Company has hired to retrieve the information.

C. Any request by Lincoln Benefit Life Company for medical records is on my behalf; the information must be provided within any requirements imposed by applicable state statutes governing patient access to medical records.

D. Data about mental illness, alcoholism, sexually transmitted diseases, and the use of drugs are to be included.

E. Lincoln Benefit Life Company or its reinsurers may make a brief report about me or my children to the MIB, Inc.

F. This permit is good for 30 months after it is signed.

G. Lincoln Benefit Life Company may obtain an investigative consumer report ("inspection report") on me.

☐ I want to be interviewed if such a report is obtained.

H. I have read this permit and know I may request a copy of it. I also have received the NOTICE REGARDING MIB, INC., NOTICE UNDER THE FAIR CREDIT REPORTING ACT and INSURANCE INFORMATION PRACTICES.

## DECLARATIONS

A. I (each undersigned) declare that all answers written on this application are full and correct to the best of my knowledge and belief. Except in Maine, Missouri, Oregon, and South Carolina, Lincoln Benefit Life Company is not presumed to know any information not in this application.

B. Lincoln Benefit Life Company may add to or correct the Application in the space "For Home Office Endorsements Only" on an addendum page immediately following the application. Any changes are agreed to if the policy issued is accepted by me (us), but written agreement will be obtained from me for any change in insurance amount, plan, benefits, payment class or age at issue. (In West Virginia and Pennsylvania, written consent will be obtained for any changes.)

C. Insurance will start only as provided in the Receipt and Temporary Insurance Agreement issued in connection with this application. If no receipt is issued, or if insurance under it has stopped and not started again, no insurance will start by reason of the application until the policy is delivered and the first payment is accepted by Lincoln Benefit Life Company. In this case, the insurance will start when the policy is delivered and the first premium paid in full. No insurance will start if at that time the health of all proposed insureds is not as described in the application.

D. I acknowledge that I have read and understand this application, including the notices regarding the Fair Credit Reporting Act, MIB, and Insurance Information Practices. I acknowledge receipt of those notices.

E. Only an officer of Lincoln Benefit Life Company may change this application or waive a right or requirement. No agent may do this.

ALL QUESTIONS WERE ASKED OF ME AND, IF APPLICABLE, THE ADDITIONAL/JOINT INSURED AND PARENT(S) OF ANY CHILDREN LISTED ON THIS APPLICATION. I (WE) HAVE READ ALL INFORMATION BEFORE SIGNING.

_Savannah, LA_ _____ _12-21-07_ x _Phyllis Pohl_

SIGNED AT (City, State)    DATE (M/D/Y)    SIGNATURE OF PRIMARY PROPOSED INSURED

_____    x _____

SIGNATURE OF AGENT    SIGNATURE OF ADDITIONAL/JOINT INSURED

x _____    x _____

SIGNATURE OF OWNER    SIGNATURE OF PARENT (if ANY insured under age 16)

x _____

TITLE IF OWNER IS A BUSINESS OR OTHER ORGANIZATION

LA 2000    Page 6

06/24/2007  09:12  2017672661          HENRY FARAH                      PAGE  01

From: (816) 299-1901   To: Dr. Henry Farah   Page: 2/4   Date: 9/12/2003 1:21:09 PM

**PART II** **Continuation of Application to the Jefferson Pilot Financial Insurance Company or Jefferson Pilot Life Insurance Company (hereinafter referred to as "the Company")**

Proposed (First, Last, First, Middle Name): Pohl Phyllis    Birthdate: (Month/Day/Year) 6/11/80
Insured

1 a. Name and address of your personal physician?  Noel Siccal   914 962 3983
   b. Date and reason last consulted?
   c. What treatment was given or medication prescribed?

2. Have you ever had or been told by a medical professional to seek treatment for any of the following?   Yes  No    Details of "Yes" answers, identify question number, circle applicable items, include diagnoses, dates, duration, names and addresses, of all physicians and facilities.

   a. Disorder of eyes, ears, nose, mouth or throat, including sleep apnea? ☐ ☑
   b. Head, brain, spinal cord disorder, dizziness, fainting, convulsions, headache, paralysis, stroke, epilepsy, mental or nervous disorder? ☐ ☑
   c. Shortness of breath, persistent hoarseness or cough, asthma, congestive heart failure, bronchitis, pleurisy, emphysema, tuberculosis or chronic respiratory disorder? ☐ ☑
   d. Chest pain, palpitation, high blood pressure, rheumatic fever, heart attack, angina, myocardial infarction, murmur or other disorder of the heart or blood vessels? ☐ ☑
   e. Hepatitis, jaundice, intestinal bleeding, ulcer, colitis, diverticulitis, recurrent indigestion, or other disorder of the stomach or esophagus? ☐ ☑
   f. Sugar, protein, blood or pus in urine, sexually transmitted disease, stone or other disorder of kidney, bladder or prostate? ☐ ☑
   g. Diabetes, thyroid or other endocrine disorder? ☐ ☑
   h. Neuritis, arthritis, gout, or disorder of the muscles, bones, including the spine, back and joints, deformity, lameness or amputation or skin disorder? ☐ ☑
   i. Cancer, leukemia, removal of any organ, benign tumor, polyp or cyst? ☐ ☑
   j. Allergies, anemia, disorder of lymph glands, or other disorder of the blood? ☐ ☑
   k. Need for treatment because of alcohol or drug abuse? ☐ ☑
   l. Abnormalities, disease or disorder of the reproductive organs or breasts, menstruation or pregnancy? ☐ ☑

3. Have you ever been diagnosed by a medical professional as having AIDS Related Condition (ARC) or Acquired Immunodeficiency Syndrome (AIDS), or have you received treatment from a medical professional for AIDS or ARC? ☐
4. Are you now under observation or taking treatment, including prescription and/or nonprescription medication? ☐
5. Has your weight changed by more than 10 lbs. in the past year? ☐
6. Other than previously answered, have you in the past 5 years had any mental or physical disorder not listed above; had a checkup, consultation, illness, injury or surgery; been a patient in a hospital, clinic or other medical facility; had an electrocardiogram, x-ray or other diagnostic test or been advised to have any diagnostic test, hospitalization or surgery which was not completed? ☐
7. In the past three years, have you smoked a cigarette, cigar or pipe, chewed or used tobacco or nicotine in any form? If "Yes", form ___ last used on ___ (month), ___ year?
8. Have you ever requested or received a pension, benefits or payment, due to an injury, sickness or disability? ☐
9. Have you ever received a blood transfusion or been refused as a donor? ☐
10. Are you planning to seek medical advice or treatment for any reason? ☐
11. Family History: Tuberculosis; diabetes; cancer; high blood pressure; lung, bowel, heart or kidney disease; mental illness; alcoholism; or suicide? ☐

Details of Yes answers (right column handwriting):
6) Routine Physical
   William Simon
   9501 S. Congress Ave
   Atlantis FL 33462
2h) Irritable Bowel Dx
   Dr Oncol Brostitla
   Dr Pessiman    Atlanta FL
6) Mammogram + Bone Density
   Dr ___
   Westchester ___
   12 Green Rage Rd
   White Plains NY 10605
6) ___
   Total Hysterectomy
   for Prolapse
   UK-2003
   2001 Greenwich Hosp
   Greenwich CT
   Dr Siccal ___
11) ___
   Mother had Melanoma ___
   age 45

| Parents | Age if Alive | Age at Death | Cause of Death | Siblings | Age if Alive | Age at Death | Cause of Death |
|---------|--------------|--------------|----------------|----------|--------------|--------------|----------------|
| Father  | 47           |              | MVA            | Brothers |              |              |                |
| Mother  | 55           |              | Pneumonia      | Sisters  | 76           |              |                |

The answers to the above questions are to the best of my knowledge and belief complete, true and correct (as I, the Proposed Insured, give them. For the purpose of underwriting this Application for Life Insurance, I authorize, ___ the Examiner as named below, to complete the attached medical examination and provide it and all records or knowledge of the Proposed Insured's health (including but not limited to treatment records, medical files, etc.) to the Company, their licensed representatives and/or their reinsurers to determine eligibility for insurance, or to administer my coverage. The Company may not give this information to any person or entity except: 1) a reinsurer or other reinsurers to whom I have applied or may apply; 2) MIB; or 3) any other person or entity who performs business or legal services in connection with the administration of my insurance coverage. I understand that some of these people or entities may not be covered by federal or state privacy regulations and that the information they receive may be redisclosed. Information may be disclosed as allowed by law or regulation. I have revoked a Privacy Practices notice wherein I detail the method I must use to exercise my right to access, correct, and amend any information gathered about me or my children which relates to this examination. I understand that I can provide written revocation of this authorization to the Company at any time, except: 1) if the Company has taken action in reliance on this authorization; or 2) the Company is using the authorization in connection with a contestable claim under the policy. I agree that a copy of this authorization shall be as valid as the original and that this authorization shall be valid for 24 months from the date shown below. I may have a copy upon request.

City and state where signed: Rye NY    Date: 6/21/07    Signature of Proposed Insured (Parent or Guardian if under 14 years of age) Phyllis Pohl

Signature of Examiner: Dr Genel

Please contact Superior Mobile Medics if you have any questions 1-800-898-3926    Page 1 of 2

Pohl/LBL 000753

This page intentionally left blank.

Pohl/LBL 000754

## LINCOLN BENEFIT LIFE COMPANY

### Lincoln, Nebraska

### AMENDMENT OF APPLICATION

I (we) hereby amend my (our) application for Policy 01N1364514 as follows:

### VERIFICATION OF MEDICAL EXAM

In support of my (our) application for life insurance, I (we) have supplied to Lincoln Benefit Life Company a copy of the physical exam completed for

JEFFERSON PILOT FINANCIAL INSURANCE COMPANY                     _6/21/2007_
    (Company)                                                                       (Date)

I (we) do hereby verify and reaffirm the responses made by the person proposed for life insurance of such physical examination and declare that to the best of my (our) knowledge and belief there has been no change in the applicant's health since the date of such physical examination.

This amendment shall be part of the application for the above-numbered policy.

**CHANGES OR ALTERATIONS TO THIS FORM WILL NOT BE ACCEPTED.**

Signed at _____ Date_____,20___
          City       State              Month   Day   Year

Signature of Owner                          Signature of Insured

Signature of Joint Owner                    Signature of Joint/Additional Insured

**To the best of my knowledge and belief the above statements regarding the insured's health are full, complete, and true.**

_____
                Signature of Agent

*LBL 1522, Rev. 7/98*

Pohl/LBL 000755

This page intentionally left blank.

Pohl/LBL 000756

# LINCOLN BENEFIT LIFE COMPANY
### Lincoln, Nebraska
## AMENDMENT OF APPLICATION AND STATEMENT OF HEALTH

I (we) hereby amend my (our) application for Policy  01N1364514 as follows:

SEE MANUAL AMENDMENTS--DO NOT SIGN THIS ONE.

## STATEMENT OF HEALTH AND INSURABILITY

To the best of my (our) knowledge and belief, since the original application date, no person proposed for life insurance in this application:

1.  has made application for life insurance elsewhere;
2.  has consulted with or been examined or treated by a physician or practitioner; or
3.  has had any change in health and insurability as indicated in Parts I and II of the application or exam, whichever is later.

All answers and statements contained in Parts I and II of this application and any amendments thereof and supplements thereto are full, complete and true to the best of my (our) knowledge and belief as though they were given on this date.

If there are any exceptions to the above statements, give full details in the space provided. If any exceptions are given, the policy must not be placed in force or delivered. This signed form and policy must be immediately returned to the Home Office Underwriting Department.

EXCEPTIONS:

This amendment and statement of health shall be part of the application for the above-numbered policy. **CHANGES OR ALTERATIONS TO THIS FORM WILL NOT BE ACCEPTED.**

Signed at _____      Date_____
           (City)          (State)                (Month)      (Day)      (Yr.)

Signature of Owner
PHYLLIS POHL IRREV LIFE TRUST 6/6/07

Signature of Insured
PHYLLIS POHL

Signature of Joint Owner

Signature of Joint/Additional Insured

To the best of my knowledge and belief the above statements regarding the insured's health are full, complete, and true.

Signature of Agent
ERNEST ROSENDO MADERA

*LBL-1521, Rev. 7/98*

Pohl/LBL 000757

This page intentionally left blank.

Pohl/LBL 000758

Pohl/LBL 000759

## FLEXIBLE PREMIUM ADJUSTABLE LIFE INSURANCE POLICY

**Lincoln Benefit Life Company promises to pay the death benefit on death of the insured upon receipt of due proof of death of the insured, subject to the terms and conditions of this policy. Minimum initial payment is required to issue this policy. Premium payments are flexible for life. This policy does not pay dividends.**

Pohl/LBL 000760



U.S. Department of Justice

United States Attorney
District of New Hampshire

Federal Building                          603/225-1552
53 Pleasant Street, 4th Floor
Concord, New Hampshire 03301

April 30, 2012

Maria A. Barton, Esq.
Benton J. Campbell, Esq.
Barry M. Sabin, Esq.
Latham and Watkins LLP
885 Third Avenue
New York, New York 10022

      Re:  Imperial Holdings, Inc.

Dear Ms. Barton and Messrs. Campbell and Sabin:

      On the understandings specified below, the United States Attorney's Office for the District of New Hampshire (the "USAO") will not criminally prosecute Imperial Holdings, Inc. or any of its present or former subsidiaries or affiliates (collectively referred to as "Imperial" or the "Company") for any crimes (except for criminal tax violations, as to which the USAO does not make any agreement) related to the Company's involvement in making and agreeing to make, or aiding and abetting the making of, misrepresentations on life insurance applications in connection with its premium finance business from 2006 through 2011, including the specific conduct described in Appendix A hereto, and potential securities fraud claims related to the premium finance business.

      The USAO enters into this Non-Prosecution Agreement based, in part, on the following factors:  (a) Imperial's complete disclosure of the facts described in Appendix A; (b) Imperial's self-investigation and cooperation with the USAO to date; (c) Imperial's decision to voluntarily terminate its premium finance business; (d) the fact that Imperial employees who are known at this time to have been primarily responsible for the conduct described in Appendix A are no longer at the Company; (e) Imperial's acceptance of the resignation of a senior officer and termination of senior sales staff involved in the premium finance business; and (f) the negative impact and collateral consequences that charging the Company would have on the Company's employees and shareholders and other business activities that are not part of the USAO's investigation.

      It is understood that Imperial admits, and accepts and acknowledges responsibility for, the conduct set forth in Appendix A, and agrees not to make any public statement contradicting Appendix A, provided, however, that nothing in this paragraph precludes Imperial from taking good faith positions in any other contexts, including in any civil litigation or regulatory proceeding.

If Imperial fully complies with the understandings specified in this Non-Prosecution Agreement, the USAO will not bring any criminal case against Imperial based on the conduct of present and former officers, directors, employees, agents, and consultants, related to the Company's involvement in making and agreeing to make, or aiding and abetting the making of, misrepresentations on life insurance applications in connection with its premium finance business from 2006 through 2011, including the specific conduct described in Appendix A hereto, and potential securities fraud claims related to the premium finance business. This Agreement does not provide any protection against prosecution for any crimes except as set forth above, and applies only to Imperial and its present or former subsidiaries and affiliates and not to any other entities except as set forth in this Agreement or to any individuals. Imperial expressly understands that the protections provided under this Agreement shall not apply to any acquirer or successor entities unless and until such acquirer or successor formally adopts and executes this Agreement.

This Agreement shall have a term of three years from the date of this Agreement, except as specifically provided in the following paragraph. It is understood that for the three-year term of this Agreement, Imperial shall: (a) commit no U.S. crimes whatsoever; (b) truthfully and completely disclose non-privileged information with respect to the activities of Imperial, its officers and employees, and others concerning all matters about which the USAO inquires of it, which information can be used for any purpose, except as otherwise limited in this Agreement; (c) use best efforts to identify witnesses who, to Imperial's knowledge, possess material information regarding the matters covered by this Agreement, including all aspects of Imperial's premium financing business as identified in Appendix A, Paragraph 7; and (d) bring to the USAO's attention all criminal conduct by, or criminal investigations of, Imperial or any of its employees that comes to the attention of Imperial or its management, as well as any administrative proceeding or civil action brought by any U.S. or state governmental authority that alleges fraud by or against Imperial. Additionally, two years from the date of this Agreement, provided that it has otherwise complied with its obligations under this Agreement, Imperial may petition the USAO to forego the final year of the Agreement, subject to the provisions of the following paragraph.

Until the date upon which all investigations and prosecutions arising out of the conduct described in this Agreement are concluded, whether or not they are concluded within the three-year term of this Agreement, Imperial shall, with respect to these matters: (a) cooperate fully with the USAO, and any law enforcement agency designated by the USAO; (b) assist the USAO by providing logistical and technical support for any meeting, interview, grand jury proceeding, or any trial or other court proceeding; (c) use its best efforts promptly to secure the attendance and truthful statements or testimony of any officer, agent, or employee at any meeting or interview or before the grand jury or at any trial or other court proceeding; and (d) provide the USAO, upon request, all non-privileged information, documents, records, or other tangible evidence about which the USAO or any law enforcement agency designated by the USAO inquires, including facilitating USAO and law enforcement access to Imperial's non-privileged electronic data and email.

It is understood that, if the USAO in its sole discretion determines that Imperial has committed any crime after signing this Agreement, that Imperial has given false, incomplete, or

2

misleading testimony or information at any time, or that Imperial otherwise has violated any provision of this Agreement, Imperial shall thereafter be subject to prosecution for any violation of federal law of which the USAO has knowledge, including perjury and obstruction of justice.   Any such prosecution related to the facts set forth in Appendix A that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against Imperial, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the expiration of the term of this agreement if the term of the Agreement lasts three years or, if the USAO agrees to forego the last year of the term of the Agreement as discussed above, one year beyond the effective date of the USAO's decision.   Thus, by signing this Agreement, Imperial agrees that the statute of limitations with respect to any prosecution related to the facts set forth in Appendix A that is not time-barred on the date that this Agreement is signed shall be tolled for the term of three years from the date of this Agreement, as set out in this paragraph.

Upon execution of this Agreement, Imperial agrees to pay a monetary penalty of $8,000,000.00, in equal amounts to the Federal Bureau of Investigation, the United States Secret Service, and the United States Postal Inspection Service Consumer Fraud Fund, pursuant to instructions provided to Imperial by the USAO under separate cover, by April 30, 2012.   Imperial acknowledges that no tax deduction may be sought in connection with this payment.

