*SOLICITATION VERSION*

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| RED REEF ALTERNATIVE INVESTMENTS, LLC and EMERGENT CAPITAL, INC.,[1] | ) Case No. 20-12602 (BLS) |
| | ) |
| Debtors. | ) |

---

**DISCLOSURE STATEMENT FOR DEBTOR EMERGENT CAPITAL, INC.'S FIRST AMENDED PLAN OF REORGANIZATION**

---

Dated:  November 13, 2020
 
PACHULSKI STANG ZIEHL & JONES LLP
Richard M. Pachulski (CA Bar No. 90073)
Maxim B. Litvak (CA Bar No. 215852)
Colin R. Robinson (DE Bar No. 5524)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Tel:  (302) 652-4100
Fax:  (302) 652-4400
E-mail: rpachulski@pszjlaw.com
         mlitvak@pszjlaw.com
         crobinson@pszjlaw.com

Counsel for Emergent Capital, Inc.,
Debtor and Debtor-in-Possession

---

[1]  The last four digits of each Debtor's taxpayer identification number are:  Red Reef Alternative Investments, LLC (0302) and Emergent Capital, Inc. (3473).  The location of the Debtors' service address for purposes of these cases is 1200 North Federal Highway, Suite 200, Boca Raton, FL 33432.

For the avoidance of doubt, the Plan does not apply to Debtor Red Reef Alternative Investments, LLC.  All alternatives continue to be evaluated with respect to this entity, pending expiration of the bar date.

**ARTICLE I.** EXECUTIVE SUMMARY ........................................................................ 8

    A.     AN OVERVIEW OF THE CHAPTER 11 PROCESS .................................. 9

    B.     SUMMARY OF THE PLAN ......................................................... 9

    C.     PURPOSE AND EFFECT OF THE PLAN .................................. 12

          1.     Plan of Reorganization Under Chapter 11 of the Bankruptcy Code ............................................................. 12

          2.     Plan Overview ................................................................. 12

          3.     Who May Vote on the Plan ............................................. 13

          4.     Summary of Solicitation Package and Voting Instructions ............. 13

          5.     Confirmation of the Plan ................................................. 15

          6.     Confirming and Consummating the Plan ......................... 15

          7.     Rules of Interpretation ................................................... 15

          8.     The Voting Record Date ................................................. 16

          9.     Other Restructuring Documents ...................................... 16

          10.    Distribution of Confirmation Hearing Notice to Holders of Claims in Non-Voting Classes and Holders of Disputed Claims .............................................................. 16

          11.    Filing of the Plan Supplement ........................................ 17

          12.    The Confirmation Hearing ............................................. 17

          13.    The Deadline for Objecting to Confirmation of the Plan ............. 17

          14.    Notice Parties ................................................................. 17

          15.    Effect of Confirmation of the Plan ................................. 18

    D.     CONSUMMATION OF THE PLAN .......................................... 18

    E.     RISK FACTORS ........................................................................ 18

**ARTICLE II.** BACKGROUND TO THE CHAPTER 11 CASE ..................................... 18

    A.     THE DEBTOR'S BUSINESS ................................................... 18

    B.     CORPORATE STRUCTURE OF THE DEBTOR ..................... 19

C.     PREPETITION CAPITALIZATION AND INDEBTEDNESS OF THE DEBTOR ........................................................................... 19

D.     PRIOR CHAPTER 11 PROCEEDINGS OF WHITE EAGLE .................. 20

E.     EVENTS LEADING TO THE COMMENCEMENT OF THE BANKRUPTCY CASE ............................................................... 21

F.     COMMENCEMENT OF THE DEBTOR'S CHAPTER 11 CASE ........... 22

G.     ANTICIPATED BANKRUPTCY FILINGS ............................................ 22

H.     EXCLUSIVE PERIOD FOR FILING A PLAN AND SOLICITING VOTES ...................................................................... 22

I.     DEADLINE TO ASSUME OR REJECT LEASES OF NONRESIDENTIAL REAL PROPERTY .................................................. 22

J.     SUMMARY OF THE RESTRUCTURING SECURITIES UNDER THE PLAN ........................................................................ 22

K.     SUMMARY OF THE NEW SERIES A NOTES ..................................... 23

L.     SUMMARY OF THE NEW SERIES B NOTES ..................................... 24

M.     SUMMARY OF THE NEW PPNS, NEW UNVESTED WARRANTS, NEW PPN WARRANTS, NEW SARS, AND NEW PPN SARS ...................................................................... 25

N.     SUMMARY OF THE GRANTOR TRUST AND GRANTOR TRUST CERTIFICATES .......................................................... 27

O.     PAYMENT PRIORITY OF RESTRUCTURING SECURITIES .............. 27

P.     GOVERNANCE OF LAMINGTON AND THE DEBTOR ...................... 29

**ARTICLE III.** SUMMARY OF THE PLAN ...................................................... 30

A.     ADMINISTRATIVE AND PRIORITY TAX CLAIMS ............................ 30

    1.    Administrative Expense Claims ........................................ 30

    2.    Priority Tax Claims .......................................................... 31

B.     CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS ........................................ 31

    1.    Summary .......................................................................... 31

    2.    Separate Classification of Other Secured Debt Claims ................... 32

3.      Elimination of Vacant Classes.........................................................32

4.      Voting; Presumptions; Solicitation in Good Faith...........................32

5.      Cramdown.........................................................................................33

6.      Classification and Treatment of Claims and Equity Interests .........33

7.      Special Provision Governing Unimpaired Claims............................36

8.      Discharge of Claims .........................................................................36

9.      Subordinated Claims.........................................................................36

C.      ACCEPTANCE OR REJECTION OF THE PLAN ....................................36

1.      Presumed Acceptance of Plan ..........................................................36

2.      No Presumed Rejection of Plan ........................................................37

3.      Voting Classes ..................................................................................37

4.      Acceptance by Impaired Classes of Claims and Equity
        Interests.............................................................................................37

5.      Confirmation Pursuant to Section 1129(b) of the
        Bankruptcy Code ..............................................................................37

D.      MEANS FOR IMPLEMENTATION OF THE PLAN ...............................37

1.      General Settlement of Claims............................................................37

2.      Restructuring Transactions ...............................................................37

3.      Corporate Existence..........................................................................39

4.      Vesting of Assets in the Debtor .......................................................40

5.      New Indenture Documents; New Series A Notes; New
        Series B Notes; New PPNs; New PPN Warrants; New PPN
        SARs; Sources of Cash for Plan Distributions ................................40

6.      Creation of Grantor Trust; Grantor Trust Certificates; New
        Unvested Warrants; New SARs.........................................................41

7.      Distribution of New Series A Notes, New Series B Notes,
        New PPNs, Grantor Trust Certificates, New Unvested
        Warrants, New PPN Warrants, New SARs, New PPN
        SARs and Related Documentation ....................................................41

8.     Release of Liens, Claims and Equity Interests ................................41

9.     Organizational Documents ..............................................................42

10.    Post-Effective Date Management ....................................................42

11.    Corporate Action .............................................................................43

12.    Cancellation of Notes, Certificates and Instruments ......................44

13.    Cancellation of Existing Instruments Governing Security Interests............................................................................................44

14.    Restructuring Transactions ..............................................................44

15.    Treatment of Vacant Classes ...........................................................44

E.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..................................................................45

    1.    Assumption and Rejection of Executory Contracts and Unexpired Leases.............................................................................45

    2.    Assumption and Assignment of Executory Contracts or Unexpired Leases.............................................................................45

    3.    Claims on Account of the Rejection of Executory Contracts or Unexpired Leases ........................................................................46

    4.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.............................................................................46

    5.    Assumption of Director and Officer Insurance Policies.................47

    6.    Indemnification Provisions...............................................................47

F.    DEBTOR RELEASE AND RELATED PROVISIONS ............................47

    1.    General..............................................................................................47

    2.    Release .............................................................................................48

G.    THIRD PARTY RELEASE, DISCHARGE, EXCULPATION & INJUNCTION....................................................................................49

    1.    Third Party Release..........................................................................49

    2.    Discharge of Claims ........................................................................49

    3.    Exculpation ......................................................................................50

4.      Injunction ....................................................................... 50

H.      BINDING NATURE OF PLAN .................................................... 50

I.      CONFIRMATION PROCEDURES ............................................... 51

1.      Confirmation Hearing ........................................................ 51

2.      Filing Objections to the Plan ............................................. 51

J.      STATUTORY REQUIREMENTS FOR CONFIRMATION OF
        THE PLAN ................................................................................ 51

1.      Best Interests of Creditors Test/Liquidation Analysis ....................52

2.      Feasibility ......................................................................... 53

3.      Valuation............................................................................ 54

4.      Acceptance by Impaired Classes ...................................... 56

5.      Confirmation Without Acceptance by Impaired Classes.................57

6.      No Unfair Discrimination .................................................. 57

7.      Fair and Equitable Test...................................................... 57

K.      CONSUMMATION OF THE PLAN ............................................ 58

ARTICLE IV. RISK FACTORS.......................................................... 59

A.      CERTAIN BANKRUPTCY LAW CONSIDERATIONS ......................... 59

1.      Parties in Interest May Object to the Debtor's Classification
        of Claims and Equity Interests........................................... 59

2.      The Conditions Precedent to the Effective Date of the Plan
        May Not Occur. ................................................................. 59

3.      The Debtor May Fail to Satisfy the Vote Requirement. ................. 59

4.      The Debtor May Not Be Able to Secure Confirmation of
        the Plan. ............................................................................ 59

5.      Non-Consensual Confirmation of the Plan May Be
        Necessary.......................................................................... 60

6.      Continued Risk Upon Confirmation................................... 60

7.      The Debtor May Object to the Amount or Classification of a Claim or Equity Interest................................................................61

8.      The Effective Date May Not Occur................................................61

9.      The Chapter 11 Case May Be Converted to a Case Under Chapter 7 of the Bankruptcy Code ..................................................61

10.     Releases, Injunctions, and Exculpations Provisions May Not Be Approved..............................................................................61

B.      RISK FACTORS THAT MAY AFFECT THE VALUE OF SECURITIES TO BE ISSUED UNDER THE PLAN AND/OR RECOVERIES UNDER THE PLAN.........................................................62

1.      There May Be a Lack of Active Trading Market for the Restructuring Securities..................................................................62

2.      The Debtor Expects to Incur Significant Costs and Expenses in Connection with the Restructuring.............................62

3.      The Estimated Reorganization Value of the Debtor's Assets and the Restructuring Securities and the Estimated Recoveries to Holders of Allowed Claims and Equity Interests Are Not Necessarily Representative of the Private or Public Sale Values of the Restructuring Securities. ...................63

4.      Tax Implications of the Plan..........................................................63

C.      RISKS ASSOCIATED WITH FORWARD LOOKING STATEMENTS ..................................................................................63

1.      The Financial Information Contained Herein is Based on the Debtor's Books and Records and, Unless Otherwise Stated, No Audit was Performed. ...................................................63

2.      Financial Projections and Other Forward Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary. ....................................................................................63

D.      DISCLOSURE STATEMENT DISCLAIMER .........................................64

1.      The Information Contained Herein is for Soliciting Votes Only. ..............................................................................................64

2.      This Disclosure Statement was Not Approved by the Securities and Exchange Commission............................................64

3.    The Debtor Relied on Certain Exemptions From Registration Under the Securities Act. ...........................................64

4.    This Disclosure Statement Contains Forward Looking Statements. ......................................................................64

5.    No Legal or Tax Advice is Provided to You by This Disclosure Statement. ......................................................65

6.    No Admissions Are Made by This Disclosure Statement. ..............65

7.    No Reliance Should Be Placed on Any Failure to Identify Litigation Claims or Projected Objections. .....................................65

8.    Nothing Herein Constitutes a Waiver of Any Right to Object to Claims or Equity Interests or Recover Transfers and Assets. ........................................................................65

9.    The Information Used Herein was Provided by the Debtor and was Relied Upon by the Debtor's Advisors..............................66

10.    The Potential Exists for Inaccuracies and the Debtor Has No Duty to Update..........................................................................66

11.    No Representations Made Outside the Disclosure Statement Are Authorized. ......................................................................66

**ARTICLE V.** ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN.........................................................66

A.    LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE ........................................................................66

B.    FILING OF AN ALTERNATIVE PLAN OF REORGANIZATION ..................................................................66

**ARTICLE VI.** ISSUANCE AND RESALE OF RESTRUCTURING SECURITIES UNDER THE PLAN........................................................67

A.    EXEMPTION FROM REGISTRATION REQUIREMENTS OF THE SECURITIES ACT .............................................................67

1.    Section 4(a)(2) of the Securities Act (Solicitation of the Plan).................................................................................67

2.    Section 1145 of the Bankruptcy Code (Solicitation of the Plan; Distribution to Holders of Senior Secured Notes, Convertible Unsecured Notes, and Equity Interests in the Debtor)...............................................................................68

B.      RESALES OF RESTRUCTURING SECURITIES ....................................68

      1.     Resales of the 1145 Securities ..........................................68

C.      LISTING OF RESTRUCTURING SECURITIES ....................................69

**ARTICLE VII.** SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO HOLDERS OF SENIOR SECURED NOTES CLAIMS, CONVERTIBLE UNSECURED NOTES CLAIMS, AND EQUITY INTERESTS IN THE DEBTOR..................................70

A.      DEFINITION OF U.S. HOLDER AND NON-U.S. HOLDER .................72

B.      TREATMENT OF THE DEBTOR WITH RESPECT TO THE SATISFACTION OF SENIOR SECURED NOTES CLAIMS, CONVERTIBLE UNSECURED NOTES CLAIMS, AND EQUITY INTERESTS IN THE DEBTOR FOR RESTRUCTURING SECURITIES.................................................................72

C.      TAX CONSEQUENCES FOR U.S. PERSONS HOLDING SENIOR SECURED NOTES CLAIMS, CONVERTIBLE UNSECURED NOTES CLAIMS, OR EQUITY INTERESTS IN THE DEBTOR...........................................................................73

      1.     Exchange of Senior Secured Notes Claims and Convertible Unsecured Notes Claims for Restructuring Securities ....................73

      2.     Exchange of Equity Interests of the Debtor for Restructuring Securities.................................................75

D.      TAX CONSEQUENCES FOR NON-U.S. PERSONS HOLDING SENIOR SECURED NOTES CLAIMS, CONVERTIBLE UNSECURED NOTES CLAIMS, OR EQUITY INTERESTS IN THE DEBTOR...........................................................................77

      1.     Gain Recognition ...........................................................77

      2.     Distributions in Discharge of Accrued Interest ...............77

E.      TAXATION OF HOLDERS OF RESTRUCTURING SECURITIES.................................................................78

      1.     Tax Treatment of New Series A Notes, New Series B Notes, and New PPNs.......................................................78

      2.     Withholding Tax .............................................................78

      3.     Encashment Tax..............................................................79

4.    Stamp Duty ............................................................................... 79

5.    Tax Consequences for a U.S. Holder of Receiving
Distributions on Restructuring Securities ........................................ 79

6.    Tax Consequences for a U.S. Holder of Subsequent
Dispositions of Restructuring Securities ......................................... 83

7.    Certain Additional Tax Considerations for U.S. Holders
Holding Restructuring Securities..................................................... 84

F.    TAX CONSEQUENCES FOR A NON-U.S. HOLDER OF
HOLDING RESTRUCTURING SECURITIES ......................................... 87

G.    FATCA ...................................................................................................... 88

H.    INFORMATION REPORTING AND BACKUP WITHHOLDING ......... 88

1.    Information Reporting ..................................................................... 88

2.    Backup Withholding........................................................................ 88

I.    GENERAL DISCLAIMER ........................................................................ 89

**ARTICLE VIII.** RECOMMENDATION .......................................................... 89

EMERGENT CAPITAL, INC., as a debtor and debtor in possession in the above-captioned case ("Emergent" or the "Debtor"), is sending you this document and the accompanying materials (the "Disclosure Statement") because you are a creditor or shareholder entitled to vote to approve the *Debtor Emergent Capital, Inc.'s First Amended Chapter 11 Plan of Reorganization* dated November 13, 2020, as the same may be amended from time to time (the "Plan").[2]  This Disclosure Statement has been approved by the Bankruptcy Court as containing adequate information within the meaning of section 1125(a) of the Bankruptcy Code.  The Debtor is soliciting your vote to accept or reject the Plan.

A copy of the Plan is attached hereto as **Exhibit A**.  The Debtor expects that the Plan will have the support of a majority in principal amount of the Holders of Senior Secured Notes Claims and the Convertible Unsecured Notes Claims (as defined therein).

**ONLY HOLDERS OF SENIOR SECURED NOTES CLAIMS (CLASS 3), CONVERTIBLE UNSECURED NOTES CLAIMS (CLASS 4), AND EQUITY INTERESTS IN THE DEBTOR (CLASS 6) ARE ENTITLED TO VOTE ON THE PLAN AND ARE BEING SOLICITED UNDER THIS DISCLOSURE STATEMENT.**

---

**THE VOTING DEADLINE IS 4:00 P.M. PREVAILING EASTERN TIME ON DECEMBER 17, 2020 (UNLESS THE DEBTOR EXTENDS THE VOTING DEADLINE).**

**BENEFICIAL HOLDERS RECEIVING BENEFICIAL HOLDER BALLOTS MUST RETURN SUCH BENEFICIAL HOLDER BALLOTS TO THEIR RESPECTIVE INTERMEDIARY RECORD OWNERS AS SOON AS POSSIBLE TO ALLOW SUFFICIENT TIME FOR INTERMEDIARY RECORD OWNERS TO VALIDATE AND INCLUDE THEIR VOTES ON A MASTER BALLOT AND RETURN SUCH MASTER BALLOTS TO THE VOTING AGENT ON OR BEFORE THE VOTING DEADLINE.**

**IN ORDER FOR YOUR VOTE TO BE COUNTED, THE MASTER BALLOT SUBMITTED ON YOUR BEHALF TO YOUR NOMINEE MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT ON OR BEFORE THE VOTING DEADLINE.**

---

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT FOR YOU TO READ**

---

[2]  All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.  To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition included in the Plan shall control and govern.

THE DEBTOR IS PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND EQUITY INTERESTS FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT OR REJECT THE DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IV HEREIN.

**THE PLAN IS PROPOSED BY THE DEBTOR.  THE DEBTOR EXPECTS TO HAVE THE SUPPORT OF A MAJORITY IN PRINCIPAL AMOUNT OF THE HOLDERS OF SENIOR SECURED NOTES CLAIMS AND CONVERTIBLE UNSECURED NOTES CLAIMS.  THE DEBTOR URGES HOLDERS OF SENIOR SECURED NOTES CLAIMS, CONVERTIBLE UNSECURED NOTES CLAIMS, AND EQUITY INTERESTS IN THE DEBTOR TO VOTE TO ACCEPT THE PLAN.**

UPON CONFIRMATION OF THE PLAN, CERTAIN OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C. §§ 77A–77AA, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "SECURITIES ACT"), OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN LAWS, IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE.  OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS.  TO THE EXTENT EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR APPLICABLE FEDERAL SECURITIES LAW DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT.

THE RESTRUCTURING SECURITIES TO BE ISSUED UNDER THE PLAN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL OR REGULATORY AUTHORITY. THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. NEITHER THIS SOLICITATION NOR THIS DISCLOSURE STATEMENT CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF FEDERAL SECURITIES LAWS. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE

- 2 -

THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  THE DEBTOR CONSIDERS ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS.  FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT:

- FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH APPLICABLE COVENANTS;

- FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;

- VARIATION FROM PROJECTED FINANCIAL DATA; AND

- AVAILABILITY AND TERMS OF CAPITAL.

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTOR'S OR ANY AFFILIATE'S FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTOR'S OR AN AFFILIATE'S ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTOR UNDERTAKES NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN.  THE READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS.  THE LIQUIDATION ANALYSIS, PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE VALUE OF THE PROPERTY DISTRIBUTED TO HOLDERS OF ALLOWED CLAIMS OR EQUITY INTERESTS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.  THEREFORE, ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016 AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THE RESTRUCTURING SECURITIES DESCRIBED HEREIN WILL BE ISSUED TO CREDITORS WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR ANY STATE SECURITIES LAWS ("BLUE SKY LAWS").

THE DEBTOR INTENDS TO RELY ON SECTION 4(A)(2) OF THE SECURITIES ACT TO EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT THE OFFER OF NEW SERIES A NOTES, SERIES B NOTES, NEW PPNS, AND GRANTOR TRUST CERTIFICATES TO HOLDERS OF SENIOR SECURED NOTES CLAIMS AND CONVERTIBLE UNSECURED NOTES CLAIMS, INCLUDING IN CONNECTION WITH THE SOLICITATION.

THE DEBTOR INTENDS TO RELY ON SECTION 1145 OF THE BANKRUPTCY CODE TO EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND BLUE SKY LAWS THE OFFER OF RESTRUCTURING SECURITIES TO HOLDERS OF SENIOR SECURED NOTES CLAIMS, CONVERTIBLE UNSECURED NOTES CLAIMS, AND EQUITY INTERESTS IN THE DEBTOR, INCLUDING IN CONNECTION WITH THE SOLICITATION.

THE DEBTOR INTENDS TO RELY ON SECTION 1145 OF THE BANKRUPTCY CODE TO EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT THE ISSUANCE OF RESTRUCTURING SECURITIES TO HOLDERS OF SENIOR SECURED NOTES CLAIMS, CONVERTIBLE UNSECURED NOTES CLAIMS, AND EQUITY INTERESTS IN THE DEBTOR, AS APPLICABLE.  THE DEBTOR RECOMMENDS THAT POTENTIAL RECIPIENTS OF ANY NOTES OR SECURITIES PURSUANT TO THE PLAN CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE TRANSFERABILITY OF ANY SUCH NOTES OR SECURITIES.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT.  THE DEBTOR URGES EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHER, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURES CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN OR A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

PACHULSKI STANG ZIEHL & JONES LLP ("PSZ&J") IS GENERAL INSOLVENCY COUNSEL TO THE DEBTOR.  PSZ&J HAS RELIED UPON INFORMATION PROVIDED BY THE DEBTOR AND ITS OTHER PROFESSIONALS IN CONNECTION WITH PREPARATION OF THIS DISCLOSURE STATEMENT.  PSZ&J HAS NOT INDEPENDENTLY VERIFIED THE INFORMATION CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN ANTICIPATED EVENTS IN THE DEBTOR'S CHAPTER 11 CASE, AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE OR THAT MAY BE FILED LATER WITH THE PLAN SUPPLEMENT.  ALTHOUGH THE DEBTOR BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  IN THE EVENT OF ANY CONFLICT, INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN AND CONTROL FOR ALL PURPOSES.  EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTOR RELIED ON FINANCIAL DATA DERIVED FROM ITS BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTOR'S BUSINESS. THE DEBTOR'S MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THE DEBTOR HAS USED ITS REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED (UNLESS OTHERWISE EXPRESSLY PROVIDED HEREIN) AND NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTOR'S BUSINESS AND ITS FUTURE FINANCIAL RESULTS.  THE DEBTOR EXPRESSLY CAUTIONS READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER.  RATHER, THIS DISCLOSURE STATEMENT SHALL CONSTITUTE A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO POTENTIAL CONTESTED MATTERS, POTENTIAL ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM OR EQUITY INTEREST IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT.  EXCEPT AS PROVIDED UNDER THE PLAN, THE DEBTOR MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND CAUSES OF ACTION AND MAY OBJECT TO CLAIMS OR EQUITY INTERESTS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR EQUITY INTERESTS OR OBJECTIONS TO CLAIMS OR EQUITY INTERESTS ON THE TERMS SPECIFIED IN THE PLAN.

THE DEBTOR IS GENERALLY MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF WHERE FEASIBLE, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTOR MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTOR HAS NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DISCLOSURE STATEMENT WAS SENT.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTOR RESERVES THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME.

THE DEBTOR HAS NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT

**WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTOR HAS NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.**

**HOLDERS OF CLAIMS AND EQUITY INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTOR AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. IMPORTANTLY, PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IN A VOTING CLASS SHOULD REVIEW THE PLAN IN ITS ENTIRETY AND CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS HERETO, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL IN ARTICLE IV HEREIN, "RISK FACTORS."**

**THE DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M. (EASTERN TIME) ON <u>DECEMBER 17, 2020</u>, UNLESS EXTENDED BY THE DEBTOR IN ITS DISCRETION.**

**IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF EQUITY INTERESTS IN (INCLUDING THOSE HOLDERS OF CLAIMS AND EQUITY INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN), THE DEBTOR WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.**

**NOTWITHSTANDING ANY RIGHTS OF APPROVAL AS TO THE FORM OR SUBSTANCE OF THIS DISCLOSURE STATEMENT, THE PLAN OR ANY OTHER DOCUMENT RELATING TO THE TRANSACTIONS CONTEMPLATED THEREUNDER, NONE OF THE SUPPORTING SENIOR SECURED NOTEHOLDERS, THE SUPPORTING CONVERTIBLE UNSECURED NOTEHOLDERS, OR THEIR RESPECTIVE REPRESENTATIVES, MEMBERS, FINANCIAL OR LEGAL ADVISORS OR AGENTS, HAS INDEPENDENTLY VERIFIED THE INFORMATION CONTAINED HEREIN OR TAKES ANY RESPONSIBILITY THEREFOR AND NONE OF THE FOREGOING ENTITIES OR PERSONS MAKES ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER CONCERNING THE INFORMATION CONTAINED HEREIN.**

**THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO BECOME EFFECTIVE WILL BE SATISFIED (OR WAIVED).**

**ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.**

## **EXHIBITS**

EXHIBIT A – Plan of Reorganization

EXHIBIT B – Organizational Chart of the Debtor and Relevant Subsidiaries

EXHIBIT C – Liquidation Analysis

EXHIBIT D – Financial Projections

EXHIBIT E – Valuation Analysis

THE DEBTOR HEREBY ADOPTS AND INCORPORATES EACH EXHIBIT
ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE
AS THOUGH FULLY SET FORTH HEREIN.

# ARTICLE I.
## EXECUTIVE SUMMARY

**Only Holders of Senior Secured Notes Claims (Class 3), Convertible Unsecured Notes Claims (Class 4), and Equity Interests in the Debtor (Class 6) are entitled to vote on the Plan and are being solicited under this Disclosure Statement.**

This Executive Summary is being provided to Holders of Senior Secured Notes Claims, Convertible Unsecured Notes Claims, and Equity Interests in the Debtor as an overview of the material items addressed in the Disclosure Statement and the Plan, which is qualified by reference to the entire Disclosure Statement and by the actual terms of the Plan (and including all exhibits attached hereto and to the Plan), and should not be relied upon for a comprehensive discussion of the Disclosure Statement and/or the Plan.  Prior to soliciting votes on a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance or rejection of the plan of reorganization.  As such, this Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.  This Disclosure Statement includes, without limitation, information about:

- the Debtor's business and financial history;

- the significant events that have occurred to date;

- the solicitation procedures for voting on the Plan;

- the Confirmation process and the voting procedures that Holders of Claims and Equity Interests who are entitled to vote on the Plan must follow for their votes to be counted;

- the terms and provisions of the Plan, including certain effects of Confirmation of the Plan, certain risk factors relating to the Debtor or its affiliates, the Plan and the securities to be issued under the Plan, and the manner in which distributions will be made under the Plan; and

- the proposed organization and financing of the Debtor and its affiliates if the Plan is confirmed and becomes effective.