It is understood that, if the USAO in its sole discretion determines that Imperial has committed any crime after signing this Agreement, or that Imperial has given false, incomplete, or misleading testimony, or has otherwise violated any provision of this Agreement:   (a) all statements made by Imperial to the USAO or other designated law enforcement agents and any testimony given by Imperial before a grand jury or other tribunal, whether prior or subsequent to the signing of this Agreement, and any leads from such statements or testimony, shall be admissible in evidence in any criminal proceeding brought against Imperial; and (b) Imperial shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, or any other federal rule that such statements or any leads therefrom should be suppressed.   By signing this Agreement, Imperial waives all rights in the foregoing respects.

It is further understood that this Agreement does not bind any federal, state, local, or foreign prosecuting authority other than the USAO.   The USAO will, however, bring the cooperation of Imperial to the attention of other prosecuting and investigative offices, if requested by Imperial.

It is further understood that Imperial and the USAO may disclose this Agreement to the public.

With respect to this matter, from the date of execution of this Agreement forward, this Agreement supersedes all prior, if any, understandings, promises, and/or conditions between the USAO and Imperial.   No additional promises, agreements, or conditions have been entered into other than those set forth in this Agreement and none will be entered into unless in writing and signed by all parties.

3

JOHN P. KACAVAS
United States Attorney

By:

Seth R. Aframe

By:

Arnold H. Huftalen
Assistant United States Attorneys
United States Attorney's Office
District of New Hampshire

AGREED AND CONSENTED TO:

Imperial Holdings, Inc.

By:

Michael Altschuler
General Counsel

APPROVED:

By:

Maria A. Barton

Benton J. Campbell

Barry M. Sabin
Attorneys for Imperial Holdings, Inc.

4

**APPENDIX A**

**STATEMENT OF FACTS**

This Statement of Facts is incorporated by reference as part of the Non-Prosecution

Agreement, dated April 30, 2012, between the United States Attorney's Office for the District of

New Hampshire ("USAO") and Imperial Holdings, Inc. or any of its present or former

subsidiaries or affiliates (collectively referred to as "Imperial").  The USAO and Imperial agree

that the following facts are true and correct:

      1.     Imperial is a specialty finance company headquartered in Boca Raton,

Florida and incorporated under Florida law.  In February 2011, Imperial held an initial

public offering and was listed on the New York Stock Exchange.

      2.     Prior to February 2011, Imperial was a private limited liability company

that was organized on November 29, 2006.  At that time, the company's primary business

activities involved providing premium financing for life insurance policies and,

beginning in 2007, purchasing structured settlements.  The senior representatives of

Imperial divided primary responsibility for running the premium financing and structured

settlement businesses.

      3.     With respect to the premium finance business, Imperial normally issued

loans for the purpose of paying premiums on universal life insurance policies.  Most

loans typically matured in approximately two (2) years from the loan date.  With few

exceptions, Imperial obtained funding for the loans from various credit facilities.

Between in or about December 2007 and December 2010, Imperial's lenders required

that it obtain lender protection insurance coverage for premium loans to ensure that the

credit facilities would be repaid in the event a loan defaulted.

4.      The stated terms of premium finance loans offered by Imperial typically required either a personal guaranty up to the full extent of the loan or a $5,000 cash contribution from the insured.  In addition the loan agreements provided that (1) the life insurance policy be held in an irrevocable life insurance trust, (2) a professional co-trustee be appointed and (3) the co-trustee be responsible for ensuring that premium payments were made from the proceeds of the loan.  At all times during the loan, the policy was owned by an irrevocable life insurance trust for beneficiaries, who were required to be family members of the insured.

5.      At loan maturity, the borrower had several options:  repay the loan and retain ownership of the policy; sell the policy in the secondary market and use the proceeds to pay off the loan; or default on the loan and relinquish ownership of the policy.  In the majority of loans, the borrower defaulted on the payment of the loan and relinquished ownership of the policy under the terms of the loan agreement.

6.      Pursuant to Imperial's business model, Imperial had the opportunity to make money at the beginning as well as the end of the loan transaction.  Life insurance carriers normally paid commissions to agents for placing life insurance policies.  As a condition to making premium finance loans on insurance policies, Imperial received agency fees that were calculated off of the commissions received by the life insurance agents who wrote the underlying policies.  At the end of the loan transaction, in the instances where a loan was repaid by the borrower, Imperial also was paid a substantial origination fee and interest on the loan in addition to the outstanding principal.

7.      Imperial financed premiums on life insurance policies that were submitted to the Company through three separate channels.  First, Imperial conducted seminars to

2

market life insurance policies and premium financing to individuals over 65 years old (referred to as the "retail seminar business"). Second, certain Imperial employees who were also licensed life insurance agents worked with external general agents and brokers to obtain life insurance for individuals over 65 years of age from various insurance carriers and premium financing from Imperial (referred to as the "retail non-seminar business"). Finally, Imperial financed premiums on life insurance policies that had been obtained by external agents and brokers (referred to as the "wholesale business").

8.     Imperial engaged in the wholesale business from 2006 through 2011. As part of this business, the Company financed premium finance loans for policies obtained by external agents and/or brokers who assisted prospective insureds in completing life insurance applications and submitting the applications to various life insurance companies.

9.     Imperial employees had direct contact with prospective insureds in the retail seminar and the retail non-seminar businesses and those Imperial employees who were also life agents were directly involved in making representations on behalf of the prospective insureds on applications for life insurance from the various carriers. The retail seminar business ended in or about May 2008 and the retail non-seminar business ended in or about January 2009.

10.     From December 2006 to January 2009, in connection with its retail non-seminar business, those Imperial employees who were also life agents assisted prospective insureds and external general agents and brokers in completing life insurance applications and submitting the applications to various life insurance companies. During

this process, Imperial had direct contact with prospective insureds and/or should have

demanded direct access to prospective insureds.

11.    At all relevant times, certain insurance companies required that the

prospective insured applying for a life insurance policy, and sometimes the agent,

disclose information relating to premium financing on applications for life insurance

policies. These questions typically required the prospective insured to disclose if he or

she intended to seek premium financing in connection with the policy and sometimes

required the agent to disclose if he or she was aware of any such intent on the part of the

applicant.

12.    From December 2006 to January 2009, in connection with the retail non-

seminar business, Imperial had a practice of disclosing on applications that the

prospective insured was seeking premium financing when the life insurance company

allowed premium financing from Imperial. However, in certain instances, Imperial

internal life agents facilitated and/or made misrepresentations on applications that the

prospective insured was not seeking premium financing when the insurance carrier was

likely to deny the policy on the basis of premium financing.

13.    To the extent that external agents, brokers and insureds caused other

misrepresentations to be made in life insurance applications in connection with the retail

non-seminar business from December 2006 to January 2009, Imperial failed to

appropriately tailor controls to prevent potential fraudulent practices in this business.

14.    From December 2006 to January 2009, in connection with the retail non-

seminar business, in the course of the application process, Imperial and external general

agents and brokers would mail, fax and/or email some of the forms to insurance

companies and would cause the insurance companies to mail, fax and/or email policies and other related forms.

15.    As a result, in connection with the retail non-seminar business from December 2006 to January 2009, in certain circumstances, Imperial facilitated and/or made misrepresentations regarding premium financing on life insurance applications for elderly individuals and failed to take appropriate precautions to prevent other misrepresentations that may have been made on said life insurance applications by employees, prospective insureds, and external agents and brokers.

16.    In or about January 2009, Imperial discontinued its retail non-seminar business.

## **<u>Exhibit B</u>**


**Loan Agreement**

## LOAN APPLICATION & AGREEMENT

**THIS APPLICATION & AGREEMENT**, dated as of March 12, 2008 (this "Agreement"), among Imperial Premium Finance, LLC, a Florida limited liability company, with a principal address at 701 Park of Commerce Blvd., Ste. 301, Boca Raton, FL 33487 (the "Lender") and Phyllis Pohl Irrevocable Trust, a Utah trust, with a principal address at 200 East South Temple, Salt Lake City, UT 84111 ("Trust" or "Borrower").

### RECITALS

**WHEREAS**, the Trust intends to acquire, or has acquired, the Life Insurance Policy and desires to obtain, pursuant to the terms hereof, financing of Premium payments for up to twenty-six months;

**WHEREAS**, the Lender has agreed to lend, on the terms and conditions and subject to the limitations set forth herein, funds in the amounts designated in this Agreement to pay Premiums on the Life Insurance Policy owned, or to be owned, by the Trust under the Trust Agreement, together with related Trustee Expenses; and

**WHEREAS**, the Insured is providing additional credit support for the Obligations by delivering the Personal Guaranty.

**NOW, THEREFORE**, in consideration of these premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

### ARTICLE 1

### PAYMENT TERMS

1.1.     **Loan Payment Amount and Provisions**

The following is a summary of the terms of the Advances to be provided under this Agreement. This Section 1.1 is only a summary and to the extent of any conflict with the balance of this Agreement, the terms and provisions set forth elsewhere shall prevail.

**Loan Date:    March 12, 2008**

**Advance: $252,406.00**

**Maximum Loan Amount:  $442,739.33**

**Interest Rate: floating, LIBOR (ONE MONTH) plus 756 basis points (indicative rate on January 30, 2008 is 12.16%), adjusted monthly.**

**Principal Amount: Variable based on amount advanced hereunder.**

**Insured/Borrower Contribution: $5,000.00**

WTEM_Pohl0002508

**Maturity Date: May 12, 2010.**

**Loan Number: 2008-488**

**Borrower Name and Address: Phyllis Pohl Irrevocable Trust, 200 East South Temple, Salt Lake City, UT 84111.**

**Lender Name and Address: Imperial Premium Finance, LLC, 701 Park of Commerce Blvd., Ste. 301, Boca Raton, FL 33487**

**Life Insurance Policy: (a) Insurer: Lincoln Benefit Life Company, (b) Policy Number: 01N1364514, (c) Face Amount: $9,000,000.00, and (d) Policy Issued Date: January 07, 2008.**

**Insurance Agent, Broker and/or Agency for Policy: Ernest Madera,**
9100 Ocean Wall LN #10 S _____. (address)
Pompano Bch, Fl 33062
**Origination Fees: $110,684.83**

**Service Charges: $0**

**Prepayment: Subject to Section 2.4, the Obligations hereunder may be prepaid in full, but not in part, provided that a Yield Maintenance Premium payment will be required in connection with a voluntary prepayment.**

**LENDER PROTECTION INSURANCE CHARGE: $0.00.**

---

**INSURANCE PREMIUM FINANCE AGREEMENT NOTICE: Do not sign this Agreement before you have read it or if it contains any blank spaces. You are entitled to a completely filled in copy of this Agreement. Keep your copy of this Agreement to protect your legal rights.**

---

1.2. **Premium and Trustee Expense Advances.**

(a)     Subject to the terms and conditions hereof, the Lender shall cause to be made and loaned to the Trust, and the Trust shall borrow, the Advance that the Lender may elect to make for the purpose of funding certain Premiums and Trustee Expenses during the Term of this Agreement.

The Advance shall be made on the Initial Premium Funding Date. The Advance hereunder may be (a) delivered to the Trust or (b) paid directly to the Insurer at the Insurer's Mailing Address for Payments with respect to the Life Insurance Policy.

(b)     Any Advance for Trustee Expenses may be made at the election of the Lender on the Initial Premium Funding Date. If the Lender elects not to make an Advance for Trustee Expenses, such Trustee Expenses shall be the responsibility of the Trust. The date of any

MILW_2677238.4                                    2

WTEM_Pohl0002509

Advance for Trustee Expenses may be changed by the Lender. Any Advance for Trustee
Expenses may be applied by the Lender directly to such expenses.

(c)     Any Advance made hereunder by the Lender shall be evidenced by, and repaid
with interest in accordance with, the Promissory Note payable to the order of the Lender.

### 1.3.    **Total Amount Due.**

(a)     Interest due under the Promissory Note shall accrue at the Interest Rate on the
aggregate principal amount of the Advance outstanding hereunder on each day from the date of
the Advance to the date that the Advance plus accrued interest is paid in full. Such outstanding
principal amount plus any accrued and unpaid interest as of any date shall be referred to as the
"Total Amount Due."

(b)     On the Maturity Date, the Trust shall pay to the Lender the Total Amount Due
under the Promissory Note plus the Origination Fee plus the Lender Protection Insurance
Charge.

(c)     Anything contained herein or within the Promissory Note to the contrary
notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum
allowable under applicable law, then the Trust shall be liable only for the payment of such
maximum as allowed by law, and any payment received from the Trust in excess of such legal
maximum, whenever received, shall be applied to reduce the principal balance of the amount due
hereunder to the extent of such excess or, at the option of the Trust, shall be returned to the Trust.

(d)     The Lender may perform its obligations to compute and determine any amounts
under this Agreement directly or through an agent. The Lender shall not be liable to the Trustee
in connection with the performance of any such obligations in the absence of willful misconduct
or gross negligence.

### 1.4.    **Partial and Surplus Payments.**

If at any time the Lender receives a smaller payment than the Total Amount Due or any
other Obligations due under this Agreement, the Promissory Note or the other Financing
Documents, it may apply the amount actually received in or towards discharge of the Obligations
in the order indicated by the Promissory Note. If the amount realized by the Lender under Article
6 of this Agreement is more than the amount of the Obligations, the Lender shall pay the excess
to the Trust.

### 1.5.    **Dispute Resolution.**

(a)     All controversies or disputes arising out of or in connection with this Agreement
("Disputes") shall be resolved pursuant to this Section 1.5.

(b)     All Disputes shall in the first instance be discussed amicably between the parties
with a view to resolving such Dispute, commencing upon one party giving other parties written
notice of such Dispute. In the event that such Dispute is not resolved within thirty (30) days after
such notice (or such longer period as the parties may agree in writing with respect to any such

WTEM_Pohl0002510

Dispute), any party may submit such Dispute to be finally settled by arbitration administered under the Commercial Arbitration Rules of the American Arbitration Association (the "Rules") by a panel of three arbitrators sitting in Salt Lake City, UT. One arbitrator shall be nominated by the party initiating arbitration at the time of the filing of its demand for arbitration, the second arbitrator shall be nominated by the opposing party(ies) at the time of the filing of its answering statement, and the third arbitrator (who shall act as chairman) shall be jointly nominated by party-nominated arbitrators if they are able to agree. If the first two party nominated arbitrators are unable to agree upon a third within thirty (30) days after the nomination of the second, or if either party fails to nominate an arbitrator as set forth herein, an arbitrator shall be appointed pursuant to the Rules. The award of the arbitrators shall be final and binding upon the parties, and shall not be subject to any appeal or review. The parties agree that such award may be recognized and enforced in any court of competent jurisdiction. The parties agree to submit to the personal jurisdiction of the federal and state courts sitting in Salt Lake City, UT, for the sole purpose of enforcing this Agreement (including, where appropriate, issuing injunctive relief), the agreement to arbitrate contained herein and any award resulting from arbitration pursuant to this Section and, to the fullest extent permitted by law, waive any objection which they may have at any time to the laying of venue of any proceedings brought in such court and any claim that such proceedings have been brought in an inconvenient forum.

(c)     The Trust further agrees that no claim may be brought as a class action, and that the Insured and Trustee, on behalf of the Trust, do not have the right to act, nor shall they attempt to act, as a class representative or participate as a member of a class of claimants with respect to any claim related to or arising out of this Agreement. To the extent that this arbitration provision is held unenforceable, the Trust: (i) irrevocably submits to the exclusive jurisdiction of any federal or state court sitting in Salt Lake City, UT in respect of any action or proceeding arising under or related to in any manner whatsoever this Agreement or the transactions contemplated under this Agreement, (ii) agrees that this Agreement and the transactions contemplated by the Financing Documents shall in all respects be governed by and construed in accordance with the laws of the State of Utah (without reference to conflicts of laws provisions) and (iii) HEREBY WAIVES THE RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (I) ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, OR (II) IN ANY WAY IN CONNECTION WITH OR PERTAINING OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES TO THIS AGREEMENT IN CONNECTION WITH THIS DISCLOSURE STATEMENT, REPRESENTATIONS AND WARRANTIES, AND CONSENT OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES UNDER THIS AGREEMENT OR OTHERWISE, OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES HERETO, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. The Parties hereby agree and acknowledge that this provision is intended to encompass any dispute between any Party to this Agreement and any interested third party.

(d)     In any arbitral proceeding arising under this Agreement, the parties agree that they will engage in cooperative discovery, to be supervised by the arbitral tribunal. In its discretion, the tribunal may order the exchange of documents in the custody or control of parties to this Agreement, and may order a limited number of party depositions of one (1) day's duration

WTEM_Pohl0002511

each if requested by the opposing party and if the tribunal finds that such depositions would contribute to the efficient development of evidence.

(e)     The sole exception to this Section 1.5 involves suits brought on behalf of the Lender seeking a temporary restraining order, preliminary injunction, and/or permanent injunction ("injunctive relief") based upon (i) any failure of the Borrower to use the proceeds advanced hereunder exclusively as set forth in this Agreement, the Promissory Note, the Financing Documents or any other documents related to this Agreement; (ii) any act by the Borrower or any Guarantor to transfer, amend, change ownership, cancel, convey, sell or assign the Life Insurance Policy without the express written consent of the Lender; or (iii) any failure to act by the Borrower or any Guarantor that results, directly or indirectly, in the transfer of the Life Insurance Policy or any amendment, change of ownership, cancellation, conveyance, sale or assignment thereof, in the event there is immediate and irreparable injury, loss, or damage (which immediate and irreparable injury, loss, or damage may be presumed by law and/or by agreement of the Parties).

(f)     The parties hereby expressly agree, and each interested third party in receipt of this Agreement acknowledges, that the arbitration provisions in this Section 1.5 shall not apply to the Trustee in respect of its rights, duties, protections and immunities under the Trust Agreement.

## ARTICLE 2

## GENERAL PAYMENT PROVISIONS

### 2.1.   **Payments.**

(a)     All payments by the Trust of any Obligations shall be made in Dollars in immediately available funds, without defense, setoff or counterclaim, free of any restriction or condition, and delivered to the Lender not later than 12:00 p.m. (EST) on the date due by wiring such funds to the Lender at such account as the Lender may from time to time designate in writing to the Trust or by payment of bank or certified check to the Lender's address as it may from time to time provide in writing to the Trust.

(b)     Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder.

### 2.2.   **Default Interest; Payments Set Aside.**

(a)     Any Obligations payable by the Trust under the Promissory Note or any Financing Document not paid when due (whether upon the Maturity Date or otherwise), and any Obligations payable at any time if a Default or an Event of Default shall have occurred and be continuing (without reference to any cure period), shall (to the fullest extent permitted by law) bear interest from the date when due, or the date upon which such Default or Event of Default shall have occurred, until paid in full at a rate per annum equal to the Interest Rate in effect at the time of such due date or Default or Event of Default plus 2% per annum (the "Default Rate").