If the Plan cannot be confirmed for any reason, then, (a) the Plan may be revoked by the Debtor, or (b) the Debtor may seek to convert the Chapter 11 Case to a chapter 7 liquidation.  The Debtor intends to seek confirmation of the Plan pursuant to the "cram down" provisions contained in section 1129(b) of the Bankruptcy Code with respect to any non-accepting Class of Claims or Equity Interests that is Impaired as set forth in Article III hereof.

In connection with developing the Plan, the Debtor reviewed its current business and compared its prospects as a reorganized enterprise with the estimated recoveries in various liquidation scenarios.  As a result, the Debtor concluded that its reorganization value would be maximized by implementing a restructuring through the Plan.  The Debtor believes that its assets have significant value that would not be realized in a liquidation, either in whole or in substantial part.  Consistent with the liquidation analysis described herein, the value of the Debtor's assets would be considerably greater if the Debtor reorganizes instead of liquidating.  Moreover, the Debtor believes that any alternative to Confirmation of the Plan, such as an out-of-court

restructuring, liquidation, or attempts by another party in interest to file a plan of reorganization, would result in significant delays, litigation, and additional costs, and ultimately would diminish the Debtor's reorganization value. **Accordingly, the Debtor strongly recommends that all Holders of Senior Secured Notes Claims (Class 3), Convertible Unsecured Notes Claims (Class 4), and Equity Interests in the Debtor (Class 6) vote to accept the Plan.**

## A.    AN OVERVIEW OF THE CHAPTER 11 PROCESS

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Pursuant to chapter 11 of the Bankruptcy Code, a debtor may remain in possession of its assets and business and attempt to reorganize its business for the benefit of such debtor, its creditors and other parties in interest.

The commencement of a reorganization case creates an estate comprised of all of the legal and equitable interests of a debtor in property as of the date that the bankruptcy petition is filed. Sections 1107 and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession," unless the bankruptcy court orders the appointment of a trustee. The filing of a bankruptcy petition also triggers the automatic stay provisions of section 362 of the Bankruptcy Code which provide, among other things, for an automatic stay of all attempts to collect prepetition claims from a debtor or otherwise interfere with its property or business. Except as otherwise ordered by the bankruptcy court, the automatic stay generally remains in full force and effect until the effective date of a plan of reorganization, following confirmation of such plan of reorganization.

The Bankruptcy Code provides that upon commencement of a chapter 11 bankruptcy case, the Office of the United States Trustee may appoint a committee of unsecured creditors and may, in its discretion, appoint additional committees of creditors or of equity interest holders if necessary to assure adequate representation.

Upon the commencement of a chapter 11 bankruptcy case, all creditors and equity interest holders have standing to be heard on any issue in the chapter 11 proceedings pursuant to section 1109(b) of the Bankruptcy Code.

The formulation and confirmation of a plan of reorganization is the principal objective of a chapter 11 case. The plan of reorganization sets forth the means of satisfying the claims against and equity interests in the debtor.

## B.    SUMMARY OF THE PLAN

After over a year of active and arm's-length negotiations, the Debtor, in consultation with its advisors, reached agreement on the terms of the Plan with the Supporting Senior Secured Noteholders and the Supporting Convertible Unsecured Noteholders, representing a majority by principal amount of the Holders of Senior Secured Notes Claims and Convertible Unsecured Notes Claims, respectively, as reflected in those certain *Restructuring Support Agreement (Senior Secured Notes)* dated as of October 14, 2020 and *Restructuring Support Agreement (Convertible Unsecured Notes)* dated as of October 14, 2020 (the "Restructuring Support Agreements"). The Debtor believes that the Plan is the best restructuring alternative reasonably available to the Debtor. Because Holders of Senior Secured Notes Claims, Convertible Unsecured Notes Claims, and Equity Interests in the Debtor are the only impaired Classes under the Plan, only such Holders are entitled to vote on the Plan.

The Restructuring Support Agreements and the Plan represent a significant achievement for the Debtor and should greatly enhance the Debtor's ability to reorganize successfully and

expeditiously.  The Plan also will provide an efficient restructuring through the bankruptcy process, which is designed to minimize cost and disruption to the Debtor and all parties in interest.

The Debtor is a holding company with indirect interests in certain valuable life settlement assets held through non-Debtor White Eagle Asset Portfolio, L.P., a Delaware limited partnership ("White Eagle").  The ultimate goal of the Plan is to preserve and maximize the value of these interests for the benefit of all the Debtor's constituents, while addressing Emergent's existing capital structure.  The Debtor's indirect minority share of the equity interests in White Eagle total 27.5% and are held through an indirect subsidiary of the Debtor called Lamington Road Designated Activity Company, an Irish Section 110 Company ("Lamington").

Pursuant to the Restructuring Support Agreements and the Plan: (i) Lamington and a grantor trust to be formed under the laws of the Cayman Islands (the "Grantor Trust"), the purpose of which will be to hold certain securities of Lamington that will be issued as part of the restructuring, will dividend or issue certain securities to the Debtor, (ii) the Debtor will distribute those securities to its noteholders and shareholders in connection with its dissolution, (iii) the Debtor's existing securities will be canceled, and (iv) the Debtor will continue its winding up until it is liquidated.  Inactive operations of the Debtor will be eliminated and any assets of Debtor that are outside of Lamington will be liquidated as expeditiously as possible.  Lamington will be recapitalized in order to provide for the securities of Lamington that will be distributed first to the Debtor and then to the Debtor's noteholders and shareholders.  For all of the reasons set forth herein, the Debtor believes that it will have sufficient liquidity during the course of the Chapter 11 Case and that Lamington and the Grantor Trust will be well-positioned from a financial perspective on a going forward basis.

As of the date hereof, the Debtor had outstanding noteholder debt having an aggregate principal amount of approximately $117 million.  The Debtor expects that the Plan will have the support of Holders of a majority in principal amount of the Senior Secured Notes and the Convertible Unsecured Notes.

As a result of the Plan, (i) Holders of existing Senior Secured Notes will receive one New Series A Note of Lamington for each $100.00 of augmented principal amount of Senior Secured Notes (which augmented principal amount shall equal 1.04x the total of, as of the exchange, the existing principal amount of, and all accrued but unpaid interest on, the Senior Secured Notes); (ii) Holders of existing Convertible Unsecured Notes will receive one New Series B Note of Lamington and Grantor Trust Certificates representing ten (10) New PPNs for, as of the exchange, each $100.00 of the total principal amount of, and all accrued but unpaid interest on, the Convertible Unsecured Notes, (iii) Holders of existing Equity Interests in the Debtor (other than Unvested Warrants), par value $0.01 per share, will receive Grantor Trust Certificates representing one (1) New PPN per share of common stock (subject to adjustment for a cashless exercise in respect of vested warrants to purchase Debtor's common stock), *provided that* (i) New Unvested Warrants to purchase Grantor Trust Certificates shall be distributed to Holders of Unvested Warrants, conformed to the extent possible to the Unvested Warrants, and (ii) (x) equity awards of restricted stock under the Omnibus Plan shall be deemed vested as of the Effective Date and treated the same as the other Equity Interests in the Debtor and (y) New SARs exercisable for Grantor Trust Certificates will be distributed to Holders of Existing SARs, conformed to the extent possible to the Existing SARs.  New PPN Warrants also will be issued in order to allow new PPNs to be issued to the Grantor Trust upon the exercise of the New Unvested Warrants.  The foregoing ratios were determined based on negotiation among the Debtor, the Supporting Senior Secured Noteholders, and the Supporting Convertible Unsecured Noteholders.

The New Series A Notes, the New Series B Notes, the New PPNs, and the Grantor Trust Certificates will all be denominated in U.S. dollars.  The New Series A Notes will initially carry an interest rate of 8.5% per annum, compounded and payable semi-annually, subject to increase.  At Lamington's election, the interest on the New Series A Notes may be paid in cash or in kind ("PIK Interest") in additional New Series A Notes, and any such PIK Interest payments shall accrue and be paid at a rate of 11.5% per annum compounded and payable semi-annually.  The New Series B Notes will initially carry an interest rate of 5.0% per annum, compounded semi-annually, subject to increase.  At Lamington's election, the interest on the New Series B Notes may be paid in cash or as PIK Interest in additional New Series B Notes, and any such PIK Interest payments shall accrue and be paid at a rate of 7.0% per annum compounded semi-annually.  The New Series A Notes and the New Series B Notes will be redeemable in accordance with applicable priority provisions.

Upon the Effective Date of the Plan, all existing Senior Secured Notes, Convertible Unsecured Notes, and Equity Interests in the Debtor will be canceled and extinguished.  The Debtor's existing common stock, which currently trades on the OTCQX, will cease to be traded there, and the New Series A Notes, New Series B Notes, New PPNs, and Grantor Trust Certificates to be issued under the Plan will be listed on a stock exchange deemed suitable by the Debtor.

In sum, the New Series A Notes will have substantially the same terms as the existing Senior Secured Notes, except that the New Series A Notes will not be secured, will have a maturity date of 100 years after issuance, will have a par value augmented by a factor of 1.04, will not provide for many of the events of default and all of the consent rights as the Senior Secured Notes carry, will provide for increases in interest rate upon certain events, and will be traded on a stock exchange.

The New Series B Notes will have substantially the same terms as the existing Convertible Unsecured Notes, except that the New Series B Notes will have a maturity date of 100 years after issuance, will not provide for many of the events of default and all of the consent rights as the Convertible Unsecured Notes carry, and will provide for increases in interest rate upon certain events, and will be traded on a stock exchange.

The New PPNs, New PPN SARs, and the Grantor Trust Certificates will provide holders with substantially the same economic terms as the Debtor's existing common stock, except that they will not provide for meetings of holders or for the election of directors or the right to vote on other matters.  Holders of Unvested Warrants will receive New Unvested Warrants to purchase Grantor Trust Certificates, conformed to the extent possible to the Unvested Warrants.  New PPN Warrants also will be issued in order to allow new Grantor Trust Certificates to be issued upon the exercise of the New Unvested Warrants.  Equity awards of restricted stock under the Omnibus Plan shall be deemed vested as of the Effective Date and treated the same as the other Equity Interests in the Debtor.  Further, New SARs exercisable for Grantor Trust Certificates will be distributed to Holders of Existing SARs, conformed to the extent possible to the Existing SARs.

Because the Debtor is a holding company, aside from noteholder debt, the Debtor has few, if any, Other Priority Claims, Other Secured Debt Claims, and General Unsecured Claims.  All such Claims are treated as Unimpaired under the Plan.  There is one litigation claim against the Debtor, which is the subject of dispute.

The Plan is feasible and will be implemented with existing cash-on-hand at the Debtor or its non-Debtor subsidiaries.

This Disclosure Statement contains descriptions of the material terms of the Restructuring Securities to be issued under the Plan and other Plan-related documentation. The definitive documents are in the process of being finalized and will be filed with the Bankruptcy Court as part of the Plan Supplement at a later date.

## C.    PURPOSE AND EFFECT OF THE PLAN

### 1.    Plan of Reorganization Under Chapter 11 of the Bankruptcy Code

The Debtor is reorganizing pursuant to chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code. As a result, the confirmation of the Plan means that the Debtor will reorganize as set forth in the Plan and does not mean that the Debtor's assets will be immediately liquidated. Additionally, a bankruptcy court's confirmation of a plan binds the debtor, any entity acquiring property under the plan, any holder of a claim or an equity interest in the debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code to the terms and conditions of the confirmed plan, whether or not such Entity voted on the plan or affirmatively voted to reject the plan.

### 2.    Plan Overview

The Plan provides for the classification and treatment of Claims against and Equity Interests in the Debtor. For classification and treatment of Claims and Equity Interests, the Plan designates Classes of Claims and Classes of Equity Interests. These Classes and Plan treatments take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Equity Interests.

The following chart briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan.[3] Amounts listed below are estimated.

In accordance with section 1122 of the Bankruptcy Code, the Plan provides for six (6) Classes of Claims against and/or Equity Interests in the Debtor.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTOR'S CLASSIFICATION AND TREATMENT OF CLAIMS OR EQUITY INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN AND THE RISK FACTORS DESCRIBED IN ARTICLE IV BELOW. THE TABLE IS INTENDED FOR ILLUSTRATIVE PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR A REVIEW OF THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY. FOR CERTAIN CLASSES OF CLAIMS, THE ACTUAL AMOUNT OF ALLOWED CLAIMS COULD BE MATERIALLY DIFFERENT THAN THE ESTIMATED AMOUNTS SHOWN IN THE TABLE BELOW.**

| Class | Type of Claim or Interest | Estimated Claim Amount | Impairment | Entitled to Vote | Estimated Recovery Under Plan |
|-------|---------------------------|------------------------|------------|------------------|-------------------------------|
| 1 | Other Priority Claims | $0 | No | No | 100% |

---

[3] This chart is only a summary of the classification and treatment of Claims and Equity Interests under the Plan. References should be made to the entire Disclosure Statement and the Plan for a complete description.

| Class | Type of Claim or Interest | Estimated Claim Amount | Impairment | Entitled to Vote | Estimated Recovery Under Plan |
|---|---|---|---|---|---|
| 2 | Other Secured Claims | $0 | No | No | 100% |
| 3 | Senior Secured Notes Claims | $48,758,887.50 plus any interest, fees, and expenses | Yes | Yes | 100% over time |
| 4 | Convertible Unsecured Notes Claims | $67,836,966.00 plus any interest, fees, and expenses | Yes | Yes | 100% over time |
| 5 | General Unsecured Claims | $0 – $250,000 (approx.)[4] | No | No | 100% |
| 6 | Equity Interests in Debtor | N/A | Yes | Yes | Value of certain Grantor Trust Certificates |

3.     **Who May Vote on the Plan**

Each Holder of an Allowed Claim in Classes 3 and 4 and an Allowed Equity Interest in Class 6 is entitled to vote either to accept or to reject the Plan. Only those votes cast by Holders of Allowed Claims in Classes 3 and 4 and Allowed Equity Interests in Class 6 shall be counted in determining whether acceptances have been received sufficient in number and amount to obtain Confirmation. An Impaired Class of Claims or Equity Interests shall have accepted the Plan if: (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims or Equity Interests actually voting in such Class have voted to accept the Plan, and (b) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims and Equity Interests actually voting in such Class have voted to accept the Plan. Classes 1, 2, and 5 are Unimpaired under the Plan, are each deemed to accept the Plan by operation of law, and are not entitled to vote on the Plan. No Classes of Claims or Equity Interests are deemed to reject the Plan by operation of law. Without limiting the foregoing, in the event that any Class of Claims or Equity Interests entitled to vote on the Plan fails to accept the Plan as required by section 1129(a) of the Bankruptcy Code, the Plan may be amended and, in any event, the Debtor reserves the right to seek confirmation of the Plan over such rejection pursuant to section 1129(b) of the Bankruptcy Code.

4.     **Summary of Solicitation Package and Voting Instructions**

The following materials constitute the solicitation package with respect to the Plan enclosed herewith (the "Solicitation Package"):

- a solicitation cover letter from the Debtor addressed to the voting creditor or shareholder;

---

[4] There are certain litigation claims pending against the Debtor involving a $9 million life insurance policy. The Debtor disputes such claims and has sought to estimate them at $0.

- the appropriate form of Ballot and instructions for completing the Ballot;

- this Disclosure Statement with all exhibits;

- the Plan (as an exhibit hereto); and

- a copy of the order approving this Disclosure Statement (without exhibits).

Only Holders of Senior Secured Notes Claims (Class 3), Convertible Unsecured Notes Claims (Class 4), and Equity Interests in the Debtor (Class 6) are entitled to vote to accept or reject the Plan and shall be served with electronic or paper copies of this Disclosure Statement and the Plan. All parties entitled to vote to accept or reject the Plan shall receive electronically or a paper copy of each appropriate Ballot. Any party who desires additional paper copies of these documents may request copies from Kurtzman Carson Consultants LLC (the "Voting Agent") at no charge by calling the Voting Agent at 888-647-1744 (toll free) or +1 310-751-2628 (international) or emailing EmergentInfo@kccllc.com.

The Voting Agent will, among other things, answer questions, provide additional copies of all Solicitation Package materials, and generally oversee the solicitation process.

Only the Holders of Claims in Classes 3, 4, and 6 are entitled to vote to accept or reject the Plan. To be counted, Ballots cast by Holders must be received by the Voting Agent by **4:00 p.m. (prevailing Eastern Time) on** <u>December 17, 2020</u>, **the Voting Deadline**. Voting instructions are attached to each Ballot.

**If you are a Beneficial Holder of a voting Claim or Equity Interest, you may need to deliver your Ballot to your broker, bank, dealer, agent, or other nominee (each of the foregoing, a "Nominee"). Please promptly return your Ballot to your Nominee in order to allow for sufficient time to permit your Nominee to deliver a Master Ballot including your vote to the Debtor's Voting Agent by the Voting Deadline.**

Unless the Debtor in its discretion decides otherwise, any Ballot received after the Voting Deadline shall not be counted. As soon as practicable after the Voting Deadline, the Voting Agent will process and tabulate received Ballots and will File a voting report.

Parties may contact the Voting Agent with any questions related to the solicitation procedures applicable to their Claims.

The Plan Supplement will be Filed by the Debtor by the date fixed in the Plan. When Filed, the Plan Supplement will be available in both electronic and hard copy form.

**Any Ballot that is properly executed by the Holder of a Claim or Equity Interest but fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection of the Plan, shall not be counted.**

**All Ballots are accompanied by voting instructions. It is important to follow the specific instructions provided with the Ballot. Voting tabulation procedures are set forth in the Ballots.**

**The Debtor intends to rely on section 4(a)(2) of the Securities Act to exempt from registration under the Securities Act the offer of Restructuring Securities on account of the treatment of Senior Secured Notes Claims and Convertible Unsecured Notes Claims in connection with the Solicitation and the Plan. The Debtor intends to rely on section 1145 of**

the Bankruptcy Code to exempt from registration under the Securities Act and Blue Sky Laws the offer of Restructuring Securities on account of the treatment of Claims and Equity Interests in the Debtor.  The Debtor intends to rely on section 1145 of the Bankruptcy Code to exempt from registration under the Securities Act and Blue Sky Laws the issuance of Restructuring Securities on account of the treatment of Claims and Equity Interests in connection with the Plan.

### 5.    Confirmation of the Plan

(a)    <u>Generally</u>

"Confirmation" is the technical term for the Bankruptcy Court's approval of a plan of reorganization or liquidation.  The timing, standards and factors considered by the Bankruptcy Court in deciding whether to confirm a plan of reorganization are discussed below.

The confirmation of a plan of reorganization by the Bankruptcy Court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

(b)    <u>The Confirmation Hearing</u>

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

The Debtor will provide notice of the Confirmation Hearing to all necessary parties.  The Confirmation Hearing may be adjourned, with the consent of the Requisite Parties, from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing of any adjournment thereof.

### 6.    Confirming and Consummating the Plan

It is a condition to Confirmation of the Plan that the Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to the Debtor and the Requisite Parties.  Certain other conditions contained in the Plan must be satisfied or waived pursuant to the provisions of the Plan.

### 7.    Rules of Interpretation

The following rules for interpretation and construction shall apply to this Disclosure Statement:  (1) capitalized terms used in the Disclosure Statement and not otherwise defined shall have the meaning ascribed to such terms in the Plan; (2) unless otherwise specified, any reference in this Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document shall be a reference to such document in the particular form or substantially on such terms and conditions described; (3) unless otherwise specified, any reference in this Disclosure Statement to an existing document, schedule, or exhibit, whether or not filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) any reference to an entity as a Holder of a Claim or

Equity Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references in this Disclosure Statement to Sections are references to Sections of this Disclosure Statement; (6) unless otherwise specified, all references in this Disclosure Statement to exhibits are references to exhibits in this Disclosure Statement; (7) unless otherwise set forth in this Disclosure Statement, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (8) any term used in capitalized form in this Disclosure Statement that is not otherwise defined in this Disclosure Statement or the Plan but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

8.    **The Voting Record Date**

**The Voting Record Date is November 16, 2020**.  Only Holders of Allowed Claims and Equity Interests in the Voting Classes on the Voting Record Date will receive the Solicitation Package and are allowed to vote to accept or reject the Plan.

9.    **Other Restructuring Documents**

Holders of Senior Secured Notes Claims (Class 3), Convertible Unsecured Notes Claims (Class 4), and Equity Interests in the Debtor (Class 6) on the Voting Record Date will receive the Solicitation Package, which will be delivered by the Debtor via its Voting Agent.

In addition to the Solicitation Package, Holders of Senior Secured Notes Claims, Convertible Unsecured Notes Claims, and Equity Interests in the Debtor on the Voting Record Date will receive, as ordered by the Bankruptcy Court, the following supplemental materials (the "Supplemental Materials"):

(i)    a notice of the Confirmation Hearing approved by the Bankruptcy Court for transmission to Holders of Claims, Equity Interests, and other parties in interest (the "Confirmation Hearing Notice"); and

(ii)    such other materials as the Bankruptcy Court may direct.

10.    **Distribution of Confirmation Hearing Notice to Holders of Claims in Non-Voting Classes and Holders of Disputed Claims**

As set forth above, certain Holders of Claims are not entitled to vote on the Plan.  As a result, such parties will not receive Solicitation Packages or Supplemental Materials but, instead, will only receive the Confirmation Hearing Notice that explains, among other things, that (i) Classes 1, 2, and 5 are Unimpaired under the Plan, and therefore, are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, (ii) instructions for Holders of Claims and Equity Interests in all Classes on how they may obtain a copy of the Plan and this Disclosure Statement, (iii) the deadline by which to object to confirmation of the Plan; and (iv) the Confirmation Hearing date and time.  No Holders of Claims or Equity Interests are Impaired and receive no distribution under the Plan on account of such Claims and Equity Interests. Therefore, no Class of Claims or Equity Interests is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code

Contract and Lease Counterparties.  Parties to certain of the Debtor's executory contracts and unexpired leases may not have Claims pending the disposition of their contracts or leases by assumption or rejection under the Plan.  Such parties nevertheless will receive the Confirmation Hearing Notice after the Debtor's Chapter 11 Case is filed, as well as notice of the projected disposition of their contracts and/or lease and the scheduled Confirmation Hearing.

11.     **Filing of the Plan Supplement**

The Debtor will file the Plan Supplement with the Bankruptcy Court on or before five (5) Business Days prior to the Voting Deadline.  The Plan Supplement shall comprise, among other documents and unless otherwise agreed by the Debtor and the Requisite Parties, the following: (a) Grantor Trust Agreement, (b) Grantor Trust Certificate, (c) New Indenture Documents, (d) New PPN(s), (e) New PPN Warrants, (f) New PPN SAR(s), (g) New SAR(s), (h) New Series A Notes, (i) New Series B Notes, (j) New Unvested Warrants, (k) identity of the Plan Agent, (l) the identity of the members of the New Board, (m) the Schedule of assumed contracts, if any, and (l) any and all other documentation, which shall be consistent in all material respects with the Restructuring Support Agreements and/or otherwise in form and substance acceptable to the Debtors and the Requisite Parties, necessary to effectuate the Restructuring Transactions or that is contemplated by the Plan.  The Debtor, with the consent of the Requisite Parties, shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date.  **Parties may obtain a copy of the Plan Supplement, once it is filed, through the Voting Agent at www.kccllc.net/emergent or by calling the Voting Agent at 877-499-4509 (toll free) or +1 (917) 281-4800 (international) or emailing EmergentInfo@kccllc.com**.

12.     **The Confirmation Hearing**

**The Confirmation Hearing has been scheduled to commence on December 21, 2020 at 10:00 a.m. (prevailing Eastern time).**  The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtor by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.  Moreover, the Plan may be modified or amended, if necessary, with the consent of the Requisite Parties and pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

13.     **The Deadline for Objecting to Confirmation of the Plan**

**The deadline for objecting to Confirmation of the Plan is December 15, 2020 at 4:00 p.m. (prevailing Eastern time)**.  Subject to order of the Bankruptcy Court, any objection to confirmation of the Plan must:  (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name of the Debtor, the name of the objecting party and the amount and nature of the Claim of such Entity in the Chapter 11 Case or the amount of Equity Interests held by such Entity in the Chapter 11 Case; (iv) state with particularity the legal and factual bases and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed with the Bankruptcy Court and served by no later than the deadline to Confirmation set by the Bankruptcy Court on the parties set forth below (the "Notice Parties"), which service may be by way of the CM/ECF system, with courtesy copies by email.

CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.  INSTRUCTIONS WITH RESPECT TO THE CONFIRMATION HEARING AND DEADLINES WITH RESPECT TO CONFIRMATION WILL BE INCLUDED IN THE NOTICE OF CONFIRMATION HEARING APPROVED BY THE BANKRUPTCY COURT.

14.     **Notice Parties**

(a)     <u>Counsel to the Debtor</u>, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19801 (Attn:  Richard M.  Pachulski, Maxim

B. Litvak, and Colin R. Robinson);

(b)　　Counsel to the Supporting Senior Secured Noteholders, Faegre Drinker Biddle & Reath LLP, 1177 Avenue of the Americas, 41st Floor, New York, NY 10036 (Attn:  James H. Millar, Laura E. Appleby, and Kyle R. Kistinger);

(c)　　Counsel to the Supporting Convertible Unsecured Noteholders, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, NY 10038 (Attn:  Brett Lawrence and Matthew G. Garofalo); and

(d)　　The Office of the United States Trustee for the District of Delaware, 944 King Street, Suite 2207, Wilmington, DE 19801 (Attn: Juliet Sarkessian).

15.　　**Effect of Confirmation of the Plan**

The Plan contains certain provisions relating to (a) the compromise and settlement of Claims and Equity Interests, (b) the release of the Released Parties by the Debtor and the Holders of Claims or Equity Interests, and each of their respective Related Persons, and (c) exculpation of certain parties.

> THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (B) HAS FILED A PROOF OF CLAIM IN THE CHAPTER 11 CASE (IF ANY ARE FILED), OR (C) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

## D.　　CONSUMMATION OF THE PLAN

It will be a condition to confirmation of the Plan that all provisions, terms and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant to the provisions of Article IX of the Plan.  Following confirmation, the Plan will be consummated on the Effective Date.

## E.　　RISK FACTORS

**PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IN A VOTING CLASS IS URGED TO CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IV HEREIN TITLED, "RISK FACTORS."**

## ARTICLE II.
## BACKGROUND TO THE CHAPTER 11 CASE

## A.　　THE DEBTOR'S BUSINESS

The Debtor is a holding company that, through its subsidiaries, owns a 27.5% equity investment in White Eagle. White Eagle, which was a wholly-owned indirect subsidiary of the Debtor until August 2019, holds a portfolio of approximately 500 life insurance policies, also

referred to as life settlements, having a face value of approximately $2.4 billion (the "White Eagle Portfolio").

The Debtor's existing common stock is publicly traded on the OTCQX market under the ticker symbol "EMGC".

The Debtor's principal asset is its indirect interests in the White Eagle Portfolio. The purpose of the Plan is to preserve and maximize the value of such interests for the benefit of all constituents of the Debtor.

## B.    CORPORATE STRUCTURE OF THE DEBTOR

Emergent holds all of the equity interests in Red Reef Alternative Investments, LLC ("Red Reef"), a Delaware limited liability company, which has commenced a chapter 11 case concurrently with the Debtor. As addressed further below, 65% of Emergent's interests in Red Reef have been pledged to the senior secured noteholders. The Debtor is considering its options with respect to Red Reef, pending the expiration of the bar date; hence, the Plan does not currently extend to Red Reef.