WTEM_Pohl0002512

(b)     To the extent that the Trust makes a payment to the Lender, or the Lender enforces any security interest or lien, and such payment or proceeds of such enforcement or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy or insolvency law, any other state or federal law, common law or any equitable principles, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Encumbrances, rights and remedies therefor or related thereto, shall, to the fullest extent permitted by law, be revived and continued in full force and effect as if such payment had not been made or such enforcement had not occurred.

### 2.3.   **Determinations and Delegation by Lender.**

(a)     Any determination by the Lender or a Person retained by the Lender of the principal amount including capitalized interest shall be binding absent manifest error.

(b)     The Lender may retain a servicer, a special servicer, a calculation agent, an actuary or other Person to make any determinations, prepare any calculations, reports and notices, and provide any other services in connection with the Lender's performance of its obligations, or the exercise of its rights, under this Agreement and the other Financing Documents.

### 2.4.   **Prepayment.**

No privilege is reserved by Borrower to prepay any principal due hereunder and under the Promissory Note prior to the Maturity Date, except that the Borrower may after giving five (5) days' prior written notice to Lender, prepay in full, but not in part, all principal and interest to and including the date on which payment is made, along with all sums, amounts, advances, or charges due under this Agreement, the Promissory Note or the other Financing Documents, upon the payment of the Yield Maintenance Premium. Notwithstanding the foregoing, no Yield Maintenance Premium payment shall be required in the event that a full prepayment of the Obligations hereunder is made promptly following a death of the Insured under the Life Insurance Policy.

### ARTICLE 3

### CONDITIONS PRECEDENT

### 3.1.   **Conditions Precedent to the Initial Premium Funding Date.**

The Lender in its sole discretion may make the Advance. In addition to any other conditions imposed by the Lender, the Lender shall not make the Advance unless the following conditions have been satisfied or waived:

(a)     The Lender shall have received this Agreement and the other documents described in the Closing Package, each duly executed and dated the Initial Premium Funding Date (or such earlier date as shall be satisfactory to the Lender), and in form and substance satisfactory to the Lender;

WTEM_Pohl0002513

(b)    The Lender shall be satisfied that the life insurance illustration corresponds with the policy form number, personal data, underwriting classification and cash surrender value set forth in the Life Insurance Policy to be provided on the Initial Premium Funding Date; and

(c)    The representations and warranties of the Trust contained herein and in the other Financing Documents shall be true and correct on and as of the Initial Premium Funding Date to the same extent as though made on and as of such date (except to the extent such representations and warranties relate to a specified date); all obligations of the Trust in this Agreement and the other Financing Documents required to be performed on or prior to the Initial Premium Funding Date shall have been performed; and no event shall have occurred and be continuing or would result from the making of such Advance or the consummation of the other transactions contemplated hereby that would constitute an Event of Default or a Default under this Agreement or the other Financing Documents.

3.2.    **Termination.**

From the Execution Date to the Initial Premium Funding Date, this Agreement may be terminated at any time at the Lender's sole discretion with written notice to the Trust.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES

The Trust represents and warrants to the Lender, as of the Execution Date, the Initial Premium Funding Date and on the dates otherwise specified below, as follows:

(a)    Organization. The Trust Agreement is valid and enforceable and is in full force and effect under the laws of the State of Utah (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and to equitable principles of general application, regardless of whether such principles are considered in a proceeding in equity or at law). The Trust has requisite capacity and all requisite power and authority and all requisite authorizations, consents and approvals, in each case, to hold the trust estate, to purchase and own the Life Insurance Policy, to enter into the Financing Documents to which the Trust is a party and to carry out the transactions contemplated thereby.

(b)    Execution. This Agreement and the other Financing Documents to which the Trust is a party have been duly executed and delivered by the Trustee. Assuming due authorization, execution and delivery by the other parties thereto, this Agreement and such other Financing Documents constitute legal, valid and binding obligations of the Trust, enforceable against the Trust in accordance with their terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and to equitable principles of general application, regardless of whether such principles are considered in a proceeding in equity or at law).

(c)    No Conflict. The execution and performance by the Trust of this Agreement and the other Financing Documents to which it is a party do not (i) violate, conflict with or result in the breach of any provision of its constitutive documents or the Trust Agreement, (ii) conflict

WTEM_Pohl0002514

with or cause a violation of any Law or Governmental Order applicable to it or to any of the Trust's assets, properties or business or (iii) conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment or acceleration pursuant to any Contract to which the Trust is a party.

(d)    Consents. No authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority is required to be obtained by the Trust that has not been obtained or is not in full force and effect, and no registration, declaration, or filing with any Governmental Authority is required to be given or made by the Trust to or with, any Governmental Authority that has not been given or made or the applicable waiting period for which has not expired or terminated, each in connection with the execution and delivery of this Agreement and the other Financing Documents and the consummation of the transactions contemplated hereby and thereby.

(e)    No Default; Compliance and Litigation. No Default or Event of Default under this Agreement or any other Financing Document has occurred and is continuing. The Trust is not in violation of any Law or Governmental Order applicable to it or any of its properties or assets. No judicial, administrative or arbitral proceeding is pending or, to the best knowledge of the Trust, threatened against the Trust, which would have an adverse effect on the Trust's ability to perform under the Financing Documents.

(f)    Payment of Taxes. The Trust has filed all tax returns and reports of the Trust required to be filed, and all taxes shown on such tax returns to be due and payable, and all assessments, fees and other governmental charges upon the Trust and upon its properties, assets, income, businesses and franchises which are due and payable, have been paid when due and payable.

(g)    Investment Company Act. The Trust is not subject to regulation under the Investment Company Act of 1940, as amended and is not a "registered investment company" or company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such quoted terms are defined in the Investment Company Act of 1940, as amended.

(h)    Purpose of Loan. The Trust has entered into this Agreement for estate and retirement planning purposes and the Trust has no present intention to transfer the Life Insurance Policy or any interest therein, other than any collateral assignment or pledge made in connection with this Agreement.

(i)    Independent Decision. The Trust has read and understood, and the Trust has signed or caused to be signed by the appropriate Persons (other than Lender), each document in the Closing Package. The Trust has been encouraged by Lender to consult with and has had ample opportunity to receive advice from attorneys, accountants and tax or other financial advisors of its choosing. The Trust has considered other options for financing the Life Insurance Policy, and is satisfied that entering into this Agreement and the other Financing Documents and consummating the transactions contemplated by this Agreement and the other Financing

WTEM_Pohl0002515

Documents are in the best interests of the Trust. The Trust acknowledges that it has had this Agreement and the other Financing Documents for an amount of time sufficient to thoroughly analyze, discuss and receive advice from any professionals or anyone else of the Trust's choosing.

(j)     Trustee.    At least one trustee of the Borrower is an attorney, certified public accountant or bank or trust company which is authorized to serve as trustee for the Borrower in the state where the Borrower has its situs and has its principal place of administration.

The representations and warranties made by the Trust hereunder shall at all times be true until the termination of this Agreement in accordance with the terms hereof.

## ARTICLE 5

## COVENANTS

For so long as any Obligations remain outstanding, the Trust hereby covenants and agrees as follows:

(a)     To take such further action and/or execute and deliver all further assurances, documents and/or instruments as may be reasonably requested by the Lender in order to (i) effect, administer or enforce the transactions contemplated by this Agreement and the other Financing Documents to which the Trust is a party, (ii) permit the realization of the benefits of any collateral assignment or pledge of the Life Insurance Policy to the Lender and its assigns, (iii) execute any documents reasonably requested by the Lender to submit to the Insurer for payment of the Death Benefit, and (iv) authorize the provision and/or delivery of medical, financial, personal and other information and documentation about the Insured to the Lender, any affiliate of the Lender, any of their assigns, or any Insurer from any physician, hospital, medical provider, provider of a life expectancy estimate, insurance company or other Person with respect to the Insured.

(b)     To notify the Lender in writing of any change of the address, telephone number or other contact information of the Trust\. The Trust acknowledges that the Lender or its designee may be verifying quarterly the current addresses, contact information and other relevant information of the Trust. The Trust covenants and agrees that it shall accurately complete and manually execute its response and return the same to the Lender and/or its designees in a timely manner. The Trust further acknowledges that the Lender or its designee may use other methods to obtain such information, and the Trust agrees to cooperate, and to request that other Persons cooperate, in providing such information.

(c)     If the Trust receives proceeds derived or to be derived from the Life Insurance Policy or from the sale of the beneficial interests in the Trust, to (i) hold such proceeds in trust for the benefit of the Lender and its assigns (to the extent of amounts owed hereunder), (ii) notify the Lender of such receipt within three (3) Business Days, (iii) transfer, convey and pay over such proceeds (to the extent of amounts owed hereunder) to the Lender within three (3) Business Days of its receipt of payment instructions from the Lender and (iv) take any and all actions reasonably requested by the Lender, at the expense of the Lender, in order to change the payment

MILW_2677238.4                                            9

WTEM_Pohl0002516

instructions with respect to such Life Insurance Policy or such beneficial interest such that
~~proceeds therefrom are payable directly to the Lender or any person designated in writing by the~~
Lender.

(d)     The Trust shall preserve its existence as a trust established under the laws of the
State of Utah, and shall not change its form of organization, amend the Trust Agreement or
permit an Encumbrance to the Life Insurance Policy or any Collateral (except as contemplated
by this Agreement) without the consent of the Lender. The Trust shall maintain an office located
~~in the State of Utah.~~

(e)     The Trust shall pay all Taxes imposed upon the Trust or any of its properties or
assets before any penalty or fine accrues thereon, and shall notify the Lender of any such Taxes
as soon as the Trust has actual knowledge thereof. .

(f)     The Trust shall notify the Lender in writing of (i) the Insured's death, and (ii) any
breaches of the representations and warranties of the Trust or the Insured in this Agreement or
the other Financing Documents within one (1) business day of its actual knowledge thereof.

(g)     The Trust shall not engage in any business or activity other than (i) the
acquisition, maintenance and protection of the Life Insurance Policy and (ii) the entering into
this Agreement, the Promissory Note and the other Financing Documents contemplated hereby;

(h)     The Trust shall not incur any indebtedness not committed or provided by this
Agreement or assume or guaranty directly or indirectly any indebtedness of any other entity,
other than Trustee's fees (and any related costs of counsel and out of pocket expenses and other
Trustee Expenses), except with the express written consent of the Lender, which consent shall be
granted or withheld in the sole discretion of the Lender;

(i)     The Trustee shall not dissolve or liquidate the Trust, in whole or in part; and

(j)     Following an Event of Default, the Trust shall accept written instructions from the
Collateral Agent under the Collateral Assignment regarding the disposition of the Life Insurance
Policy and any other Collateral or proceeds covered thereby, including instructions to assign
ownership of the Life Insurance Policy to the Lender or any third party engaged to dispose of the
Collateral, or to dispose of the Collateral in a commercially reasonable fashion or as otherwise
directed by the Collateral Agent.

(k)     In the event that the Trust elects to sell, assign or settle, or to consider selling,
assigning or settling, the Life Insurance Policy when any amounts are outstanding hereunder, the
Trust agrees to solicit bona fide offers (each, an "Offer") from multiple potential buyers (each, a
"Bidder"), at least one of which shall be either (a) a duly licensed life settlement provider
identified to the Trust by the Lender or (b) a Bidder identified by a duly licensed life settlement
broker or life agent identified to the Trust by the Lender, provided that any person identified or
referred to the Trust by the Lender under clauses (a) or (b) shall not be affiliated with, or related,
to the Lender in any manner. This covenant is designed solely to protect the owners or
beneficiaries of the Trust and to ensure that if a sale, assignment or settlement is pursued that at
least one bona fide offer is obtained. For avoidance of doubt, the Trust shall not be obligated

MILW_2677238.4                          10

whatsoever to consummate a sale, assignment or settlement of a Life Insurance Policy with any person identified or referred to the Trust by the Lender.

## ARTICLE 6

## EVENTS OF DEFAULT AND REMEDIES

### 6.1.    **Events of Default.**

The occurrence and continuance of any of the following events shall constitute an "Event of Default":

(a)    **Payment Default.** Trust fails to make any payment within three (3) Business Days after the same becomes due and payable under this Agreement, the Promissory Note or any other Financing Document.

(b)    **Other Defaults.** Trust fails to comply with or to perform any other term, obligation, covenant or condition contained in the Promissory Note, this Agreement or in any of the other Financing Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Trust.

(c)    **False Statements.** Any warranty, representation or statement made or furnished to Lender by Trust, the Insured, or on Trust's behalf under the Promissory Note, this Agreement or any other Financing Document is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

(d)    **Related Agreements.** The Life Insurance Policy, Promissory Note, this Agreement, Security Agreement or any other Financing Document ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason; the Trust becomes a revocable trust, contests the validity or enforceability of any Financing Document or denies that it has any further liability under any Financing Document to which it is a party, or cancels or terminates, or attempts to cancel or terminate, the Life Insurance Policy; or the Insurer contests the Life Insurance Policy based on the Trust lacking an insurable interest in the life of the Insured.

(e)    **Indebtedness, Creditor or Forfeiture Proceedings.** Any garnishment of any of Trust's accounts, attachment, lien, levy, additional encumbrance or additional security interest being placed upon any of the Collateral, or any commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Trust or by any governmental agency against any Collateral, and which is not discharged in full within one (1) day of the placement thereof. However, this Event of Default shall not apply if there is a good faith dispute by Trust as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Trust gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

WTEM_Pohl0002518

(f)    **Insolvency or Default of Trust**.    The Trust is: (i) dissolved, liquidated or terminated; (ii) is unable to pay its debts as they mature; (iii) makes an assignment for the benefit of creditors; (iv) is bankrupt or insolvent; (v) seeks appointment of, or becomes the subject of an order appointing, a trustee, conservator, liquidator or receiver as to all or part of its assets; (vi) commences, approves or consents to, or is the debtor in, any case or proceeding under any bankruptcy, reorganization or similar law, and in the case of an involuntary case or proceeding, such case or proceeding is not dismissed thirty (30) days following its commencement; (vii) is the subject of an order for relief in an involuntary case under federal bankruptcy law; (viii) the Trust defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Trust's property or Trust's ability to repay the Promissory Note or perform Trust's Obligations under the Promissory Note, this Agreement or any of other Financing Documents; or (ix) Trust violates any Law.

(g)    **Insolvency or Default of Insured or Guarantor.**    (i) The Insured or any Guarantor makes an assignment for the benefit of creditors; (ii) The Insured or any Guarantor is adjudicated a bankrupt or insolvent; (iii) The Insured or any Guarantor seeks appointment of, or becomes the subject of an order appointing, a trustee, conservator, or receiver as to all or part of his or her assets; (iv) The Insured or any Guarantor commences, approves or consents to, or is the debtor in, any case or proceeding under any bankruptcy or similar law and, in the case of an involuntary case or proceeding, such case or proceeding is not dismissed thirty (30) days following its commencement; (v) The Insured or any Guarantor is the subject of an order for relief in an involuntary case under federal bankruptcy law; (vi) Trust defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Trust's property or Trust's ability to repay the Obligations; or (vii) any Guarantor defaults under the terms of the Personal Guaranty.

(h)    **Events Affecting Guarantor.**    Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness under the Promissory Note or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by the Promissory Note; in the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

(i)    **Adverse Change.**    A material adverse change occurs in Trust's financial condition, or Lender believes the prospect of payment or performance of the Obligations is materially impaired.

(j)    **Cure Provisions.**    Other than as set forth in the preceding clauses of this Section, failure by the Trust or Insured, as applicable, to perform in any material respect any of its obligations under the Promissory Note, this Agreement, Security Agreement or any other Financing Document to which either is a party if such failure is not remedied on or prior to the fifteenth (15th) day after written notice of such failure is given to the Trust or the Insured, respectively, by the Lender.

WTEM_Pohl0002519

## 6.2.    **Remedies.**

(a)    Automatically upon the occurrence of any Event of Default described in Section 6.1, and in the case of any other Event of Default, upon notice from the Lender to the Trust, the Total Amount Due, together with all other Obligations, shall immediately become due and payable, without presentment, demand, protest or other requirements of any kind, all of which are expressly waived by the Trust.

(b)    Upon the occurrence and during the continuance of an Event of Default, in addition to the remedies set forth in Section 6.2(a) above, the Lender and its assigns shall have the right to:

(i)    exercise all rights and remedies provided for herein or in any other Financing Document (including surrendering the Life Insurance Policy) or otherwise available to it at law or in equity, and all rights and remedies of a secured party on default under the Uniform Commercial Code; and

(ii)    execute any instrument and do all other things necessary and proper to protect, preserve and realize upon any Collateral and the other rights contemplated hereunder and under the other Financing Documents.

(c)    Upon the occurrence and during the continuance of an Event of Default, the Trust agrees to accept written instructions from the Collateral Agent regarding the disposition of the Life Insurance Policy and any other Collateral or proceeds thereof, including instructions to assign ownership of the Life Insurance Policy to the Lender or any third party engaged to dispose of the Collateral, or to dispose of the Collateral in a commercially reasonable fashion or as otherwise directed in writing by the Collateral Agent.

## ARTICLE 7

## OTHER PROVISIONS

### 7.1.    **Notices.**

All notices, requests, claims, demands and other communications required or permitted to be given hereunder shall be in writing, shall be given to the Lender and the Trust (with a copy to the Insured), shall be delivered by hand or telecopied or sent by reputable overnight courier service, and shall be deemed given when so delivered by hand or telecopied (with proof of transmission) or emailed or one (1) Business Day after being sent by reputable overnight domestic courier service, and five (5) Business Days after being sent by reputable overnight international courier service.    All such notices, requests, claims, demands and other communications shall be addressed as set forth below, or pursuant to such other instructions as may be designated in writing to the other party in accordance with this Section.

MILW_2677238.4                                13

WTEM_Pohl0002520

| | |
|---|---|
| If to the Trust: | Phyllis Pohl Irrevocable Trust |
| | c/o  Bank of Utah, co-trustee |
| | 200 East South Temple Suite 210 |
| | Salt Lake City, UT 84111 |
| | Phone: _____ |
| | Fax: _____ |
| | Email:_____ |
| | |
| | Phyllis Pohl Irrevocable Trust |
| | c/o Thomas Mahoney Jr, co-trustee |
| | 110 Oglethorpe Avenue East |
| | Savannah, GA 31401 |
| | |
| With a copy to Insured: | Phyllis Pohl |
| | 10510 Laurel Estates Lane |
| | Wellington, FL 33467 |
| | Phone: 561-642-1411 |
| | Fax:_____ |
| | Email:_____ |
| | |
| If to the Lender: | Imperial Premium Finance, LLC |
| | 701 Park of Commerce Blvd. |
| | Suite 301 |
| | Boca Raton, FL 33487 |
| | Phone: 561-995-4200 |
| | Fax: 561-995-4201 |
| | Email:_____ |

## 7.2. **Expenses.**

(a)     Except as otherwise specified in this Agreement, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby, shall be paid by the party incurring such costs and expenses unless, at any time after the Initial Premium Funding Date, the Lender elects in its sole discretion to pay the costs and expenses of any other party hereto.