Another subsidiary of Emergent, Imperial Premium Finance, LLC, commenced a chapter 11 case on October 26, 2020, but such case is not jointly administered with the Debtor.

The Debtor also holds all of the equity interests in OLIPP IV, LLC ("OLIPP"), a Delaware limited liability company.

OLIPP holds all of the equity interests in Markley Asset Portfolio, LLC ("Markley"), a Delaware limited liability company.

Markley holds the Debtor's interests in Lamington, which is an Irish Section 110 Company. Lamington is a designated activity company with limited liability. However, an Irish Section 110 Company is typically financed through the issuance of debt instruments, resulting in its share capital being of nominal value. Currently, Lamington has issued and outstanding certain profit participation notes held by Markley, which entitle Markley to all profits earned by Lamington (except for a small annual profit amount for corporate benefit purposes). Lamington's shares are held on a charitable trust basis and are of limited value. Lamington holds 27.5% of the equity interests in White Eagle, which are designated as the Class B Units in White Eagle.

As a parent holding company, the Debtor has no employees or operations itself. The Debtor's operating subsidiary is Imperial Finance & Trading, LLC ("Imperial Finance"), which entity employs staff, leases office space, contracts with outside vendors, and otherwise manages the Debtor's business affairs. The Debtor's administrative expenses during the course of the Chapter 11 Case, including any allowed professional fees incurred by the Estate, will be paid through Imperial Finance.

Attached hereto as **Exhibit B** is an organizational chart of the Debtor and its relevant subsidiaries for purposes of this Chapter 11 Case.

## C.    PREPETITION CAPITALIZATION AND INDEBTEDNESS OF THE DEBTOR

On July 28, 2017, the Debtor consummated a series of integrated transactions to effect a recapitalization (the "Recapitalization"), pursuant to which (i) the Debtor issued and sold 115,000,000 shares (the "Recapitalization Shares") of common stock, (ii) the Debtor issued

warrants (the "Recapitalization Warrants") to purchase up to an aggregate of 42,500,000 shares of common stock at an exercise price of $0.20 per share (the "Warrant Shares"), of which 17,500,000 Recapitalization Warrants were immediately vested (and constitute the Warrants) and 25,000,000 Recapitalization Warrants remain unvested (the "Unvested Warrants"), (iii) investors, which included some of the investors that acquired Recapitalization Shares and Recapitalization Warrants, purchased all of the Debtor's then-outstanding 15% senior secured notes due 2018 and amended and restated the relevant indenture to reduce the interest rate to 8.5% and increase the issuable principal amount to $40,0000,000, thereby creating the Senior Secured Notes, and such investors exchanged the old notes for $30,000,000 principal amount of Senior Secured Notes and (iv) the holders of substantially all of the Debtor's then-outstanding 8.5% convertible notes due 2019 exchanged such notes for $75,836,966 principal amount of Convertible Unsecured Notes.  The Senior Secured Notes are secured by, among other things, a pledge of 65% of the Debtor's interests in OLIPP.  The Debtor agreed to register the resale of the Recapitalization Shares, the Warrant Shares, the Convertible Unsecured Notes and the shares underlying the Convertible Unsecured Notes, and such registration was effected in September 2017 (the "2017 Registration"). At the time of the Recapitalization, the Debtor's articles of incorporation (the "Articles") were amended and restated to authorize the issuance of 415,000,000 shares of common stock.

In connection with the Recapitalization, the Debtor's board of directors was reconstituted to consist of six (6) directors, five (5) of whom were designees of investors in the Recapitalization pursuant to board designation agreements (the "Board Designation Agreements"). The Debtor's Board has since been expanded to consist of nine (9) directors.

In August 2017, the Debtor issued and sold an additional 12,500,000 shares of common stock and $5,000,000 principal amount of Senior Secured Notes to a new investor.  In December 2018, the Debtor issued and sold $5,667,000 principal amount of Senior Secured Notes and amended and restated the Senior Secured Notes Indenture to (i) increase the principal amount issuable thereunder to $70,000,000 and (ii) to permit PIK Interest to be paid on principal amounts designated by holders, if so elected by the Debtor, and with all future purchases of Senior Secured Notes subject to PIK Interest payments, providing that PIK Interest payments carry an additional 3% interest.  In January and February 2019, the Debtor issued and sold an aggregate of $2,967,000 of additional Senior Secured Notes.

As of the Petition Date, Emergent has outstanding common stock, Recapitalization Warrants, $48,758,887.50 principal amount of Senior Secured Notes, and $67,836,966.00 principal amount of Convertible Unsecured Notes.

## D.     PRIOR CHAPTER 11 PROCEEDINGS OF WHITE EAGLE

On November 14, 2018, Lamington and White Eagle General Partner, LLC, the Debtor's wholly-owned indirect Delaware subsidiary ("WEGP"), filed voluntary chapter 11 petitions for relief in the Bankruptcy Court.  At the time, Lamington was the limited partner and owned 99.99%, and WEGP was the general partner and owned 0.01%, of White Eagle.  In its capacity as general partner, WEGP managed the affairs of White Eagle.  On December 13, 2018, White Eagle filed a voluntary chapter 11 petition for relief in the Bankruptcy Court.  The cases were pending before Judge Kevin Gross.

The foregoing chapter 11 cases were filed in order to protect the White Eagle Portfolio, which was pledged as collateral under a revolving credit agreement between White Eagle and an affiliate of Beal Bank (the "White Eagle Revolving Credit Facility"). The terms of the White Eagle Revolving Credit Facility were onerous and constricted the Debtor's access to its main source of revenue and cash flow.

As part of its plan of reorganization and its exit from bankruptcy, White Eagle, along with the Debtor, Lamington and WEGP, entered into the White Eagle Transaction (defined below) on August 16, 2019. Subsequently, on September 16, 2019, the Bankruptcy Court entered an order and final decree closing White Eagle's chapter 11 case. On November 25, 2019, the Bankruptcy Court entered an order and final decree closing Lamington's and WEGP's chapter 11 cases.

On August 16, 2019, White Eagle, Emergent, Lamington and WEGP entered into a subscription agreement (the "Subscription Agreement") with Palomino JV, L.P. ("Palomino"), pursuant to which 72.5% of the limited partnership interests in White Eagle, consisting of all of the newly issued and outstanding Class A and Class D interests, were sold to Palomino (collectively, the "White Eagle Transaction") for an aggregate purchase price of approximately $366,200,000 and $8,000,000 for the Class A and Class D interests, respectively. Pursuant to the Subscription Agreement, Lamington received 27.5% of the limited partnership interests of White Eagle, consisting of all of the newly issued and outstanding Class B interests in exchange for all of its previously owned White Eagle limited partnership interests. The limited partnership agreement of White Eagle was amended and restated to provide for the new classes of interests and their terms. The proceeds of the White Eagle Transaction, together with other funds of White Eagle, were used to satisfy in full the White Eagle Revolving Credit Facility, which was terminated and the underlying collateral, consisting of the White Eagle Portfolio, was released.

## E.    EVENTS LEADING TO THE COMMENCEMENT OF THE BANKRUPTCY CASE

As a result of the White Eagle Transaction, Emergent has been able to participate in proceeds of maturities from the White Eagle Portfolio without the burdens of excessive bank debt and, as a result, Emergent's financial performance has markedly improved. However, Emergent continues to be burdened by approximately $117 million of noteholder obligations that must be serviced on a going forward basis. In order to address Emergent's liquidity needs over the foreseeable future, it is the Emergent's business judgment that a restructuring should be effectuated.

Over the course of over a year, Emergent and its representatives heavily negotiated the terms of a possible restructuring, which is now memorialized in the Restructuring Support Agreements and the proposed Plan. At least a majority in principal amount of the holders of the Senior Notes and the Convertible Notes are parties to the Restructuring Support Agreements and support the Plan. Emergent expects that additional noteholders will join the supporting noteholders leading up to confirmation of the Plan.

In accordance with the Restructuring Support Agreements and as reflected in the Plan, Emergent's restructuring will be accomplished through Lamington, an Irish indirect subsidiary of Emergent. Lamington is located in a tax-favorable jurisdiction. Emergent proposes to transfer the ownership of Lamington to its security holders by having Lamington and the Grantor Trust issue new securities that will be exchanged for the securities currently held by Emergent's security holders. Emergent's securities will be cancelled and ultimately Emergent and its subsidiaries other than Lamington and Lamington's subsidiaries will be liquidated. As a result, current security holders of Emergent, including equity holders, will become security holders of Lamington, with such securities, which will be listed for trading on a foreign public stock exchange deemed suitable for this purpose, representing ownership of the same assets as before the restructuring.

**F.      COMMENCEMENT OF THE DEBTOR'S CHAPTER 11 CASE**

In order to obtain confirmation of the Plan and in accordance with the Restructuring Support Agreements, the Debtor has filed for chapter 11 bankruptcy protection in order to effectuate the Restructuring.

The Debtor intends to move promptly towards confirmation of the Plan and to exit bankruptcy by December 31, 2020 in order to minimize any potential adverse impact of the bankruptcy filing on the Debtor's assets.  The Debtor believes that the proposed Plan is in the best interests of the Debtor's creditors and will maximize the value of this Estate.

**G.      ANTICIPATED BANKRUPTCY FILINGS**

The Debtor intends to employ advisors and seek relief described below following the commencement of the Chapter 11 Case.

To assist the Debtor in carrying out its duties as debtor in possession and to otherwise represent the Debtor's interests in the contemplated Chapter 11 Case, the Debtor has filed or will file applications seeking authorization to retain and employ certain advisors, whose terms of retention will be subject to approval by the Bankruptcy Court, including Pachulski Stang Ziehl & Jones LLP, as general insolvency counsel to the Debtor.

In addition, the Debtor has obtained authority from the Bankruptcy Court to maintain its existing bank account and has set a general bar date of December 11, 2020 for the filing of most creditor claims.  Finally, the Debtor, along with its debtor affiliate Imperial Premium Finance, LLC, have sought to estimate at $0 for distribution purposes certain litigation claims asserted against them with respect to a $9 million insurance policy.

**H.      EXCLUSIVE PERIOD FOR FILING A PLAN AND SOLICITING VOTES**

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief.  If a debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the Petition Date to solicit acceptances to the plan.  During these exclusive periods, no other party in interest may file a competing plan of reorganization; however, a court may extend these periods upon request of a party in interest and "for cause."

**I.      DEADLINE TO ASSUME OR REJECT LEASES OF NONRESIDENTIAL REAL PROPERTY**

Pursuant to section 365(d)(4) of the Bankruptcy Code, the time within which the Debtor must assume or reject unexpired leases of nonresidential real property is 120 days from the Petition Date, unless extended by order of the Bankruptcy Court.

**J.      SUMMARY OF THE RESTRUCTURING SECURITIES UNDER THE PLAN**

As part of the Plan, securities of Lamington and the Grantor Trust will be distributed to current holders of the Debtor's securities.  Upon such distribution, concurrent with the receipt by holders of the Restructuring Securities, the Debtor's securities currently held by the security holders will no longer be valid and will deemed to be canceled.

The Restructuring Securities (defined below) will mirror the outstanding Debtor securities as closely as practicable.  Lamington is an Irish Section 110 company, not a U.S. corporation.  Accordingly, it is authorized to issue different types of securities than a typical corporation organized in the United States.  Lamington, as a Section 110 company, enjoys certain favorable tax treatment that would not be available to an Irish public limited company (the form of entity that more closely resembles a U.S. corporation).  There will be five (5) classes of Lamington securities created in connection with the Restructuring:  (1) New Series A Notes, a fixed income instrument that mimics the existing Senior Secured Notes; (2) New Series B Notes, a fixed income instrument that mimics the existing Convertible Unsecured Notes; (3) New PPNs, profit participating notes that will provide economic benefits similar to the Debtor's existing common stock; (4) New PPN Warrants to purchase PPNs that conform to the existing Unvested Warrants to the extent possible; and (5) New PPN SARs that conform to the Existing SARs to the extent possible.  In addition, there will be three (3) classes of Grantor Trust securities created in connection with the Restructuring: (1) Grantor Trust Certificates, (2) New Unvested Warrants; and (3) New SARs. The New PPNs, New PPN Warrants and New PPN SARs will be contributed to the Grantor Trust, and the Holders of the Debtor's securities will receive Grantor Trust Certificates and, as applicable, New Warrants and New SARs.  The New PPN Warrants will be issued in order to allow new PPNs to be issued to correspond to new Grantor Trust Certificates to be issued upon the exercise of the New Unvested Warrants.  The New PPN SARs will be issued in order to allow new PPNs to be issued to correspond to new Grantor Trust Certificates to be issued upon the exercise of the New SARs. The New Series A Notes, the New Series B Notes, the New PPNs, the Grantor Trust Certificates, the New Unvested Warrants, the New PPN Warrants, the New SARs, and the New PPN SARs are collectively referred to as the "Restructuring Securities".

The New Series A Notes, the New Series B Notes, the New PPNs, the Grantor Trust Certificates will be freely tradable on a stock exchange deemed suitable for this purpose by the Debtor.

## K.    SUMMARY OF THE NEW SERIES A NOTES

Upon the Effective Date of the Plan, Holders of Senior Secured Notes will receive one New Series A Note for each $100.00 of augmented principal amount of Senior Secured Notes. The augmented principal amount shall equal 1.04x the total of, as of the exchange, the existing principal amount of, and all accrued but unpaid interest on, the Senior Secured Notes.  The New Series A Notes will be unsecured and will have no financial covenants.

The New Series A Notes will be fixed income instruments that will mature 100 years after issuance (the "Maturity Date"), at which time Lamington will be obligated to repay the outstanding principal balance of the New Series A Notes together with all accrued and unpaid interest thereon.  The New Series A Notes will be denominated in U.S. dollars and will have a par value of $100.00 per New Series A Note.  The initial principal amount of the New Series A Notes issued equal to 1.04 times the sum of (a) $48,758,887.50 and (b) any accrued and unpaid non-cash interest on the Senior Secured Notes.

The New Series A Notes will initially carry a cash interest rate of 8.5% per annum, compounded and payable semi-annually, subject to increase as described below.  At Lamington's election, and subject to the Payment Priority Waterfall, all or a portion of the interest may be paid in kind ("PIK Interest") in additional New Series A Notes, and any such PIK Interest payments shall initially accrue and be paid at a rate of 11.5% per annum compounded and payable semi-annually, and subject to increase as described below.  Interest on the Series A Notes shall be paid semi-annually in arrears and will be computed on the basis of a 360-day year.

With respect to any New Series A Notes that remain outstanding on or after July 15, 2021, the New Series A Notes will be entitled to interest in cash at a rate of 9.75% per annum compounded and payable semi-annually, or PIK Interest, at the Issuer's election, at a rate of 14% per annum compounded and payable semi-annually.

Lamington shall redeem the outstanding New Series A Notes for cash at a price equal to the outstanding principal balance thereof plus all accrued and unpaid interest, upon the earlier of: (i) the Maturity Date; (ii) the acceleration of all obligations under the New Series A Notes following the occurrence of a New Series A Event of Default (as defined below); and (iii) a Deemed Liquidation.[5]

The New Series A Notes may be repaid at the option of the Issuer, in whole and not in part, at any time before the Final Maturity Date, at a price equal to the then outstanding principal amount plus all accrued and unpaid interest thereon.

Each $100.00 principal amount of New Series A Notes is convertible at any time into Grantor Trust Certificates representing 100 New PPNs at the discretion of the Series A Noteholder.

The following will constitute events of default under the New Series A Notes:  (a) the Issuer shall fail to pay any interest, in cash or in kind, on the New Series A or New Series B Notes after the same shall become due and payable, (b) the Issuer shall fail to redeem the Restructuring Securities in accordance with the Payment Priority Waterfall, or (c) any proceeding shall be instituted by or against the Issuer under any law relating to bankruptcy, insolvency, or reorganization.

With respect to payments of interest and rights upon liquidation, winding up or dissolution (whether voluntary or involuntary) or sale of Lamington or of all or substantially all of its assets, the New Series A Notes will rank senior to each of the New Series B Notes and the New PPNs.

The New Series A Notes will be listed for trading on a stock exchange deemed suitable for this purpose by the Debtor.

## L.    SUMMARY OF THE NEW SERIES B NOTES

Upon the Effective Date, Holders of Convertible Unsecured Notes will receive one New Series B Note plus Grantor Trust Certificates representing 10 New PPNs for, as of the exchange, each $100.00 of the total principal amount of, and all accrued but unpaid interest on, the Convertible Unsecured Notes.  The New Series B Notes will be unsecured and will have no financial covenants.

The New Series B Notes will be fixed income instruments and will mature on the Maturity Date, at which time Lamington shall be obligated to repay the outstanding principal

---

[5]  Deemed Liquidation shall mean, in substance but not necessarily in form, (a)  a sale, transfer, lease or other disposition, in a single transaction or series of related transactions, of all or substantially all of the assets of (i) the Company or (ii) White Eagle Asset Portfolio, LP or (b) the consummation of any transaction (including any merger or consolidation or whether by operation of law or otherwise), the result of which is that any one third party purchaser (or group of affiliated third party purchasers) becomes the beneficial owner, directly or indirectly, of more than fifty percent (50%) of the then outstanding Trust Certificates issued pursuant to the Grantor Trust Agreement (as discussed below in the section "Trust Certificates") or of the surviving entity of any such merger or consolidation.

balance of the New Series B Notes together with all accrued and unpaid interest thereon.  They will be denominated in U.S. dollars and will have a par value of $100.00 per New Series B Note.  The initial principal amount of the New Series B Notes issued will be $67,836,966.00, plus any accrued and unpaid interest on the Convertible Unsecured Notes.  The New Series B Notes will initially carry a cash interest rate of 5.0% per annum, compounded semi-annually, subject to increase as described below.  At Lamington's election, all or a portion of the interest may be paid as PIK Interest in additional New Series B Notes, and any such PIK Interest payments shall initially accrue and be paid at a rate of 7.0% per annum compounded semi-annually.  Interest on the Series B Notes shall be paid semi-annually in arrears and will be computed on the basis of a 360-day year.

With respect to any Series B Notes that remain outstanding after February 15, 2023, the cash interest rate shall increase to 6.0% and the PIK Interest Rate shall increase to 8.0%.

To the extent that the Issuer does not elect to pay interest on the New Series B Notes as PIK Interest, any such accrued and unpaid cash interest shall be paid to holders of the New Series B Notes before the Issuer uses any funds to redeem the New Series A Notes.

Lamington shall redeem the outstanding New Series B Notes for cash at a price equal to the unpaid principal balance thereof plus all accrued and unpaid interest, upon the earlier of (i) the Maturity Date; (ii) the acceleration of all obligations under the New Series B Notes following the occurrence of a New Series B Event of Default (as defined below); and (iii) a Deemed Liquidation.

The Series B Notes may be repaid at the option of the Issuer, in whole and not in part, at any time before the Final Maturity Date, at a price equal to the then outstanding principal amount plus accrued and unpaid interest thereon.

Each $100.00 principal amount of Series B Notes is convertible at any time into Trust Certificates representing 200 PPNs at the discretion of the Series B Noteholder.

The following will constitute events of default under the New Series B Notes:  (a) the Issuer shall fail to pay any interest, in cash or in kind, on the New Series A or New Series B Notes after the same shall become due and payable, (b) the Issuer shall fail to redeem the Restructuring Securities in accordance with the Payment Priority Waterfall, or (c) any proceeding shall be instituted by or against the Issuer under any law relating to bankruptcy, insolvency, or reorganization.

With respect to payments of interest and rights upon liquidation, winding up or dissolution (whether voluntary or involuntary) or sale of the Issuer of all or substantially all of its assets, the New Series B Notes will rank senior to the New PPNs, but junior to the New Series A Notes.

The New Series B Notes will be listed for trading on a stock exchange deemed suitable for this purpose by the Debtor.

## M.    SUMMARY OF THE NEW PPNS, NEW UNVESTED WARRANTS, NEW PPN WARRANTS, NEW SARS, AND NEW PPN SARS

Upon the Effective Date, each existing share of the Debtor's common stock and vested warrants will be exchanged on a one-for-one basis for one New PPN (subject, in the case of the vested warrants, to adjustment for a cashless exercise thereof).  Each such New PPN will be

deposited by the Debtor with the Grantor Trust Trustee, which will issue an equal number of Grantor Trust Certificate(s) to the holders thereof.

Further, (i) New Unvested Warrants to purchase Grantor Trust Certificates shall be distributed to Holders of Unvested Warrants, conformed to the extent possible to the Unvested Warrants, and (ii) (x) equity awards of restricted stock under the Omnibus Plan shall be deemed vested as of the Effective Date and treated the same as the other Equity Interests in the Debtor and (y) New SARs exercisable for Grantor Trust Certificates will be distributed to Holders of Existing SARs, conformed to the extent possible to the Existing SARs.  The terms of the New PPN Warrants to purchase the New PPNs shall be conformed, to the extent practicable, to the existing provisions of the Unvested Warrants.  The terms of the New PPN SARs exercisable for New PPNs shall be conformed, to the extent practicable, to the existing provisions of the Existing SARs.

Funds shall be distributed to holders of the New PPNs only in the limited circumstances set forth in Payment Priority Waterfall.

If funds are distributed to holders of the New PPNs (in the limited circumstances set forth in Payment Priority Waterfall), the paying agent in respect of the Grantor Trust Certificates will declare distributions on the Grantor Trust Certificates on a pro rata basis in an amount equal to the distributions received in respect of the New PPNs, after deducting reasonable fees and expenses applicable to the Grantor Trust.

The New PPNs shall mature on the Final Maturity Date.  The Issuer will be obligated to repay the unpaid principal balance of the New PPNs, together with any applicable distributions thereon, on the Final Maturity Date.

The Grantor Trust Certificates shall mature on the Final Maturity Date.  Upon receipt of the proceeds of the Grantor PPNs on the Final Maturity Date, the paying agent in respect of the Grantor Trust Certificates will pay holders of the Grantor Trust Certificates the cash receipts and other distributions it receives in respect of the New PPNs, after deducting fees and expenses applicable to the Grantor Trust.

The Issuer shall redeem the outstanding New PPNs on a pro rata basis for cash at a price equal to the unpaid principal balance thereof, plus any applicable distributions thereon, plus any call premium associated with such redemption, upon the earlier of (i) the Final Maturity Date; (ii) the acceleration of all obligations under the New PPNs following the occurrence of an Event of Default; and (iii) a Deemed Liquidation. Upon receipt of such redemption proceeds, the paying agent in respect of the Grantor Trust Certificates will redeem a pro rata portion of the Grantor Trust Certificates and pay holders of such Grantor Trust Certificates the cash receipts and other distributions it receives in respect of the redemption of the New PPNs, after deducting fees and expenses applicable to the Grantor Trust.

The following will constitute events of default under the New PPNs:  (a) the Issuer shall fail to redeem the Restructuring Securities in accordance with the Payment Priority Waterfall or (b) any proceeding shall be instituted by or against the Issuer under any law relating to bankruptcy, insolvency, or reorganization.

With respect to payments of interest and rights upon liquidation, winding up or dissolution (whether voluntary or involuntary) or sale of the Issuer of all or substantially all of its assets, the New PPNs (which underlie the Grantor Trust Certificates) will rank junior to each of the Series A Notes and the Series B Notes.

Grantor Trust Certificates representing the New PPNs will be listed for trading on a stock exchange deemed suitable for this purpose by the Debtor.

## N.   SUMMARY OF THE GRANTOR TRUST AND GRANTOR TRUST CERTIFICATES

Irish securities laws require, among other things, that a Section 110 company not make an offer to the public. This prohibition does not apply to an offer addressed to fewer than 150 persons, other than qualified investors.. The Debtor currently has more than 150 beneficial owners of its common stock, which includes owners who hold common stock in "street name" through a broker. If the Debtor were to distribute the New PPNs to the existing holders of its common stock, Lamington would have made an offer to over 150 persons and would not be in compliance with the Irish securities laws. Therefore, instead of distributing the New PPNs directly to the holders of common stock, the Debtor will transfer the New PPNs to the Grantor Trust in exchange for a single class of ownership interests, representing undivided beneficial interests in the sole assets of the Grantor Trust consisting of the New PPNs. As a result, the Debtor will own 100% of the Grantor Trust Certificates immediately before the Effective Date. At the time of the Debtor's distributions under the Plan, the Debtor will distribute Grantor Trust Certificates to the holders of its common stock (as well as to holders of Convertible Unsecured Notes), each evidencing an undivided beneficial interest in the assets of the Grantor Trust (namely, the New PPNs). The Grantor Trust also will hold the New PPN Warrants and the New PPN SARs with respect to the New Unvested Warrants and the New SARs that will be distributed by the Debtor to the holders of the Existing Warrants and Existing SARs. There will be no practical or economic difference to the holders in holding the Grantor Trust Certificates instead of the New PPNs directly, and this structure will permit Lamington to remain in compliance with Irish securities laws.

The Grantor Trust Certificates shall be issued pursuant to a Grantor Trust Agreement between the Debtor, as grantor, and the Grantor Trust Trustee. Each Grantor Trust Certificate will represent one New PPN having a principal amount equal to the greater of (i) the closing price of the Debtor's common stock immediately preceding the Petition Date or (ii) the closing price of the Debtor's common stock immediately preceding the Effective Date. The Grantor Trust Trustee will hold the New PPNs, the New PPN Warrants, and the New PPN SARs and the holders of the Grantor Trust Certificates, New Unvested Warrants, and New SARs will have rights as provided in the Grantor Trust Agreement.

The identity of the Grantor Trustee will be disclosed in the Plan Supplement.

The Grantor Trust Certificates will be listed for trading on a stock exchange deemed suitable for this purpose by the Debtor.

## O.   PAYMENT PRIORITY OF RESTRUCTURING SECURITIES

Lamington shall retain a minimum cash balance of at least $5,000,000 (the "Minimum Cash Balance") until such time that all of the New Series A Notes and New Series B Notes are retired or repurchased following the Effective Date to fund operating expenses and contingencies and a nominal profit amount; provided that the Board of Directors of Lamington may reduce the Minimum Cash Balance, (a) by $1,000,000 no more often than once every six (6) months through December 31, 2022 until the Minimum Cash Balance reaches $3,000,000, acting by majority vote, and (b) if additional reduction is desired after December 31, 2022, to $2,000,000, acting by Defined Majority Approval (as will be defined in the New Indenture Documents). The Minimum Cash Balance shall be reported as of June 15 and December 15 of each year, and shall be certified by a director, manager or officer of Lamington as true and correct. Falling below the

Minimum Cash Balance will not constitute an event of default under any of the Restructuring Securities.

On any date up to and including December 31, 2022, the Issuer may, at its option, but subject to approval by the Issuer's Board of Directors (without requiring a Defined Majority Approval), repurchase the New Series A Notes and/or the New Series B Notes in the open market, provided that the Minimum Cash Balance is maintained immediately following such repurchasing transaction ("Open Market Repurchases").

For so long as the Minimum Cash Balance is maintained, any funds held by the Issuer in excess of the Minimum Cash Balance and remaining after any Open Market Repurchases ("Available Funds") shall be distributed to the holders of the Restructuring Securities in accordance with the following payment priority waterfall outlined below (the "Payment Priority Waterfall").

Cash interest on the New Series A Notes and New Series B Notes shall be paid only to the extent of Available Funds, as detailed in the Payment Priority Waterfall.