(b)     The Trust agrees, after the occurrence of a Default or an Event of Default, to pay all costs and expenses incurred by the Lender in enforcing any Obligations of, or in collecting any payments due from, the Trust hereunder or under the other Financing Documents, including reasonable fees and expenses of the Lender's attorneys (which shall include the allocated costs of internal counsel), financial advisors and accountants within five (5) Business Days after receiving an invoice from the Lender.

(c)     This Section shall survive the payments of all other amounts due hereunder.

14

WTEM_Pohl0002521

7.3.    **Completeness.** Notwithstanding anything else herein to the contrary, if the Life Insurance Policy is not issued at the time this Agreement is executed, the Borrower authorizes the Lender to fill in the name of the insurance company, policy number and face amount of the policy after the Life Insurance Policy directly or indirectly funded hereby is issued.

7.4.    **Confidentiality.**

(a)    The Lender is committed to maintaining the confidentiality, integrity and security of personal information about its current, former and prospective customers. The Trust does not have to contact the Lender to benefit from the Lender's privacy protections; they apply automatically. By entering into this Agreement, the Trust consents to the collection and use of information as set forth below and in Schedule B.

(b)    The Lender agrees (i) not to use or disclose non-public medical, financial and personal information about the Trust and the Insured except as necessary, in the opinion of the Lender, to secure funding or insurance for its obligations under this Agreement or the other Financing Documents or to effect, administer or enforce the transactions contemplated by this Agreement, the other Financing Documents and any other agreements entered into in connection therewith, including, without limitation, the sale or exercise of rights under the Life Insurance Policy; and (ii) to keep such information confidential and limit access to such information to those Persons who, in the Lender's reasonable discretion, require access to such information to effect, administer or enforce the transactions contemplated by this Agreement, the other Financing Documents and any other agreements entered into in connection therewith, including, without limitation, the sale or the exercise of rights under the Life Insurance Policy.

(c)    Nothing in this Section shall prohibit disclosure of information that is required or permitted by any Law or regulation, including, but not limited to, the Gramm-Leach-Bliley Act of 1999, or in response to legal process or to the extent that it may otherwise have become publicly available without the fault of the person proposing to disclose. In addition, notwithstanding anything herein to the contrary, in accordance with Section 1.6011-4(b)(3) of the United States Treasury Regulations, the parties (and each employee, representative, or other agent of any party) may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by this Agreement and all materials of any kind (including opinions or other tax analyses) that are provided to the parties relating to such tax treatment and tax structure.

7.5.    **Entire Agreement; Effectiveness; Counterparts; Headings; Severability.**

(a)    This Agreement, together with the other Financing Documents, embodies the entire agreement and understanding between the Trust and the Lender with respect to the financing hereunder and supersedes all prior, contemporaneous or subsequent oral agreements of the Trust and the Lender.

(b)    This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument. Delivery of an executed counterpart of a

signature page to this Agreement by facsimile shall be effective as delivery of an original executed counterpart of this Agreement.

(c)     Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

(d)     In case any provision in or obligation hereunder shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

## 7.6.   **Amendments and Waivers.**

No amendment, waiver, modification or supplement of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the Lender and the Trust, provided that no amendment, waiver, modification or supplement of any provision of this Agreement that affects the rights or obligations of the Insured shall be effective until approved in writing by the Insured, and each amendment, waiver, modification, supplement or consent shall be effective only in the specific instance and for the specific purpose for which given. Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy. The rights, powers and remedies given to the Lender hereby are cumulative and shall be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law or in any of the other Financing Documents.

## 7.7.   **Assignments; Third Party Beneficiaries.**

(a)     Except as otherwise expressly provided herein to the contrary, this Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their respective successors and permitted assigns, and nothing herein is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement. The rights or obligations hereunder or any interest therein of the Trust may not be assigned or delegated without the prior written consent of the Lender.

(b)     The Lender shall have the right at any time  to sell, assign or transfer all or any portion of its rights and obligations under this Agreement and the other Financing Documents, including, without limitation, all or a portion of the financing hereunder or any other of the Obligations to (i) any Affiliates of the Lender, including Imperial PFC Financing, LLC, an Illinois limited liability company ("Imperial PFC Financing") or (ii) to any Wholesale Lender. Further, the Lender shall have the right at any time, with notice to, and the written consent of the Borrower, which consent shall not be unreasonably withheld, delayed or conditioned, to sell, assign or transfer all or any portion of its rights and obligations under this Agreement and the other Financing Documents, including, without limitation, all or a portion of the financing hereunder or any other of the Obligations to any other third party. The Lender shall also have the right at any time, without notice to or consent of any other party, to sell one or more

MILW_2677238.4                                    16

WTEM_Pohl0002523

participations to any Person in all or any part of the financing hereunder or in any of the other Obligations on terms and conditions satisfactory thereto.

(c)     The Lender may, without notice to or consent of any other party, pledge, collaterally assign or grant a security interest in the right, title and interest of the Lender in and to this Agreement and the other Financing Documents and its interest in the Collateral.  In such case, the Lender shall remain liable for all of its obligations under this Agreement and the other Financing Documents, and the secured party shall not be liable for any obligation of the Lender whether under this Agreement or the other Financing Documents or otherwise.

## 7.8.    **Limited Liability of Trustees.**

(a)     It is expressly understood and agreed by the parties hereto that in no event shall Bank of Utah and Thomas Mahoney Jr, as co-trustees of the Trust, in its individual capacity have any liability for the representations, warranties, covenants, agreements or other obligations of the Trust hereunder or under any schedule, exhibit, appendix or other document in connection with this Agreement, as to all of which recourse shall be had solely to the assets of the Trust, and under no circumstances shall  Bank of Utah and Thomas Mahoney Jr as co-trustees of the Trust be personally liable for the payment of any indebtedness or expenses of Trust or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by Trust under this Agreement or under any schedule, exhibit, appendix or other document in connection with this Agreement.

(b)     In no event shall any officers, directors, employees, agents, accountants, attorneys or service providers of Lender be liable in their personal capacities to any Person for the representations and obligations of the Lender under any Financing Document.

## 7.9.    **Survival of Representations, Warranties and Agreements.**

All representations, warranties and agreements made in this Agreement shall survive the execution and delivery hereof, and shall continue in full force and effect, until no Obligation remains outstanding.

## 7.10.   **Governing Law.**

THIS AGREEMENT AND ALL MATTERS RELATING THERETO SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LOCAL LAW OF THE STATE OF UTAH (WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THAT COULD OR WOULD CAUSE THE APPLICATION OF ANY OTHER LAWS), ALL RIGHTS AND REMEDIES BEING GOVERNED BY SAID LAW.

WTEM_Pohl0002524

## ARTICLE 8

## DEFINITIONS AND RULES OF INTERPRETATION

### 8.1. **Definitions.**

As used in this Agreement, the following terms shall have the respective meanings set forth in this Section.

"Advance" means the initial amount advanced as set forth in this Agreement, equal to the sum of Premium plus any amounts advanced for the payment of Trustee Expenses.

"Advance for Trustee Expenses" means amounts advanced for the payment of Trustee Expenses, subject to such adjustments as the Lender may elect.

"Beneficiary" means the beneficiary of the Trust.

"Bidder" has the meaning set forth in Section 5(k).

"Borrower" has the meaning set forth in the introductory paragraph.

"Business Day" means (i) any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the States of Utah or New York, or is a day on which banking institutions located in such states are authorized or required by law or other governmental action to close.

"Closing Package" means, collectively, the agreements, instruments, certificates, reports and documents set forth in Schedule A to this Agreement, to the extent they are required to be delivered and/or completed on or prior to the Initial Premium Funding Date.

"Collateral" means the Trust's entire beneficial interest in and to the Life Insurance Policy and any related documents and security and the death benefits payable under the Life Insurance Policy and all proceeds thereof.

"Collateral Agent" means such person or entity designated as the collateral agent in the Collateral Assignment.

"Collateral Assignment" means the agreement under which the Borrower assigns the Life Insurance Policy as collateral to secure the Obligations due or to become due hereunder.

"Contract" means any contract, agreement, lease, sublease, license, note, bond, mortgage or indenture, permit, franchise, insurance policy or other instrument, whether written or oral.

"Death Benefit" means the amount paid by any Insurer upon the death of the Insured under the terms of the Life Insurance Policy, including any interest paid by the Insurer attributable to the period beginning on the Death Date.

"Death Date" means the date on which the Insured dies.

WTEM_Pohl0002525

"Default" means (i) a condition or event that, after notice or lapse of time or both, would constitute an Event of Default under this Agreement or (ii) any default under any Financing Document.

"Default Rate" means the rate of interest set forth in Section 2.2(a).

"Disputes" has the meaning set forth in Section 1.5(a).

"Dollar" and the sign "$" mean the lawful money of the United States of America.

"Encumbrance" means any mortgage, pledge, hypothecation, assignment, security interest, charge, lien (statutory or other), or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing.

"Event of Default" means each of the events set forth in Section 6.1.

"Execution Date" means the date on which this Agreement is fully executed by the Lender and the Trust.

"Financing Documents" means this Agreement, any pledge or collateral assignment of the Life Insurance Policy, the Disclosure Statement Representations and Warranties and Consent, the Personal Guaranty, the Closing Package and all other documents, instruments or agreements executed and delivered by the Trust for the benefit of the Lender in connection herewith, as the same may be amended or modified with the consent of the Lender.

"Governmental Authority" means any foreign, or U.S. federal, state, regional, local, municipal or other government, or any department, commission, board, bureau, agency, public authority or instrumentality thereof or any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government or any court or arbitrator.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or administrative ruling or award entered by or with any Governmental Authority.

"Guarantor" means any person who delivers a Personal Guaranty to guaranty a portion or all of the Obligations due by the Borrower hereunder.

"Imperial PFC Financing" has the meaning set forth in Section 7.7(b).

"Initial Premium Funding Date" means the date on which the Lender makes the Advance in its sole discretion pursuant to Section 3.1.

"Insured" means Phyllis Pohl .

"Insurer" means the issuer of the Life Insurance Policy as identified in this Agreement.

WTEM Pohl0002526

"Insurer's Mailing Address for Payments" is as follows:  Lincoln Benefit Life Company, 2940 South 84th Street , Lincoln, NE 68506-4142.

"Interest Period" means each period commencing on the first day of each calendar month during the term of this Agreement (or, in the case of the first Interest Period, the date the Advance is made) and ending on the last day of each calendar month during the term of this Agreement (or in the case of the final Interest Period, the Maturity Date or such earlier date the Obligations hereunder become due or are pre-paid by the Trust).

"Interest Rate" means a per annum rate of interest set as follows: floating, LIBOR (one month) plus 756 basis points (indicative rate on January 30, 2008 is 12.16%), adjusted monthly..

"Interest Determination Date" means, with respect to any Interest Reset Date for an Interest Period, the second London Banking Day prior to such Interest Reset Date.

"Interest Reset Date" means, with respect to each Interest Period, the first (1st) day of such Interest Period.

"LIBOR" means, with respect to any Interest Period, the London Interbank Offered Rate (one month) on the Interest Determination Date which is publicly announced in the "Money Rates" section of The Wall Street Journal, Eastern Edition, or such other similar publication, as is reasonably determined by the Lender.

"Law" means any federal, national, supranational, state, provincial or local statute, law, ordinance, regulation, rule, code, order, requirement or rule of law (including, without limitation, common law).

"Lender" means Imperial Premium Finance, LLC, a Florida limited liability company authorized to do business in the State of Utah.

"Lender Protection Insurance Charge" means an amount payable by the Borrower to the Lender to reimburse the Lender for an insurance charge paid, directly or indirectly, by the Lender to a third party insurer to protect the Lender or other interested person against losses resulting from the failure of the Borrower to repay the Obligations hereunder in full and/or a failure of the Lender to realize sufficient funds following an Event of Default from a foreclosure upon all collateral for this Loan, including without limitation, the Life Insurance Policy and collection efforts under any personal guaranties obtained in connection herewith.

"Life Insurance Policy" means the life insurance policy or policies identified in this Agreement, including all amendments, modifications and supplements thereto and all restatements and replacements thereof.

"Loan Date" has the meaning given to such term in Section 1.1 of this Agreement.

"London Banking Day" means a day on which dealings in deposits in United States dollars are transacted on the London Interbank Market.

WTEM_PohI0002527

"Maturity Date" means the earliest of: (i) one (1) Business Day after payment of any proceeds of the Life Insurance Policy, and (ii) any other date that principal and interest on the Total Amount Due shall become due and payable in full hereunder, whether by acceleration, notice of prepayment, or otherwise.

"Net Death Benefit" with respect to the financing hereunder means an amount equal to the Death Benefit payable by the Insurer under the Life Insurance Policy less the Total Amount Due and any other Obligations.

"Obligations" means all payment and performance obligations of every nature of the Trust from time to time owed to the Lender under any Financing Document, including without limitation, the Total Amount Due in connection with the financing hereunder, principal, interest (including interest which, but for the filing of a petition in bankruptcy or the commencement of any insolvency, reorganization, or like proceeding with respect to the Trust would have accrued on any Obligation, whether or not a claim is allowed against the Trust for such interest in such proceeding), the Origination Fee, the Yield Maintenance Premium, the Lender Protection Insurance Charge, fees, costs, expenses (including the reasonable fees, charges and disbursements of counsel to the Lender), indemnification or otherwise.

"Offer" has the meaning set forth in Section 5(k).

"Origination Fee" means an amount equal to $110,684.83.

"Person" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, unincorporated associations, companies, trusts, banks, trust companies, business trusts or other entity, or a government or political subdivision or agency thereof.

"Personal Guaranty" means a guaranty executed by the Insured in favor of the Lender in such form as shall be agreed to by the Lender.

"Policy Issued Date" means January 07, 2008.

"Premium(s)" means the premium(s) for the Life Insurance Policy, subject to adjustment with the Lender's approval, payable on the Initial Premium Funding Date.

"Promissory Note" shall mean the promissory note from the Borrower to the Lender, executed contemporaneously with this Agreement, evidencing amounts owed and/or to be owed under this Agreement, as such note may be amended, modified or extended.

"Rules" has the meaning set forth in Section 1.5(b).

"Security Agreement" means each and every security agreement executed by any beneficiary of the Trust pursuant to which beneficial interests in the Trust are pledged to secure the obligations due by the Borrower to the Lender.

"Tax" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding of any nature and whatever called, by whomsoever, on whomsoever

WTEM_Pohl0002528

and wherever imposed, levied, collected, withheld or assessed, and including interest, additions to tax and penalties.

"Term" shall mean the twenty-six month period commencing on and including the Policy Issued Date.

"Total Amount Due" has the meaning given to such term in clause (b) of Section 1.3 of this Agreement.

"Trust" has the meaning set forth in the introductory paragraph.

"Trust Agreement" means the Trust Agreement entered into between the Grantor named therein and the Trustee, dated June 6, 2007.

"Trustee" and/or "Co-Trustee means  Bank of Utah and Thomas Mahoney Jr and any successor or additional Trustee.

"Trustee Expenses" means any fees and expenses of the Trustee which the Lender may elect to advance.

"Wholesale Lender" means any person or entity that provides or has provided financing to the Lender or its Affiliates to, directly or indirectly, fund the making, continuing or carrying of retail life insurance premium finance loans, including the financing under this Agreement. The term "Wholesale Lender" shall include any Affiliates of a Wholesale Lender as well as agents acting on behalf of one or more Wholesale Lender and named as such in agreements relating to such financings.

"Yield Maintenance Premium" shall mean the premium calculated as provided in subparagraphs (a) through (c) of this definition below:

(a)     Determine the "Reinvestment Yield." The Reinvestment Yield will be equal to the yield on the U.S. Treasury Issue ("Primary Issue")* selected by Lender, published one week prior to the date of prepayment, and converted to an equivalent monthly compounded nominal yield. In the event there is no market activity involving the Primary Issue at the time of prepayment, Lender shall choose a comparable Treasury Bond, Note or Bill ("Secondary Issue") which Lender reasonably deems to be similar to the Primary Issue's characteristics (i.e., rate, remaining time to maturity, yield).

(b)     Calculate the "Present Value of the Loan." The Present Value of the Loan is the present value of the payments to be made in accordance with this Agreement and the Promissory Note (all installment payments and any remaining payment due on the Maturity Date discounted at the Reinvestment Yield for the number of months remaining from the date of prepayment to the Maturity Date).

(c)     Subtract the amount of the prepaid proceeds (excluding the payment of this Yield Maintenance Premium) from the Present Value of the Loan as of the date of prepayment. Any resulting positive differential shall be the yield maintenance premium.

22

WTEM_Pohl0002529

\*    If at this time there is not a U.S. Treasury Issue for this prepayment period. At the time of prepayment, Lender shall select in its sole and absolute discretion a U.S. Treasury Issue with similar remaining time to the end of the applicable prepayment period.

The Yield Maintenance Premium shall not be less than zero.    Further, notwithstanding anything else herein to the contrary, in no event shall the Yield Maintenance Premium be in an amount which would cause the Borrower to pay more upon prepayment of the loan hereunder than the Borrower would have paid in full satisfaction of the loan hereunder at maturity on the scheduled Maturity Date and to the extent necessary, the Yield Maintenance Premium shall be reduced in the least amount needed to comply with this limit.

## 8.2.    **Interpretation.**

(a)    A reference to any document or agreement shall include such document or agreement as amended, modified or supplemented from time to time in accordance with its terms or the terms of this Agreement.

(b)    The singular includes the plural and the plural includes the singular.

(c)    A reference to any law includes any amendment or modification to such law.

(d)    A reference to any Person includes its permitted successors and permitted assigns.

(e)    The words "include", "includes" and "including" are not limiting.

(f)    All terms not specifically defined herein, which terms are defined in the Uniform Commercial Code as in effect in the State of Utah, have the meanings assigned to them therein.

(g)    The words "herein", "hereof", "hereunder" and words of like import shall refer to this Agreement as a whole and not to any particular section or subdivision of such Agreement.

(h)    This Agreement is the result of negotiation between, and has been reviewed by counsel to, the Lender and the Trust. Accordingly, this Agreement is not intended to be construed against the Lender merely on account of the Lender's involvement in the preparation of such document.

WTEM_Pohl0002530

IN WITNESS WHEREOF, the parties have executed this Agreement with the effect from the date specified above.