Payment Priority Waterfall:

1) First, holders of the New Series A Notes shall receive, on a semi-annual basis,[6] all accrued and unpaid interest in full, including any arrears, and for the avoidance of doubt such interest payment shall not include a catch-up cash interest payment for any PIK interest that has been previously capitalized as principal, but shall include any increase in cash interest payable as a result of such PIK Interest capitalization on the previous payment dates. If insufficient Available Funds exist to pay interest on the Series A Notes, in full, such Available Funds shall be used to make cash interest payments on a *pro rata* basis to holders of the Series A Notes, and any remaining interest owed shall be paid as PIK Interest and capitalized as principal.

2) Second, holders of the Series B Notes shall receive, on a semi-annual basis,[7] all accrued and unpaid interest in full, including any arrears, and for the avoidance of doubt such interest payment shall not include a catch-up cash interest payment for any PIK Interest that has been previously capitalized as principal, but shall include any increase in cash interest payable as a result of such capitalization on the previous payment dates. If insufficient Available Funds exist to pay interest on the Series B Notes, in full, such Available Funds shall be used to make cash interest payments on a *pro rata* basis to holders of the Series B Notes, and any remaining interest owed shall be paid as PIK Interest and capitalized as principal.

3) Third, after December 31, 2022, the retirement of Class D Units outstanding in White Eagle Asset Portfolio, LP ("White Eagle") until all such Class D Units are retired.

4) Fourth, after December 31, 2022, until all Series A Notes have been redeemed or repaid in full, the Company shall redeem any and all of the Series A Notes at a price equal to the outstanding principal amount of the Series A Notes being redeemed plus accrued and unpaid interest thereon on a semi-annual basis that is

---

[6] June 30 and December 31 of each year.

[7] June 30 and December 31 of each year.

substantially contemporaneous with its semi-annual Board of Directors' meeting and/or reporting obligations, provided that the Minimum Cash Balance is maintained immediately following such redemption.

5) Fifth, after December 31, 2022, until sufficient Series B Notes, including Accrued Series B PIK Interest, such that the outstanding principal amount of Series B Notes (including Accrued Series B PIK Interest) does not exceed $30 million have been redeemed or repaid, the Company shall redeem any and all of the Series B Notes at a price equal to the outstanding principal amount of the Series B Notes being redeemed plus accrued and unpaid interest thereon on a semi-annual basis that is substantially contemporaneous with Lamington's semi-annual meeting of the Board of Directors and/or reporting obligations, provided that the Minimum Cash Balance is maintained immediately following such redemption.

6) Sixth, after December 31, 2022, 50% of the Available Funds shall be used by Lamington to redeem any and all of the Series B Notes at a price equal to the outstanding principal amount of the Series B Notes being redeemed plus accrued and unpaid interest thereon, and 50% of the Available Funds shall be paid to the holders of the New PPNs, in each case on a semi-annual basis that is substantially contemporaneous with Lamington's semi-annual Board of Directors' meeting and/or reporting obligations, provided that the Minimum Cash Balance is maintained immediately following such redemption and payment.

7) Seventh, after December 31, 2022, after all Series B Notes have been redeemed or repaid in full, any remaining Available Funds shall be paid to the holders of the New PPNs on an annual basis.

For the avoidance of doubt, prior to December 31, 2022, only items 1 and 2 above will apply (and items 3-7 will not apply).

## P.    GOVERNANCE OF LAMINGTON AND THE DEBTOR

On the Effective Date, Lamington shall have a board of directors consisting of five (5) members, including (a) two (2) designated by the ad hoc committee of the Supporting Senior Secured Noteholders, (b) one (1) designated by the ad hoc committee of the Supporting Convertible Unsecured Noteholders, (c) one (1) designated by the non-conflicted equity members of the Debtor's Board of Directors, and (d) one (1) Irish citizen acceptable to the other four (4) director designees. Each such designee may be removed and replaced by his or her designator(s). The duration of such designation rights and other rights of such directors, including voting rights and restrictions, will be contained in the New Indenture Documents. Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtor will disclose, prior to the Confirmation Hearing, the identity and affiliations of any Person proposed to serve on the initial board of directors of Lamington or as an officer of Lamington and, to the extent such Person is an insider other than by virtue of being a director or officer, the nature of any compensation for such Person. Each such director, and officer will serve from and after the Effective Date pursuant to applicable organizational documents of Lamington and the New Indenture Documents.

Pending consummation of the Restructuring Transactions and until such time that the Debtor has fulfilled its obligations under the Plan, the directors and officers of the Debtor after the Effective Date will be the directors and officers of the Debtor existing immediately prior to the Effective Date, with all of the powers of a corporation pursuant to the applicable law in its state of incorporation.

Upon consummation of the Restructuring Transactions and the Debtor fulfilling its obligations under the Plan, the directors and officers of the Debtor will be deemed to have resigned as of such date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any other Person or any director, stockholder, securityholder, manager, member, or partner (or board thereof) of any Entity.

Following consummation of the Restructuring Transactions and until the Debtor is wound up and liquidated, the Debtor shall be managed by the Plan Agent who will be compensated on an hourly basis out of the Debtor's revested assets.  The identity of the Plan Agent will be disclosed in the Plan Supplement.

## ARTICLE III.
## SUMMARY OF THE PLAN

> **THIS ARTICLE III IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE MATERIAL TERMS OF THE PLAN AND IS QUALIFIED BY REFERENCE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN.  TO THE EXTENT THERE ARE ANY INCONSISTENCIES OR CONFLICTS BETWEEN THIS ARTICLE III AND THE PLAN, THE TERMS AND CONDITIONS SET FORTH IN THE PLAN SHALL CONTROL AND GOVERN.**

## A.      ADMINISTRATIVE AND PRIORITY TAX CLAIMS

### 1.      Administrative Expense Claims

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) payment in full in Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.  All Administrative Expense Claims must be Filed within thirty (30) days after the Effective Date, and served on the Debtor and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court.

*Professional Fee Claims.*  Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must File, within thirty (30) days after the Effective Date, and serve on the Debtor and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim; *provided* that the Debtor will pay Professionals in the ordinary course of business, for any work performed after the Effective Date, including those fees and expenses incurred by Professionals in connection with the

implementation and consummation of the Plan, in each case without further application or notice to or order of the Bankruptcy Court in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order(s) relating to or allowing any such Fee Claim; *provided, further*, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order.

Objections to any Professional Fee Claim must be Filed and served on the Debtor and the requesting party fourteen (14) days after the Filing of the applicable request for payment of the Professional Fee Claim.  Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor in Cash within five (5) Business Days of entry of the order approving such Allowed Professional Fee Claim.

*Restructuring Expenses, Senior Secured Notes Trustee Fees, and Convertible Unsecured Notes Trustee Fees*.  The Senior Secured Notes Trustee Fees and the Convertible Unsecured Noted Trustee Fees and the fees and expenses incurred by the Supporting Senior Secured Noteholder Professionals and the Supporting Convertible Unsecured Noteholder Professionals shall be paid in connection with the Plan or any applicable orders entered by the Bankruptcy Court on the Effective Date or as soon as reasonably practicable thereafter.  Nothing herein shall require such professionals (or the Senior Secured Notes Trustee or the Convertible Unsecured Notes Trustee) to file applications with, or otherwise seek approval of, the Bankruptcy Court as a condition to the payment of such fees and expenses.

2.      **Priority Tax Claims**

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; or (b) such other less favorable treatment as agreed to in writing by the Debtor and such Holder.  Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree or order converting or dismissing the Chapter 11 Case; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

**B.      CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS**

1.      **Summary**

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are placed in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified as described in Article III, Section B of the Plan.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest

qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date.

**Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Debt Claims | Unimpaired | Deemed to Accept |
| 3 | Senior Secured Notes Claims | Impaired | Entitled to Vote |
| 4 | Convertible Unsecured Notes Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| 6 | Equity Interests in the Debtor | Impaired | Entitled to Vote |

2.      **Separate Classification of Other Secured Debt Claims**

Although all Other Secured Debt Claims have been placed in one Class for purposes of nomenclature within the Plan, each Other Secured Claim, to the extent secured by a Lien on Collateral different from the Collateral securing a different Other Secured Claim, shall be treated as being in a separate sub-Class for the purposes of voting to accept or reject the Plan and receiving Plan Distributions.

3.      **Elimination of Vacant Classes**

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

4.      **Voting; Presumptions; Solicitation in Good Faith**

Only Holders of Allowed Claims in Classes 3 and 4 and Equity Interests in Class 6 are entitled to vote to accept or reject this Plan.  An Impaired Class of Claims shall have accepted this Plan if (i) the Holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept this Plan and (ii) the Holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept this Plan. An Impaired Class of Equity Interests shall have accepted the Plan if Holders of at least two-thirds (2/3) in amount of Allowed Equity Interests actually voting in such Class have voted to accept this Plan.  Holders of Claims and Equity Interests in the Voting Classes will receive Ballots containing detailed voting instructions.

The Debtor will solicit votes on the Plan from the Voting Classes in good faith and in compliance with the applicable provisions of the Bankruptcy Code.  Accordingly, the Debtor and each of its Related Persons shall be entitled to, and upon the Confirmation Date will be granted, the protections of section 1125(e) of the Bankruptcy Code.

5.      **Cramdown**

If any Class of Claims or Equity Interests is deemed to reject the Plan or is entitled to vote on the Plan and does not vote to accept the Plan, the Debtor intends to (i) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify the Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

6.      **Classification and Treatment of Claims and Equity Interests**

(a)      Class 1 - Other Priority Claims

- o    *Classification*:  Class 1 consists of the Other Priority Claims.

- o    *Treatment*:  The legal, equitable and contractual rights of the Holders of Class 1 Claims are unaltered by the Plan.  With respect to each Allowed Class 1 Claim, on or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 1 Claim is an Allowed Class 1 Claim on the Effective Date or (ii) the date on which such Class 1 Claim becomes an Allowed Class 1 Claim, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor:  (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code.

- o    *Impairment and Voting*:  Class 1 is an Unimpaired Class, and the Holders of Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims will not be entitled to vote to accept or reject the Plan and will not be solicited.

(b)      Class 2 - Other Secured Debt Claims

- o    *Classification*:  Each Class 2 Claim is an Other Secured Debt Claim against the Debtor.  This Class will be further divided into subclasses designated by letters of the alphabet (Class 2A, Class 2B and so on), so that each holder of any Allowed Other Secured Debt Claim against the Debtor is in a Class by itself, except to the extent that there are Other Secured Debt Claims that are substantially similar to each other and may be included within a single Class.

- o    *Treatment*:  The legal, equitable and contractual rights of the Holders of Class 2 Claims are unaltered by the Plan.  With respect to each Allowed Class 2 Claim, on or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 2 Claim is an Allowed Class 2 Claim on the Effective Date or (ii) the date on which such Class 2 Claim becomes an Allowed Class 2 Claim, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of,

and in exchange for, such Allowed Class 2 Claim, at the election of the Debtor (with the consent of the Requisite Parties): (A) Cash equal to the amount of such Allowed Class 2 Claim; (B) return of the collateral securing such Allowed Class 2 Claim; (C) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 2 Claim will have agreed upon in writing; (D) any defaults shall be cured and shall be paid or satisfied in accordance with and pursuant to the terms of the applicable agreement between the Debtor and the Holder of the Allowed Class 2 Claim; or (E) Reinstatement or such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code.

o   *Impairment and Voting*: Class 2 is an Unimpaired Class, and the Holders of Class 2 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 2 Claims will not be entitled to vote to accept or reject the Plan and will not be solicited.

(c)   Class 3 – Senior Secured Notes Claims

o   *Classification*: Class 3 consists of the Senior Secured Notes Claims.

o   *Allowance*: On the Effective Date, the Senior Secured Notes Claims shall be Allowed, without offset, counterclaim or defense of any kind, in the aggregate principal amount of Forty Eight Million Seven Hundred Fifty Eight Thousand Eight Hundred Eighty Seven Dollars and Fifty Cents ($48,758,887.50), plus any accrued and unpaid interest, fees, costs and expenses and other amounts.

o   *Treatment*: On the Effective Date, (i) each and every Holder of an Allowed Senior Secured Notes Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim, shall receive its Pro Rata share of the New Series A Notes in accordance with the ratios, payment priorities, and descriptions set forth on Exhibit A and Exhibit B attached to the Plan, and (ii) the Debtor shall pay in full in Cash all outstanding Senior Secured Notes Trustee Fees.

o   *Impairment and Voting*: Class 3 is an Impaired Class, and Holders of Class 3 Claims are entitled to vote to accept or reject the Plan.

(d)   Class 4 – Convertible Unsecured Notes Claims

o   *Classification*: Class 4 consists of the Convertible Unsecured Notes Claims.

o   *Allowance*: On the Effective Date, the Convertible Unsecured Notes Claims shall be Allowed, without offset, counterclaim or defense of any kind, in the aggregate principal amount of Sixty Seven Million Eight Hundred Thirty Six Thousand Nine Hundred Sixty Six Dollars ($67,836,966.00) plus any accrued and unpaid interest, fees, costs and expenses and other amounts.

> o    *Treatment*:  On the Effective Date, (i) each and every Holder of an Allowed Convertible Unsecured Notes Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim, shall receive its Pro Rata share of:  (a) the New Series B Notes and (b) those Grantor Trust Certificates delivered in connection with the New Series B Notes in accordance with the ratios, payment priorities, and descriptions set forth on Exhibit A and Exhibit B attached to the Plan, and (ii) the Debtor shall pay in full in Cash all outstanding Convertible Unsecured Notes Trustee Fees.

> o    *Impairment and Voting*:  Class 4 is an Impaired Class, and Holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

(e)    Class 5 – General Unsecured Claims

> o    *Classification*:  Class 5 consists of the General Unsecured Claims.

> o    *Treatment*:  The legal, equitable and contractual rights of the Holders of Class 5 Claims are unaltered by the Plan.  With respect to each Allowed Class 5 Claim, on or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 5 Claim is an Allowed Class 5 Claim on the Effective Date or (ii) the date on which such Class 5 Claim becomes an Allowed Class 5 Claim, each Holder of an Allowed Class 5 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 5 Claim, at the election of the Debtor (with the consent of the Requisite Parties):  (A) Cash equal to the amount of such Allowed Class 5 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 5 Claim will have agreed upon in writing; or (C) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code.

> o    *Impairment and Voting*:  Class 5 is an Unimpaired Class, and the Holders of Class 5 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 5 Claims will not be entitled to vote to accept or reject the Plan and will not be solicited.

(f)    Class 6 – Equity Interests in Debtor

> o    *Classification*:  Class 6 consists of the Equity Interests in Debtor.

> o    *Treatment*:  On the Effective Date, each and every Holder of an Equity Interest in the Debtor, in full satisfaction, settlement, discharge and release of, and in exchange for, such Equity Interest, shall receive its Pro Rata share of the Grantor Trust Certificates in accordance with the ratios and payment priorities set forth on Exhibit A attached to the Plan, *provided that* (i) New Unvested Warrants to purchase Grantor Trust Certificates shall be distributed to Holders of Unvested Warrants and (ii) (x) equity awards of restricted stock under the Omnibus Plan shall be deemed vested as of the Effective Date and treated the same as the other Equity Interests in the Debtor and (y) New SARs exercisable for Grantor Trust Certificates will be distributed to Holders of Existing SARs.  The existing Equity

Interests in the Debtor shall be canceled and extinguished as of the Effective Date.

o   *Impairment and Voting*:  Class 6 is an Impaired Class, and Holders of Class 6 Claims are entitled to vote to accept or reject the Plan.

7. **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims, including the right to cure any arrears or defaults that may exist with respect to contracts to be assumed under the Plan.

8. **Discharge of Claims**

Except as otherwise provided in the Plan and effective as of the Effective Date:  (i) the rights afforded herein and the treatment of all Claims and Equity Interests will be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtor or any of its Assets, property, or Estate; (ii) the Plan will bind all Holders of Claims and Equity Interests, notwithstanding whether any such Holders abstained from voting to accept or reject the Plan or voted to reject the Plan; (iii) all Claims and Equity Interests will be satisfied, discharged, and released in full, and the Debtor's liability with respect thereto will be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (iv) all Entities will be precluded from asserting against the Debtor, the Debtor's Estate, each of their successors and assigns, and each of their Assets and properties, any other Claims or Equity Interests based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

9. **Subordinated Claims**

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtor reserves the right to re-classify, or to seek to subordinate, any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.  Unless the Confirmation Order provides otherwise, no distributions under the Plan shall be made on account of any subordinated Claim.

C. **ACCEPTANCE OR REJECTION OF THE PLAN**

1. **Presumed Acceptance of Plan**

Classes 1, 2, and 5 are Unimpaired under the Plan, and are, therefore, presumed to have accepted the Plan pursuant to section 1126 of the Bankruptcy Code.

2. **No Presumed Rejection of Plan**

No Classes of Claims or Equity Interests are Impaired such that they receive no distribution under the Plan on account of such Claims and Equity Interests. Therefore, no Classes of Claims or Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

3. **Voting Classes**

Each Holder of an Allowed Claim or Equity Interest as of the applicable Voting Record Date in the Voting Classes (Classes 3, 4, and 6) will be entitled to vote to accept or reject the Plan.

4. **Acceptance by Impaired Classes of Claims and Equity Interests**

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. An Impaired Class of Equity Interests has accepted the Plan if Holders of at least two-thirds in amount of Allowed Equity Interests actually voting in such Class have voted to accept the Plan.

5. **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

The Debtor shall seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class or Equity Interest that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Debtor reserves the right to modify the Plan or any Exhibit thereto or Plan Schedule in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

**D.    MEANS FOR IMPLEMENTATION OF THE PLAN**

1. **General Settlement of Claims**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan will constitute a good-faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Equity Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtor and its Estate.

2. **Restructuring Transactions**

Upon the Effective Date, the Debtor shall cause the following Restructuring Transactions to be consummated, in addition to such other transactions and events as the officers of the Debtor deem necessary, advisable, or appropriate in connection with the consummation of the Plan, regardless of the order in which they occur:

i.    The Debtor shall cause (and shall cause its subsidiaries to cause) Lamington to recapitalize, such that all of Lamington's currently issued profit participating notes are converted into (a) the New Series A Notes, (b) the New Series B Notes, (c) the New PPNs, (d) the New PPN Warrants to purchase the New PPNs, and (e) the New PPN SARs exercisable for New PPNs;

ii.    The Debtor shall cause (and shall cause its subsidiaries to cause) (a) Lamington to dividend to Markley Asset Portfolio, LLC, an indirect wholly-owned subsidiary of the Debtor, the New Series A Notes, the New Series B Notes, the New PPNs, the New PPN Warrants and the New PPN SARs, (b) Markley Asset Portfolio, LLC to dividend or otherwise transfer to OLIPP IV, LLC, a direct wholly-owned subsidiary of the Debtor, the New Series A Notes, the New Series B Notes, the New PPNs, the New PPN Warrants and the New PPN SARs and (c) OLIPP IV, LLC to dividend to the Debtor, the New Series A Notes, the New Series B Notes, the New PPNs, the New PPN Warrants and the New PPN SARs.

iii.    The Debtor shall (a) form the Grantor Trust and cause the Grantor Trust to issue the Grantor Trust Certificates, the New Unvested Warrants and the New SARs and (b) contribute the New PPNs, the New PPN Warrants and the New PPN SARs into the Grantor Trust in exchange for the Grantor Trust Certificates, the New Unvested Warrants (so that upon exercise of any New Unvested Warrants the proceeds thereof would be used to exercise the New PPN Warrants) and the New SARs (so that upon exercise of any New SARs the proceeds thereof would be used to exercise the New PPN SARs);

iv.    The Debtor shall cause (and shall cause its subsidiaries to cause) to have the New Series A Notes, the New Series B Notes, the New PPNs, and the Grantor Trust Certificates listed on a stock exchange deemed suitable for such purpose by the Debtor;

v.    The Debtor shall dispose of certain of its assets other than its securities of Lamington in a tax-efficient manner, which disposition may occur prior to or during the winding up of the Debtor and may be subsequent to the distributions to be made pursuant to subsection (vi) below;

vi.    Subject to the right of (a) the Convertible Unsecured Notes Trustee to exercise the Convertible Unsecured Notes Charging Lien and (b) the Senior Secured Notes Trustee to exercise the Senior Secured Notes Charging Lien, the Debtor shall distribute (x) the New Series A Notes to Holders of Senior Secured Notes Claims; (y) the New Series B Notes and a portion of the Grantor Trust Certificates to Holders of the Convertible Unsecured Notes Claims, and (c) a portion of the Grantor Trust Certificates to Holders of Equity Interests in the Debtor, all in accordance with the ratios and payment priorities set forth on Exhibit A to the Plan, in each case, in accordance with the terms of the Plan and the Restructuring Support Agreements (but not a Restructuring Support Agreement that has been terminated); *provided that*, (i) New Unvested Warrants to purchase Grantor Trust Certificates will be distributed to Holders of Unvested Warrants and (ii) equity awards of (x) restricted stock under the Omnibus Plan shall be deemed vested as of the Effective Date and treated the same as the other Equity Interests in the Debtor and (y) New SARs exercisable for Grantor Trust Certificates will be distributed to Holders of Existing SARs, in each case, in accordance with the terms of this Plan and the Restructuring Support

Agreements (but not a Restructuring Support Agreement that has been terminated).  In consideration of such distributions, the existing Senior Secured Notes, the Convertible Unsecured Notes, and the Equity Interests in the Debtor shall be canceled and extinguished in accordance with Article V.L of the Plan;

vii.    On the Effective Date (or as soon as practicable thereafter), the Debtor shall terminate, or cause to be terminated, (i) the listing of the Equity Interests in the Debtor on the OTCQX Marketplace and (ii) the reporting obligations of the Debtor under the Exchange Act, and file such other statements, forms, schedules or reports pursuant to the Exchange Act or other federal or state securities laws as the officers of the Debtor deem necessary, advisable or appropriate; and

viii.    The Debtor shall wind up its remaining operations and affairs, which may include the sale or other disposition of remaining assets in a tax-efficient manner, and shall take such other actions the Plan Agent deems necessary or advisable to accomplish the purposes of the Plan and consummate the liquidation and winding up of the Debtor thereunder.  At the conclusion of the liquidation and following the discharge of any remaining liabilities of the Debtor, the Plan Agent shall cause the Debtor to distribute any remaining liquidation proceeds and any Cash held by the Debtor to Lamington.

3.    **Corporate Existence**

Pending consummation of the Restructuring Transactions and until such time that the Debtor has fulfilled its obligations under the Plan, the Debtor will continue to exist after the Effective Date, with all of the powers of a corporation pursuant to the applicable law in its state of incorporation, and in accordance with its certificate of incorporation and bylaws, except as modified by the Plan or through the Confirmation Order.

On the Effective Date or as soon thereafter as is reasonably practicable, and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any director, stockholder, securityholder, manager, member, or partner (or board thereof) of any Entity, the Debtor may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate this Plan, including, without limitation:  (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase or liquidation containing terms that are consistent with the terms of the Plan, the Plan Documents, the Restructuring Support Agreements (but not a Restructuring Support Agreement that has been terminated) and that satisfy the requirements of applicable law and any other terms to which the applicable entities and Requisite Parties may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan and the Restructuring Support Agreements (but not a Restructuring Support Agreement that has been terminated) and having other terms to which the applicable parties and Requisite Parties agree; (iii) the filing of appropriate certificates or articles of incorporation and amendments thereto, reincorporation, merger, consolidation, conversion, amalgamation or dissolution pursuant to applicable law; (iv) the Restructuring Transactions; and (v) all other actions that the applicable Entities determine to be necessary or appropriate, including, without limitation, making filings or recordings that may be required by applicable law in connection with the Plan.  The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in,

contemplated by, or necessary to effectuate the Plan.  On the Effective Date or as soon as reasonably practicable thereafter, the applicable Entities shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring Transactions.

4.      **Vesting of Assets in the Debtor**

Except as otherwise provided in the Plan, in any agreement, instrument, or other document incorporated in the Plan, or the Confirmation Order, on or after the Effective Date, all property and Assets of the Estate (including, without limitation, Causes of Action) and any property and Assets acquired by the Debtor pursuant to the Plan will vest in the Debtor, free and clear of all Liens, Claims, charges or other encumbrances.  Notwithstanding the foregoing, Avoidance Actions shall be deemed released and relinquished as of the Effective Date.

Except as may be otherwise provided in the Plan, on and after the Effective Date, the Debtor may manage its affairs and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.  Without limiting the foregoing, the Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

Any proceeds realized by the Debtor from the liquidation of its Assets will be disposed of in a tax-efficient manner.

5.      **New Indenture Documents; New Series A Notes; New Series B Notes; New PPNs; New PPN Warrants; New PPN SARs; Sources of Cash for Plan Distributions**

(a)      *New Indenture Documents*.  On the Effective Date, the Debtor will cause Lamington to execute and deliver the New Indenture Documents, the New Series A Notes, the New Series B Notes, the New PPNs, the New PPN Warrants and the New PPN SARs to the Debtor (which will immediately thereafter contribute such New PPNs, New PPN Warrants and New PPN SARs to the Grantor Trust), and any related instruments and documents, amendments to the foregoing, or agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any director, stockholder, securityholder, manager, member, or partner (or board thereof) of any Entity and Confirmation of the Plan shall be deemed approval of all such documents.  The material terms of the New Series A Notes, the New Series B Notes, and the New PPNs are summarized in Exhibit B attached to the Plan.

(b)      *Sources of Cash for Plan Distributions.*  Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Debtor to make payments required pursuant to the Plan will be obtained from Cash on hand at the Debtor or through its direct or indirect wholly-owned subsidiaries.

6.      **Creation of Grantor Trust; Grantor Trust Certificates; New Unvested Warrants; New SARs**

On the Effective Date, the Debtor shall establish the Grantor Trust pursuant to the Grantor Trust Agreement for the purpose of holding the New PPNs, the New PPN Warrants and the New PPN SARs and the Debtor will cause the Grantor Trust to issue and deliver the Grantor Trust Certificates, the New Unvested Warrants and the New SARs to the Debtor.  The Grantor Trust will be managed and administered by the Grantor Trust Trustee, without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any director, stockholder, securityholder, manager, member, or partner (or board thereof) of any Entity.  The identity of the Grantor Trust Trustee will be disclosed prior to the Confirmation Hearing as part of the Plan Supplement in accordance with Section 1129(a)(5) of the Bankruptcy Code.  The expenses of the Grantor Trust, including the fees of the Grantor Trust Trustee, shall be borne by Lamington.

7.      **Distribution of New Series A Notes, New Series B Notes, New PPNs, Grantor Trust Certificates, New Unvested Warrants, New PPN Warrants, New SARs, New PPN SARs and Related Documentation**

On the Effective Date, the Debtor will be authorized to distribute the New Series A Notes, the New Series B Notes, the Grantor Trust Certificates, the New Unvested Warrants, and the New SARs and contribute the New PPNs, the New PPN Warrants and the New PPN SARs, in accordance with the Plan and the Restructuring Support Agreements (but not a Restructuring Support Agreement that has been terminated) without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any director, stockholder, securityholder, manager, member, or partner (or board thereof) of any Entity.  From and after the Effective Date, the Debtor will cease to be under any disclosure or other obligations in connection with the Senior Secured Notes Indenture, the Convertible Unsecured Notes Indenture, or the Equity Interests.