**Imperial Premium Finance, LLC**

By:_____

Name:_____

Title:_____

Place of Execution:_____

**Phyllis Pohl Irrevocable Trust**

By:   **Bank of Utah**, not in its individual
      capacity, but solely as Co-Trustee under
      the Trust Agreement

By:_____

Name:____Michael Hoggan____
          Vice President

Title:_____

Place of Execution: SALT LAKE CITY, UT

**Phyllis Pohl Irrevocable Trust**

By:
      **Thomas Mahoney Jr**, not in his individual
      capacity, but solely as Co-Trustee under
      the Trust Agreement

By:_____

Name:_____

Title:_____

Place of Execution: _____

WTEM_Pohl0002521

IN WITNESS WHEREOF, the parties have executed this Agreement with the effect from the date specified above.

**Imperial Premium Finance, LLC**

By:_____

Name:_____

Title:_____

Place of Execution: _____

**Phyllis Pohl Irrevocable Trust**

By: **Bank of Utah**, not in its individual
capacity, but solely as Co-Trustee under
the Trust Agreement

By:_____

Name:_____

Title:_____

Place of Execution: _____

**Phyllis Pohl Irrevocable Trust**

By:
**Thomas Mahoney Jr**, not in his individual
capacity, but solely as Co-Trustee under
the Trust Agreement

By: _Mahoney_

Name: _THOMAS J. MAHONEY JR_

Title: _Co-TRUSTEE_

Place of Execution: _SAVANNAH, GA._

24

WTEM_Pohl0002532

## SCHEDULE A

### CLOSING PACKAGE

1. Irrevocable and Durable Limited Power of Attorney signed by the Insured permitting the Lender to review and receive copies of all records protected by the federal Health Insurance Portability and Accountability Act of 1996.

2. Authorization for Disclosure of Protected Health Information from the Insured.

3. Authorization and Direction to Provide Death Certificate Form from Insured.

4. Copy of the Trust Agreement as in effect on the Initial Premium Funding Date, together with any other documents affecting the Trust requested by the Lender.

5. A copy of the driver's license of the Insured or other proof of the Insured's age and sex reasonably satisfactory to the Lender, and confirmation of the Insured's social security number and address.

6. The original, executed Life Insurance Policy, or a complete copy thereof.

7. The original of the application for the Life Insurance Policy, or a complete copy thereof.

8. Life insurance illustration signed by the Trust reasonably satisfactory to the Lender.

9. Risk and Disclosure Statement executed by the Insured.

10. Risk and Disclosure Statement executed by the Trust.

11. Acknowledgment for the Life Insurance Policy from the Insurer that the Trust is the sole recorded owner of and duly designated beneficiary under such Life Insurance Policy.

12. Notice from the life insurance agent/broker confirming that medical records provided to the Lender are true and accurate and that no form of rebating has occurred.

13. Fully Executed Personal Guaranty of the Insured in such form as shall be approved by the Lender.

14. Security Agreement.

15. Promissory Note.

16. A Collateral Assignment of the Life Insurance Policy.

17. Such other documents, instruments, or opinions as the Lender may reasonably request.

MILW_2677238.4                25

## SCHEDULE B

### GRAMM-LEACH-BLILEY PRIVACY NOTICE

The Lender knows that you, as the Borrower or Trust, are concerned with how personal information is treated. This notice is designed to help describe what personal information is collected and how such information is used with respect to current and former customers. Terms used, but not defined herein, shall have the meanings given to them in the Agreement to which this schedule is annexed.

### Categories of nonpublic personal information collected by the Lender:

Nonpublic personal information may be collected from the following sources:

(i)     information we received from the Trust or the Insured, including information received on applications or other forms, such as name, address, social security number, assets and income;

(ii)     information about transactions with us, our affiliates, or others, including other parties to this transaction; such as account balances, payment history, assets purchased and sold; and

(iii)     information we received from a consumer reporting agency, such as your credit history and creditworthiness.

### Disclosure of nonpublic personal information:

(i)     The Lender does not disclose any nonpublic personal information about the Trust or the Insured to anyone, except as permitted or required by law. The Lender may disclose the information described above to firms that perform services on our behalf in connection with maintaining or servicing an account of the Trust or the Insured, or in connection with processing products or services at the request of the Trust or the Insured.

(ii)     In addition, the Lender reserves the right to disclose nonpublic personal information to any person or entity, including without limitation any governmental agency, regulatory authority or self-regulatory organization having jurisdiction over the Lender or an affiliate of the Lender, if (i) the Lender determines in our discretion that such disclosure is necessary or advisable pursuant to or in connection with any United States federal, state or local, or non-U. S., law, rule, regulation, executive order or policy, including without limitation any anti-money laundering law or the USA PATRIOT Act of 2001, and (ii) such disclosure is not otherwise prohibited by law, rule, regulation, executive order or policy.

WTEM_Pohl0002534

## Confidentiality and security

THE LENDER RESTRICTS ACCESS TO NONPUBLIC PERSONAL INFORMATION ABOUT THE TRUST AND THE INSURED TO THOSE EMPLOYEES AND AGENTS WHO NEED TO KNOW THAT INFORMATION TO PROVIDE PRODUCTS OR SERVICES TO THE TRUST OR THE INSURED, AND AS ALLOWED BY APPLICABLE LAW OR REGULATION, AND DOES NOT PERMIT IT TO BE SHARED OR USED FOR ANY OTHER PURPOSE. THE LENDER MAINTAINS PHYSICAL, ELECTRONIC, AND PROCEDURAL SAFEGUARDS TO GUARD THE NONPUBLIC PERSONAL INFORMATION OF THE TRUST AND THE INSURED.

WTEM_Pohl0002535

## **Exhibit C**

**Promissory Note**

# PROMISSORY NOTE

| Maximum Principal | Loan Date | Maturity | Loan No. | Fixed/Variable Rate | Account |
|---|---|---|---|---|---|
| $442,739.33 | March 12, 2008 | May 12, 2010 | 2008-488 | floating | ***** |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any items above containing ***** or left blank have been omitted due to text length limitations

Borrower:   Phyllis Pohl Irrevocable Trust          Lender:   Imperial Premium Finance, LLC
            200 East South Temple Suite 210                    701 Park of Commerce Blvd.
            Salt Lake City UT 84111                            Suite 301
                                                               Boca Raton, FL 33487

**Maximum Principal Amount: $442,739.33, Initial Loan Amount Advanced: $252,406.00, Initial Rate: 12.16%, Date of Note: March 12, 2008**

**PROMISE TO PAY. Phyllis Pohl Irrevocable Trust** ("Borrower") promises to pay to the order of Imperial Premium Finance, LLC ("Lender") in lawful money of the United States of America, all principal, together with accrued interest and all other charges, owed under the terms of this Promissory Note as hereinafter set forth and the Loan Agreement (as defined below). The maximum principal that may be advanced to Borrower shall be **$442,739.33**, or such lesser amount as determined in accordance with that certain Loan Application and Agreement (the "Loan Agreement") of even date herewith between Borrower and Lender and Lender shall have no obligation to make any advance in excess of that amount. Any advance shall be made under, and in accordance with, the Loan Agreement. In the event the unpaid balance of this Promissory Note ever is greater than the maximum principal advance, Borrower agrees to repay immediately the excess upon Lender's written demand. Capitalized terms used but not defined herein shall have the meanings assigned thereto in the Loan Agreement.

**PAYMENT.** The principal amount of this Promissory Note, together with all accrued but unpaid interest and all other charges, shall be due and payable in full in one lump sum on May 12, 2010, or if earlier, either: (a) one (1) Business Day after payment of any proceeds of the Life Insurance Policy to or for the benefit of the Borrower; or (b) if the Life Insurance Policy is rescinded for any reason, one (1) Business Day after the return of any Life Insurance Policy premium. All payments shall be applied in the following order: (i) to any collection costs Lender may have incurred in procuring Borrower's performance on this Promissory Note; (ii) to any fees due under the Loan Agreement; (iii) to the outstanding interest which has accrued on the balance of the Promissory Note; and (iv) to the outstanding principal balance of the Promissory Note. All interest under the Promissory Note shall be calculated on the basis of a 360-day year for the actual number of days elapsed in an interest period (actual/360 method). Determination of a rate of interest by the Lender shall, in the absence of manifest error, be conclusive and binding upon the Borrower. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing. All payments shall be made in lawful money of the United States to Lender at the address set forth above or at such other place as the Lender under this Promissory Note may designate in writing ("Payment Address").

**INTEREST RATE.** The Interest Rate on this Promissory Note shall be set (or initially set) at 12.16% rate per annum on a simple interest basis. The interest rate on this Promissory Note shall be a **floating** rate. If a fixed rate, it shall be fixed at the Interest Rate set forth in the preceding sentence; if a floating or variable rate, it shall be reset periodically as follows. If the interest rate on this Promissory Note is set as variable/floating and not fixed, the Interest Rate shall initially be as set forth in the first sentence of this paragraph and shall be adjusted thereafter on the first day of each month during the term of this Promissory Note. Each date on which the interest rate could vary or change is called a "Change Date." Beginning

MILW_2606602.7

1

WTEM Pohl0001361

with the first Change Date, the Interest Rate will be based on an Index plus the Spread. The "Index" is the LIBOR (one month) on the Change Date which is publicly announced in the "Money Rates" section of The Wall Street Journal, Eastern Edition, or such other similar publication, as is reasonably determined by the Lender. If the Index is no longer available, the Lender will choose a new index which is based upon comparable information. If the Change Date is not a Business Day, the rate as announced on the next Business Day shall be used.

On each Change Date, the Lender will calculate the new interest rate by adding 756 basis points (the "Spread") to the Index. Subject to the limits set forth herein, this amount will be the new interest rate until the next Change Date. The interest rate the Borrower is required to pay under this Promissory Note will not be greater than 16% or less than 11.5%. Any new interest rate will become effective on each Change Date.

NOTICE: Under no circumstances will the effective rate of interest on this Promissory Note be more than the maximum rate allowed by applicable law.

**PREPAYMENT.** Borrower agrees that all loan fees, including the Origination Fee and the Yield Maintenance Premium, and other prepaid finance charges are earned fully as of the date of this Promissory Note and will not be subject to refund upon early payment (whether voluntary or as a result of default), except: (i) in the case of death of the Insured prior to maturity, the Yield Maintenance Premium will be waived, or (ii) as otherwise required by law. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Promissory Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to the Payment Address. No privilege is reserved by Borrower to prepay any principal due hereunder and under the Loan Agreement prior to the Maturity Date, except that the Borrower may after giving five (5) days' prior written notice to Lender, prepay in full, but not in part, all principal and interest to and including the date on which payment is made, along with all sums, amounts, advances, or charges due under the Loan Agreement, this Promissory Note or the other Financing Documents, upon the payment of the Yield Maintenance Premium.

**LATE CHARGE.** Borrower shall pay to Lender a "late charge" in an amount equal to three percent (3%) of any amounts that are not paid within five (5) days after the due date thereof to cover the extra expense involved in handling delinquent payments. Lender's collection of a late charge hereunder shall not be deemed a waiver by Lender of any of its rights under this Promissory Note, or any other document between Borrower and Lender.

**SECURITY.** This Promissory Note is entitled to the benefit of, among other things, that certain Assignment Of Life Insurance Policy As Collateral ("Collateral Assignment") made by Borrower in favor of Portfolio Financial Servicing Company, as collateral agent for the Lender (the "Collateral Agent"), pursuant to which the Collateral Agent is granted a first priority security interest in the Life Policy (as such term is defined in the Collateral Assignment). This Promissory Note shall be subject to the terms and conditions set forth in such Collateral Assignment, the Loan Agreement, and the other Financing Documents.

**INTEREST AFTER DEFAULT.** Upon default, all amounts due under this Promissory Note shall bear interest from the date of acceleration or maturity at the interest rate set forth in this Promissory Note (as it may be adjusted from time to time) plus 2% per annum.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Promissory Note:

WTFM PohI0001363

**Payment Default.** Borrower fails to make any payment within three (3) Business Days after the same becomes due and payable under this Promissory Note, the Loan Agreement, or any other Financing Document.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Promissory Note, the Loan Agreement or in any of the other Financing Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower, the Insured or on Borrower's behalf under this Promissory Note, the Loan Agreement or any other Financing Document is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Related Agreements.** The Life Insurance Policy, Promissory Note, Loan Agreement, Security Agreement or any other Financing Document ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason; the Borrower becomes a revocable trust, contests the validity or enforceability of any Financing Document or denies that it has any further liability under any Financing Document to which it is a party, or cancels or terminates, or attempts to cancel or terminate, the Life Insurance Policy; or the Insurer contests the Life Insurance Policy based on the Borrower lacking an insurable interest in the life of the Insured.

**Indebtedness, Creditor or Forfeiture Proceedings.** Any garnishment of any of Borrower's accounts, attachment, lien, levy, additional encumbrance or additional security interest being placed upon any of the Collateral, or any commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any Collateral, and which is not discharged in full within one (1) day of the placement thereof. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Insolvency or Default of Borrower.** The Borrower is: (i) dissolved, liquidated or terminated; (ii) is unable to pay its debts as they mature; (iii) makes an assignment for the benefit of creditors; (iv) is bankrupt or insolvent; (v) seeks appointment of, or becomes the subject of an order appointing, a trustee, conservator, liquidator or receiver as to all or part of its assets; (vi) commences, approves or consents to, or is the debtor in, any case or proceeding under any bankruptcy, reorganization or similar law, and in the case of an involuntary case or proceeding, such case or proceeding is not dismissed thirty (30) days following its commencement; (vii) is the subject of an order for relief in an involuntary case under federal bankruptcy law; (viii) the Borrower defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Promissory Note or perform Borrower's Obligations under this Promissory Note, the Loan Agreement or any of other Financing Documents; or (ix) Borrower violates any Law.

**Insolvency or Default of Insured or Guarantor.** (i) The Insured or any Guarantor makes an assignment for the benefit of creditors; (ii) The Insured or any Guarantor is adjudicated a bankrupt or insolvent; (iii) The Insured or any Guarantor seeks appointment of, or is the subject of an order appointing, a trustee, conservator, or receiver as to all or part of his assets (iv) The Insured or any Guarantor commences, approves or consents to, or is the debtor in, any case or proceeding under any bankruptcy or similar law and, in the case of an involuntary case or proceeding, such case or proceeding is not dismissed thirty (30) days following its commencement; (v) The Insured or any

WTEM Pohl0001263

Guarantor is the subject of an order for relief in an involuntary case under federal bankruptcy law; (vi) Borrower defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay the Obligations; or (vi) any Guarantor defaults under the terms of the Personal Guaranty.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness under this Promissory Note or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Promissory Note; in the event of a death of a Guarantor, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the Personal Guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Obligations is materially impaired.

**Cure Provisions.** Other than as set forth in the preceding clauses of this Section, failure by the Borrower or Insured, as applicable, to perform in any material respect any of its obligations under this Promissory Note, Loan Agreement, Security Agreement or any other Financing Document to which either is a party if such failure is not remedied on or prior to the fifteenth (15th) day after written notice of such failure is given to the Borrower or the Insured, respectively, by the Lender.

**LENDER'S RIGHTS.** It is stipulated and agreed in the event one or more installments are not paid when the same falls due, or in default of any covenant herein, then the entire balance of the indebtedness shall at once or at any time thereafter, at the option of the payee of this Promissory Note, become due, payable and collectible. Demand, protest, and notice of demand, protest, and non-payment are hereby waived by the undersigned.

**ATTORNEYS' FEES: EXPENSES.** Lender may hire or pay someone else to help collect this Promissory Note if Borrower does not pay. Borrower will pay Lender the amount of these costs and expenses, which includes, subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses whether or not there is a lawsuit including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.** LENDER AND BORROWER HEREBY WAIVE THE RIGHT TO ANY JURY TRIAL IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM BROUGHT BY EITHER LENDER OR BORROWER AGAINST THE OTHER.

**GOVERNING LAW.** THIS PROMISSORY NOTE WILL BE GOVERNED BY THE LAWS OF THE STATE OF UTAH WITHOUT REGARD TO ITS CONFLICTS OF LAW PROVISIONS. THIS PROMISSORY NOTE HAS BEEN ACCEPTED BY LENDER IN THE STATE OF UTAH. BORROWER AGREES TO BE SUBJECT TO THE EXCLUSIVE JURISDICTION OF SALT LAKE CITY, UT CONCERNING ANY DISPUTES ARISING OUT OF OR RELATING TO THIS PROMISSORY NOTE AND HEREBY SUBMITS TO SUCH JURISDICTION.

**REQUESTS FOR SPECIAL SERVICES.** In general, there are no borrower-paid fees associated with the routine servicing of a loan. Borrower, however, may occasionally find it necessary to request services for which there is a charge. The services that fall outside of routine servicing include, without limitation, providing the following documents upon request: duplicate year-end statements, copies of loan documents or periodic statements, payment histories, and replacement coupon books. Borrower agrees to pay the fees imposed by Lender in connection with providing the requested services, as in effect from time to time. Borrower also agrees to pay facsimile or other fees imposed by Lender if these services are requested on an

WTFM_Pohl0001261

expedited basis. All such fees shall be fully earned and non-refundable and shall be paid upon Lender's demand (provided, that Lender, in its discretion, may add the fees to the principal indebtedness due, and accrue interest thereon, and the same shall be due, if not sooner demanded by Lender upon the maturity of the indebtedness without further demand). The fees shall not be deemed to be interest or charges for the use of money.

**SUCCESSOR INTERESTS.** The terms of this Promissory Note shall be binding upon Borrower, and upon Borrower's heirs, personal representative, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.** If any part of this Promissory Note cannot be enforced, this fact will not affect the rest of this Promissory Note. Borrower does not agree or intend to pay, and Lender does not agree or intend to contract for, charge, collect, take, reserve or receive (collectively referred to herein as charge or collect), any amount in the nature of interest or in the nature of a fee for this loan, which would in any way or event (including demand prepayment, or acceleration) cause Lender to charge or collect more for this loan than the maximum Lender would be permitted to charge or collect by federal law or the law of the State of Utah (as applicable). Any such excess interest or unauthorized fee shall, instead of anything stated to the contrary, be applied first to reduce the principal balance of the amounts due hereunder to the extent of such excess or, at the option of the Borrower, shall be returned to the Borrower. Lender may delay or forgo enforcing any of its rights or remedies under this Promissory Note without losing them. Borrower and any other person who signs, guarantees or endorses this Promissory Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. This Promissory Note is the Promissory Note referred to in, and is entitled to the benefits of, the Loan Agreement and the other Financing Documents.

PRIOR TO SIGNING THIS PROMISSORY NOTE BORROWER HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS PROMISSORY NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE PROMISSORY NOTE.