The Restructuring Securities to be issued and distributed pursuant to the Plan will be exempt from the registration requirements of federal, state or local securities laws to the fullest extent permitted by Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder, and/or Section 1145(a) of the Bankruptcy Code.  Without limiting the effects of such provisions, all financing documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan, including, without limitation, the New Series A Notes, the New Series B Notes, the New PPNs, the Grantor Trust Certificates, the New Unvested Warrants, the New PPN Warrants, the New SARs and the New PPN SARs, and any other agreement or document related to or entered into in connection with any of the foregoing, will become effective and binding in accordance with their respective terms and conditions upon execution and delivery by the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any director, stockholder, securityholder, manager, member, or partner (or board thereof) of any Entity (other than as expressly required by such applicable agreement).

8.      **Release of Liens, Claims and Equity Interests**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens,

Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any director, stockholder, securityholder, manager, member, or partner (or board thereof) of any Entity.  Any Entity holding such Liens or Interests will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor.  For the avoidance of doubt, nothing in this provision shall impair the right of (i) the Convertible Unsecured Notes Trustee to exercise the Convertible Unsecured Notes Charging Lien, or (ii) the Senior Secured Notes Trustee to exercise the Senior Secured Notes Charging Lien.

9.      **Organizational Documents**

On the Effective Date, the organizational documents of Lamington shall be revised consistent with the provisions of the Plan and the Restructuring Support Agreements (but not a Restructuring Support Agreement that has been terminated)  and the organizational documents of the Debtor shall be deemed revised consistent with the provisions of the Plan and the Restructuring Support Agreements (but not a Restructuring Support Agreement that has been terminated).  Specifically, on the Effective Date, the organizational documents of the Debtor shall be deemed revised to (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of additional non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code and (ii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein.  After the Effective Date, Lamington may amend and restate its operating agreement and other applicable organizational documents, as permitted by applicable law.

10.     **Post-Effective Date Management**

On the Effective Date, Lamington shall have a board of directors consisting of five (5) members, including (a) two (2) designated by the ad hoc committee of the Supporting Senior Secured Noteholders, (b) one (1) designated by the ad hoc committee of the Supporting Convertible Unsecured Noteholders, (c) one (1) designated by the non-conflicted equity members of the Debtor's Board of Directors, and (d) one (1) Irish citizen acceptable to the other four (4) director designees. Each such designee may be removed and replaced by his or her designator(s).  The duration of such designation rights and other rights of such directors, including voting rights and restrictions, will be contained in the New Indenture Documents. Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtor will disclose, prior to the Confirmation Hearing, the identity and affiliations of any Person proposed to serve on the initial board of directors of Lamington or as an officer of Lamington and, to the extent such Person is an insider other than by virtue of being a director or officer, the nature of any compensation for such Person.  Each such director, and officer will serve from and after the Effective Date pursuant to applicable organizational documents of Lamington and the New Indenture Documents.

The directors and officers of the Debtor will be deemed to have resigned as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any other Person or any director, stockholder, securityholder, manager, member, or partner (or board thereof) of any Entity.

On the Effective Date, the Plan Agent shall be appointed as the sole director, sole manager, sole managing member and sole officer of the Debtor.  From and after the Effective Date, and until the Debtor is wound up and liquidated, the Debtor shall be managed by the Plan Agent, pursuant to the terms of the Plan and the Confirmation Order, which shall provide that the Plan Agent will be compensated on an hourly basis out of the Debtor's revested assets.  The Plan Agent shall act for the Debtor in the same fiduciary capacity as applicable to a board of directors, board of managers, managing members and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).

11.     **Corporate Action**

From and after the Effective Date, the Debtor may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the liquidation of the Debtor's Assets and distribution of the securities to be issued pursuant to the Plan and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any other Person or any director, stockholder, securityholder, manager, member, or partner (or board thereof) of any Entity (except for those expressly required pursuant to the Plan) and all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects.

From and after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of any stockholders, securityholders, directors, managers, members or partners of the Debtor (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further notice to or any vote, consent, authorization, approval, ratification or other action by the stockholders, directors, managers or members of such Debtor, or the need for any notice to or any vote, consent, authorization, approval, ratification or other, action by any Person and all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects.

Upon the Effective Date, all matters provided for in the Plan involving the legal or corporate structure of the Debtor, and any legal or corporate action required by the Debtor in connection with the Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any other Person or any director, stockholder, manager, member, or partner (or board thereof) of any Entity and all matters provided for in the Plan involving the legal or corporate structure of the Debtor shall be deemed authorized and approved by the Bankruptcy Court in all respects.  On the Effective Date, the appropriate officers of the Debtor are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in the Plan in the name of and on behalf of the Debtor without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or other Person or any director, stockholder, manager, member, or partner (or board thereof) of any Entity.  The secretary and any assistant secretary of the Debtor will be authorized to certify or attest to any of the foregoing actions.

12.    **Cancellation of Notes, Certificates and Instruments**

Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim against, or Equity Interest in, the Debtor and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect; *provided, however,* that (i) the Convertible Unsecured Notes and the Convertible Unsecured Notes Indenture, and (ii) the Senior Secured Notes and the Senior Secured Notes Indenture shall continue in effect solely for the purposes of (a) allowing the Holders of Convertible Unsecured Notes and Senior Secured Notes (as applicable) to receive their Plan Distributions, (b) preserving the Convertible Unsecured Notes Trustee and the Senior Secured Notes Trustee's respective right to payment of the Convertible Unsecured Notes Trustee Fees and the Senior Secured Notes Trustee Fees, respectively, (c) permitting the Convertible Unsecured Notes Trustee and the Senior Secured Notes Trustee to exercise the Convertible Unsecured Notes Charging Lien and the Senior Secured Notes Charging Lien, respectively, and (d) allow the Convertible Unsecured Notes Trustee and the Senior Secured Notes Trustee to enforce their rights, claims and interests vis-à-vis any other parties other than the Debtor and to appear in  the Chapter 11 Case and (e) maintaining the right to indemnification, contribution or subrogation or any other claim or entitlement they may have from the Debtor pursuant to and subject to the respective terms of the Convertible Unsecured Notes Indenture and the Senior Secured Notes Indenture.  Except for the foregoing with respect to such other rights of the Convertible Unsecured Notes Trustee and the Senior Secured Notes Trustee that survive the applicable indentures, the Convertible Unsecured Notes Trustee and the Senior Secured Notes Trustee and their respective agents shall be relieved of all further duties and responsibilities related to the applicable Indentures and the Plan.

13.    **Cancellation of Existing Instruments Governing Security Interests**

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtor any Collateral or other property of the Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

14.    **Restructuring Transactions**

On the Effective Date or as soon as reasonably practicable thereafter, and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or other Person or any director, stockholder, manager, member, or partner (or board thereof) of any Entity, the Debtor may take all actions consistent with this Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with this Plan and the Restructuring Support Agreements (but not a Restructuring Support Agreement that has been terminated).

15.    **Treatment of Vacant Classes**

Any Claim or Interest in a Class that is considered vacant under Article III.C of the Plan shall receive no Plan Distribution.

**E.      TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

1.      **Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtor will be deemed rejected in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts and Unexpired Leases that:

1.      have previously expired or terminated pursuant to their own terms or by agreement of the parties thereto;

2.      have been assumed by order of the Bankruptcy Court;

3.      are the subject of a motion to assume or motion to reject pending on the Effective Date;

4.      are identified on a schedule of assumed contracts in the Plan Supplement; or

5.      are assumed pursuant to the terms of the Plan.

Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan (including, without limitation, any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Debtor's assumption of such Executory Contract or Unexpired Lease, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Each Executory Contract and Unexpired Lease assumed pursuant to the Plan will revest in and be fully enforceable by the Debtor in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

2.      **Assumption and Assignment of Executory Contracts or Unexpired Leases**

In the event of an assumption and assignment of an Executory Contract or Unexpired Lease, at least twenty-one (21) days prior to the Confirmation Hearing, the Debtor will serve upon counterparties to such Executory Contracts and Unexpired Leases a notice of the proposed assumption and assignment that will:  (a) list the applicable cure amount, if any; (b) identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court; additionally, the Debtor will file with the Bankruptcy Court a list of such Executory Contracts and Unexpired Leases to be assigned and the proposed cure amounts.  Any applicable cure amounts will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assignment or any related cure amount must be Filed, served and actually received by

the Debtor at least five (5) Business Days prior to the Confirmation Hearing. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assignment or cure amount will be deemed to have consented to such assignment of its Executory Contract or Unexpired Lease. The Confirmation Order will constitute an order of the Bankruptcy Court approving any proposed assignments of Executory Contracts or Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Unless otherwise indicated, all assumptions, assumptions and assignments, and rejections of Executory Contracts and Unexpired Leases in the Plan will be effective as of the Effective Date.

Notwithstanding the foregoing paragraph or anything contrary herein, the Debtor reserves the right, with the consent of the Requisite Parties, to alter, amend, modify, or supplement the Executory Contracts and Unexpired Leases identified for assumption, assumption and assignment, or rejection in the Plan Supplement prior to the Effective Date.

In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assigned or (c) any other matter pertaining to assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assignment. If an objection to assignment or cure amount is sustained by the Bankruptcy Court, the Debtor, in its sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming and assigning it.

### 3.    Claims on Account of the Rejection of Executory Contracts or Unexpired Leases

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court on the later of (a) the applicable bar date; (b) within thirty (30) days after service of the applicable rejection order; and (c) any other date set by an order of the Court. The Debtor will provide notice of such rejection and specify the appropriate deadline for the filing of such Proof of Claim.

Any Entity that is required to File a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so will be forever barred, estopped and enjoined from asserting such Claim, and such Claim will not be enforceable, against the Debtor or the Estate, and the Debtor and its Estate and property will be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan. All such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in Article XI.C of the Plan. All claims arising from the rejection of any Executory Contract or Unexpired Lease shall be treated as General Unsecured Claims, subject to any applicable limitation or defense under the Bankruptcy Code and applicable law.

### 4.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree. Following the Petition Date, the Debtor may serve a notice on parties to executory contracts and unexpired leases to be assumed reflecting the Debtor's intention to assume the contract or lease in connection with the Plan and setting forth

the proposed Cure Amount (if any).  If a counterparty to any executory contract or unexpired lease that the Debtor intends to assume does not receive such a notice, the proposed Cure Amount for such executory contract or unexpired lease shall be deemed to be zero dollars ($0).

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption must be Filed, served and actually received by the Debtor at least three (3) Business Days prior to the Confirmation Hearing.  Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption will be deemed to have assented and will be deemed to have forever released and waived any objection to the proposed assumption.  In the event of a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.  If an objection to cure is sustained by the Bankruptcy Court, the Debtor, in its sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

     5.      **Assumption of Director and Officer Insurance Policies**

Upon the Effective Date, the Debtor shall be deemed to assume all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code.  Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtor's foregoing assumption of each of the D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan will not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtor under the Plan as to which no Proof of Claim need be Filed.  Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan will not impair or otherwise modify any rights of the Debtor under the D&O Liability Insurance Policies.

     6.      **Indemnification Provisions**

On the Effective Date, all Indemnification Provisions (whether in the by-laws, operating agreements, certificate of incorporation or organization, board resolutions, member consents, contracts, or otherwise) will be Reinstated (or assumed, as the case may be), and will survive effectiveness of the Plan.  No such Reinstatement or assumption shall in any way extend the scope or term of any Indemnification Provision beyond that contemplated in the underlying contract or document as applicable.

## F.     DEBTOR RELEASE AND RELATED PROVISIONS

     1.      **General**

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

In accordance with the provisions of the Plan and pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date (1) the Debtor may, in its sole and absolute discretion, compromise and settle Claims against it and (2) the Debtor may, in its sole and absolute discretion, compromise and settle Causes of Action against other Entities.

2.    **Release**

**Effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy of which is hereby acknowledged and confirmed, the Debtor, in its individual capacity and as debtor-in-possession (collectively, the "Releasing Party") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Releasing Party) and their respective properties from any and all claims, causes of action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the effective date or thereafter arising, in law, at equity, whether for tort, contract, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to the Debtor, the Chapter 11 Case, the Disclosure Statement, the Plan, or the solicitation of votes on the Plan that the Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for or on behalf of the Debtor or its Estate (whether directly or derivatively) against any of the Released Parties; *provided, however*, that the foregoing provisions of this release shall not operate to waive or release (i) any offset, defense, counterclaim, reduction, or credit that the Debtor may have with regard to any Claim asserted against it by a Released Party, (ii) any causes of action expressly set forth in and preserved by the Plan or the Plan Supplement; (iii) any Causes of Action arising from actual fraud, gross negligence, or willful misconduct as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (iv) the rights of the Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan or assumed pursuant to the Plan or assumed pursuant to Final Order of the Bankruptcy Court.  The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification, or other action by any entity or other person or any director, stockholder, security holder, manager, member, or partner (or board thereof) of any entity and the Confirmation Order will permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities released pursuant to this release.**

The Released Parties are, collectively, the following parties each in its capacity as such: (a) the Debtor, (b) the Debtor's current and former directors and officers, (c) the Senior Secured Notes Trustee, (d) the Convertible Unsecured Notes Trustee, (e) the Supporting Senior Secured Noteholders, (f) the Supporting Convertible Unsecured Noteholders, (g) the Holders of Claims and Equity Interests who vote in favor of the Plan; and (h) the Related Persons of each of (a) through (g) of the foregoing.

### G.    THIRD PARTY RELEASE, DISCHARGE, EXCULPATION & INJUNCTION

1.    **Third Party Release**

**As of and subject to the occurrence of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Plan Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Debtor and the implementation of the Restructuring and the Restructuring Transactions, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties are deemed forever released and discharged by the (i) Holders of all Claims and Equity Interests who vote to accept the Plan, (ii) Holders of Claims that are Unimpaired under the plan, (iii) Holders of Claims or Equity Interests whose vote to accept or reject the Plan is solicited but who do not vote either to accept or to reject the Plan, (iv) Holders of Claims or Equity Interests who vote to reject the Plan but do not opt out of granting the releases set forth in the Plan, (v) the Senior Secured Notes Trustee, and (vi) the Convertible Unsecured Notes Trustee, from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, causes of action, losses, remedies, and liabilities whatsoever, including any derivative claims, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Holders or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any claim or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Chapter 11 Case, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the Restructuring, the restructuring of any Claim or Equity Interest before or during the Chapter 11 Case, the Restructuring Transactions, the negotiation, formulation, or preparation of the Disclosure Statement, the Plan, and related agreements, instruments, and other documents (including the Plan Documents), the solicitation of votes with respect to the Plan, or any other act or omission, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes actual fraud, gross negligence, or willful misconduct.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transactions, or any document, instrument, or agreement executed to implement the Plan.**

2.    **Discharge of Claims**

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests.  Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed

discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

3.     **Exculpation**

Without affecting or limiting the releases in Article X.B or XI of the Plan, the Exculpated Parties will neither have nor incur any liability to any Entity for any claims or Causes of Action arising before, on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or Postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtor, the approval of the Disclosure Statement or confirmation or Consummation of the Plan; *provided, however*, that the foregoing provisions will have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted actual fraud, gross negligence or willful misconduct; *provided, further*, that each Exculpated Party will be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above-referenced documents, actions or inactions; *provided, further*, however that the foregoing provisions will not apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by the Plan or the Plan Supplement.

The Exculpated Parties are, collectively:  (a) the Debtor, (b) the Plan Agent, and (c) the respective Related Persons of each of the foregoing Entities.

4.     **Injunction**

**Except as otherwise provided in the Plan, from and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner, any suit, action or other proceeding, or creating, perfecting or enforcing any lien of any kind, on account of or respecting any claim, demand, liability, obligation, debt, right, cause of action, equity interest, or remedy released or to be released, exculpated or to be exculpated, or discharged or to be discharged pursuant to the Plan or the Confirmation Order.  By accepting distributions pursuant to the Plan, each Holder of an Allowed Claim or Equity Interest will be deemed to have specifically consented to the injunction in the Plan.  All injunctions or stays provided for in the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the Effective Date.**

## H.     BINDING NATURE OF PLAN

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, ALL HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTOR AND SUCH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN

THE CHAPTER 11 CASE OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR AFFIRMATIVELY VOTED TO REJECT THE PLAN.

## I.    CONFIRMATION PROCEDURES

### 1.    Confirmation Hearing

**You will be provided with notice of the Confirmation Hearing.**  Once scheduled, the Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtor without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.  Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

**You will be provided with notice of the Confirmation Objection Deadline**.

All Confirmation Objections must be filed with the Bankruptcy Court and served on the Debtor and certain other parties in accordance with the Disclosure Statement Order on or before the deadline for Confirmation objections.

> CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

### 2.    Filing Objections to the Plan

Any objection to confirmation of the Plan must:  (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name of the objecting party and the amount and nature of the Claim or the amount of Equity Interests held by such Entity; (iv) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the deadline for Confirmation objections (once set) by the Notice Parties, as defined in Article I.C.14 herein.

## J.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtor believes that:  (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtor has complied or will comply with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.  Specifically, the Debtor believes that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code;

- The Debtor has complied and will comply with the applicable provisions of the Bankruptcy Code;

- The Plan has been proposed in good faith and not by any means forbidden by law;

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the case, has been or will be disclosed to the Bankruptcy Court, and any such payment: (a) made before the confirmation of the Plan is reasonable; or (b) is subject to the approval of the Bankruptcy Court as reasonable if it is to be fixed after confirmation of the Plan;

- The Debtor will disclose the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtor, an affiliate of the Debtor participating in the plan with the Debtor, or a successor to the Debtor under the Plan.  The appointment to, or continuance in, such office by such individual, will be consistent with the interests of creditors and equity security holders and with public policy and the Debtor will have disclosed the identity of any insider that the Debtor will employ or retain, and the nature of any compensation for such insider;

- Either each Holder of an Impaired Claim against the Debtor or Equity Interest in the Debtor will (A) have accepted the Plan or will receive or retain under the Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtor were liquidated on that date under chapter 7 of the Bankruptcy Code, or (B) if section 1111 (b)(2) applies to such Claim, receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the value of such Holder's interest in the estate's interest in the property that secures such claims;

- Each Class of Claims or Equity Interests that is entitled to vote on the Plan will either have accepted the Plan or will not be Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code;

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Expense Claims and Priority Claims will be paid in full in Cash on the Effective Date, or as soon thereafter as is reasonably practicable;

- At least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class;

- Except as specifically set forth in the Plan, confirmation of the Plan will not likely be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor thereto under the Plan;

- The Debtor has paid or will pay all fees payable under section 1930 of title 28, and the Plan provides for the payment of all such fees on the Effective Date; and

- The Plan provides for the continuation after the Effective Date of payment of all retiree benefits.

1.     **Best Interests of Creditors Test/Liquidation Analysis**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the bankruptcy court find, as a condition to confirmation of a chapter 11 plan, that each

holder of a claim or equity interest in each impaired class:  (i) has accepted the plan; or (ii) among other things, will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such Person would receive if each of the Debtor were liquidated under chapter 7 of the Bankruptcy Code.  To make these findings, the Bankruptcy Court must:  (1) estimate the Cash proceeds (the "Liquidation Proceeds") that a chapter 7 trustee would generate if the Debtor's Chapter 11 Case were converted to a chapter 7 case on the Effective Date and the assets of such Debtor's Estate were liquidated; (2) determine the distribution (the "Liquidation Distribution") that each non-accepting Holder of a Claim or Equity Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and (3) compare each Holder's Liquidation Distribution to the distribution under the Plan ("Plan Distribution") that such Holder would receive if the Plan were confirmed and consummated.

To assist the Bankruptcy Court in making the findings required under section 1129(a)(7) of the Bankruptcy Code, the Debtor's valuation advisor, RSM US LLP ("RSM"), with assistance from the Debtor and its other professionals, prepared a Liquidation Analysis, a copy of which is attached hereto as **Exhibit C**.

The Liquidation Analysis presents "High" and "Low" estimates of Liquidation Proceeds representing the estimated liquidation value of the Debtor's principal asset, its 27.5% minority interest in White Eagle, which in turn holds a portfolio of life insurance policies.  The Liquidation Analysis incorporates certain assumptions relating to the risks and costs associated with a liquidation process and the estimated proceeds that may be realized as a result thereof.  The "High" and "Low" estimates of Liquidation Proceeds for the Chapter 11 Case are $53.7 million and $109.8 million, respectively.  For additional detail with respect to such estimates, refer to the Liquidation Analysis attached hereto as **Exhibit C**.  It is assumed that the liquidation would occur promptly.  The projected date of a hypothetical chapter 7 liquidation would commence as of September 30, 2020.

THE STATEMENTS IN THE LIQUIDATION ANALYSIS, INCLUDING ESTIMATES OF ALLOWED CLAIMS, WERE PREPARED SOLELY TO ASSIST THE BANKRUPTCY COURT IN MAKING THE FINDINGS REQUIRED UNDER SECTION 1129(a)(7) AND MAY NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE.

THE DEBTOR BELIEVES THAT ANY ANALYSIS OF A HYPOTHETICAL LIQUIDATION IS NECESSARILY SPECULATIVE.  THERE ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, COMPETITIVE, AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTOR OR A CHAPTER 7 TRUSTEE.  NEITHER THE LIQUIDATION ANALYSIS, NOR THE FINANCIAL INFORMATION ON WHICH IT IS BASED, HAS BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.  THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WOULD NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS PRESENTED IN THE LIQUIDATION ANALYSIS.

2.    **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation of the Debtor or any successor thereto or the need for further financial reorganization, unless the plan contemplates such liquidation.

For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtor has analyzed its ability and that of Lamington to meet their respective obligations under the Plan.

The Debtor believes that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code.  In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtor analyzed its ability and that of Lamington to satisfy their respective financial obligations.  The Debtor prepared financial projections for Lamington through calendar year 2023 (the "Financial Projections").  The Financial Projections, together with the assumptions on which they are based, are attached hereto as **Exhibit D**.

In general, as illustrated by the Financial Projections, the Debtor believes that the new capital structure provided under the Plan will allow the Debtor and Lamington to maximize value for the benefit of all constituents.  Further, the Debtor and Lamington should have sufficient Cash flow and Cash on hand to make all payments required pursuant to the Plan.  Except as specifically set forth in the Plan, the Debtor believes that confirmation and Consummation is, therefore, not likely to be followed by the liquidation or further reorganization of the Debtor or Lamington.  Accordingly, the Debtor believes that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

THE FINANCIAL PROJECTIONS ARE INHERENTLY UNCERTAIN IN THAT THEY ARE BASED ON ASSUMPTIONS SURROUNDING THE PERFORMANCE OF LIFE SETTLEMENT ASSETS.  THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN.  WHILE DEBTOR'S MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED.  THE DEBTOR THEREFORE MAKES NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS.

The Financial Projections have not been examined or compiled by independent accountants.  The Debtor makes no representation as to the accuracy of the Financial Projections or Lamington's ability to achieve the projected results.  Many of the assumptions on which the projections are based are inherently subject to uncertainties and contingencies beyond the control of the Debtor and its management – namely that the performance of life settlement assets cannot be predicted.  Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results.  Therefore, the actual results achieved throughout the period covered by the Financial Projections may vary from the projected results and the variations may be material.  All Holders of Claims and Equity Interests that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the financial projections are based in connection with their evaluation of the Plan.

3.    **Valuation**

In order to provide information to parties in interest regarding the possible range of values of their distributions under the Plan, the Debtor has been advised by RSM, its valuation advisor, with respect to the estimated value of the Debtor's principal asset, its 27.5% minority interest in White Eagle, which in turn holds a portfolio of life insurance policies.  RSM estimates that the value of the Debtor's (or Lamington's) interests in White Eagle under the Plan to be substantially greater than liquidation value.  Specifically, RSM estimates the total value of the Debtor's minority interests in White Eagle to be approximately $141.4 million to $156.8 million

as of September 30, 2020, with a mid-point of $148.8 million. Such estimate of the value of the Debtor's principal asset does not reflect values that could be attainable in public or private markets, and is not a prediction or guarantee of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan. The Debtor does not intend such estimate to be binding for U.S. federal income tax purposes, in part because such estimate may not consider additional discounts that may be applicable to the assets of the Debtor in the hands of the Holders. A valuation report prepared by RSM is attached hereto as **Exhibit E**.

DEPENDING ON THE PERFORMANCE OF THE WHITE EAGLE PORTFOLIO, THE VALUE OF THE DEBTOR'S ASSETS MAY CHANGE SIGNIFICANTLY. THE PERFORMANCE OF LIFE SETTLEMENT ASSETS IS INHERENTLY UNCERTAIN AND IMPOSSIBLE TO PREDICT WITH ANY LEVEL OF PRECISION. IN ADDITION, THE VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, AND OTHER FACTORS THAT GENERALLY INFLUENCE THE PRICES OF SECURITIES. ACTUAL MARKET PRICES OF SUCH SECURITIES ALSO MAY BE AFFECTED BY THE DEBTOR'S HISTORY IN THE CHAPTER 11 CASE AND BY OTHER FACTORS NOT CAPABLE OF ACCURATE PREDICTION. ACCORDINGLY, THE VALUE ESTIMATED BY RSM DOES NOT NECESSARILY REFLECT, AND SHOULD NOT BE CONSTRUED AS REFLECTING, VALUES THAT WILL BE ATTAINED IN THE PUBLIC OR PRIVATE MARKETS. THE VALUE ASCRIBED BY RSM DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE. SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE VALUE RANGES DESCRIBED IN RSM'S VALUATION REPORT. INDEED, THERE CAN BE NO ASSURANCE THAT AN ACTIVE TRADING MARKET WILL DEVELOP FOR THE RESTRUCTURING SECURITIES. THE ESTIMATED VALUE DEPENDS HIGHLY UPON ACHIEVING THE FUTURE FINANCIAL RESULTS SET FORTH IN THE FINANCIAL PROJECTIONS, AS WELL AS THE REALIZATION OF CERTAIN OTHER ASSUMPTIONS THAT ARE NOT GUARANTEED. RSM'S VALUATION REPRESENTS ESTIMATED VALUES AND DOES NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS.

THE SUMMARY OF RSM'S VALUATION SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED BY RSM. THE PREPARATION OF A VALUATION REPORT INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ESTIMATE IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION. FURTHER, VALUATION OF AN EQUITY INTEREST IN A LIFE SETTLEMENTS PORTFOLIO IS A COMPLEX ANALYTICAL PROCESS, SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES THAT ARE DIFFICULT TO PREDICT AND BEYOND THE CONTROL OF RSM AND THE DEBTOR. CONSEQUENTLY, SUCH VALUATION WILL FLUCTUATE WITH CHANGES IN THE PORTFOLIO, ALL OF WHICH ARE DIFFICULT TO PREDICT. RSM DOES NOT PROVIDE ASSURANCES OR GUARANTEES ON THE ACHIEVABILITY OF ANY FORECASTS, PROJECTIONS OR OTHER FORWARD-LOOKING MATTERS. UNANTICIPATED EVENTS AND CIRCUMSTANCES MAY

OCCUR AND ACTUAL RESULTS MAY VARY FROM THOSE CONTEMPLATED HEREIN.  SUCH VARIATIONS MAY BE MATERIAL.  AS A RESULT, THE ESTIMATED RANGE OF VALUES SET FORTH IN THIS DISCLOSURE STATEMENT IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN.  BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER RSM, THE DEBTOR NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY.

ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  THE STATEMENTS, FINANCIAL PROJECTIONS, AND VALUE ASCRIBED TO THE DEBTOR AND THE PLAN CONSIDERATION ARE NOT INTENDED, AND SHOULD NOT BE CONSTRUED, TO BE INVESTMENT ADVICE IN ANY MANNER WHATSOEVER.  FURTHER, NO OPINION, COUNSEL, OR INTERPRETATION IS INTENDED IN MATTERS THAT REQUIRE LEGAL, ACCOUNTING, TAX, INSURANCE OR OTHER APPROPRIATE PROFESSIONAL ADVICE.  SUCH OPINIONS, COUNSEL, OR INTERPRETATIONS SHOULD BE OBTAINED FROM THE APPROPRIATE PROFESSIONAL SOURCES.

4.    **Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  A class is "impaired" unless the plan:  (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or (2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default— (A) cures any such default that occurred before or after the commencement of the Chapter 11 Case, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (B) reinstates the maturity of such claim or interest as such maturity existed before such default; (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan and are not insiders.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.  Section 1126(d) of the Bankruptcy Code, except as otherwise provided in section 1126(e) of the Bankruptcy Code, defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of equity interests in that class actually voting to accept or to reject the plan.

Classes 1, 2, and 5 are not Impaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan.

Claims in Classes 3 and 4 and Equity Interests in Class 6 are Impaired under the Plan, and as a result, the Holders of Claims and Equity Interests in such Classes are entitled to vote on the Plan.

No Classes of Claims or Equity Interests are Impaired, receive no recovery under the Plan, and are deemed to reject.

Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims and Equity Interests in the Voting Classes must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Classes, and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described herein. As stated above, Classes 3, 4, and 6 will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims in each such Class (other than any Claims or Equity Interests designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

5.    **Confirmation Without Acceptance by Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if less than all impaired classes entitled to vote on the plan have accepted it, *provided* that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired Class's rejection or deemed rejection of the Plan, the Plan will be confirmed, at the Debtor's request, in a procedure commonly known as "cram down," so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims or Equity Interests that is impaired under, and has not accepted, the Plan.

6.    **No Unfair Discrimination**

The unfair discrimination test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

Under the Plan, General Unsecured Claims are Unimpaired, while Convertible Unsecured Notes Claims receive an alternative treatment. Such treatment is fair because the Debtor cannot afford to completely unimpair Convertible Unsecured Notes Claims. Further, Holders of such Convertible Unsecured Notes are receiving the benefit of an equity share (*i.e.*, the New PPNs) in the Grantor Trust.

7.    **Fair and Equitable Test**

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class:

The condition that a plan be "fair and equitable" to a non-accepting Class of Secured Claims includes the requirements that: (a) the Holders of such Secured Claims retain the liens securing such Claims to the extent of the Allowed amount of the Claims, whether the property subject to the liens is retained by the Debtor or transferred to another entity under the Plan; and (b) each Holder of a Secured Claim in the Class receives deferred Cash payments totaling at least the Allowed amount of such Claim with a present value, as of the Effective Date of the Plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting Class of unsecured Claims includes the requirement that either: (a) the plan provides that each Holder of a Claim of such Class receive or retain on account of such Claim property of a value, as of the Effective Date of the plan, equal to the allowed amount of such Claim; or (b) the Holder of any Claim or Equity Interest that is junior to the Claims of such Class will not receive or retain under the plan on account of such junior Claim or Equity Interest any property.

The condition that a plan be "fair and equitable" to a non accepting Class of Equity Interests includes the requirements that either: (a) the plan provides that each Holder of an Equity Interest in that Class receives or retains under the plan, on account of that Equity Interest, property of a value, as of the Effective Date of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such Holder is entitled, (ii) any fixed redemption price to which such Holder is entitled, or (iii) the value of such interest; or (b) if the Class does not receive such an amount as required under (a), no Class of Equity Interests junior to the non-accepting Class may receive a distribution under the plan.

To the extent that any class of Claims or Class of Equity Interests either reject the Plan or are deemed to have rejected the Plan, the Debtor intends to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code.

Notwithstanding the rejection of any Class that votes to reject the Plan, the Debtor does not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Equity Interests. The Debtor believes that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for non-consensual confirmation of the Plan.

## K.    CONSUMMATION OF THE PLAN

The Plan will be consummated on the Effective Date. For a more detailed discussion of the conditions precedent to the consummation of the Plan and the impact of failure to meet such conditions, see Article IX of the Plan.

## ARTICLE IV.
## RISK FACTORS

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTOR'S ASSETS OR THE PLAN AND ITS IMPLEMENTATION.

### A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

1.    **Parties in Interest May Object to the Debtor's Classification of Claims and Equity Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtor believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtor created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.    **The Conditions Precedent to the Effective Date of the Plan May Not Occur.**

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are not waived or not met, the Effective Date will not take place.

3.    **The Debtor May Fail to Satisfy the Vote Requirement.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtor intends to seek, as promptly as practicable thereafter, confirmation of the Plan.  In the event that sufficient votes are not received, the Debtor may seek to accomplish an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims or Equity Interests as those proposed in the Plan.

4.    **The Debtor May Not Be Able to Secure Confirmation of the Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, findings by the bankruptcy court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of Claims within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim or Equity Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes, or the Plan contains other terms disapproved of by the Bankruptcy Court.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan.  If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims or Equity Interests would receive with respect to their Allowed Claims or Equity Interests.

The Debtor, subject to the terms and conditions of the Plan, reserves the right to modify the terms and conditions of the Plan as necessary for confirmation.  Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan.  Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.  Section 1127 of the Bankruptcy permits the Debtor to modify the Plan at any time before confirmation, but not if such modified Plan fails to meet the requirements for confirmation.  The Debtor may modify the Plan at any time after confirmation of the Plan and before substantial consummation of the Plan if circumstances warrant such modification and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, but not if such modified Plan fails to meet the requirements for confirmation.  The Debtor will comply with the disclosure and solicitation requirements set forth in section 1125 of the Bankruptcy Code with respect to the modified Plan.  Any Holder of a Claim or Equity Interest that has accepted or rejected the Plan is deemed to have accepted or rejected, as the case may be, the Plan as modified, unless, within the time fixed by the Bankruptcy Court, such Holder changes its previous acceptance or rejection.

5.      **Non-Consensual Confirmation of the Plan May Be Necessary.**

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class) and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  The Debtor believes that the Plan satisfies these requirements and the Debtor intends to request such non-consensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, in the event that a Voting Class does not accept the Plan, there can be no assurance that the Bankruptcy Court will reach this conclusion.

6.      **Continued Risk Upon Confirmation.**

Even if the Plan is consummated, the Debtor will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes to the White Eagle Portfolio, changes in tax law, and increasing expenses.  Some of

these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtor's stated goals.

In addition, at the outset of the Chapter 11 Case, the Bankruptcy Code provides the Debtor with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtor will have retained the exclusive right to propose the Plan upon filing their petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtor's ability to achieve confirmation of the Plan in order to achieve the Debtor's stated goals.

      7.      **The Debtor May Object to the Amount or Classification of a Claim or Equity Interest.**

Except as otherwise provided in the Plan, the Debtor reserves the right to object to the amount or classification of any Claim or Equity Interest under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim or Equity Interest where such Claim or Equity Interest is or may become subject to an objection, counterclaim or other suit by the Debtor. Any Holder of a Claim or Equity Interest that is or may become subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

      8.      **The Effective Date May Not Occur.**

Although the Debtor believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

      9.      **The Chapter 11 Case May Be Converted to a Case Under Chapter 7 of the Bankruptcy Code**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtor believes that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in the Plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

      10.      **Releases, Injunctions, and Exculpations Provisions May Not Be Approved**

Articles X-XI of the Plan provide for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtor or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan. The releases

provided to the Released Parties and the exculpation provided to the Exculpated Parties is necessary to the success of the Debtor's reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtor's reorganization efforts and have agreed to make further contributions, including by agreeing to the impaired treatment under the Plan, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the Restructuring and the financial benefits embodied in the Plan.

**B.      RISK FACTORS THAT MAY AFFECT THE VALUE OF SECURITIES TO BE ISSUED UNDER THE PLAN AND/OR RECOVERIES UNDER THE PLAN**

1.      **There May Be a Lack of Active Trading Market for the Restructuring Securities.**

There can be no assurance that an active trading market on a foreign public exchange will develop or be sustained for any of the Restructuring Securities following the completion of the Restructuring.  In any case, the New PPN Warrants, New PPN SARs, the New SARs, and the Unvested Warrants will not be publicly traded.  In the absence of an active trading market for the Restructuring Securities, holders of Restructuring Securities, including the Grantor Trust Certificates, may be unable to liquidate an investment in such securities.  Moreover, in order to reduce the risk of Lamington being classified as a CFC, language is intended to be added to Lamington's organizational documents, as well as to the New Indenture Documents and the Grantor Trust Agreement, to provide that no purchase, sale, exercise, conversion, redemption, or other transfer or disposition of Restructuring Securities shall be effective to the extent it would result in Lamington being classified as a CFC for U.S. federal income tax purposes.  Similarly, in order to reduce the risk of Lamington failing to qualify for benefits of The Convention Between the Government of the United States of America and the Government of Ireland for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital Gains (the "Irish Tax Treaty"), language is intended to be added to Lamington's organizational documents, as well as to the New Indenture Documents and the Grantor Trust Agreement, to provide that no purchase, sale or other transfer or disposition of Restructuring Securities shall be effective to the extent it would result in Restructuring Securities being transferred to a person other than a Qualified Person (as defined under Article 23(2)(a), (b), (d), (e) or (f) of the Irish Tax Treaty (*i.e.*, United States or Irish citizens or resident individuals, certain United States or Irish qualified governmental entities, certain United States or Irish tax-exempt entities, and certain United States or Irish publicly traded companies or subsidiaries thereof described in Article 23(2) of the Irish Tax Treaty).  These provisions may have the effect of reducing the ability of holders of the Restructuring Securities to liquidate their investment in such securities by limiting, to some degree, the potential purchasers of such securities and the ability of Lamington to redeem such securities.  These provisions may also have the effect of reducing the ability of holders of certain of the Restructuring Securities to exercise certain conversion features thereof.

2.      **The Debtor Expects to Incur Significant Costs and Expenses in Connection with the Restructuring.**

The Debtor expects that it will incur certain nonrecurring costs in connection with the consummation of the Restructuring, including advisory, legal and other transaction costs.  A majority of these costs have already been incurred or will be incurred regardless of whether the Restructuring is completed.  While many of the expenses that will be incurred, by their nature, are difficult to estimate accurately at the present time, the Debtor continues to assess the magnitude of these costs, and additional unanticipated costs may be incurred in connection with the Restructuring.  Although the Debtor expects that the realization of benefits related to the

Restructuring will offset such costs and expenses over time, no assurances can be made that this net benefit will be achieved in the near term, or at all.

3.      **The Estimated Reorganization Value of the Debtor's Assets and the Restructuring Securities and the Estimated Recoveries to Holders of Allowed Claims and Equity Interests Are Not Necessarily Representative of the Private or Public Sale Values of the Restructuring Securities.**

The Debtor's estimated recoveries to Holders of Allowed Claims and Equity Interests are not intended to represent the private or public sale values of the Restructuring Securities.  The estimated recoveries are based on numerous assumptions (the realization of many of which are beyond the control of the Debtor or Lamington), including, without limitation:  (a) the successful reorganization of the Debtor; (b) an assumed date for the occurrence of the Effective Date; (c) Lamington's ability to achieve the financial results included in the Financial Projections based on the uncertain performance of the White Eagle Portfolio; and (d) the Debtor's and Lamington's ability to maintain adequate liquidity to fund their respective obligations under the Plan.

However, no assurance can be given that the market will react favorably to the Restructuring, thereby causing the Restructuring Securities to not be attractive to investors.

4.      **Tax Implications of the Plan.**

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtor has not requested and does not intend to seek any ruling from the IRS on the tax consequences of the Plan.  There can be no assurance that the IRS will not challenge the various positions the Debtor has taken, or intends to take, with respect to the U.S. federal income tax treatment in the Plan, or that a court would not sustain such a challenge. *See* "Summary of Certain U.S. Federal Income Tax Consequences of the Plan," at Article VII herein.

## C.      RISKS ASSOCIATED WITH FORWARD LOOKING STATEMENTS

1.      **The Financial Information Contained Herein is Based on the Debtor's Books and Records and, Unless Otherwise Stated, No Audit was Performed.**

**The financial information contained in this Disclosure Statement has not been audited**.  In preparing this Disclosure Statement, the Debtor relied on financial data derived from its books and records that was available at the time of such preparation.  Although the Debtor has used its reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement and, while the Debtor believes that such financial information fairly reflects the financial condition of the Debtor, the Debtor is unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

2.      **Financial Projections and Other Forward Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary.**

This Disclosure Statement contains various projections concerning the financial results of the Debtor and Lamington following the Effective Date, including the Financial Projections, that are, by their nature, forward looking, and which projections are necessarily based on certain

assumptions and estimates.  Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Debtor and Lamington may turn out to be different from the financial projections.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Debtor, Lamington, and the White Eagle Portfolio, some of which may not materialize, including, without limitation, assumptions concerning:  (a) the timing of confirmation and Consummation of the Plan in accordance with its terms; (b) the anticipated future performance of the White Eagle Portfolio; (c) expected tax benefits to the Restructuring; and (d) general business and economic conditions.

DUE TO THE INHERENT UNCERTAINTIES ASSOCIATED WITH PROJECTING FINANCIAL RESULTS GENERALLY, THE PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSIDERED ASSURANCES OR GUARANTEES OF THE AMOUNT OF FUNDS OR THE AMOUNT OF CLAIMS THAT MAY BE ALLOWED IN THE VARIOUS CLASSES.  WHILE THE DEBTOR BELIEVES THAT THE FINANCIAL PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT ARE REASONABLE, THERE CAN BE NO ASSURANCE THAT THEY WILL BE REALIZED.

## D.    DISCLOSURE STATEMENT DISCLAIMER

### 1.    The Information Contained Herein is for Soliciting Votes Only.

The information contained in this Disclosure Statement is for purposes of soliciting votes on the Plan and may not be relied upon for any other purposes.

### 2.    This Disclosure Statement was Not Approved by the Securities and Exchange Commission.

Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

### 3.    The Debtor Relied on Certain Exemptions From Registration Under the Securities Act.

This Disclosure Statement has been prepared pursuant to sections 1125 and 1126, as applicable, of the Bankruptcy Code and Rule 3016(b) of the Bankruptcy Rules and is not necessarily in accordance with the requirements of federal or state securities laws or other similar laws.  The offer and issuance of Restructuring Securities to Holders of Senior Secured Notes Claims, Convertible Unsecured Notes Claims, and Equity Interests in the Debtor has not been registered under the Securities Act or Blue Sky Laws.  To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable nonbankruptcy law, the Solicitation, the issuance of the Restructuring Securities will be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code and section 4(a)(2) of the Securities Act.

### 4.    This Disclosure Statement Contains Forward Looking Statements.

This Disclosure Statement contains "forward looking statements" within the meaning of the federal securities laws.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may,"

"expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology.  The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims and Equity Interests may be affected by many factors that cannot be predicted.  Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

5.    **No Legal or Tax Advice is Provided to You by This Disclosure Statement.**

**This Disclosure Statement is not legal or tax advice to You**.  The contents of this Disclosure Statement should not be construed as legal, business or tax advice, and are not personal to any person or entity.  Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest.  This Disclosure Statement may not be relied upon for any purpose other than as a disclosure of certain information to determine how to vote on the Plan or object to confirmation of the Plan.

6.    **No Admissions Are Made by This Disclosure Statement.**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtor) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtor, Holders of Allowed Claims or Equity Interests, or any other parties in interest.

None of the Supporting Senior Secured Noteholders, Supporting Convertible Unsecured Noteholders, or their respective representatives, members, financial or legal advisors or agents, has independently verified the information contained herein or takes any responsibility therefor and none of the foregoing entities or persons makes any representations or warranties whatsoever concerning the information contained herein.

7.    **No Reliance Should Be Placed on Any Failure to Identify Litigation Claims or Projected Objections.**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement.  The Debtor may seek to investigate, file, and prosecute litigation rights and claims against any third parties and may object to Claims or Equity Interests after the Confirmation Date or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such litigation claims or objections to Claims or Equity Interests.

8.    **Nothing Herein Constitutes a Waiver of Any Right to Object to Claims or Equity Interests or Recover Transfers and Assets.**

The vote by a Holder of an Allowed Claim or Equity Interest for or against the Plan does not constitute a waiver or release of any claims or rights of the Debtor (or any party in interest, as the case may be) to object to that Holder's Allowed Claim or Equity Interest regardless of whether any Claims or Causes of Action of the Debtor or its Estate are specifically or generally identified herein.

9.      **The Information Used Herein was Provided by the Debtor and was Relied Upon by the Debtor's Advisors.**

Counsel to and other advisors retained by the Debtor have relied upon information provided by the Debtor in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtor have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

10.      **The Potential Exists for Inaccuracies and the Debtor Has No Duty to Update.**

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date.  While the Debtor has used its reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtor nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtor may subsequently update the information in this Disclosure Statement, the Debtor has no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

11.      **No Representations Made Outside the Disclosure Statement Are Authorized.**

No representations concerning or relating to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in or included with this Disclosure Statement should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to counsel to the Debtor and the United States Trustee.

## ARTICLE V.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

## A.      LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE

If no chapter 11 plan can be confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code in which case, a trustee would be elected or appointed to liquidate the Debtor's assets.  In performing the liquidation analysis, the Debtor has assumed that all Holders of Claims and Equity Interests will be determined to have claims or equity interests that are entitled to share in the proceeds from any such liquidation.  The Debtor believes that liquidation under chapter 7 would result in (i) smaller distributions being made to creditors than those provided for in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of unexpired leases and executory contracts in connection with the cessation of the Debtor's operations, and (iii) the failure to realize the greater reorganization value of all of the Debtor's assets.

## B.      FILING OF AN ALTERNATIVE PLAN OF REORGANIZATION

If the Plan is not confirmed, the Debtor or any other party in interest could attempt to formulate a different plan of reorganization.  Such a plan might involve either a reorganization of

the Debtor's business or an orderly liquidation of the Debtor's assets.  During the negotiations prior to the filing of the Plan, the Debtor explored various alternatives to the Plan.

The Debtor believes that the Plan will enable the Debtor to emerge from chapter 11 successfully and expeditiously and allows all parties in interest to realize the highest recoveries under the circumstances.  In a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtor would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, and a trustee need not be appointed.  Accordingly, creditors would receive greater recoveries than in a chapter 7 liquidation.  Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, the Debtor believes that a liquidation under chapter 11 is a much less attractive alternative to creditors and interest holders than the Plan because the Plan provides for a greater return to creditors and interest holders.

Moreover, the prolonged continuation of the Chapter 11 Case is likely to adversely affect the Debtor.  Prolonged continuation of the Chapter 11 Case also will make it more difficult to attract and retain management and other key personnel necessary to the success of the Debtor's reorganization.  Further, so long as the Chapter 11 Case continues, the Debtor will be required to incur substantial costs for professional fees and other expenses associated with the proceedings. The prolonged continuation of the Chapter 11 Case may also require the Debtor to seek additional financing in order to service its debt and other obligations.  It may not be possible for the Debtor to obtain additional financing during the pendency of the Chapter 11 Case on commercially favorable terms or at all.  If the Debtor were required to seek additional financing during the Chapter 11 Case and was unable to obtain the financing on favorable terms or at all, it is unlikely the Debtor could successfully reorganize.

**ARTICLE VI.**
**ISSUANCE AND RESALE OF RESTRUCTURING SECURITIES UNDER THE PLAN**

**A.    EXEMPTION FROM REGISTRATION REQUIREMENTS OF THE SECURITIES ACT**

1.    **Section 4(a)(2) of the Securities Act (Solicitation of the Plan)**

The Debtor is relying on exemptions from the registration requirements of the Securities Act including, without limitation, section 4(a)(2) thereof, to exempt the offering of the Restructuring Securities to Holders of Senior Secured Notes Claims and Convertible Unsecured Notes Claims pursuant to the Solicitation prior to the Petition Date.

Section 4(a)(2) of the Securities Act exempts transactions by an issuer not involving any public offering, and Regulation D provides a safe harbor under section 4(a)(2) for transactions that meet certain requirements, including that the investors participating therein qualify as "accredited investors" within the meaning of U.S. securities laws.

The Debtor does not have any contract, arrangement or understanding relating to, and will not, directly or indirectly, pay any commission or other remuneration to any broker, dealer, salesperson, agent or any other person for soliciting votes to accept or reject the Plan or for soliciting any exchange of the Senior Secured Notes or Convertible Unsecured Notes, except for reasonable, actual and necessary out-of-pocket expenses of mailing.  In addition, none of its financial advisors engaged to provide financial analysis and assist the Debtor with addressing the financial aspects of the restructuring or any broker, dealer, salesperson, agent or any other person has been engaged or authorized to express any statement, opinion, recommendation or judgment with respect to the relative merits and risks of the Solicitation or the Plan (and the transactions contemplated thereby).  Further, the Debtor believes that many (if not all) of the Supporting

Senior Secured Noteholders and Convertible Unsecured Noteholders receiving the Restructuring Securities under the Plan will be accredited investors.

> 2. **Section 1145 of the Bankruptcy Code (Solicitation of the Plan; Distribution to Holders of Senior Secured Notes, Convertible Unsecured Notes, and Equity Interests in the Debtor)**

The Debtor is relying on the exemption provided by section 1145(a)(1) of the Bankruptcy Code from the registration requirements of the Securities Act to exempt the offering, issuance and distribution of the Restructuring Securities to Holders of Senior Secured Notes Claims, Convertible Unsecured Notes Claims, and Equity Interests in the Debtor (the "Section 1145 Securities") pursuant to the Plan.

Section 1145(a)(1) of the Bankruptcy Code provides that registration requirements of Section 5 of the Securities Act and any applicable Blue Sky Laws will not apply to the offer or sale of stock, warrants or other securities by a debtor under a plan of reorganization if (i) the offer or sale occurs under a plan of reorganization, (ii) the recipients of securities hold a claim against, an interest in or claim for administrative expense against the debtor and (iii) the securities are issued in exchange for a claim against or interest in a debtor or are reissued principally in such exchange and partly for cash and property.

## B.    RESALES OF RESTRUCTURING SECURITIES

> 1.    **Resales of the 1145 Securities**

To the extent that the issuance of the Section 1145 Securities pursuant to the Plan is covered by section 1145 of the Bankruptcy Code, the Section 1145 Securities generally may be resold without registration under applicable Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Laws of the various states; however, the availability of such exemptions cannot be known unless individual states' Blue Sky Laws are examined.  In addition, the Section 1145 Securities governed by section 1145 of the Bankruptcy Code may be resold without registration under the Securities Act pursuant to an exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" (as such term is defined in Section 1145(b) of the Bankruptcy Code) with respect to the Section 1145 Securities.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who, except with respect to ordinary trading transactions of an entity that is not an issuer, (i) purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if such purchase is with a view to distributing any security received or to be received in exchange for such a claim or interest; (ii) offers to sell securities offered or sold under a plan of reorganization for the holders of those securities; (iii) offers to buy securities offered or sold under a plan of reorganization from the holders of such securities, if such offer to buy is (a) with a view to distribution of such securities and (b) under an agreement made in connection with such plan of reorganization, with the consummation of such plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or (iv) is an "issuer" (as the term is defined in section 2(a)(11) of the Securities Act) with respect to such securities.

The definition of an "issuer" for purposes of whether a person is an "underwriter" under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover the entity issuing the securities and

"control persons" of such issuer of the securities. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "control person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of the securities of a reorganized debtor may be presumed to be a "control person" and, therefore, an underwriter.

Resales of the Section 1145 Securities by persons deemed to be "underwriters" (which by definition includes "control persons") (collectively, the "Restricted Holders") would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. However, Restricted Holders may be permitted to sell their Section 1145 Securities without registration if they are able to comply with the provisions of Rule 144 of the Securities Act (as discussed below). The Debtor expresses no view as to whether any Person or Entity would be deemed an "underwriter" with respect to the Section 1145 Securities and, in turn, whether any recipient of Section 1145 Securities may freely resell such securities.

**Recipients of securities under the Plan may be able to resell such securities pursuant to one or more exemptions from registration under the federal securities law. The Debtor recommends that potential recipients of securities under the Plan consult their own counsel concerning their ability to freely trade such securities without registration under applicable federal securities laws and Blue Sky Laws.**

**WHETHER OR NOT ANY PARTICULAR PERSON WOULD BE DEEMED TO BE AN "UNDERWRITER" OF RESTRUCTURING SECURITIES TO BE ISSUED PURSUANT TO THE PLAN OR AN "AFFILIATE" OF THE DEBTOR WOULD DEPEND UPON VARIOUS FACTS AND CIRCUMSTANCES APPLICABLE TO THAT PERSON. ACCORDINGLY, THE DEBTOR EXPRESSES NO VIEW AS TO WHETHER ANY SUCH PERSON WOULD BE SUCH AN "UNDERWRITER" OR AN "AFFILIATE." IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE DEBTOR, THE DEBTOR MAKES NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES OF THE DEBTOR OR LAMINGTON. ACCORDINGLY, THE DEBTOR RECOMMENDS THAT POTENTIAL RECIPIENTS OF ANY RESTRUCTURING SECURITIES TO BE ISSUED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH RESTRUCTURING SECURITIES.**

## C.    LISTING OF RESTRUCTURING SECURITIES

The Debtor expects that the Restructuring Securities (except the New PPN Warrants, New PPN SARs, the New SARs, and the Unvested Warrants) will be freely tradeable and listed for trading on a foreign public stock exchange deemed suitable for this purpose by the Debtor. Nonetheless, there can be no assurance that an active trading market for the Restructuring Securities will ever develop or, if such market does develop, that it will be maintained.

***Notwithstanding any language to the contrary contained in this Disclosure Statement, the Plan and/or the Confirmation Order, no provision of the Plan or the Confirmation Order shall (i) preclude the United States Securities and Exchange Commission ("SEC") from***

*enforcing its police or regulatory powers; or, (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against any nondebtor person or nondebtor entity in any forum.*

## ARTICLE VII.
## SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO HOLDERS OF SENIOR SECURED NOTES CLAIMS, CONVERTIBLE UNSECURED NOTES CLAIMS, AND EQUITY INTERESTS IN THE DEBTOR

The following disclosure (the "Tax Disclosure") summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to a Holder of Senior Secured Notes Claims, Convertible Unsecured Notes Claims, or Equity Interests in the Debtor (but not the taxation of those to whom such a Holder subsequently transfers Restructuring Securities). The Debtor has not requested, and will not request, a ruling from the Internal Revenue Service (the "IRS") or an opinion of counsel with respect to any of the tax aspects of the Plan, and the discussion below is not binding upon the IRS or the courts. Thus, no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This Tax Disclosure is limited to beneficial owners who hold the Senior Secured Notes Claims, Convertible Unsecured Notes Claims or Equity Interests in the Debtor (collectively, the "Relevant Claims") as "capital assets" within the meaning of the Tax Code (generally, property held for investment). This summary does not address alternative minimum tax considerations, the 3.8% tax imposed on certain net investment income, or the tax considerations arising under the laws of any foreign, state, local or other jurisdiction or qualification under any income tax treaty. In addition, this summary does not address any U.S. federal tax considerations (such as estate or gift taxes) other than U.S. federal income tax considerations. Furthermore, this discussion does not address all tax considerations that may be relevant to an investor in light of the investor's particular circumstances (such as the effects of Section 451 of the Tax Code), or to certain categories of investors that may be subject to special rules, such as:

- brokers and dealers in securities or commodities;

- traders in securities that have elected the mark-to-market method of accounting for their securities holdings;

- U.S. Holders (as defined below) whose functional currency is not the U.S. Dollar;

- persons holding Relevant Claims as part of a hedge, straddle, conversion or other "synthetic security" or integrated transaction;

- former U.S. citizens or long-term residents of the United States;

- banks and other financial institutions;

- insurance companies;

- regulated investment companies;

- real estate investment trusts;

- • "controlled foreign corporations" within the meaning of the Tax Code;

- • "passive foreign investment companies" within the meaning of the Tax Code;

- • corporations that accumulate earnings to avoid U.S. federal income tax;

- • entities that are tax-exempt for U.S. federal income tax purposes;

- • persons who are related to the Debtor;

- • persons who are or were employees of the Debtor (or of persons related to the Debtor)

- • holders of Relevant Claims who have previously claimed a bad debt deduction with respect to a Relevant Claim;

- • holders of Relevant Claims who are themselves in bankruptcy; and

- • partnerships, other pass-through entities and holders of interests therein.