It is expressly understood and agreed by any recipient hereof that in no event shall Bank of Utah, as trustee of the Borrower, in its individual capacity have any liability for the representations, warranties, covenants, agreements or other obligations of the Borrower hereunder or under any schedule, exhibit, appendix or other document in connection with this Promissory Note, as to all of which recourse shall be had solely to the assets of the Borrower, and under no circumstances shall Bank of Utah as trustee of the Borrower be personally liable for the payment of any indebtedness or expenses of the Borrower or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Borrower under this Promissory Note or under any schedule, exhibit, appendix or other document in connection with this Promissory Note.

WTEM Pohl0001365

BORROWER:

**Phyllis Pohl Irrevocable Trust**

By: **Bank of Utah, Co-Trustee**

Signature: _____
Name:         Michael Hoggan
Title:          Vice President

Before me, the undersigned, personally appeared _Michael Hoggan_, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, and he or she acknowledged to me that he or she is a _____Vice President_____ of Bank of Utah, which executed the foregoing instrument as Co-Trustee of the Phyllis Pohl Irrevocable Trust; and that he or she was authorized by general signing authority resolutions adopted by Bank of Utah to execute documents such as this instrument.

GIVEN under my hand and official seal of office this the _24_ day of _DECEMBER_, 2008.

ARGE FEOTIS
Notary Public
State of Utah
My Comm. Expires Aug 27, 2011
711 S State Salt Lake City UT 84111

_____
Notary Public

**Phyllis Pohl Irrevocable Trust**

By: _____
         Name: Thomas Mahoney Jr
         Title:  Co-Trustee

Before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, and he or she acknowledged to me that he or she is a Co-Trustee of the Phyllis Pohl Irrevocable Trust, and that he or she was authorized to execute documents such as this instrument.

GIVEN under my hand and official seal of office this the _____ day of _____, 2008.

_____
Notary Public

WTEM_Pohl0001266

BORROWER:

**Phyllis Pohl Irrevocable Trust**

By: **Bank of Utah, Co-Trustee**

Signature: _____
Name: _____
Title: _____

Before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, and he or she acknowledged to me that he or she is a _____ of Bank of Utah, which executed the foregoing instrument as Co-Trustee of the Phyllis Pohl Irrevocable Trust; and that he or she was authorized by general signing authority resolutions adopted by Bank of Utah to execute documents such as this instrument.

GIVEN under my hand and official seal of office this the _____ day of _____, 2008.

_____
Notary Public

**Phyllis Pohl Irrevocable Trust**

By: _____ *Co-Trustee*
Name: **Thomas Mahoney Jr**
Title: **Co-Trustee**

Before me, the undersigned, personally appeared *Thomas J. Mahoney Jr*, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, and he or she acknowledged to me that he or she is a Co-Trustee of the Phyllis Pohl Irrevocable Trust, and that he or she was authorized to execute documents such as this instrument.

GIVEN under my hand and official seal of office this the _29_ day of _Dec_, 2008.

_____
Notary Public

*[Notary seal: DEBORAH M. LIGHTFOOT, NOTARY PUBLIC, CHATHAM COUNTY, GA, My Comm. Exp. Sept. 30, 2012]*

MILW_2606602.7                                    6

**<u>Exhibit D</u>**

**Guaranty**

GUARANTY

THIS GUARANTY is entered into as of March 12, 2008 by the undersigned (the "Guarantor"), in favor of and for the benefit of Imperial Premium Finance, LLC, a Florida limited liability company (which for all purposes of this Guaranty shall include any assignees, whether or not by operation of law, and successors thereto, the "Lender").

RECITALS

Pursuant to a loan agreement between the Lender and Phyllis Pohl Irrevocable Trust ("Trust" or "Borrower") dated March 12, 2008 (the "Loan Agreement"), the Lender has made an initial loan in the amount of $252,406.00 (the "Loan") to the Trust as evidenced by the Promissory Note dated March 12, 2008 (as amended, supplemented or modified from time to time, the "Note"). The proceeds of the Loan were used to pay or reimburse for the premiums due under life insurance policy number 01N1364514 issued by Lincoln Benefit Life Company (the "Insurer") on the life of Phyllis Pohl in the face amount of $9,000,000.00 (the "Policy").

The Guarantor, as grantor of the Borrower, acknowledges and agrees that the Guarantor has received and will receive direct and indirect benefits from the extension of the Loan made to the Borrower. Any capitalized terms used herein and not otherwise defined shall have the definitions accorded to such terms in the Loan Agreement.

1.    **Conditions to Liability**.    Notwithstanding anything herein to the contrary, this Guaranty shall result in liability to the Guarantor only in the event that any of the following shall occur (each of which shall be identified as a "Default"):

(a)    Any act (or omission to act) of fraud or willful misconduct on the part of the Guarantor, or any other action or inaction by the Guarantor, that impairs the Lender's ability to be repaid under the Note or otherwise under the Loan;

(b)    Any act (or omission to act) of the Guarantor that directly or indirectly impairs the Lender's rights to the Policy as collateral under the terms of the Loan, the Note, any Financing Document and/or the Collateral Assignment;

(c)    Any failure of the Borrower to use the proceeds of the Loan exclusively as set forth in the Note, the Financing Documents or any other documents related to the Loan;

(d)    Any act by the Borrower or the Guarantor to transfer, amend, change ownership of, cancel, convey, sell or assign the Policy or any interest therein without the express written consent of the Lender;

(e)    Any failure to act by the Borrower or the Guarantor that results, directly or indirectly, in the transfer of the Policy or any interest therein or any amendment, change of ownership, cancellation, conveyance, sale or assignment thereof, except with the express written consent of the Lender;

(f)    The breach of any representation, warranty or covenant by the Guarantor contained in the Collateral Assignment or in any Financing Document; and



EXHIBIT
21
10·24·16

(g)    Any failure of the Borrower, the Guarantor or any beneficiary of the Borrower who directly or indirectly receives any payment from the Insurer prior to the repayment of the Loan, to pay or cause to be paid to the Lender all or such portion of such payment necessary to repay the entire outstanding balance of the Loan and any other outstanding amounts under the Financing Documents, together with any accrued and unpaid interest thereon and any other charges and expenses payable to the Lender under the terms of the Note, the Financing Documents and any other documents related to the Loan.

Upon the occurrence of a Default, the Guarantor hereby irrevocably and unconditionally guarantees to the Lender, the due and punctual payment when due of all liabilities and all other amounts outstanding or due to be paid to the Lender under, in connection with or related to, the Loan and any other agreements entered into with respect thereto (including the Financing Documents), including but not limited to outstanding principal and accrued and unpaid interest under the Note, any early termination fees, costs and expenses payable to the Lender (including, but not limited to, reasonable attorneys' fees) in the event of an uncured default under the Loan or any Financing Document, as well as any and all costs and expenses of the Lender to enforce this Guaranty (including, but not limited to, reasonable attorneys' fees), whether or not (i) due or owing to, or in favor or for the benefit of, the Lender, or (ii) ARISING OR ACCRUING BEFORE OR AFTER THE FILING BY OR AGAINST THE GUARANTOR OF A PETITION UNDER THE BANKRUPTCY CODE OR ANY SIMILAR FILING BY OR AGAINST THE GUARANTOR, AS THE CASE MAY BE, UNDER THE LAWS OF ANY JURISDICTION OR (c) ALLOWABLE UNDER SECTION 502(b)(2) OF THE BANKRUPTCY CODE (collectively, the "Guaranteed Obligations").

Notwithstanding the foregoing, in the event liability under this Guaranty results solely as a result of a Default as described in Section 1(g), the Guarantor's liability shall be limited to 100% of the amount outstanding or due under the Guaranteed Obligations.

2.    **Waiver**.

(a)    The Guarantor unconditionally and irrevocably waives, to the fullest extent permitted by applicable law: (i) notice of any of the matters referred to in Section 1 hereof; (ii) all notices which may be required by statute, rule of law or otherwise to preserve any rights against the Guarantor hereunder, including, without limitation, notice of the acceptance of this Guaranty, or the creation, renewal, extension, modification or accrual of the Guaranteed Obligations or notice of any other matters relating thereto, any presentment, demand, notice of dishonor, protest, nonpayment of any damages or other amounts payable under any Financing Document; (iii) any requirement for the enforcement, assertion or exercise of any right, remedy, power or privilege under or in respect of any Financing Document, including, without limitation, diligence in collection or protection of or realization upon the Guaranteed Obligations or any part thereof or any collateral therefor; (iv) any requirement of diligence; (v) any requirement to mitigate the damages resulting from a default by the Borrower under the Note or any Financing Document; (vi) the occurrence of every other condition precedent to which the Guarantor or the Borrower may otherwise be entitled; (vii) the right to require the Lender to proceed against the Borrower or any other person liable on the Guaranteed Obligations, to proceed against or exhaust any security held by the Borrower or any other person, or to pursue any other remedy in the Lender's power whatsoever; (viii) the right to have the property of the Borrower first applied to

the discharge of the Guaranteed Obligations; (ix) any lack of validity or enforceability in the Note or any other Financing Document, (x) any exchange or release of, or non-perfection of any collateral securing, all or any of the Guaranteed Obligations; (xi) any release, amendment or waiver of or consent to departure from any other guaranty or any document relating to any security for or in respect of the Guaranteed Obligations; (xii) any other circumstances which might otherwise constitute a defense available to, or discharge of, the Guarantor; or (xiii) any and all rights it may now or hereafter have under any agreement or at law or in equity (including, without limitation, any law subrogating the Guarantor to the rights of the Lender) to assert any claim against or seek contribution, indemnification or any other form of reimbursement from the Borrower or any other party liable for payment of any or all of the Guaranteed Obligations for any payment made by the Guarantor under or in connection with this Guaranty or otherwise.

(b)    The Lender may, at its election, exercise any right or remedy it may have against the Borrower without affecting or impairing in any way the liability of the Guarantor hereunder and the Guarantor waives, to the fullest extent permitted by applicable law, any defense arising out of the absence, impairment or loss of any right of reimbursement, contribution or subrogation or any other right or remedy of the Guarantor against the Borrower, whether resulting from such election by the Lender or otherwise. The Guarantor waives any defense arising by reason of any disability or other defense of the Borrower or by reason of the cessation for any cause whatsoever of the liability, either in whole or in part, of the Borrower to the Lender for the Guaranteed Obligations.

(c)    The Guarantor assumes the responsibility for being and keeping informed of the financial condition of the Borrower and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and agrees that the Lender shall not have any duty to advise the Guarantor of information regarding any condition or circumstance or any change in such condition or circumstance. The Guarantor acknowledges that the Lender has not made any representations to the Guarantor concerning the financial condition of the Borrower. The value of the consideration received and to be received by the Guarantor is reasonably worth at least as much as the liability and obligation of Guarantor incurred or arising under this Guaranty and all related papers and arrangements.

3.    **Parties**. This Guaranty shall inure to the benefit of the Lender and its successors, assigns or transferees, and shall be binding upon the Guarantor and his or her respective heirs, successors and assigns; provided, that the Guarantor may not delegate or assign any of the Guarantor's duties or obligations under this Guaranty without the prior written consent of the Lender.

4.    **Notices**. All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by U.S. mail, certified with return receipt requested, or sent by telecopy (with confirmed receipt or followed by overnight delivery) to the addresses (or telecopy numbers) set forth on the signature pages hereto. The Guarantor or the Lender may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given in accordance with the provisions of this Guaranty shall be deemed to have been given on the date of receipt or, if mailed, the fifth (5th) business day following the date so mailed, if earlier, or the next business day if sent by overnight courier.

5.    **Right to Deal with the Borrower**.  At any time and from time to time, without terminating, affecting or impairing the validity of this Guaranty or the obligations of the Guarantor hereunder, the Lender may deal with the Borrower in the same manner and as fully as if this Guaranty did not exist and shall be entitled, among other things, to grant the Borrower, without notice or demand and without affecting the Guarantor's liability hereunder, such extension or extensions of time to perform, renew, compromise, accelerate or otherwise change the time for payment of or otherwise change the terms of indebtedness or any part thereof contained in or arising under any Financing Document or any other document evidencing Obligations of the Borrower to the Lender, or to waive any obligation of the Borrower to perform, any act or acts as the Lender may deem advisable.

6.    **Subrogation.**  Notwithstanding anything to the contrary contained herein, any and all rights and claims of the Guarantor against the Borrower or any of its property or against any other person, arising by reason of any payment by the Guarantor to the Lender pursuant to the provisions, or in respect, of this Guaranty shall be subordinate, junior and subject in right of payment to the prior and indefeasible payment in full of the Guaranteed Obligations to the Lender, and until such time, the Guarantor shall have no right of subrogation, contribution or any similar right and hereby waive any right to enforce any remedy the Lender may now or hereafter have against the Borrower, any endorser or any other guarantor of all or any part of the Guaranteed Obligations and any right to participate in, or benefit from, any security given to the Lender to secure the Guaranteed Obligations.  Any promissory note evidencing such liability of the Borrower to the Guarantor shall be non-negotiable, shall expressly state that it is subordinated pursuant to this Guaranty and shall be immediately assigned (with recourse) and delivered to the Lender.  All liens and security interests of the Guarantor, whether now or hereafter arising and howsoever existing, in assets of the Borrower or any assets securing the Guaranteed Obligations shall be and hereby are subordinated to the rights and interests of the Lender in those assets until the prior and indefeasible final payment in full of all of the Guaranteed Obligations to the Lender and termination of all financing arrangements between the Borrower and the Lender.  If any amount shall be paid to the Guarantor contrary to the provisions of this Section 6 at any time when all the Guaranteed Obligations shall not have been indefeasibly paid in full, such amount shall be held in trust for the benefit of the Lender and shall forthwith be turned over in kind in the form received to the Lender (duly endorsed if necessary) to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms of the Financing Documents and this Guaranty.

7.    **Survival of Representations, Warranties, and Agreements.**    All representations, warranties, covenants and agreements made herein, including representations and warranties deemed made herein, shall survive any investigation or inspection made by or on behalf of the Lender and shall continue in full force and effect until all of the obligations of the Guarantor under this Guaranty shall be fully performed in accordance with the terms hereof, and until the payment in full of the Guaranteed Obligations.

8.    **GOVERNING LAW; CONSENT TO JURISDICTION; WAIVER OF JURY TRIAL.**    THIS GUARANTY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF UTAH.  THE GUARANTOR HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR ANY DISTRICT OF UTAH AND ANY COURT IN THE STATE OF

UTAH IN ANY ACTION, SUIT OR PROCEEDING BROUGHT AGAINST THE
GUARANTOR AND RELATED TO OR IN CONNECTION WITH THIS GUARANTY OR
THE TRANSACTIONS CONTEMPLATED HEREBY, AND TO THE EXTENT PERMITTED
BY APPLICABLE LAW, THE GUARANTOR HEREBY WAIVES AND AGREES NOT TO
ASSERT BY WAY OF MOTION, AS A DEFENSE OR OTHERWISE IN ANY SUCH SUIT,
ACTION OR PROCEEDING, ANY CLAIM THAT THE GUARANTOR IS NOT
PERSONALLY SUBJECT TO THE JURISDICTION OF SUCH COURTS, THAT THE SUIT,
ACTION OR PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM, THAT THE
VENUE OF THE SUIT, ACTION OR PROCEEDING IS IMPROPER, OR THAT THIS
GUARANTY OR ANY DOCUMENT OR ANY INSTRUMENT REFERRED TO HEREIN OR
THE SUBJECT MATTER THEREOF MAY NOT BE LITIGATED IN OR BY SUCH
COURTS.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE GUARANTOR
AGREES (I) NOT TO SEEK AND HEREBY WAIVES THE RIGHT TO ANY REVIEW OF
THE JUDGMENT OF ANY SUCH COURT BY ANY COURT OF ANY OTHER NATION
OR JURISDICTION WHICH MAY BE CALLED UPON TO GRANT AN ENFORCEMENT
OF SUCH JUDGMENT AND (II) NOT TO ASSERT ANY COUNTERCLAIM, IN ANY
SUCH SUIT, ACTION OR PROCEEDING UNLESS SUCH COUNTERCLAIM COULD
NOT, BY REASON OF ANY APPLICABLE FEDERAL OR STATE PROCEDURAL LAWS,
BE INTERPOSED, PLEADED OR ALLEGED IN ANY OTHER ACTION.    THE
GUARANTOR AGREES THAT SERVICE OF PROCESS MAY BE MADE UPON THE
GUARANTOR BY CERTIFIED OR REGISTERED MAIL TO THE ADDRESS FOR
NOTICES SET FORTH IN THIS GUARANTY OR ANY METHOD AUTHORIZED BY THE
LAWS OF UTAH. THE GUARANTOR IRREVOCABLY WAIVES ALL RIGHT TO TRIAL
BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR
RELATING TO THIS GUARANTY, THE FINANCING DOCUMENTS OR THE
TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

9.    **Expenses**.  The Guarantor hereby agrees to pay on demand, and to hold the
Lender harmless against liability for, any and all costs and expenses (including, without
limitation, reasonable legal fees, costs and expenses of counsel and fees, costs and expenses
incurred in connection with any bankruptcy proceeding) incurred or expended by the Lender in
connection with the enforcement, amendment, modification or waiver of or preservation of any
rights under this Guaranty, and the collection of amounts payable hereunder, and until so paid,
such fees, costs, disbursements and expenses shall be added to, and constitute, Guaranteed
Obligations.

10.    **Further Assurances**. The Guarantor hereby covenants and agrees to execute and
deliver to the Lender such additional agreements, instruments and documents as the Lender may
reasonably request to give effect to the obligations of the Guarantor under this Guaranty.

11.    **Miscellaneous**.

If any term of this Guaranty or any application hereof shall be invalid or
unenforceable, the remainder of this Guaranty and any other application of such term shall not be
affected thereby.

Any term of this Guaranty may be amended, waived, discharged or terminated only by an instrument in writing signed by the Guarantor and the Lender. No notice to or demand on the Guarantor shall be deemed to be a waiver of the obligations of the Guarantor or of the right of the Lender to take further action without notice or demand as provided in this Guaranty. No course of dealing between the Guarantor and the Lender shall change, modify or discharge, in whole or in part, this Guaranty or any obligations of the Guarantor hereunder. No waiver of any term, covenant or provision of this Guaranty shall be effective unless given in writing by the Lender and if so given shall only be effective in the specific instance in which given.

The headings in this Guaranty are for purposes of reference only and shall not limit or define the meaning hereof.

No delay or failure of the Lender in exercising any right, power or privilege hereunder or under the Financing Documents, shall affect such right, power or privilege nor shall any single or partial exercise thereof or any abandonment or discontinuance of steps to enforce such a right, power or privilege preclude any further exercise thereof or of any other right, power or privilege. The Lender's rights and remedies hereunder are cumulative and not exclusive of any rights or remedies which it would otherwise have. Any waiver, permit, consent or approval of any kind or character of the Lender concerning any breach or default by the Guarantor under this Guaranty must be in writing and specifically described.