If an entity or arrangement treated as a partnership or other pass-through entity for U.S. federal income tax purposes holds Relevant Claims, the U.S. federal income tax treatment of a partner in such partnership or other pass-through entity generally will depend upon the status of the partner or other equityholder and the activities of the partnership or other pass-through entity. If you are a partnership or other pass-through entity holding Relevant Claims or a partner or other beneficial owner in such a partnership or other pass-through entity, you are urged to consult your own tax advisor about the U.S. federal income tax considerations with respect to the Plan.

In addition, the Tax Disclosure does not attempt to consider whether the particular circumstances of any Holder of a Claim may modify or alter the consequences described below. The remainder of the Claims under the Plan against the Debtor are not being solicited and hence not specifically addressed in this Article VII.

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the regulations promulgated thereunder by the U.S. Department of the Treasury ("Treasury Regulations"), judicial decisions, and published administrative rules and pronouncements of the IRS in effect on the date hereof. Changes in, or new interpretations of, such rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF A HOLDER OF A CLAIM OR EQUITY INTEREST. EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISOR FOR THE U.S. FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

A.      **DEFINITION OF U.S. HOLDER AND NON-U.S. HOLDER**

In this Tax Disclosure, a "U.S. Person" is any Person that is

- an individual that is a citizen or resident of the United States for U.S. federal income tax purposes;

- a corporation (or entity treated as a corporation for U.S. federal income tax purposes) created or organized in the United States or under the laws of the United States, or of any state thereof, or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust if (1) one or more U.S. Persons have the authority to control all substantial decisions of the trust, and a United States court is able to exercise primary supervision over the administration of the trust; or (2) the trust has made a valid election to be treated as a U.S. Person under the Tax Code.

A "Non-U.S. Person" is any Person that is not a U.S. Person and is not a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes). Holders of Relevant Claims or Restructuring Securities that are U.S. Persons are hereafter referred to as "U.S. Holders" and Holders of Relevant Claims or Restructuring Securities that are Non-U.S. Persons are hereafter referred to as "Non-U.S. Holders."

If a Holder of a Relevant Claim is a partnership (including any other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes), the treatment of a partner in the partnership will depend on whether the partner is a Non-U.S. Person and the extent of the partnership's activities in the United States. A partner in a partnership that is a Holder of a Senior Secured Notes Claim, Convertible Unsecured Notes Claims, or Equity Interest in the Debtor is urged to consult its own tax advisor regarding the U.S. federal, state and local and non-U.S. tax consequences to it under the Plan.

B.      **TREATMENT OF THE DEBTOR WITH RESPECT TO THE SATISFACTION OF SENIOR SECURED NOTES CLAIMS, CONVERTIBLE UNSECURED NOTES CLAIMS, AND EQUITY INTERESTS IN THE DEBTOR FOR RESTRUCTURING SECURITIES**

For U.S. federal income tax purposes, the Debtor is treated as a corporation. As a result, the cancellation of the Equity Interests in the Debtor and the satisfaction of the Relevant Claims in the Debtor with the Restructuring Securities pursuant the Plan generally should be treated for U.S. federal income tax purposes as (i) with respect to the cancellation and extinguishment of the Equity Interests of the Debtor, a distribution of a portion of the Restructuring Securities in complete liquidation under Tax Code Section 336, pursuant to which the Debtor will recognize gain or loss on the distribution as if the Restructuring Securities distributed were sold to the distributees at their fair market value and (ii) with respect to the satisfaction of the Senior Secured Notes Claims and Convertible Unsecured Notes Claims, a repayment of such Claims with the fair market value of the portion of the Restructuring Securities transferred in satisfaction of each such Claim. Under the Plan, except as otherwise specified, the value of distributions in respect of Senior Secured Notes Claim and Convertible Unsecured Notes Claim (collectively, the "Debt Claims") will be allocated first to the stated principal amount of such Claims (with such amount treated as a repayment of principal by the Debtor), with any excess allocated to accrued but unpaid interest (and treated as a repayment of interest by the Debtor). Certain legislative

history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest.  There can be no assurance that the IRS or the courts will respect the Plan allocation for U.S. federal income tax purposes.

Under the Tax Code, a taxpayer generally recognizes cancellation of debt income ("CODI") to the extent that indebtedness of the taxpayer (such as, with respect to the Debtor, the Senior Secured Notes Claims and Convertible Unsecured Notes Claims) is cancelled for less than the amount owed by the taxpayer, subject to certain judicial or statutory exceptions. The most significant of these exceptions with respect to the Debtor is that taxpayers who are operating under the jurisdiction of a federal bankruptcy court are not required to recognize such income. In that case, however, the taxpayer must reduce its tax attributes, such as its net operating losses, general business credits, capital loss carryforwards, and tax basis in assets, by the amount of the CODI avoided. In this case, to the extent the Debtor recognizes significant CODI from the implementation of the Plan, its tax attributes may be reduced on account of such CODI. However, because the Debtor intends to liquidate, any remaining net operating losses or other tax attributes will have no ongoing value to the Debtor or to the Holders of Allowed Claims.

## C.  TAX CONSEQUENCES FOR U.S. PERSONS HOLDING SENIOR SECURED NOTES CLAIMS, CONVERTIBLE UNSECURED NOTES CLAIMS, OR EQUITY INTERESTS IN THE DEBTOR

The Plan provides for the Debtor to distribute the Restructuring Securities to Holders of Allowed Senior Secured Notes Claims, Convertible Unsecured Notes Claims, and Equity Interests in the Debtor in exchange for the full and final satisfaction, settlement, release and discharge of such Claims and Equity Interests.

### 1.  Exchange of Senior Secured Notes Claims and Convertible Unsecured Notes Claims for Restructuring Securities

Each Holder of a Debt Claim in the Debtor should be treated as receiving Restructuring Securities in repayment of such Debt Claims.

#### (a)  Gain or Loss Realized on Satisfaction of Debt Claims

The receipt by a U.S. Holder of Restructuring Securities in satisfaction of its Debt Claims pursuant to the Plan will be a taxable transaction for U.S. federal income tax purposes. Subject to the discussion below, including under "Market Discount," a U.S. Holder that has its Debt Claims satisfied pursuant to the Plan generally will recognize capital gain or loss equal to the difference between (1) the fair market value of the total consideration received in exchange for the satisfied Debt Claims (other than amounts attributable to accrued interest, which will be taxable as discussed below under "Accrued Interest") and (2) the U.S. Holder's adjusted tax basis in the Debt Claims.  In general, a U.S. Holder's adjusted tax basis in a Debt Claim will equal the U.S. Holder's initial cost of such Debt Claim, increased by any market discount previously included in income by the U.S. Holder with respect to the Debt Claim, and decreased (but not below zero) by the amount of any bond premium previously amortized by the U.S. Holder with respect to the Debt Claim and any principal payments previously received.  Except to the extent that gain is recharacterized as ordinary income pursuant to the market discount rules discussed below, such gain or loss generally will be capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has held such Debt Claim for more than one year at the time of satisfaction. Long-term capital gains recognized by non-corporate U.S. Holders (including such income recognized

through certain flow-through entities) generally are eligible for preferential rates of taxation. The deductibility of capital losses is subject to limitations.  A U.S. Holder's initial tax basis in the Restructuring Securities acquired in the satisfaction of Debt Claims pursuant to the Plan as described above should equal the fair market value of the Restructuring Securities received in satisfaction of such U.S. Holder's Debt Claims as described above.  A U.S. Holder's holding period in such Restructuring Securities should begin the day following the Effective Date.

(b)    Market Discount

An exception to the capital gain treatment described above may apply to a U.S. Holder that holds a Debt Claim acquired with market discount.  If a U.S. Holder purchased a Debt Claim for less than its principal amount, the Debt Claim may have "market discount."  Market discount generally is the excess, if any, of the principal amount of the Debt Claim over the U.S. Holder's tax basis in the Debt Claim immediately after its acquisition, unless that excess is less than a statutorily defined de minimis amount (where the market discount is less than 0.25% of the principal amount at maturity multiplied by the number of complete years to maturity remaining), in which case market discount is treated as zero.  If such market discount is at least the statutorily defined de minimis amount, any gain recognized by a U.S. Holder on the satisfaction of the Debt Claims pursuant to the Plan will be treated as ordinary income rather than capital gain to the extent of "accrued market discount" on the date of sale, unless the U.S. Holder has made an election to include market discount in income as it accrued. If a U.S. Holder elected to include accrued market discount in income as it accrued, no additional market discount needs to be taken into account with respect to the satisfaction of a Debt Claim pursuant to the Plan. Any gain in excess of accrued market discount generally will be subject to the capital gains rules described above.  The market discount rules may not apply to deeply distressed debt acquired for less than 50% of its face value.  U.S. Holders are urged to consult their own tax advisors as to the portion of their gain, if any, that would be taxable as ordinary income under these provisions.

(c)    Accrued Interest

A U.S. Holder holding Debt Claims who, under its accounting method, did not previously include in its income accrued but unpaid interest ("Accrued Interest") attributable to that Debt Claim, and who exchanges such a Debt Claim for Restructuring Securities pursuant to the Plan, should be treated as receiving ordinary interest income to the extent of any consideration so received allocable to such Accrued Interest, regardless of whether that U.S. Holder realizes an overall gain or loss as a result of the exchange of its Debt Claim.  The tax basis of any property received in exchange for Debt Claims for Accrued Interest should be the fair market value of such property.  The holding period for such property should begin the day after the exchange.

A U.S. Holder holding Debt Claims generally should be able to recognize a deductible loss (or, possibly, a write-off against a reserve for bad debts) to the extent any Accrued Interest claimed was previously included in its gross income and is not paid in full by the Debtor.  Such loss may be ordinary, but the tax law is unclear on this point.

Under the Plan, except as otherwise specified, the value of distributions in respect of Debt Claims will be allocated first to the stated principal amount of such Claims, with any excess allocated to Accrued Interest.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest.  There can be no assurance that the IRS or the courts will respect the Plan allocation for U.S. federal income tax purposes.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE U.S. FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST**.

2.    **Exchange of Equity Interests of the Debtor for Restructuring Securities**

(a)    Gain or Loss Realized on Exchange of Equity Interests of the Debtor for Restructuring Securities

Subject to the discussion in subsection 2.(b)–(d) below,  the exchange of Equity Interests in the Debtor for Restructuring Securities pursuant to the Plan by a U.S. Holder will be a taxable transaction for U.S. federal income tax purposes, and generally should be treated as a distribution received in complete liquidation of the Debtor under Tax Code Section 331.  As such, U.S. Holders who receive Restructuring Securities in exchange for their Equity Securities in the Debtor generally should be treated as receiving such Restructuring Securities in full payment of such Equity Securities.  Subject to the discussion below, including in subsection 2.(b)–(d), a U.S. Holder that exchanges Equity Interests of the Debtor for Restructuring Securities pursuant to the Plan generally will recognize capital gain or loss equal to the difference between (1) the fair market value of the total consideration received in exchange for the exchanged Equity Interests of the Debtor and (2) the U.S. Holder's adjusted tax basis in the Equity Interests of the Debtor exchanged.  In general, a U.S. Holder's adjusted tax basis in its Equity Interests of the Debtor will equal the U.S. Holder's initial cost of such Equity Interests of the Debtor decreased by any prior distributions paid to such U.S. Holder with respect to its Equity Securities of the Debtor treated as a return of capital.  Such gain or loss generally will be capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has held such Equity Interests of the Debtor for more than one year at the time of exchange. Long-term capital gains recognized by non-corporate U.S. Holders generally are eligible for preferential rates of taxation.  The deductibility of capital losses is subject to limitations.  A U.S. Holder's initial tax basis in the Restructuring Securities acquired in exchange for the Equity Interests of the Debtor pursuant to the Plan as described above should equal the fair market value of the Restructuring Securities received in exchange for the Equity Interests of the Debtor pursuant to the Plan as described above.  A U.S. Holder's holding period in such Restructuring Securities should begin the day following the Effective Date.

(b)    Vested Warrants

It is intended that U.S. Holders holding vested warrants to purchase common stock of the Debtor generally should be treated for U.S. federal income tax purposes as (i) exercising such vested warrants to receive common stock of the Debtor via a cashless exercise immediately prior to the exchange of Equity Interests of the Debtor for Restructuring Securities pursuant to the Plan and (ii) exchanging such common stock of the Debtor for Restructuring Securities pursuant to the Plan.  Gain or loss recognized with respect to the exchange of the common stock of the Debtor received in the deemed cashless exercise for Restructuring Securities pursuant to the Plan generally should be as described above under "Gain or Loss Realized on Exchange of Equity Interests of the Debtor for Restructuring Securities."

The tax consequences of a cashless exercise of a warrant are not clear under current U.S. federal income tax law. A cashless exercise may be tax-free, either because the exercise is not a realization event or because the exercise is treated as a recapitalization for U.S. federal income tax purposes. In either tax-free situation, a U.S. Holder's tax basis in the common stock of the Debtor received generally would equal the U.S. Holder's tax basis in the warrants. If the cashless exercise was not a realization event, it is unclear whether a U.S. Holder's holding period for the

common stock of the Debtor would be treated as commencing on the date of exercise of the warrant or the day following the date of exercise of the warrant. If the cashless exercise were treated as a recapitalization, the holding period of the common stock of the Debtor would include the holding period of the warrants.

It is also possible that a cashless exercise could be treated as a taxable exchange in which gain or loss would be recognized.  In such event, a U.S. Holder could be deemed to have surrendered warrants with an aggregate fair market value equal to the exercise price for the total number of warrants to be exercised. The U.S. Holder would recognize capital gain or loss in an amount equal to the difference between the fair market value of the warrants deemed surrendered and the U.S. Holder's tax basis in such warrants.  In this case, a U.S. Holder's tax basis in the common stock of the Debtor received would equal the sum of the U.S. Holder's initial investment in the warrants exercised and the exercise price of such warrants.  It is unclear whether a U.S. Holder's holding period for the common stock of the Debtor would commence on the date of exercise of the warrant or the day following the date of exercise of the warrant.

Due to the absence of authority on the U.S. federal income tax treatment of a cashless exercise, there can be no assurance which, if any, of the alternative tax consequences and holding periods described above would be adopted by the IRS or a court of law. Accordingly, U.S. Holders should consult their tax advisors regarding the tax consequences of a cashless exercise.

(c)    Unvested Warrants and Existing SARs

Other than a U.S. Holder that received Unvested Warrants or Existing SARs in exchange for services, a U.S. Holder that exchanges Unvested Warrants or Existing SARs for New Unvested Warrants and New SARs, respectively, pursuant to the Plan generally will recognize capital gain or loss equal to the difference between (1) the fair market value of the total consideration received in exchange for the Unvested Warrants or Existing SARs and (2) the U.S. Holder's adjusted tax basis in the Unvested Warrants or Existing SARs exchanged. In general, a U.S. Holder's adjusted tax basis in its Unvested Warrants or Existing SARs will equal the U.S. Holder's initial cost of such Unvested Warrants or Existing SARs.  Such gain or loss generally will be capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has held such Unvested Warrants or Existing SARs for more than one year at the time of exchange. Long-term capital gains recognized by non-corporate U.S. Holders generally are eligible for preferential rates of taxation. The deductibility of capital losses is subject to limitations.  A U.S. Holder's initial tax basis in the New Unvested Warrants or New SARs received in exchange for the Unvested Warrants or Existing SARs pursuant to the Plan as described above should equal the fair market value of the New Unvested Warrants or New SARs received in exchange for the Unvested Warrants or Existing SARs, respectively, pursuant to the Plan as described above.  A U.S. Holder's holding period in such New Unvested Warrants and New SARs should begin the day following the Effective Date.

(d)    Equity Awards Under the Omnibus Plan

Pursuant to the Plan, certain unvested equity awards under the Omnibus Plan (including equity awards of restricted stock under the Omnibus Plan) shall be deemed vested as of the Effective Date and thereafter treated the same as the other Equity Interests in the Debtor, as discussed above in this subsection 2.  The tax consequences of the vesting of equity awards under the Omnibus Plan, including the resulting tax basis in such vested equity awards, are complex and dependent upon the individual circumstances of the U.S. Holder.  U.S. Holders who hold unvested equity awards under the Omnibus Plan are urged to consult their own tax advisors as to the appropriate treatment of the vesting of any equity awards under the Omnibus Plan.

D. **TAX CONSEQUENCES FOR NON-U.S. PERSONS HOLDING SENIOR SECURED NOTES CLAIMS, CONVERTIBLE UNSECURED NOTES CLAIMS, OR EQUITY INTERESTS IN THE DEBTOR**

The following discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the non-U.S. tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the Restructuring Securities.

Whether a Non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders.

1.     **Gain Recognition**

Any gain realized by a Non-U.S. Holder on the exchange of its Relevant Claim for Restructuring Securities generally should not be subject to U.S. federal income tax unless (1) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or (2) in the case of U.S. source gains or losses derived by an individual Non-U.S. Holder, such individual is present in the United States for 183 days or more in the taxable year of the disposition and certain other conditions are met.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder. In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.

2.     **Distributions in Discharge of Accrued Interest**

A Non-U.S. Holder holding a Senior Secured Notes Claim or Convertible Unsecured Notes Claim who exchanges that Claim for Restructuring Securities pursuant to the Plan should be treated as receiving interest income to the extent of any consideration so received allocable to Accrued Interest that was not previously taken into account for U.S. federal income tax purposes, regardless of whether such Non-U.S. Holder realizes an overall gain or loss as a result of the exchange of its Allowed Claim, and regardless of whether the Non-U.S. Holder's Allowed Claim is a capital asset in its hands.

Under the Plan, except as otherwise specified, the value of distributions in respect of Senior Secured Notes Claims and Convertible Unsecured Notes Claims will be allocated first to the stated principal amount of such Claims, with any excess allocated to Accrued Interest. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but

unpaid interest.  There can be no assurance that the IRS or the courts will respect the Plan allocation for U.S. federal income tax purposes.

Subject to the discussion in "Backup Withholding" below, the payment to a Non-U.S. Holder of interest, including Accrued Interest attributable to Senior Secured Notes and Convertible Unsecured Notes, should not be subject to U.S. federal withholding tax pursuant to the "portfolio interest exemption," *provided* that the Non-U.S. Holder (1) provides the Debtor with the appropriate IRS Form W-8, (2) does not actually or constructively own 10% or more of stock of the Debtor, as measured by voting power, (3) is not a "controlled foreign corporation" that is related to the Debtor within the meaning of the Tax Code, and (4) is not a bank receiving interest described in Section 881(c)(3)(A) of the Tax Code.

If a Non-U.S. Holder cannot satisfy the requirements of the portfolio interest exemption described above, payments of interest, including Accrued Interest, made to such Non-U.S. Holder, should be subject to a withholding tax at a rate of 30%, *provided, however*, that a Non-U.S. Holder may be eligible to claim an exemption from or reduction in the rate of withholding under an applicable income tax treaty.

If payments of accrued untaxed interest are effectively connected with a Non-U.S. Holder's trade or business in the United States (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment or fixed base) and such Non-U.S. Holder provides the Debtor with an IRS Form W-8ECI (or successor form), such Non-U.S. Holder should generally not be subject to withholding tax but will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise). A Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30% (or a reduced rate or exemption from tax under an applicable income tax treaty).

## E.    TAXATION OF HOLDERS OF RESTRUCTURING SECURITIES

### 1.    Tax Treatment of New Series A Notes, New Series B Notes, and New PPNs

Although there is no authority that specifically addresses the U.S. federal income tax treatment of the New Series A Notes, New Series B Notes, and New PPNs, it is intended that such Restructuring Securities should be treated as equity for U.S. federal income tax purposes (especially given their 100 year maturity), and the balance of this Disclosure assumes that the New Series A Notes, New Series B Notes, and New PPNs will be so treated as equity for U.S. federal income tax purposes.  There can be no assurance that the IRS or the courts will respect such equity treatment for U.S. federal income tax purposes.

### 2.    Withholding Tax

In general, tax at the standard rate of income tax (currently 20 percent), is required to be withheld from payments of Irish source interest, which should include interest payable on the New Series A Notes, New Series B Notes and New PPNs.

Subject to the discussion below, the Issuer will not be obliged to make a withholding or deduction for or on account of Irish income tax from a payment of interest on a Note so long as the following conditions are met:

(a)    the Notes are quoted Eurobonds, i.e. securities which are issued by a company (such as Lamington), which are quoted on a recognized stock exchange (which is

interpreted by the Irish Revenue Commissioners to mean an exchange which is recognized by the appropriate regulatory authorities in the country in which it is located and has substantially the same level of recognition in that country as the Irish Stock Exchange has in Ireland) and which carry a right to interest; and

(b)       the person by or through whom the payment is made is not in Ireland, or if such person is in Ireland either (i) the notes in question are held in a clearing system recognized by the Irish Revenue Commissioners (DTC is, amongst others, so recognized) or (ii) the person who is the beneficial owner of the relevant note is not resident in Ireland and has made a declaration to a relevant person (such as a paying agent located in Ireland) in the prescribed form.

Interest or other distributions paid out on the New Series A Notes, New Series B Notes and New PPNs which are profit dependent or any part of which exceeds a reasonable commercial return could, under certain anti-avoidance provisions, be re-characterized as a non-deductible distribution and so be subject to dividend withholding tax in certain circumstances. However, this should not apply on the basis of a confirmation by Lamington that, at the time the New Series A Notes, New Series B Notes and New PPNs were issued, Lamington was not in possession or aware of any information, including information about any arrangement or understanding in relation to ownership of the New Series A Notes, New Series B Notes or New PPNs after that time, which could reasonably be taken to indicate that interest or other distributions paid on the New Series A Notes, New Series B Notes or New PPNs would not be subject, without reduction computed by reference to the amount of such interest or other distribution, to a tax in a relevant territory which generally applies to profits, income or gains received in that relevant territory by persons from sources outside that relevant territory,  where the term "relevant territory" means a member state of the European Union (other than Ireland) or a country with which Ireland has signed a double tax treaty.

3.       **Encashment Tax**

Irish tax will be required to be withheld at the standard rate of income tax (currently 20 percent) from interest on any of the New Series A Notes, New Series B Notes or New PPNs, where such interest is collected or realized by a bank or encashment agent in Ireland on behalf of any holder of such notes. There is an exemption from encashment tax where the beneficial owner of the interest is not resident in Ireland and has made a declaration to this effect in the prescribed form to the encashment agent or bank.

4.       **Stamp Duty**

No stamp duty or similar tax is imposed in Ireland on the issue, transfer or redemption of the Restructuring Securities provided Lamington is a qualifying company for the purposes of Section 110 of the TCA and the proceeds of the Restructuring Securities are used in the course of Lamington's business.

5.       **Tax Consequences for a U.S. Holder of Receiving Distributions on Restructuring Securities**

(a)       <u>In General</u>

Under the U.S. federal income tax laws and subject to the passive foreign investment company rules discussed below in "PFIC Rules", the controlled foreign corporation rules discussed below in "CFC Rules", and the discussions in "Redemption of Restructuring Securities" and "Previously Taxed Income" below, the gross amount of any distribution that is

actually or constructively received (as described below, including any Irish withholding tax or other withholding tax on such amount) by a U.S. Holder with respect to Restructuring Securities, will be a dividend for U.S. federal income tax purposes to the extent of Lamington's current or accumulated earnings and profits (as determined for U.S. federal income tax purposes). To the extent that the amount of such distribution exceeds Lamington's current and accumulated earnings and profits as so computed, it will be treated first as a non-taxable return of capital to the extent of such U.S. holder's adjusted tax basis in its Restructuring Securities with respect to which such U.S. Holder receives such distribution, and to the extent the amount of such distribution exceeds such adjusted tax basis, will be treated as gain from the sale of such Restructuring Securities. With respect to non-corporate U.S. Holders, certain dividends received from a qualified foreign corporation will be subject to U.S. federal income tax at a maximum rate of 20%. As long as Lamington qualifies for benefits under the income tax treaty between the United States and Ireland or another applicable income tax treaty and is not treated as a PFIC for U.S. federal income tax purposes, Lamington generally will be treated as a qualified foreign corporation for this purpose. This reduced rate will not be available in all situations, and U.S. Holders should consult their own tax advisors regarding the application of the relevant rules to their particular circumstances. If Lamington is a PFIC as discussed below under "PFIC Rules," distributions paid by Lamington with respect to Restructuring Securities will not be eligible for the preferential income tax rate.

A U.S. Holder must include any Irish tax withheld from the dividend payment in this gross amount even though such U.S. Holder do not in fact receive it. The gross amount of the dividend is taxable to a U.S. Holder when the U.S. Holder receives the dividend, actually or constructively. Dividends paid on Restructuring Securities generally will constitute income from sources outside the United States and will generally not be eligible for the dividends-received deduction generally available to corporate U.S. Holders in respect of dividends received from other U.S. corporations. The amount of any distribution of property other than cash will be the fair market value of the property on the date of the distribution, less the sum of any encumbrance assumed by the U.S. Holder.

Subject to applicable limitations that may vary depending upon a U.S. Holder's circumstances, a U.S. Holder will be entitled to a credit against its U.S. federal income tax liability for any Irish withholding taxes withheld in respect of distributions on its Restructuring Securities not in excess of the applicable rate under the income tax treaty between the United States and Ireland. For purposes of calculating the foreign tax credit, dividends paid on Restructuring Securities generally will be treated as income from sources outside the United States, except that a portion of such dividends may be treated as income from U.S. sources. In addition, the limitation on foreign taxes eligible for credit is calculated separately with respect to specific classes of income, such as "passive" or "general" income. In addition, the amount of the qualified dividend income, if any, paid to a U.S. Holder that is subject to the reduced dividend income tax rate and that is taken into account for purposes of calculating the U.S. Holder's U.S. foreign tax credit limitation must be reduced by the rate differential portion of the dividend. The rules governing foreign tax credits are complex. U.S. Holders should consult their own tax advisors regarding the availability of foreign tax credits in their particular situation. In lieu of claiming a foreign tax credit, U.S. Holders may elect to deduct all non-U.S. taxes paid or accrued in a taxable year in computing their taxable income, subject to generally applicable limitations under U.S. federal income tax law.