All payments made by the Guarantor hereunder to the Lender in respect of the Guaranteed Obligations shall be made to the Lender in U.S. dollars and immediately available funds at an account designated by the Lender, or to such other place as the Lender may hereafter specify in writing.

The execution and delivery of this Guaranty shall not supersede, terminate, modify or supplement in any manner any other guaranty previously executed and delivered to the Lender by the Guarantor and no release or termination of this Guaranty shall be construed to terminate or release any other guaranty unless such other guaranty is specifically referred to in any such termination.

The Guarantor's obligations hereunder shall be the personal obligations of such Guarantor.

This Guaranty is a continuing guaranty and shall remain in full force and effect without regard to any defenses or counterclaims that the Guarantor or the Borrower may assert on the debt underlying this Guaranty, including, but not limited to, failure of consideration, breach of warranty, fraud, statute of frauds, bankruptcy, statute of limitations, lender liability, accord and satisfaction and usury until (A) all of the Guaranteed Obligations shall have been indefeasibly paid in full and (B) Borrower shall have indefeasibly satisfied all of its Obligations under the Note and the other Financing Documents and notice thereof has been provided by Lender to the Guarantor.

[The remainder of this page is intentionally left blank.]

IN WITNESS WHEREOF, the undersigned have executed and delivered this Guaranty as of the day and year first above written.

_____
Phyllis Pohl

Address:
10510 Laurel Estates Lane
Wellington, FL 33467
Phone: 561-042-1411
Fax: _____

## Exhibit E

**Security Agreement**

## SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** (this "Security Agreement") is made and executed between Kimberly Pohl and Allan Pohl (together, "Beneficiary"), a beneficiary of the Phyllis Pohl Irrevocable Trust (the "Trust") and Imperial Premium Finance, LLC, a Florida limited liability company ("Lender").

### RECITALS

A.    Pursuant to the Loan Application and Agreement (the "Loan Agreement") attached hereto as Schedule A, between Lender and the Trust, Lender has loaned or will loan to Trust an amount under the Loan Agreement to be used by the Trust to pay premiums on a Life Insurance Policy;

B.    The Trust is the sole owner and beneficiary of the Life Insurance Policy, which the Trust holds pursuant to the terms of the Trust Agreement;

C.    The Beneficiary will derive significant benefits from the loan to the Trust under the Loan Agreement by reason of his or her interest in the Trust;

D.    In order to induce the Lender to make the advance contemplated by the Loan Agreement and extend credit to the Trust as provided in the Loan Agreement, the Beneficiary has agreed to grant a security interest in the Beneficiary's beneficial interest in the Trust to the Lender in accordance with the terms and conditions of this Security Agreement.

**NOW, THEREFORE,** intending to be legally bound and in consideration of the matters described in the foregoing Recitals, which Recitals are incorporated herein and made a part hereof, and for other good and valuable consideration the receipt and sufficiency of which are acknowledged, Beneficiary and Lender hereby covenant and agree as follows:

1.    **GRANT OF SECURITY INTEREST.** Beneficiary hereby grants, gives, conveys and pledges to Lender a first priority security interest in all of Beneficiary's right, title and interest whether now owned or hereafter acquired and wherever located, in and to the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Security Agreement with respect to the Collateral, in addition to all other rights that Lender may have by law.

2.    **COLLATERAL DESCRIPTION.** The word "Collateral" means the following: Beneficiary's entire beneficial interest in and to the Trust, the Trust Agreement and the assets held by the Trust under the Trust Agreement and any related documents including, but not limited to, Beneficiary's interest in any death benefits that become payable under the Life Insurance Policy and all proceeds thereof.

3.    **BENEFICIARY'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Beneficiary represents and warrants to Lender that:

1

(a)    **Ownership.** On and after the Initial Premium Funding Date, the Beneficiary has, and will do nothing to impair, its full, complete and absolute ownership of the Collateral and all rights thereunder free and clear of any Encumbrances, options, purchase rights or commitments of any kind except as otherwise contemplated by the Financing Documents. Under the terms of the Trust, the Beneficiary has, and shall do nothing to impair, the sole and absolute right, subject to the terms of the Financing Documents, to pledge or assign such beneficial interests as collateral and receive all proceeds and other amounts now or in the future due and payable in respect to the Collateral. On and after the Initial Premium Funding Date, Beneficiary has not taken and shall not take, any actions to provide any Person other than the Beneficiary any interest in or claim to the Collateral other than as expressly provided in the Loan Agreement.

(b)    **Right to Grant Security Interest.** Beneficiary has the full right, power and authority to enter into this Security Agreement and to grant a security interest, assignment and pledge of the Collateral to Lender as provided herein, and this Security Agreement and the security interest created by Beneficiary hereunder does not violate or breach the Trust Agreement or any other document, instrument, mortgage or agreement to which Beneficiary is a party or to which its assets are bound.

(c)    **Trust Agreement.** A true and correct copy of the Trust Agreement, including all amendments, supplements and other modifications thereto, has been previously delivered by Trust to Lender. The Trust Agreement is a legal, valid and binding agreement, enforceable by Beneficiary in accordance with its terms, subject to applicable bankruptcy reorganization, insolvency, moratorium, or similar laws affecting creditors rights generally and to equitable principles of general application, regardless of whether such principles are considered in a proceeding in equity or at law.

(d)    **Consents.** No consent, approval, authorization or other order or other action by, and no notice to or filing with, the trustee of the Trust or any other person is required (i) for the grant of the security interest by Beneficiary in the Collateral pursuant to this Security Agreement or for the execution, delivery or performance of this Security Agreement by Beneficiary, or (ii) for the exercise by Lender of any of its rights provided for in this Security Agreement or the remedies in respect of the Collateral pursuant to this Security Agreement.

(e)    **Due Authorization, Execution and Delivery; Valid and Binding Obligation.** This Security Agreement has been duly authorized, executed and delivered by Beneficiary and constitutes a legal, valid and binding obligation of Beneficiary enforceable by Lender against Beneficiary in accordance with its terms.

(f)    **No Prior Assignment.** Beneficiary has not previously granted a security interest in the Collateral to any other creditor.

(g)    **No Further Transfer.** Beneficiary shall not sell, assign, encumber, or otherwise dispose of any of Beneficiary's rights in the Collateral except as expressly provided in this Security Agreement.

2

WTEM_Pohl0001407

(h) **No Defaults.** There are no defaults relating to the Collateral, and there are no offsets or counterclaims to the same. Beneficiary will strictly and promptly do everything required of Beneficiary under the terms, conditions, promises, and agreements contained in or relating to the Collateral.

(i) **Proceeds.** Any and all replacement or renewal certificates, instruments, or other benefits or proceeds related to the Collateral that are received by Beneficiary shall be held by Beneficiary in trust for Lender and immediately shall be delivered by Beneficiary to Lender to be held as part of the Collateral.

(j) **Location.** Beneficiary's primary office and principal place of business or residence if an individual and the place where Beneficiary keeps Beneficiary's records concerning the Collateral are located at the address set forth in Section 10(g) below. If Beneficiary changes Beneficiary's name or address, or the name or address of any person granting a security interest under this Security Agreement changes, Beneficiary will promptly notify the Lender of such change.

(k) **Further Acts.** Beneficiary will, at its sole expense, promptly execute, acknowledge and deliver all such instruments and take all such actions as Lender from time to time may request in order to ensure to Lender the benefits of its Lien in and to the Collateral intended to be created by this Security Agreement, including the filing of any necessary financing statements or continuation statements, which may be filed by Lender with or (to the extent permitted by law) without the signature of Beneficiary, and will cooperate with Lender, at Beneficiary's expense, in obtaining all necessary approvals and making all necessary filings under federal, state, local or foreign law in connection with such Lien or any sale or transfer of the Collateral.

4. **LENDER'S RIGHTS AND OBLIGATIONS WITH RESPECT TO THE COLLATERAL.** While this Security Agreement is in effect, Lender shall retain all of Beneficiary's rights, title and interest in the Collateral, together with any and all evidence of the Collateral, and this Security Agreement will remain in effect until (a) there no longer is any Indebtedness owing to Lender; and (b) all other obligations secured by this Security Agreement have been fulfilled.

5. **PERFECTION AND PROTECTION OF SECURITY.** The Beneficiary makes the following representations, warranties and covenants to the Lender from the Execution Date until the Obligations are paid in full:

(a) The pledgor's right, title and interest in any Collateral is and shall be free from any Encumbrance except for the security interest and lien created hereby and pursuant to the other Financing Documents.

(b) The Beneficiary shall cause financing statements relating to the Collateral to be filed under the Uniform Commercial Code ("UCC") in the jurisdictions indicated in this Security Agreement or as otherwise determined by the Lender. Subject to the filing of

3

continuation statements in respect of such financing statements required from time to time under the UCC, (i) the security interest in the Collateral, to the extent the same can be perfected by filing of financing statements under the UCC, constitutes and will constitute a perfected first priority security interest therein, subject to no other Encumbrance which is perfected by filing of financing statements, and (ii) subject further to the Lender's obtaining and maintaining possession or control over Collateral as to which a security interest can be perfected by possession or control under the UCC, the security interest in the Collateral, to the extent the same can be perfected under the UCC, constitutes and will constitute a perfected first priority security interest therein, subject to no other Encumbrance; provided that continuation of such security interest in the proceeds of the Collateral is limited by the provisions of Sections 9-203, 9-315 and 9-322 of the UCC.

(c)     There is no financing statement naming the Beneficiary or any of its predecessors in interest as debtor now on file or registered in any public office evidencing any Encumbrance on the Collateral, or intended so to be and the Beneficiary (including any of its predecessors in interest) has not filed or authorized the filing of, any financing statement relating to any of its right, title or interest in or to any of the Collateral, except financing statements filed or to be filed in respect of and covering the security interest and lien of the Lender granted and provided for in this Security Agreement and the other Financing Documents.

6.     **LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Beneficiary fails to comply with any provision of this Security Agreement or any Related Documents, including but not limited to Beneficiary's failure to discharge or pay when due any amounts Beneficiary is required to discharge or pay under this Security Agreement or any Related Documents, Lender on Beneficiary's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Loan Agreement from the date incurred or paid by Lender to the date of repayment by Trust. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the Total Amount Due and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance Life Insurance Policy; or (2) the remaining term of the Loan Agreement; or (C) be treated as a balloon payment which will be due and payable at the Maturity Date. This Security Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon an Event of Default.

7.     **LIMITATIONS ON OBLIGATIONS OF LENDER.** Lender shall use ordinary reasonable care in the physical preservation and custody of the Collateral to the extent the possession of the Lender but shall have no other obligation to protect the Collateral or its value. In particular, but without limitation, Lender shall have no responsibility (A) for the collection or protection of any income on the Collateral (other than any death benefits paid or payable under the Life Insurance Policy and any interest or payments in the nature of interest which may be paid or become due in respect thereto); (B) for the preservation of rights against issuers of the

4

Collateral or against third persons (other than the Insurer); (C) for ascertaining any maturities, conversions, exchanges, offers, tenders, or similar matters relating to the Collateral other than the Life Insurance Policy; nor (D) for informing the Beneficiary about any of the above, whether or not Lender has or is deemed to have knowledge of such matters.

8.    **DEFAULT.** Each of the following shall constitute an Event of Default under this Security Agreement:

(a)    **Payment Default.** Trust fails to make any payment within three (3) Business Days after the same becomes due and payable under the Loan Agreement, the Promissory Note or any other Financing Document.

(b)    **Other Defaults.** Trust fails to comply with or to perform any other term, obligation, covenant or condition contained in the Promissory Note, the Loan Agreement or in any of the other Financing Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Trust or a default occurs under the Promissory Note, Loan Agreement, this Security Agreement or any other Financing Document.

(c)    **False Statements.** Any warranty, representation or statement made or furnished to Lender by Trust, the Insured or on Trust's behalf under this Security Agreement, the Promissory Note, the Loan Agreement or any other Financing Document is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

(d)    **Related Agreements.** This Security Agreement, the Life Insurance Policy, Promissory Note, Loan Agreement, or any other Financing Document ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason; the Trust becomes a revocable trust, contests the validity or enforceability of any Financing Document or denies that it has any further liability under any Financing Document to which it is a party, or cancels or terminates, or attempts to cancel or terminate, the Life Insurance Policy; or the Insurer contests the Life Insurance Policy based on the Trust lacking an insurable interest in the life of the Insured.

(e)    **Indebtedness, Creditor or Forfeiture Proceedings.** Any garnishment of any of Trust's accounts, attachment, lien, levy, additional encumbrance or additional security interest being placed upon any of the Collateral, or any commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Trust or by any governmental agency against any Collateral, and which is not discharged in full within one (1) day of the placement thereof. However, this Event of Default shall not apply if there is a good faith dispute by Trust as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Trust gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

5

WTEM_Pohl0001410

(f) **Insolvency or Default of Trust.** The Trust is: (i) dissolved, liquidated or terminated; (ii) is unable to pay its debts as they mature; (iii) makes an assignment for the benefit of creditors; (iv) is bankrupt or insolvent; (v) seeks appointment of, or becomes the subject of an order appointing, a trustee, conservator, liquidator or receiver as to all or part of its assets; (vi) commences, approves or consents to, or is the debtor in, any case or proceeding under any bankruptcy, reorganization or similar law, and in the case of an involuntary case or proceeding, such case or proceeding is not dismissed thirty (30) days following its commencement; (vii) is the subject of an order for relief in an involuntary case under federal bankruptcy law; (viii) the Trust defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Trust's property or Trust's ability to repay the Promissory Note or perform Trust's Obligations under the Promissory Note, Loan Agreement or any of other Financing Documents; or (ix) Trust violates any Law.

(g) **Insolvency or Default of Insured or Guarantor.** The Insured or any Guarantor: (i) makes an assignment for the benefit of creditors; (ii) is adjudicated a bankrupt or insolvent; (iii) seeks appointment of, or becomes the subject of an order appointing, a trustee, conservator, or receiver as to all or part of his assets; (iv) commences, approves or consents to, or is the debtor in, any case or proceeding under any bankruptcy or similar law, and in the case of an involuntary case or proceeding, such case or proceeding is not dismissed thirty (30) days following its commencement; (v) is the subject of an order for relief in an involuntary case under federal bankruptcy law; (vi) Trust defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Trust's property or Trust's ability to repay the Obligations; or (vii) any Guarantor defaults under the terms of the Personal Guaranty.

(h) **Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness under the Promissory Note or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the Indebtedness evidenced by the Promissory Note; in the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

(i) **Adverse Change.** A material adverse change occurs in Trust's financial condition, or Lender believes the prospect of payment or performance of the Obligations is materially impaired.

(j) **Cure Provisions.** Other than as set forth in the preceding clauses of this Section, failure by the Trust or Beneficiary, as applicable, to perform in any material respect any of its obligations under the Promissory Note, Loan Agreement, this Security Agreement or any other Financing Document to which either is a party if such failure is not remedied on or prior to the fifteenth (15th) day after written notice of such failure is given to the Trust or the Beneficiary, respectively, by the Lender.

9. **RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of an Event of Default, or at any time thereafter, Lender may exercise any one or more of the following

WTEM_Pohl0001411

rights and remedies, in addition to any rights or remedies that may be available at law, in equity, or otherwise:

(a)     **Accelerate Indebtedness.** Lender may declare all Indebtedness of Trust to Lender immediately due and payable, without notice of any kind to Trust.

(b)     **Transfer Title.** Lender may effect transfer of title upon sale of all or part of the Collateral. For this purpose, Beneficiary irrevocably appoints Lender as Beneficiary's attorney-in-fact to execute endorsements, assignments and instruments in the name of Beneficiary and each of them (if more than one) as shall be necessary or reasonable.

(c)     **Other Rights and Remedies.** Lender shall have and may exercise any or all of the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, at law, in equity, or otherwise.

(d)     **Deficiency Judgment.** If permitted by applicable law, Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Section.

(e)     **Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Security Agreement or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Beneficiary under this Security Agreement, after Beneficiary's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

10.     **MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Security Agreement:

(a)     **Amendments.** This Security Agreement, together with the Loan Agreement, and all Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Security Agreement. No alteration of or amendment to this Security Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

(b)     **Arbitration.** All controversies or disputes arising out of or in connection with this Security Agreement ("Disputes") shall be resolved pursuant to this Section 10(b).

(i)     All Disputes shall in the first instance be discussed amicably between the parties with a view to resolving such Dispute, commencing upon one party giving other parties written notice of such Dispute. In the event that such Dispute is not resolved within thirty (30) days after such notice (or such longer period as the parties may agree in writing with respect to any such Dispute), any party may submit such Dispute to be finally settled by arbitration administered under the Commercial Arbitration Rules of the American Arbitration Association (the "Rules") by a panel of three arbitrators sitting in Salt Lake City, UT. One arbitrator shall be

7

nominated by the party initiating arbitration at the time of the filing of its demand for arbitration, the second arbitrator shall be nominated by the opposing party(ies) at the time of the filing of its answering statement, and the third arbitrator (who shall act as chairman) shall be jointly nominated by party-nominated arbitrators if they are able to agree. If the first two party nominated arbitrators are unable to agree upon a third within thirty (30) days after the nomination of the second, or if either party fails to nominate an arbitrator as set forth herein, an arbitrator shall be appointed pursuant to the Rules. The award of the arbitrators shall be final and binding upon the parties, and shall not be subject to any appeal or review. The parties agree that such award may be recognized and enforced in any court of competent jurisdiction. The parties agree to submit to the personal jurisdiction of the federal and state courts sitting in Salt Lake City, UT, for the sole purpose of enforcing this Security Agreement (including, where appropriate, issuing injunctive relief), the agreement to arbitrate contained herein and any award resulting from arbitration pursuant to this Section and, to the fullest extent permitted by law, waive any objection which they may have at any time to the laying of venue of any proceedings brought in such court and any claim that such proceedings have been brought in an inconvenient forum.