(b)    Redemption of Restructuring Securities

In the event that a U.S. Holder's Restructuring Securities are redeemed pursuant to the redemption provisions described in this Disclosure Statement under the section entitled "Payment Priority of Restructuring Securities," the treatment of the redemption for U.S. federal

income tax purposes will depend on whether the redemption qualifies as a sale or other exchange of Restructuring Securities under Section 302 of the Tax Code.  If the redemption qualifies as a sale of Restructuring Securities, a U.S. Holder will be treated as described above under the section entitled "Tax Consequences for a U.S. Holder of Subsequent Dispositions of Restructuring Securities."  If the redemption does not qualify as a sale of Restructuring Securities, a U.S. Holder will be treated as receiving a corporate distribution with the tax consequences to a U.S. Holder described above under the section entitled "In General."

Whether a redemption of Restructuring Securities qualifies for sale treatment will depend largely on the total number of Lamington's securities treated as equity for U.S. federal income tax purposes (including for this purposes both Restructuring Securities and any securities in Lamington treated as equity for U.S. federal income tax purpose which may be subsequently issued, collectively, "Lamington Stock") and held or treated as held by the redeemed U.S. Holder before and after the redemption relative to all of the Lamington Stock outstanding both before and after the redemption. The redemption of Restructuring Securities generally will be treated as a sale of Restructuring Securities (rather than as a corporate distribution) if the redemption (1) is "substantially disproportionate" with respect to the U.S. Holder, (2) results in a "complete termination" of the U.S. Holder's interest in Lamington Stock or (3) is "not essentially equivalent to a dividend" with respect to the U.S. Holder.  These tests are explained more fully below.

In determining whether any of the foregoing tests result in a redemption qualifying for sale treatment, a U.S. Holder takes into account not only Lamington Stock actually owned by the holder, but also Lamington Stock that is constructively owned by it.  A U.S. Holder may constructively own, in addition to Lamington Stock owned directly, Lamington Stock owned by certain related individuals and entities in which the U.S. Holder has an interest or that have an interest in such U.S. Holder, as well as any Lamington Stock that the U.S. Holder has a right to acquire by exercise of an option.

In order to meet the substantially disproportionate test, the percentage of outstanding Lamington Stock that has voting rights and is actually and constructively owned by the holder immediately following the redemption of Restructuring Securities must, among other requirements, be less than eighty percent (80%) of the percentage of outstanding Lamington Stock that has voting rights and is actually and constructively owned by the U.S. Holder immediately before the redemption (taking into account redemptions by other holders of Lamington Stock).  There will be a complete termination of a U.S. Holder's interest if either (1) all of the shares of Lamington Stock actually and constructively owned by the U.S. Holder are redeemed or (2) all of the shares of Lamington Stock actually owned by the U.S. Holder are redeemed and the U.S. Holder is eligible to waive, and effectively waives in accordance with specific rules, the attribution of Lamington Stock owned by certain family members and the U.S. Holder does not constructively own any other Lamington Stock.  The redemption of Restructuring Securities will not be essentially equivalent to a dividend if the redemption results in a "meaningful reduction" of the U.S. Holder's proportionate interest in Lamington Stock. Whether the redemption will result in a meaningful reduction in a U.S. Holder's proportionate interest in Lamington will depend on the particular facts and circumstances.  However, the IRS has indicated in a published ruling that even a small reduction in the proportionate interest of a small minority stockholder in a publicly held corporation who exercises no control over corporate affairs may constitute such a "meaningful reduction."

A U.S. Holder should consult with its own tax advisors as to the tax consequences of a redemption.

(c)     Constructive Distributions

Tax Code Section 305(a) generally provides that the amount of any distribution of the stock of a corporation made by such corporation to its shareholders with respect to its stock is not included in the taxable income of the stockholder; however, the general non-recognition rule in Tax Code Section 305(a) is subject to exceptions described in Tax Code Section 305(b), which includes certain rules related to "preferred stock."  According to the U.S. Treasury Regulations under that Tax Code Section, the term preferred stock generally refers to stock which enjoys certain limited rights and privileges (generally associated with specified dividend and liquidation priorities) but does not participate in corporate growth to any significant extent. Due to their dividend preference and limited participation in corporate growth, the New Series A Notes and New Series B Notes may constitute "preferred stock" for these purposes.  If the New Series A Notes and/or New Series B Notes are treated as "preferred stock" for purposes of Tax Code Section 305, distributions of additional New Series A Notes and/or New Series B Notes to U.S. Holders thereof (such as in payment in kind of interest as described above under "Summary of New Series A Notes" and "Summary of New Series B Notes") may be treated as dividends to the same extent and in the same manner as distributions payable in cash and therefore includable in income in the manner described under "In General" above.  In that event, the amount of such distribution (and the basis of the New Series A Notes and/or New Series B Notes so received) will equal the fair market value of such New Series A Notes and/or New Series B Notes on the date of distribution.

In addition, under certain circumstances, adjustments (or failure to make adjustments) to the conversion rate of convertible preferred stock may result in constructive distributions under Tax Code Section 305(c) to the U.S. holders of such convertible preferred stock or other stockholders includable in income in the manner described under "In General" above, if and to the extent that such adjustments (or failure to make adjustments) in the conversion rate increase the proportionate interest of a stockholder in the corporation's earnings and profits. Thus, under certain circumstances, a U.S. Holder may recognize income in the event of a constructive distribution under Tax Code Section 305(c) even though they may not receive any cash or property.

U.S. Holders are urged to consult their own tax advisors regarding the application of Tax Code Section 305 to their Restructuring Securities, including the possibility of deemed distributions resulting from adjustments (or failure to make adjustments) to the conversion rates of Restructuring Securities.

(d)     Previously Taxed Income

Tax Code Section 959 provides that a distribution by a foreign corporation of earnings and profits that have already been included under certain sections of the Tax Code in the income of a "10% U.S. Shareholder" (defined below in "Controlled Foreign Corporation Rules") of the foreign corporation while it was a CFC (defined below in "Controlled Foreign Corporation Rules") is not again included in the income of that 10% U.S. Shareholder (or its successor in interest). The distribution is excluded from the income of the 10% U.S. Shareholder (or its successor in interest) to the extent it is allocable to earnings and profits that are attributable to "previously taxed income" of the foreign corporation ("PTI").  A distribution of earnings and profits that are attributable to PTI will reduce the earnings and profits of the distributor, but will not be treated as a dividend with respect to a 10% U.S. Shareholder who has previously included such earnings and profits in its gross income under certain sections of the Tax Code or to a "successor" of such 10% U.S. Shareholder.  Such distribution of earnings and profits that are attributable to PTI gives rise to a dollar-for-dollar reduction in the tax basis of the securities with respect to which such distribution is received.  To the extent distributions of earnings and profits

attributable to a 10% U.S. Shareholder's PTI account[8] exceed a 10% U.S. Shareholder's stock basis in a CFC, the distribution is treated as taxable gain from the sale or exchange of property. If a U.S. person acquires from any person any portion of the interest in the foreign corporation of a 10% U.S. Shareholder with a PTI account, such U.S. person (a "successor in interest") may attribute the PTI account of the previous 10% U.S. Shareholder to distributions of earnings and profits made by the foreign corporation to such U.S. person, a successor in interest.  In order to do so, the successor in interest must furnish certain information to the IRS with their tax return, as prescribed by Treasury Regulations Section 1.959-1(d). Such information includes, among others, identifying information regarding the CFC or chain of CFCs, identifying information about the previous 10% U.S. Shareholder, a description of the stock acquired, the amount of exclusions under Tax Code Section 959(a) claimed, and evidence showing that the earnings and profits for which the exclusion is claimed are attributable to the PTI account of the previous 10% U.S. Shareholder.

It is anticipated that Emergent will have a PTI account with respect to its ownership of Lamington securities prior to the consummation of the transactions constituting the Plan. Although there is no authority directly on point on this subject, it is anticipated that a U.S. Holder that receives New Series A Notes, New Series B Notes and/or New PPNs held indirectly through Grantor Trust Certificates (in each case, that are treated as equity for U.S. tax purposes) pursuant to the Plan should succeed to a portion of Emergent's PTI account with respect to its ownership of such New Series A Notes, New Series B Notes and/or New PPNs held indirectly through Grantor Trust Certificates, provided such U.S. Holder provides the required information to the IRS on its tax return.  Distributions received by such U.S. Holder with respect to such New Series A Notes, New Series B Notes and/or New PPNs held indirectly through Grantor Trust Certificates should be excluded from such U.S. Holder's gross income to the extent of such U.S. Holder's PTI account with respect to such New Series A Notes, New Series B Notes and/or New PPNs held indirectly through Grantor Trust Certificates.  Any such income exclusion should give rise to a corresponding reduction in the U.S. Holder's adjusted tax basis in such New Series A Notes, New Series B Notes and/or New PPNs held indirectly through Grantor Trust Certificates. Thus, when the U.S. Holder's New Series A Notes, New Series B Notes and/or New PPNs held indirectly through Grantor Trust Certificates are eventually disposed of, the Holder will recognize an amount of additional gain or reduced loss (compared to what the Holder would have recognized had there been no such basis reduction) equal to the amount of income excluded pursuant to the PTI rules discussed above, effectively offsetting such income exclusion (but providing a timing benefit with respect thereto).

No assurances can be made as to whether, or in what proportion, any U.S. Holder will succeed to Emergent's PTI account.  U.S. Holders are urged to consult their own tax advisors regarding the application of the "previously taxed income" rules to their New Series A Notes, New Series B Notes and/or New PPNs held indirectly through Grantor Trust Certificates, including, among others, their qualification as a "successor in interest" for purposes of such rule and information reporting obligations prescribed by Treasury Regulations Section 1.959-1(d).

6. **Tax Consequences for a U.S. Holder of Subsequent Dispositions of Restructuring Securities**

Subject to the discussion below under "PFIC Rules," U.S. Holders of Restructuring Securities generally should recognize capital gain or loss for U.S. federal income tax purposes on the sale, exchange or other disposition of Restructuring Securities in the same manner as on the

---

[8]  References herein to "PTI" shall mean the previously taxed income of the relevant foreign corporation, whereas references herein to a "PTI account" shall mean the associated tax attribute in the hands of the relevant shareholder arising from PTI of the relevant foreign corporation.

sale, exchange or other disposition of any other shares held as capital assets.  Such capital gain or loss will be long-term capital gain or loss if the U.S. Holder's holding period for the Restructuring Securities exceeds one year.  Under current law, long-term capital gain of noncorporate shareholders is subject to tax at a maximum rate of 20%.  The gain or loss will generally be income or loss from sources within the United States for foreign tax credit limitation purposes.  There are limitations on the deductibility of capital losses.

A U.S. Holder that receives non-U.S. currency on the sale or other disposition of Restructuring Securities will realize an amount equal to the U.S. dollar value of the non-U.S. currency on the date of sale (or, in the case of cash basis and electing accrual basis taxpayers, the U.S. dollar value of the non-U.S. currency on the settlement date) provided that such Restructuring Securities are treated as being "traded on an established securities market."  If a U.S. Holder receives non-U.S. currency upon a sale or exchange of Restructuring Securities, gain or loss, if any, recognized on the subsequent sale, conversion or disposition of such non-U.S. currency will be ordinary income or loss, and will generally be income or loss from sources within the United States for foreign tax credit limitation purposes.  However, if such non-U.S. currency is converted into U.S. dollars on the date received by the U.S. Holder, a cash basis or electing accrual U.S. Holder should not recognize any gain or loss on such conversion.  In addition, depending on the circumstances, a redemption of Restructuring Securities by Lamington will be treated as a sale of the redeemed shares by the U.S. holder or as a distribution to the U.S. holder (which is taxable as described above under "Tax Consequences for a U.S. Holder of Receiving Distributions on Restructuring Securities").

7.    **Certain Additional Tax Considerations for U.S. Holders Holding Restructuring Securities**

(a)    PFIC Rules

The treatment of U.S. Holders could be materially different from that described above, if Lamington is treated as a passive foreign investment company ("PFIC") for U.S. federal income tax purposes.

A non-U.S. corporation, such as Lamington, will be a PFIC for U.S. federal income tax purposes for any taxable year in which, after the application of certain look-through rules either: (i) 75% or more of its gross income for such taxable year is passive income, or (ii) 50% or more of the total value of its assets (based on an average of the quarterly values of the assets during such year) is attributable to assets, including cash, that produce passive income or are held for the production of passive income.  Passive income generally includes dividends, interest, royalties, rents, annuities, net gains from the sale or exchange of property producing such income and net foreign currency gains.  The determination of whether Lamington is a PFIC is based upon the composition of Lamington's income and assets (including, among others, partnerships such as White Eagle in which Lamington owns at least a 25% interest pursuant to certain Proposed Treasury Regulations published in 2019) and the nature of Lamington's activities.

It is not expected that Lamington will be a PFIC for this taxable year or in the foreseeable future, provided that (i) more than 25% of its gross income for such taxable year is attributable to its distributive share of death benefits realized by White Eagle on insurance policies, and (ii) more than 50% of the total value of White Eagle's assets (and therefore more than 50% of the total value of Lamington's assets) is attributable to insurance policies that produce, or are held for the production of, death benefits, rather than gains on the sale thereof.  The tests for determining PFIC status are applied annually after the close of the taxable year, and it is difficult to predict accurately future income and assets relevant to this determination.  The application of the PFIC rules is subject to uncertainty in several respects and, therefore, the IRS may assert that,

contrary to expectations, Lamington is a PFIC for this taxable year or in a future year. Accordingly, there can no assurance that Lamington will not be a PFIC for this taxable year or any future taxable year.

If Lamington is or becomes a PFIC during any year in which a U.S. Holder holds Restructuring Securities, unless the U.S. Holder makes a qualified electing fund ("QEF") election or mark-to-market election with respect to its Restructuring Securities, as described below, a U.S. Holder generally would be subject to additional taxes (including taxation at ordinary income rates and an interest charge) on any gain realized from a sale or other disposition of Restructuring Securities and on any "excess distributions" received from Lamington, regardless of whether Lamington qualifies as a PFIC in the year in which such distribution is received or gain is realized.  For this purpose, a pledge of Restructuring Securities as security for a loan may be treated as a disposition. The U.S. Holder would be treated as receiving an excess distribution in a taxable year to the extent that distributions on the Restructuring Securities during that year exceed 125% of the average amount of distributions received during the three preceding taxable years (or, if shorter, the U.S. Holder's holding period).  To compute the tax on excess distributions or on any gain, (i) the excess distribution or gain would be allocated ratably over the U.S. Holder's holding period, (ii) the amount allocated to the current taxable year and any year before the first taxable year for which Lamington was a PFIC would be taxed as ordinary income in the current year, and (iii) the amount allocated to other taxable years would be taxed at the highest applicable marginal rate in effect for each such year (*i.e.*, at ordinary income tax rates) and an interest charge would be imposed to recover the deemed benefit from the deferred payment of the tax attributable to each such prior year.

If Lamington were to be treated as a PFIC, a U.S. Holder may avoid the excess distribution rules described above by electing to treat Lamington (for the first taxable year in which the U.S. Holder owns any Restructuring Securities) and any lower-tier PFIC (for the first taxable year in which the U.S. Holder is treated as owning an equity interest in such lower-tier PFIC) as a QEF.  If a U.S. Holder makes an effective QEF election with respect to Lamington (and any lower-tier PFIC), the U.S. Holder will be required to include in gross income each year, whether or not Lamington makes distributions, as capital gains, such U.S. Holder's pro rata share of Lamington's (and such lower-tier PFIC's) net capital gains and, as ordinary income, such U.S. Holder's pro rata share of Lamington's (and such lower-tier PFIC's) net earnings in excess of its net capital gains.  U.S. Holders can make a QEF election only if Lamington (and each lower-tier PFIC) provide certain information, including the amount of its ordinary earnings and net capital gains determined under U.S. tax principles.  Lamington will make commercially reasonable efforts to provide U.S. Holders with this information if we determine that Lamington is a PFIC.

The applicability of the PFIC rules described above is unclear with respect to unvested warrants; however, a U.S. Holder may not make a QEF election with respect to any warrants (vested or unvested) it may hold to acquire equity securities of Lamington.  As a result, if a U.S. Holder sells or otherwise disposes of such warrants (other than upon exercise of such warrants) and Lamington was a PFIC at any time during the U.S. Holder's holding period of such warrants, any gain recognized generally will be treated as an excess distribution, taxed as described above. If a U.S. Holder that exercises such warrants properly makes a QEF election with respect to the newly acquired Restructuring Securities (or has previously made a QEF election with respect to Restructuring Securities), the QEF election will apply to the newly acquired Restructuring Securities.  Notwithstanding any such QEF election, the adverse tax consequences relating to PFIC shares, adjusted to take into account the current income inclusions resulting from the QEF election, will continue to apply with respect to such newly acquired Restructuring Securities (which generally will be deemed to have a holding period for purposes of the PFIC rules that includes the period the U.S. Holder held the warrants), unless the U.S. Holder makes a purging election under the PFIC rules.  Under the purging election, the U.S. Holder will be deemed to

have sold such Restructuring Securities at their fair market value and any gain recognized on such deemed sale will be treated as an excess distribution, as described above.  As a result of the purging election, the U.S. Holder will have a new basis and holding period in the Restructuring Securities acquired upon the exercise of the warrants for purposes of the PFIC rules.  U.S. Holders should consult their tax advisors regarding the U.S. federal income tax consequences of the PFIC rules with respect to their warrants to acquire equity securities of Lamington.

Although a U.S. Holder normally is not permitted to make a retroactive QEF election, a retroactive election (a "retroactive QEF election") may be made for a taxable year of the U.S. Holder (the "retroactive election year") if the U.S. Holder (i) reasonably believed that, as of the date the QEF election was due, the foreign corporation was not a PFIC for its taxable year that ended during the retroactive election year; and (ii) to the extent provided for in applicable Treasury Regulations, filed a protective statement with respect to the foreign corporation, applicable to the retroactive election year, in which the U.S. Holder described the basis for its reasonable belief and extended the period of limitation on the assessment of taxes for all taxable years of the shareholder to which the protective statement applies. If required to be filed to preserve the U.S. Holder's ability to make a retroactive QEF election, the protective statement must be filed by the due date of the investor's return (including extensions) for the first taxable year to which the statement is to apply. U.S. Holders should consult their own tax advisors regarding the advisability of filing a protective statement.

As an alternative to making a QEF election, a U.S. Holder may also be able to avoid some of the adverse U.S. tax consequences of PFIC status by making an election to mark the Restructuring Securities to market annually if the Restructuring Securities are treated as "regularly traded" on a "qualified exchange or other market," as provided in applicable Treasury Regulations.  A U.S. Holder making such election generally would recognize as ordinary income or loss each year an amount equal to the difference between the U.S. Holder's adjusted tax basis in such Restructuring Securities and their fair market value. Losses would be allowed only to the extent of net mark-to-market gain previously included by the U.S. Holder under the election in previous taxable years. It is unclear whether the Vienna Stock Exchange constitutes or will constitute a "qualified exchange or other market," and we can provide no assurance that the Restructuring Securities are or will be in the future eligible for the mark-to-market election.

U.S. Holders should consult their tax advisors regarding the U.S. federal income tax consequences of the PFIC rules. If Lamington is treated as a PFIC, each U.S. Holder generally will be required to file a separate annual information return with the IRS with respect to Lamington and any lower-tier PFICs.

(b)    Controlled Foreign Corporation Rules

The treatment of U.S. Holders could be materially different from that described above, if Lamington is treated as a controlled foreign corporation ("CFC") for U.S. federal income tax purposes.

A non-U.S. corporation, such as Lamington, will generally be classified as a CFC if more than 50% of its securities treated as stock for U.S. federal income tax purposes, measured by reference to voting power or value, are owned (directly, indirectly or by attribution) by "10% U.S. Shareholders."  For this purpose, a "10% U.S. Shareholder" is any U.S. Person that owns directly, indirectly or by attribution, 10% or more (by vote or value) of the securities of a non-U.S. corporation treated as stock for U.S. federal income tax purposes.  Prior to the Restructuring, Lamington is a CFC as it is indirectly owned 100% by the Debtor, a U.S. corporation.

If Lamington were to be classified as a CFC after the Restructuring, a U.S. Holder that is a 10% U.S. Shareholder may be subject to U.S. federal income taxation at ordinary income tax rates on all or a portion of Lamington's undistributed earnings and profits attributable to such U.S. Holder's Lamington Stock (including Restructuring Securities) even if Lamington has made no distributions to such U.S. Holder, including "Subpart F income," global intangible low-taxed income and certain other income generated by Lamington, and may also be subject to U.S. federal income taxation at ordinary income tax rates on any gain realized on a sale of such U.S. Holder's Lamington Stock (including Restructuring Securities), to the extent of the current and accumulated earnings and profits of Lamington attributable to such Lamington Stock. The degree of the impact of Lamington becoming a CFC (or remaining a CFC if the Restructuring is not consummated and Lamington remains a wholly-owned subsidiary of the Debtor) is subject to changes in U.S. federal income tax laws.

It is not expected that Lamington will be classified as a CFC immediately after the Restructuring, which shall result in U.S. Holders directly owning Lamington Stock (instead of through the Debtor, a U.S. corporation). In order to reduce the risk of Lamington being classified as a CFC, language is intended to be added to Lamington's organizational documents, as well as to the New Indenture Documents and the Grantor Trust Agreement, to provide that no purchase, sale, exercise, conversion, redemption, or other transfer or disposition of Restructuring Securities shall be effective to the extent it would result in Lamington being classified as a CFC for U.S. federal income tax purposes. These provisions may have the effect of reducing the ability of holders of the Restructuring Securities to liquidate their investment in such securities by limiting, to some degree, the potential purchasers of such securities and the ability of Lamington to redeem such securities. These provisions may also have the effect of reducing the ability of holders of certain of the Restructuring Securities to exercise certain conversion features thereof. The remainder of this discussion assumes that Lamington will not be classified as a CFC for U.S. federal income tax purposes but no assurances can be offered in this regard. The CFC rules are complex and, among other items, recent changes to the attribution rules relating to the determination of CFC status, as well as the publicly traded nature of certain of the Restructuring Securities, may make it difficult to determine Lamington's CFC status after the Restructuring. U.S. Holders that are, or may be, 10% U.S. Shareholders of Lamington are urged to consult their own tax advisors regarding the possible application of the CFC rules to them in their particular circumstances.

## F.     TAX CONSEQUENCES FOR A NON-U.S. HOLDER OF HOLDING RESTRUCTURING SECURITIES

In general, a Non-U.S. holder of Restructuring Securities will not be subject to U.S. federal income tax or, subject to the discussion below under "Information Reporting and Backup Withholding," U.S. federal withholding tax on any dividends received on Restructuring Securities or any gain recognized on a sale or other disposition of Restructuring Securities (including, any distribution to the extent it exceeds the adjusted basis in the Non-U.S. Holder's Restructuring Securities) unless: (A) the dividend or gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States, and if required by an applicable tax treaty, is attributable to a permanent establishment maintained by the Non-U.S. Holder in the United States; or (B) in the case of gain only, the Non-U.S. Holder is a nonresident alien individual present in the United States for 183 days or more during the taxable year of the sale or disposition, and certain other requirements are met.

Except to the extent otherwise provided under an applicable income tax treaty, a non-U.S. Holder generally will be taxed in the same manner as a U.S. Holder on dividends paid and gains recognized that are effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States. Effectively connected dividends received and gains recognized by

a corporate Non-U.S. Holder may also, under certain circumstances, be subject to an additional "branch profits tax" at a 30% rate (or, if applicable, a lower treaty rate), subject to certain adjustments.

## G.    FATCA

The United States Foreign Account Tax Compliance Act, or FATCA, imposes a reporting regime and, potentially, a 30% withholding tax on certain payments made to certain non-US financial institutions that fail to comply with certain information reporting, account identification, withholding, certification and other FATCA related requirements in respect of their direct and indirect United States shareholders and/or United States accountholders.  To avoid becoming subject to FATCA withholding, we may be required to report information to the IRS regarding the holders of Restructuring Securities and to withhold on a portion of payments with respect to Restructuring Securities to certain Holders that fail to comply with the relevant information reporting requirements (or that hold Restructuring Securities directly or indirectly through certain non-compliant intermediaries).  This withholding tax made with respect to Restructuring Securities will not apply to payments made before the date that is two years after the date of publication of final regulations defining the term "foreign passthru payment".  An intergovernmental agreement between the United States and another country may also modify these requirements.  FATCA is particularly complex and its application is uncertain at this time. Holders of Restructuring Securities should consult their tax advisors to obtain a more detailed explanation of FATCA and to learn how FATCA might affect each Holder in its particular circumstances.

## H.    INFORMATION REPORTING AND BACKUP WITHHOLDING

### 1.    Information Reporting

In general, information reporting requirements may apply to payments made with respect to the Restructuring Securities and to the proceeds of a disposition thereof received by a U.S. Holder or, depending on the circumstances, by a Non-U.S. Holder, regardless of whether withholding was required.  Copies of the information returns reporting such payments and withholding, if any, may also be made available to the tax authorities in the country in which a Non-U.S. Holder resides under the provisions of an applicable treaty.

The Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.

### 2.    Backup Withholding

In the case of a U.S. Holder, backup withholding of taxes will generally apply to payments in respect of an Allowed Claim under the Plan, payments in respect of the Restructuring Securities, and the proceeds of a disposition of the Restructuring Securities, unless such U.S. Person provides a properly executed IRS Form W-9 to the applicable withholding agent.

In the case of a Non-U.S. Holder, backup withholding of taxes will generally apply to payments in respect of an Allowed Claim under the Plan, and depending on the circumstances may apply to payments in respect of the Restructuring Securities and the proceeds received from a disposition of Restructuring Securities, unless in each case such Non-U.S. Holder provides a

properly executed applicable IRS Form W-8 to the applicable withholding agent (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption).

Holders should consult their own tax advisors regarding application of the backup withholding rules to their particular circumstances and the availability of and procedure for obtaining an exemption from backup withholding.  U.S. backup withholding tax is not an additional tax.  Any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against a Holder's U.S. federal income tax liability provided the required information is timely furnished to the IRS.

## I.    GENERAL DISCLAIMER

THE FOREGOING U.S. FEDERAL INCOME TAX SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY.  THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

**ARTICLE VIII.**
**RECOMMENDATION**

In the opinion of the Debtor, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtor's creditors and interest holders than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Equity Interests than that which is proposed under the Plan.  Accordingly, the Debtor recommends that all Holders of Senior Secured Notes Claims, Convertible Unsecured Notes Claims, and Equity Interests in the Debtor support confirmation of the Plan and vote to accept the Plan.

*[Remainder of Page Intentionally Blank]*

Dated:  November 13, 2020

Respectfully submitted,

*/s/ Miriam Martinez*
Miriam Martinez
Chief Financial Officer
EMERGENT CAPITAL, INC.

**FILED BY**:

PACHULSKI STANG ZIEHL & JONES LLP

 */s/ Colin R. Robinson*
Richard M. Pachulski (CA Bar No. 62337)
Maxim B. Litvak (CA Bar No. 215852)
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:      rpachulski@pszjlaw.com
                 mlitvak@pszjlaw.com
                 crobinson@pszjlaw.com

Counsel for Emergent Capital, Inc.,
Debtor and Debtor-in-Possession

**[Signature page to Disclosure Statement for
Debtor Emergent Capital, Inc.'s First Amended Chapter 11 Plan of Reorganization]**