          (ii)     The Lender and Beneficiary further agree that no claim may be brought as a class action, and that the Lender and Beneficiary do not have the right to act, nor shall they attempt to act, as a class representative or participate as a member of a class of claimants with respect to any claim related to or arising out of this Security Agreement. To the extent that this arbitration provision is held unenforceable, the Lender and Beneficiary: (i) irrevocably submit to the exclusive jurisdiction of any federal or state court sitting in Salt Lake City, UT, in respect of any action or proceeding arising under or related to in any manner whatsoever this Security Agreement or the transactions contemplated under this Security Agreement, (ii) agree that this Security Agreement and the transactions contemplated by the Financing Arrangement shall in all respects be governed by and construed in accordance with the laws of the State of Utah (without reference to conflicts of laws provisions) and (iii) HEREBY WAIVE THE RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (I) ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, OR (II) IN ANY WAY IN CONNECTION WITH OR PERTAINING OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES TO THIS AGREEMENT IN CONNECTION WITH THIS SECURITY AGREEMENT, REPRESENTATIONS AND WARRANTIES, AND CONSENT OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES UNDER THIS AGREEMENT OR OTHERWISE, OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES HERETO, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. The parties hereby agree and acknowledge that this provision is intended to encompass any dispute between any party to this Security Agreement and any interested third party.

          (iii)    In any arbitral proceeding arising under this Security Agreement, the parties agree that they will engage in cooperative discovery, to be supervised by the arbitral tribunal. In its discretion, the tribunal may order the exchange of documents in the custody or control of parties to this Security Agreement, and may order a limited number of party

8

WTEM_Pohl0001413

depositions of one (1) day's duration each if requested by the opposing party and if the tribunal finds that such depositions would contribute to the efficient development of evidence.

(c)     **Attorneys' Fees; Expenses.** Beneficiary agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Security Agreement. Lender may hire or pay someone else to help enforce this Security Agreement, and Beneficiary shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Beneficiary also shall pay all court costs and such additional fees as may be directed by the court.

(d)     **Caption Headings.** Caption headings in this Security Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Security Agreement.

(e)     **Governing Law.** THIS SECURITY AGREEMENT WILL BE GOVERNED BY THE LAWS OF THE STATE OF UTAH WITHOUT REGARD TO ITS CONFLICTS OF LAW PROVISIONS. LENDER HAS ACCEPTED THIS SECURITY AGREEMENT IN THE STATE OF UTAH.

(f)     **No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Security Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Security Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Security Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Beneficiary, shall constitute a waiver of any of Lender's rights or of any of Beneficiary's obligations as to any future transactions. Whenever the consent of Lender is required under this Security Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

(g)     **Notices.** All demands, notices and communications hereunder will be in writing and will be deemed to have been duly given if personally delivered at, mailed by certified mail, return receipt requested, mailed by a nationally recognized overnight courier or sent via facsimile or email, to each applicable party at the address specified below or, as to any of such parties, at such other address or facsimile number as will be designated by such party in a written notice to the other party. Any party may change its address for notices under this Security Agreement by giving written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Beneficiary agrees to keep Lender informed at all times of Beneficiary's current address. Notice shall be provided as follows:

9

If to the Beneficiary:

Kimberly Pohl
553 Undercliff Avenue
Edge Water, New Jersey 07020
Telephone: _____
Facsimile: _____

And

Allan Pohl
4444 Woodman Avenue Apartment 38
Sherman Oaks, California 91423
Telephone: _____
Facsimile: _____

If to the Lender:

Imperial Premium Finance, LLC
701 Park of Commerce Blvd, Ste 301
Boca Raton, FL 33487
Facsimile: 1.561.995.4201

(h)    **Power of Attorney.** Beneficiary hereby appoints Lender as its true and lawful attorney-in-fact, irrevocably, with full power of substitution to do the following: (1) to demand, collect, receive, receipt for, sue and recover all sums of money or other property which may now or hereafter become due, owing or payable from the Collateral; (2) to execute, sign and endorse any and all claims, instruments, receipts, checks, drafts or warrants issued in payment for the Collateral; (3) to settle or compromise any and all claims arising under the Collateral, and in the place and stead of Beneficiary, to execute and deliver its release and settlement for the claim; and (4) to execute and sign any agreements to confirm that ownership of the Collateral has been changed to a third party and (5) to file any claim or claims or to take any action or institute or take part in any proceedings, either in its own name or in the name of Beneficiary, or otherwise, which in the discretion of Lender may seem to be necessary or advisable. The power of attorney given as security for the Indebtedness, being coupled with an interest, shall be irrevocable until the Indebtedness is indefeasibly paid in full and otherwise satisfied and discharged.

(i)    **Severability.** If a court of competent jurisdiction finds any provision of this Security Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance, if feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable, if the offending provision cannot be so modified, it shall be considered deleted from this Security Agreement. Unless otherwise required by law, the validity, invalidity, or unenforceability of any provision of this Security Agreement shall not affect the legality, validity or enforceability of any other provision of this Security Agreement.

10

WTEM_Pohl0001415

(j)     **Successors and Assigns.** Subject to any limitations stated in this Security Agreement on transfer of Beneficiary's interest, this Security Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Beneficiary, Lender, without notice to Beneficiary, may deal with Beneficiary's successors with reference to this Security Agreement and the Indebtedness by way of forbearance or extension without releasing Beneficiary from the obligations of this Security Agreement or liability under the Indebtedness.

(k)     **Survival of Representations and Warranties.** All representations, warranties, and agreements made by Beneficiary in this Security Agreement shall survive the execution and delivery of this Security Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Trust's Indebtedness shall be paid in full.

(l)     **Time is of the Essence.** Time is of the essence in the performance of this Security Agreement.

(m)     **Waive Jury.** ALL PARTIES TO THIS SECURITY AGREEMENT HEREBY WAIVE THE RIGHT TO ANY JURY TRIAL IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY.

11.     **DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Security Agreement. Capitalized terms used but not defined herein shall have the meanings assigned thereto in the Loan Agreement. Unless specifically stated to the contrary all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Security Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

(a)     **Collateral.** The word "Collateral" means all of Beneficiary's right, title and interest in and to all the Collateral as described in Section 2 of this Security Agreement.

(b)     **Event of Default.** The words "Event of Default" mean any of the events of default set forth in Section 8 of this Security Agreement.

(c)     **Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

(d)     **Guaranty.** The word "Guaranty" means any guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Promissory Note.

(e)     **Indebtedness.** The word "Indebtedness" means the indebtedness (including the Obligations) evidenced by the Loan Agreement, or the Related Documents, including all principal and interest together with all other Indebtedness and costs and expenses

11

WTEM_Pohl0001416

for which Trust is responsible under this Security Agreement or under any of the Related Documents.

(f)    **Lender.** The word "Lender" means Imperial Premium Finance, LLC, its successors and assigns.

(g)    **Life Insurance Policy.** The word "Life Insurance Policy" means the Life Insurance Policy designated in Exhibit A to the Trust Agreement and in the Loan Agreement, and any applications, riders, endorsements, supplements, amendments and other documents that modify or otherwise affect the terms and conditions of such Life Insurance Policy, and any and all proceeds thereof.

(h)    **Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, guaranties, security agreements, deeds of trust, security deeds, the Financing Documents and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

(i)    **Security Agreement.** The words "Security Agreement" mean this Security Agreement, as amended or modified from time to time, together with all exhibits and schedules attached hereto from time to time.

(j)    **Trust.** The word "Trust" means the Phyllis Pohl Irrevocable Trust.

(k)    **Trust Agreement.** The words "Trust Agreement" means the Trust Agreement between Phyllis Pohl, as grantor, and, Bank of Utah and Thomas J. Mahoney, Jr., pursuant to which the Trust is established, as the same may be amended, supplemented or otherwise modified from time to time in accordance with its terms.

KIMBERLY POHL HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS SECURITY AGREEMENT AGREES TO ITS TERMS. THIS SECURITY AGREEMENT IS DATED MARCH 12, 2008.

BENEFICIARY

_____
Kimberly Pohl

ALLAN POHL HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS SECURITY AGREEMENT AGREES TO ITS TERMS. THIS SECURITY AGREEMENT IS DATED MARCH 12, 2008.

BENEFICIARY

_____
Allan Pohl

12

WTEM_Pohl0001417

for which Trust is responsible under this Security Agreement or under any of the Related Documents.

(f)     **Lender.** The word "Lender" means Imperial Premium Finance, LLC, its successors and assigns.

(g)     **Life Insurance Policy.** The word "Life Insurance Policy" means the Life Insurance Policy designated in Exhibit A to the Trust Agreement and in the Loan Agreement, and any applications, riders, endorsements, supplements, amendments and other documents that modify or otherwise affect the terms and conditions of such Life Insurance Policy, and any and all proceeds thereof.

(h)     **Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, guaranties, security agreements, deeds of trust, security deeds, the Financing Documents and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

(i)     **Security Agreement.** The words "Security Agreement" mean this Security Agreement, as amended or modified from time to time, together with all exhibits and schedules attached hereto from time to time.

(j)     **Trust.** The word "Trust" means the Phyllis Pohl Irrevocable Trust.

(k)     **Trust Agreement.** The words "Trust Agreement" means the Trust Agreement between Phyllis Pohl, as grantor, and, Bank of Utah and Thomas J. Mahoney, Jr., pursuant to which the Trust is established, as the same may be amended, supplemented or otherwise modified from time to time in accordance with its terms.

KIMBERLY POHL HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS SECURITY AGREEMENT AGREES TO ITS TERMS. THIS SECURITY AGREEMENT IS DATED MARCH 12, 2008.

BENEFICIARY

_____
Kimberly Pohl

ALLAN POHL HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS SECURITY AGREEMENT AGREES TO ITS TERMS. THIS SECURITY AGREEMENT IS DATED MARCH 12, 2008.

BENEFICIARY

_____
Allan Pohl

12

WTEM_Pohl0001418

## SCHEDULE A

### LOAN APPLICATION AND AGREEMENT

13

WTEM_Pohl0001419

**<u>Exhibit F</u>**

**Release Agreement**

## RELEASE AND RELINQUISHMENT AGREEMENT

This **Release and Relinquishment Agreement** ( "Agreement") is entered into as of March 19, 2010 (the "Effective Date") by and between Phyllis Pohl (the "Insured"), Kimberly Pohl, Allan J. Pohl and Harvey Pohl (each, a "Beneficiary"), the Phyllis Pohl Irrevocable Trust (the "Trust") and Imperial Premium Finance, LLC, a Florida limited liability company, and its affiliates, successors and/or assigns and with a principal address at 701 Park of Commerce Blvd., Ste. 301, Boca Raton, FL 33487 (the "Lender") (individually a "Party" and collectively the "Parties"). All capitalized terms not defined herein shall have the meaning ascribed in the Loan Application & Agreement.

WHEREAS, Thomas Mahoney, Jr. and Bank of Utah are the Trustees of the Trust (each, a "Trustee") and are authorized to execute this Agreement on behalf of the Trust;

WHEREAS, Trust and Lender entered into that certain Loan Application & Agreement and that certain Promissory Note, dated as of March 12, 2008 (collectively, the "Loan Agreement"), as well as related documents (the "Loan Documents"), whereby Lender agreed to provide financing for the premium payments for Lincoln Benefit Life Company Policy # 01N1364514 insuring the life of the Insured (the "Policy");

WHEREAS, Lender will accept ownership of the Policy in exchange for a release of the Trust's obligation's to pay the amounts due under the Loan Documents or any other party's obligation, including, but not limited the Insured's obligation, to pay pursuant to any related guaranty as further set forth in the terms and conditions herein;

NOW, THEREFORE, in consideration of the foregoing, the Parties agree as follows:

1.   The Insured, the Beneficiary and the Trust represent and warrant to the Lender that:

 (i)   all representations made in the Loan Documents and signed by the respective Parties remain true, complete and correct;

 (ii)   neither the Trust, Insured nor Beneficiary have received any notice from any other party of any inaccurate statement or misrepresentation, or violation of a term or condition, contained in the application made by the Insured for the Policy or any violation of any term, condition or provision of the Policy, including without limitation, any notice of a rescission or cancellation of the Policy, or a lapse of the Policy; and

 (iii)   there is no decree, judgment, order, litigation at law or in equity, arbitration proceeding or proceeding before or by any commission, agency or other administrative or regulatory body or authority pending, or to the knowledge of the Trust, Insured or Beneficiary threatened, to which the Trust or the Trustee is a party or to which the Policy is subject or which could have an adverse effect on the Policy, and there is no basis for any other claim, litigation or proceeding;

 (iv)   there is no investigation by any commission, agency or other administrative or regulatory body or authority pending, or to the knowledge of the Trust, Insured or

WTEM_PohI0003625

Beneficiary threatened, which is related to the Policy, nor is there any basis for any such investigation.

2.     In consideration of the foregoing, the Insured and Beneficiary further represent and warrant to Lender the following:

(a)     the Insured and Beneficiary are competent and have the full legal capacity to perform the relinquishment contemplated herein;

(b)     the Insured and Beneficiary had the opportunity to consult with and obtain advice and assistance from legal, financial, insurance and tax professionals, and to be represented by counsel prior to and in the execution of this Agreement; and

(c)     the Insured and Beneficiary have entered into this Agreement freely and voluntarily and without coercion, duress or undue influence.

3.     Following execution of this Agreement, the Trustee shall execute such documents on behalf of the Trust, including a change of ownership form, as may be necessary to convey legal and beneficial ownership of the Policy to the Lender or its designee and deliver such documents to the Lender promptly upon request. Notwithstanding the foregoing, the Trust and the Lender agree that as a condition to the effectiveness of this Agreement, the Trust agrees to hold record, but not beneficial, title to the Policy until Lender notifies the Trustee in writing as to transfer of record ownership.     During that time period, in the Lender's sole discretion, the Policy shall either be offered for sale, assigned or held on behalf of the Lender by the Trust as record owner, and as directed by Lender in writing. Other than being the record owner, the Trust shall not exercise any incidences of ownership over the Policy absent the express written consent of the Lender and shall continue to hold the Policy free and clear of any lien or encumbrance. Within three (3) business days of the receipt of a written request from the Lender, the Trust agrees to execute any and all necessary documents required to secure the Lender's interest in the Policy, to be held in Trust until such time as Lender directs.

4.     In exchange for the Insured and the Beneficiary's agreement to relinquish all interest in the Trust and the Policy, Lender hereby releases and covenants not to sue or bring any legal action against the Trust, the Trustee, Insured or the Beneficiary with regard to any amounts due under the Loan Documents. Notwithstanding the foregoing, the Insured and Beneficiary understand all other obligations (i.e., representations and warranties and indemnities for any breach thereof) under the Loan Documents of the Insured, Beneficiary and Trust remain in full force and effect.

5.     The Insured and the Beneficiary understand and acknowledge that, as a result of each's execution of this Agreement, each of the Insured and Beneficiary are relinquishing any and all right and claim to any proceeds that could be derived from or through the Policy, regardless of the source, including, but not limited to, from the sale, assignment or holding of the Policy or from proceeds arising from a death benefit from the Policy, if any.

6.     In addition, the Insured and the Beneficiary, individually and collectively, release and covenant not to sue or bring any legal action against the Lender or any affiliates and agree to not

WTEM_Pohl0003626

raise any defenses with regard to any actions taken by the Lender or any affiliates as are permitted hereunder, including, but not limited to, a release of claim to any proceeds related to the Policy from whatever source, again including, but not limited, from the sale, assignment or holding of the Policy or from proceeds arising from a death benefit from the Policy, if any.

7.     The Insured and the Beneficiary have disclosed or caused to be disclosed to Lender all health and medical information requested by Lender about the Insured, and the Insured and Beneficiaries have not altered, changed or withheld any health and medical information requested by Lender about the Insured or failed to disclose the name of any doctor, physician, hospital or other health care provider or facility that has any health and medical information requested by Lender about the Insured.

8.     The Insured and the Beneficiary agree to continue to cooperate with Lender and execute all documents requested in connection with securing the Lender's interest in the Policy, including but not limited to: (i) the Insured shall continue to provide all updated medical information when and as requested; and (ii) the Insured and the Beneficiary  shall execute all documents relating to the sale of the Policy immediately upon the receipt of a written request for execution from Lender.

9.     In addition, the Insured, the Trust and the Beneficiary further agree to waive any and all applicable notice or timeframe requirements with respect to the relinquishment or any actions taken by the Lender hereunder.

10.     The Insured, the Beneficiary and the Trust understand and acknowledge that a material failure to perform by the Insured, the Beneficiary or the Trust or any party hereunder shall be a breach of this Agreement and each of them  acknowledges that the Lender shall be permitted to pursue any and all legal and equitable remedies under this Agreement and the underlying Loan Documents as a result of any such material breach.

11.     This Agreement may be executed in multiple counterparts, and via facsimile, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

12.     This Agreement shall be construed and governed in accordance with the laws of the State of Florida, without regard to conflict of laws principles. The Insured, the Beneficiary and the Trust agree that the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida shall have exclusive jurisdiction to hear and determine any claims or disputes between the parties arising out of or related to this Agreement, unless federal jurisdiction is available, in which case the Southern District of Florida, West Palm Beach Division, shall have exclusive jurisdiction to determine any claims or disputes arising out of or related to this Agreement. The Insured, the Beneficiary and the Trust expressly submit and consent in advance to such jurisdiction in any action or suit commenced in such court, and each party hereby waives any objection that it may have based upon lack of personal jurisdiction, improper venue or *forum non conveniens*.  **IN THE EVENT OF ANY LITIGATION PROCEEDINGS AND TO THE EXTENT PERMITTED BY LAW, EACH OF THE PARTIES HEREBY KNOWINGLY AND WILLINGLY WAIVES AND SURRENDERS SUCH PARTY'S RIGHT TO TRIAL**

**BY JURY AND AGREES THAT SUCH LITIGATION SHALL BE TRIED TO A JUDGE SITTING ALONE AS THE TRIER OF BOTH FACT AND LAW, IN A BENCH TRIAL, WITHOUT A JURY.**

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the date specified above.

**Trust: The Phyllis Pohl Irrevocable Trust**

By: _____
Thomas Mahoney, Jr., Trustee

By: Bank of Utah, Trustee

Signature: _____
Print Name: _____
Title: _____

**Phyllis Pohl**

Signature: _____

**Kimberly Pohl**

Signature: _____

**Allan J. Pohl**

Signature: _____

**Harvey Pohl**

Signature: _____

**Imperial Premium Finance, LLC**

Signature: _____
Print Name: Antony Mitchell
Title: CEO

BY JURY AND AGREES THAT SUCH LITIGATION SHALL BE TRIED TO A JUDGE SITTING ALONE AS THE TRIER OF BOTH FACT AND LAW, IN A BENCH TRIAL, WITHOUT A JURY.

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the date specified above.

**Trust: The Phyllis Pohl Irrevocable Trust**

By:_____
     Thomas Mahoney, Jr., Trustee

By: Bank of Utah, Trustee

Signature:_____
Print Name:_____
Title:_____

**Phyllis Pohl**

Signature:_____

**Kimberly Pohl**

Signature:_____

**Allan J. Pohl**

Signature:_____

**Harvey Pohl**

Signature:_____

**Imperial Premium Finance, LLC**

Signature:_____
Print Name:_____
Title:_____