**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| RED REEF ALTERATIVE INVESTMENTS, | ) | |
| and EMERGENT CAPITAL, INC., | ) | Case No. 20-12602 (BLS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ——————————————————— | ) | |
| | ) | |
| In re: | ) | |
| | ) | |
| IMPERIAL PREMIUM FINANCE, LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Case No. 20-12694 (BLS) |
| ——————————————————— | ) | |

**RESPONSE IN OPPOSITION TO DEBTORS' MOTION TO**
**ESTIMATE POHL LITIGATION CLAIMS FOR DISTRIBUTION PURPOSES**

Allan J. Pohl ("Allan"), individually, as Representative of Phyllis Pohl, and as Trustee of the Phyllis Pohl Irrevocable Trust, and Kimberly Seris ("Kimberly" and together with Allan, "the Pohls"), creditors and parties in interest these cases, by and through their undersigned counsel, respectfully submit their Response in Opposition to the Motion to Estimate Pohl Litigation Claims ("Motion") by Debtors Emergent Capital, Inc. ("Emergent") and Imperial Premium Finance, LLC ("Imperial" and together with Emergent, the "Debtors").

**INTRODUCTION**

1.      The Pohls, who are the only unsecured creditors in this case, are the victims of the Debtors' fraudulent life insurance premium financing scheme that was the subject of a criminal investigation in 2011 by the United States Attorney's Office, and an April 2012 Non-Prosecution Agreement in which the Debtors admitted engaging in the very same criminal conduct underlying the Pohl's claims in this case.  The Debtors have now filed what otherwise purports to be a pre-packaged Chapter 11 case, in order to create a vehicle to bring the Motion in a transparent attempt

to evade a full and fair jury trial on the merits of the Pohls' well-founded claims for fraud, civil conspiracy, declaratory judgment and related relief against Debtors that has been pending in the Palm Beach County, Florida circuit court since January 2019.

2.      As the Pohls will demonstrate and as discussed more fully below, in furtherance of their unlawful and fraudulent scheme, Emergent and Imperial: (a) falsely represented to the Pohls that Imperial would loan funds to pay the premiums due on Lincoln Benefit Life Company Policy No. 01N1364514, insuring the life of Phyllis Pohl with a face amount of $9 million (the "Pohl Policy"), until Mrs. Pohl passed and the death benefit was paid to the Pohl Trust, at which time Imperial's loan and interest would repaid from the Policy's death benefit with the remainder to be paid to Allan and Kimberly as the intended beneficiaries;  (b) caused the submission of a false and inaccurate Premium Funding Intent Form to Lincoln Benefit that intentionally concealed Imperial's premium financing arrangement with the Pohl family; (c) concealed that Imperial was not licensed in Florida to act as premium finance company, thus rendering the loan documents and loan arrangement unlawful and void *ab initio*; (d) caused the formation of the Pohl Trust and appointed, compensated, controlled and directed the trustees of the Pohl Trust to facilitate Defendants' fraudulent scheme to and misappropriate the Pohl Policy; and (e) obtained and utilized a fraudulent release to thereafter improperly acquire ownership of the Policy.

3.      As shown below and as will be thoroughly demonstrated at the December 17, 2020 hearing, the Motion should be denied.  As a matter of law, the Pohls' claims should be realistically and fairly estimated at the very least in the amount of $9,000,000.00, *i.e.*, the face amount of the policy misappropriated by the Debtors through their admitted fraud, civil conspiracy and other serious misconduct.

## THE POHL STATE COURT LITIGATION CLAIMS

4.      In January of 2019, the Pohls commenced an action in the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida, currently styled *Allan J. Pohl, Individually, as Trustee of the Phyllis Pohl Irrevocable Trust, and as Representative for Phyllis Pohl, and Kimberly Sheris v. Lincoln Benefit Life Company, Wilmington Trust National Association, Imperial Premium Finance, LLC, Ernest Madera and Emergent Capital*, Case No. 2019-CA-000521 Case No. 50-2019-CA-000521-XXXX-MB action (the "Pohl State Court Litigation"). The Pohls seek a declaration of their ownership rights to the $9 million Pohl Policy as well as damages they sustained as a consequence of the Debtors' intentional *fraud* and related misconduct (the "Pohl Litigation Claims"). A true and authentic copy of the Pohl's operative Second Amended Complaint is attached to the Declaration of Miriam Martinez in support of Debtors' Motion to Estimate. Emergent and Imperial Premium are the primary defendants in the State Court Action, along with their securities intermediary Wilmington Trust National Association.

5.      Significantly, Wilmington Trust – which is *not* a debtor in these cases  – holds legal title to the Pohl Policy. Count I of the Pohls' Second Amended Complaint in the State Court Litigation seeks a judicial declaration that the Pohl Trust is the sole owner of the Pohl Policy, and that all claims and rights asserted by Wilmington Trust to the return of premiums paid towards the Policy are barred as a result of Debtors' unclean hands and indisputable violation of Florida's licensure laws relating to premium finance companies. This claim alone warrants denial of the Motion, since regardless of how the Pohls' claims are valued for estimation and distribution purposes in these cases, they still have a pending claim for a declaratory judgment against Wilmington Trust pursuant to which the Pohls fully anticipate acquiring legal title to and

ownership of the $9 million Pohl Policy.

6.        The Pohls' Second Amended Complaint also asserts claims against the Debtors for unjust enrichment (Count II); equitable estoppel (Count IV); promissory estoppel (Count V); fraudulent inducement (Count VI); fraudulent misrepresentation and omissions (Count VII); common law fraud (Count VIII); breach of fiduciary duty (Count X); intentional infliction of emotional distress (Count XI); civil conspiracy (Count XII); and vicarious liability (Count XIV).

7.        The Pohls' State Court Litigation Claims are not merely tort claims, but rather claims grounded upon Emergent and Imperial's fraud, civil conspiracy and other inequitable misconduct.   At present, the Pohl State Court Litigation is awaiting a trial setting from the trial court judge while the parties seek to complete discovery, all of which have been placed in limbo as a result of the Debtors' filing of their Petitions for Relief.

## STATEMENT OF MATERIAL FACTS

8.        Emergent (formally known as Imperial Holdings, LLC and Imperial Holdings, Inc.) is a Florida corporation.  Emergent is and has always been the sole managing member of Imperial, a Florida limited liability company.  At all material times, Emergent controlled and directed the operations and activities of Imperial.  *See* December 7, 2020 Deposition of Miriam Martinez ("Martinez Dep."); *see also* Emergent's organization chart reflecting its affiliated and wholly owned subsidiaries, a true and authentic copy of which is designated as **Exhibit 1**.[1]

9.        During the period 2007-2010, Jonathan Neuman served as the President of both Emergent and Imperial, and he executed all corporate filings on behalf of Imperial in his capacity as an officer of its managing member, Emergent.  *See* Martinez Dep.

---

[1]  In connection with this Response, the Pohls are submitting a Notice of Filing Exhibits for ease of reference.

10.     At all material times during the period 2007 to 2011, Emergent and Imperial maintained their principal place of business at 701 Park of Commerce Blvd., Ste. 301, Boca Raton, Florida ("Debtors' Headquarters").    Martinez Dep.    All of the premium financing operations and activities conducted by Emergent and Imperial took place at, and originated from, the Debtors' Headquarters.   All of the employees of the Debtors' affiliate (Imperial Trading and Finance, LLC) which provided services and acted at the direction and instruction of Imperial were physically present at and worked out of the Debtors Headquarters in South Florida.  *See* Martinez Dep.

11.     Imperial engaged in the business of premium financing involving Florida citizens during the period 2007-2011.  *See* Martinez Dep.

12.     Phyllis Pohl and her late husband, Harvey Pohl ("Harvey" or "Mr. Pohl") were married to each other for over forty years.  After raising their children, Allan and Kimberly, and concluding successful careers in New York as an educator and accountant, respectively, Mr. and Mrs. Pohl retired to Palm Beach County in 1999.  *See* Declaration of Allan Pohl In Opposition to Motion to Estimate ("Pohl Dec."), a true and authentic copy of which is designated as **Exhibit 2**.

13.     Harvey was diagnosed with Parkinson's disease and in failing health in 2007. As part of their estate and tax planning, Mr. and Mrs. Pohl desired to leave a legacy and inheritance for Allan and Kimberly.  At that time, Mr. and Mrs. Pohl were referred by a friend to Ernest Madera ("Madera"), an insurance agent, and Wealth Modes, LLC ("Wealth Modes"), an insurance agency, to apply for and purchase a life insurance policy from Lincoln Benefit in the face amount of $9,000,000 that would be funded with a premium finance loan.  *See* Pohl Dec.; *see also* Declaration of Kimberly Sheris In Opposition to Motion to Estimate ("Sheris Dec."), a true and authentic copy of which is designated as **Exhibit 3**.

14.    Mr. Madera represented to Mr. Pohl  that the way the program worked was that the lender, Imperial, would loan the monies required to  payments until Mrs. Pohl's passing, that the loans and interest due to Imperial would be paid back and satisfied from the policy's death benefit, and that Mr. and Mrs. Pohl's children, Allan and Kimberly, would be the beneficiaries and split the remaining death benefit minus the loans and interest.  *See* Pohl Dec; Sheris Dec.; *see also* January 29, 2019 Deposition of Allan Pohl ("Pohl Dep."); December 9, 2020 Deposition of Kimberly Sheris ("Sheris Dep.").

15.    Mr. and Mrs. Pohl were extremely excited about the insurance policy and informed their children about their intent to leave them a substantial life insurance benefit as part of their estate and tax planning.  Mr. Pohl informed both Allan and Kimberly that it was his and Mrs. Pohl's intent and plan to purchase a large life insurance policy ensuring Mrs. Pohls life, that premiums would be paid with a loan from Imperial, and that upon Mrs. Pohl's passing, Allan and Kimberly would receive and share the remaining death benefit proceeds from the policy 50-50% after the loans were paid back.  *See* Pohl Dec; Sheris Dec.

16.    On or about June 21, 2007, Mrs. Pohl signed and submitted an application for life insurance to Lincoln Benefit.  Unlike many insureds involved in the Debtors' premium business, the Pohls did not apply for or purchase the Pohl Policy in exchange for a fee from Imperial or with any intend to profit from the future sale of the policy in the secondary market.  Rather, Mr. and Mrs. Pohl had an insurable interest in the Pohl Policy at all times and purchased the policy for estate and tax planning purposes with the full intent and desire to leave a substantial death benefit for their children.  *See* Pohl Dec; Sheris Dec.

17.    In connection with the purchase and financing of the life insurance policy,

Imperial prepared a trust instrument and caused Mrs. Pohl to create the Pohl Trust to serve as the owner and intended beneficiary of the insurance policy.  *See* December 17, 2007 letter to Allan Pohl from Wealth Modes, a true and authentic copy of which is designated as **Exhibit 4**.  Allan and Kimberly were named as the beneficiaries of the Pohl Trust and would inherit the insurance policy's death benefit upon Mrs. Pohl's passing.  Imperial also directed and caused the appointment of Thomas  Mahoney, Jr. as the original trustee of the Pohl Trust.  At all materials times, *Imperial controlled and directed the actions and inactions of the trustees of the Pohl Trust utilizing powers of attorneys contained in its financing documents*.  *See* Pohl Dec.

18.    On or about December 19, 2007, the Pohl Trust was executed, however, it was back-dated to be effective on June 7, 2007 to create the appearance that premium financing was not being utilized to purchase the insurance policy.

19.    Imperial also required Mrs. Pohl to send letters to her friends requiring that they notify Imperial in the event of her passing, in which Mrs. Pohl stated her intent was to "buy an insurance policy with me as the insured by [Imperial] lending [her] money to pay the premium on the Policy."  *See* Phyllis Pohl's Notification Letters, true and authentic copies of which are designated as composite **Exhibit 5**.

20.    In furtherance of the application for the Pohl Policy and the Pohl premium financing loan, Imperial entered into a "Brokers Rights of Agent" with Madera, which was executed by Imperial's President Jonathan Neuman.  In relevant part, this agreement evidences that Madera was acting as Imperial's agent and that the Pohl Policy was being purchased or financed with the assistance of Madera with financing being provided by Imperial.  A true and authentic copy of the Brokers Rights of Agent is designated as **Exhibit 6**.

21.    At the same time, Imperial caused its affiliate, Imperial Life & Annuity Services,

LLC, to execute a "Single Case Agreement" with Madera wherein the parties agreed to a split of the commissions generated by the purchase of the Pohl Policy.  A true and authentic copy of the Single Case Agreement is attached as **Exhibit 7**.

22.     At all material times, Madera was acting as an agent and on behalf of Imperial in connection with the purchase and financing of the Pohl Policy.  *See* Martinez Dep.

23.     Significantly, Imperial directed and caused its agent Madera to execute and submit a "Premium Funding Intent Form" ("Intent Form") to Lincoln Benefit in connection with the Pohl applications.  A true and authentic copy of the Intent Form is designated as **Exhibit 8**; *see* December 2, 2020 Deposition of Ernest Madera ("Madera Dep.") (admitting that his signature on the Intent Form is authentic and that he submitted the form to Lincoln Benefit).

24.     In relevant part, Question 4 of the Intent Form asks "if the source for premium payments will be premium financing," to which Madera *falsely* stated **"N/A"** and failed to complete the relevant section.  Question 4(b) of the Intent Form further asked "Do the loan terms allow transfer of ownership of this policy as an alternative to continuing the loan in the future," and Madera failed to accurately or truthfully answer this question affirmatively.  Similarly, Question 5 asked "[w]ill a collateral assignment be placed on this policy?" and "[a]re any funds other than your own being used to pay the premiums for the applied for life insurance"? Madera once again falsely answered "no" to each of these questions.  *See* **Exhibit 8**.

25.     Imperial and its agent Madera knew at the time the Intent Form was submitted that these representations were false, as Imperial and Madera knew from the inception of their dealings with the Pohls that they were seeking premium financing.  Imperial and its agent Madera further knew that the loan documents prepared exclusively by Imperial evidenced that the source for premium payments for the Pohl Policy would be premium financing; that the loan terms

allowed for the transfer of ownership of the Pohl Policy as an alternative to continuing the loan in the future;" that a collateral assignment would be placed on the policy; and that funds other than the Pohl Trusts would be used to pay the premiums for the policy.

26.    Conversely, Phyllis Pohl, a 72- year retired school teacher with no experience or understanding of insurance applications, relied upon Madera and the trustee to truthfully and accurately complete the Premium Funding Intent Form. She had no knowledge or understanding of the false statements contained on the Intent Form.

27.    On January 7, 2008, Lincoln Benefit Lincoln Benefit approved and issued a life insurance policy with a face amount of $9 million, Policy No. 01N1364514 ("the Pohl Policy"), with Mrs. Pohl as the insured and the Pohl Trust as the owner of the Policy.  A true and correct copy of the Pohl Policy is attached to the Pohls' Second Amended Complaint, which is attached as Exhibit A to the Declaration of Miriam Martinez in support of Debtors' Motion ("Martinez Dec.").

28.    At the time the application for the Policy was signed and at the time the Policy was issued, Mrs. Pohl, the Pohl Trust and the Trust's beneficiaries (Allan and Kimberly) had valid insurable interests in the life of Phyllis Pohl.  Mrs. Pohl and the Pohl Trust applied for and procured the Policy in good faith for estate planning purposes.  *See* Pohl Dec.

29.    During the period January 2007 to April 2011, Mrs. Pohl and her husband Harvey Pohl had a net worth consisting of investment accounts, retirement and pension plans, real estate and other assets in excess of $5,000,000.00.  *See* Pohl Dec.; see also Declaration of Salvatore Romano, a true and authentic copy of which is designated as **Exhibit 9**.

30.    Harvey Pohl passed away in April 2011.  *See* Pohl Dec.

31.    During the period April 2011 to the present date, Mrs. Pohl has maintained a net

worth consisting of investment accounts, retirement and pension plans, real estate and other assets in excess of $5,000,000.00. In fact, as of December 2020, Mrs. Pohl's net worth exceeds $9,000,000.00. *See* Pohl Dec.

32.     Mr. and Mrs. Pohl paid the Lincoln Benefit invoice for the initial premium on the Pohl Policy from their personal funds, which was required in order to place the Policy in force. On January 18, 2008, the Pohls issued a check payable to Lincoln Benefit Life for the Pohl Policy in the sum of $66,384.05. A true and authentic copy of the invoice is designated as **Exhibit 10**; a true and authentic copy of the Pohls' check is designated as **Exhibit 11**.

33.     On March 11, 2008, the day before the financing arrangement closed, Imperial caused the Pohl Trust to be restated and amended as a Utah trust because Imperial was not licensed in Florida as a premium financing company. As such, Imperial caused the restatement of the Pohl Trust and addition of another trustee, the Bank of Utah, in an attempt to evade and circumvent the licensure requirements of the State of Florida. A true and authentic copy of the Amended and Restated Trust is designated as **Exhibit 12**.

34.     On March 12, 2008, Imperial caused its affiliate Imperial Finance and Trading, LLC to issue a Premium Finance Funding Form, a true and authentic copy of which is designated as **Exhibit 13**. In relevant part, the Funding Form authorized the loans for the purchase of the Pohl Policy and evidences that Mahoney was the trustee *appointed by Imperial*, that Wealth Modes was the "Deal Source," that Madera was the agent, and that Jim Purdy was the Imperial Account Executive assigned to the Pohl Policy. The Funding Form further reflects that Imperial was to be paid a $110,684.83 "origination fee", that the Pohl's contribution as the insured was $5,000.00, and that the net commission payable to Imperial was $110,041.07. Jonathan Neuman was one of the officers of Imperial who signed and approved the Funding Form.

35.    In or about March 12, 2008, Imperial acted and engaged as a premium finance company by entering into numerous financing agreements with the Pohl Trust and/or the Pohl family, including a Loan Application and Agreement, Promissory Note, Guaranty and Loan Agreement.  Each of these documents was executed by Jonathan Neuman as the President of Imperial.  *See* Martinez Dec., Exhibits B through E.

36.    Imperial was not licensed as an insurance premium financing company at the time of this transaction as required by Fla. Stat. § 627.828.  *See* Martinez Dep.  Emergent's 2011 Form 10K, however, acknowledged and represented as follows:

**Regulation - Premium Financing Transactions**

The making, enforcement and collection of premium finance loans is subject to extensive regulation. These regulations vary widely, ***but often require that premium finance lenders be licensed by the applicable jurisdiction and that certain disclosures be made to insureds***, regulate the amount of late fees and finance charges that may be charged if a borrower is delinquent on its payments, and allow imposition of potentially significant penalties on lenders for violations of that jurisdiction's insurance premium finance laws. In connection with the Non-Prosecution Agreement, we are terminating our premium finance business and we anticipate that we will no longer be originating loans that are subject to these regulations.

*See* Emergent Form 10K (emphasis added), pg. 11, a true and authentic copy of which is designated as **Exhibit 14**.

37.    Imperial also required that the Pohl Trust execute an Assignment of Life Insurance Policy as Collateral, pursuant to which it assigned all of the Trust's interests and claims to Imperial as part of the premium financing transaction.   A true and authentic copy of the Assignment is designated as **Exhibit 15**.

38.    As the beneficiaries of the Pohl Trust, Imperial required that Allan and Kimberly execute a Security Agreement pledging their beneficiary interests in the Pohl Policy as collateral for Imperial's loans.   In relevant part, the Security Agreements that Imperial prepared and

required Allan and Kimberly appoint Imperial as their attorney-in-fact to execute any assignments, releases and other documents and agreements regarding ownership of the Pohl Policy, in clear violation of Fla. Stat. § 627.842. *See* Security Agreement, §9(b) and 10(h), a true and authentic copy of which is designated as **Exhibit 16**.

39.    Imperial never declared any default arising under the Security Agreement with Allan and Kimberly.  Imperial never declared a default by the Pohl Trust under the Loan Agreement or Promissory Note.  *See* Pohl Dec.

40.    While Allan and Kimberly executed various documents in their capacity as beneficiaries of the Pohl Trust, they did not execute Imperial's Loan Agreement or its Promissory Note with the Pohl Trust.  Allan and Kimberly were never provided with and never reviewed the Loan Agreement or Promissory Note, and thus had no knowledge regarding the true terms and conditions of the premium financing loan that was misrepresented to the Pohls by Emergent's agent, Madera.  *See* Pohl Dec; Sheris Dec.

41.    Imperial also required that the Pohl Trust execute another Power of Attorney in favor of its affiliated entity, Portfolio Financial Servicing Company, which authorized it to take any actions necessary for carrying out the financing arrangement and loan documents.  A true and authentic copy of the Limited Power of Attorney is designated as **Exhibit 17**.

42.    On January 19, 2009, Imperial executed an Insurance Premium Loan Sale and Assignment Agreement in which it "sells, transfers and assigns" to its wholly-owned affiliate, Imperial PFC Financing, LLC ("Imperial PFC") all of Imperial's right, title and interest in the financing agreements with the Pohl Trust.  The Loan Sale and Assignment Agreement was executed by Jonathan Neuman in his capacity as the President of Emergent as the managing member of both Imperial and Imperial PFC.  A true and authentic copy of the Loan Sale and

Assignment Agreement is designated as **Exhibit 18**.

43.    On or about March 19, 2010, Imperial caused the execution of a Release and Relinquishment Agreement ("Release"), pursuant to which the Pohls purportedly agreed to transfer ownership of the Pohl Policy to Imperial and relinquish any right or claim to the process of the Policy.  The Release was executed by Imperial Premium Finance, LLC, however, Imperial PFC is not a party to the Release.  As a consequence of the prior Loan Sale and Assignment Agreement, Imperial did not own the loans extended to the Pohl Trust to pay the premiums on the Pohl Policy at the time the Release was executed and had no claim or right to recover any portion of the loans arising under the Loan Agreement with the Trust and related financing documents.

44.    The alleged signatures of Allan Pohl, Kimberly Pohl and Harvey Pohl on the Release not their true or authentic signatures.  *See* Pohl Dec.; Pohl Dep; Sheris Dec.; Sheris Dep.

45.    Allan and Kimberly had no knowledge of the Release and had never seen it until it was produced by the Debtors in the State Court Litigation.  Allan and Kimberly never had any discussions or meetings with Emergent or Imperial relating to the Release; had no knowledge of, and never consented to, the alleged relinquishment of the Pohl Trust's ownership of the Pohl Policy or any of their rights as a beneficiary; and never consented or authorized the co-trustees of the Pohl Trust to execute and sign the Release or to consent to the Trust's relinquishment of its ownership of the Policy.  *Id.*

46.    Similarly, neither of the co-trustees, Thomas Mahoney and Bank of America, ever contacted or communicated with Allan or Kimberly regarding the Release or its execution.  Allan and Kimberly never authorized the co-trustees to agree to or execute the Release.  *Id.*

47.    On or about December 3, 2010, Imperial prepared, directed and/or caused Thomas Mahoney as trustee of the Pohl Trust to submit to Lincoln Benefit of a Change of Owner

Request and a Change of Beneficiary Request, naming Imperial PCF as the new owner and beneficiary of the Policy, thereby replacing the Pohl Trust as owner and terminating Allan and Kimberly as the beneficiaries of the Policy and its $9 million death benefit. True and authentic copies of the Change Forms is designated as **Exhibit 19**. The Pohls had no knowledge of, and did not consent to, the execution or submission of these Change Forms. The Pohls did not authorize the co-trustees of the Pohl Trust - Mr. Mahoney and Bank of Utah - to execute and sign the Change Forms and the Pohl Trust's trustees never contacted the Pohls to notify them of the Change Forms or to obtain their consent. *See* Pohl Dec.

48.    On or about February 26, 2013, Imperial caused its affiliate Imperial PFC to submit to Lincoln Benefit of a Change of Owner Request and a Change of Beneficiary Request, naming Wilmington Trust, N.A. as the new owner and beneficiary of the Pohl Policy. True and authentic copies of the Change Forms is designated as **Exhibit 20**. The Pohls had no knowledge of, and did not consent to, the execution or submission of these Change Forms. *See* Pohl Dec.

49.    On September 27, 2011, Emergent's Headquarters were raided by the FBI as part of investigation by the U.S. Attorney's Office for the District of New Hampshire in Emergent's premium finance loan business (the "USAO Investigation"). Emergent's President, Jonathan Neuman, and its National Sales Manager, James Purdy, were "targets" of the USAO Investigation. *See* Emergent December 31, 2011 Form 10K, pp. 1-2, a true and authentic copy of which is designated as **Exhibit 21**.

50.    On April 30, 2012, Emergent entered into a Non-Prosecution Agreement (the "NPA"), pursuant to which the USAO agreed not to criminally prosecute Emergent – or any of its present or former subsidiaries or affiliates, which necessarily included Imperial Premium Finance, LLC as the premium finance division of the company for any crimes (except for criminal tax

violations) related to Emergent's involvement in making, or aiding and abetting the making of, misrepresentations on life insurance applications in connection with its premium finance business from 2006 through 2011, including the specific conduct described in Appendix A to the NPA and potential securities fraud claims related to the premium finance business. A true and authentic copy of the Non-Prosecution Agreement is designated as **Exhibit 22**.

51.    As a material condition of the NPA, Emergent agreed to terminate its premium finance business; to terminate or accept the resignation of the senior officer and senior sales staff involved in the premium finance business and primarily responsible for the company's misconduct – which included specifically President Jonathan Neuman and National Sales Manager James Purdy; and to pay a monetary penalty of $8,000,000.00. Most significantly, Emergent admitted, accepted and acknowledged responsibility for misconduct set forth in Appendix A, and agreed not to make any public statement contradicting the findings. *Id.*

52.    As the USAO determined in the NPA, the stated terms of premium finance loans offered by Emergent typically required either a personal guaranty up to the full extent of the loan or a $5,000 cash contribution from the insured. In addition the loan agreements required that (1) the life insurance policy be held in an irrevocable life insurance trust, (2) a professional co-trustee be appointed and (3) the co-trustee be responsible for ensuring that premium payments were made from the proceeds of the loan. *See* NPA, Exhibit 21, Appendix A.

53.    In addition, as a condition to making premium finance loans on insurance policies, Imperial received agency fees that were calculated off of the commissions received by the life insurance agents who wrote the underlying policies. At the end of the loan transaction, in the instances where a loan was repaid by the borrower, Imperial also was paid a substantial origination fee and interest on the loan in addition to the outstanding principal. *Id.*

54.    From December 2006 to January 2009, Emergent's agents facilitated and/or made misrepresentations on applications that the prospective insured was *not* seeking premium financing when the insurance carrier was likely to deny the policy on the basis of premium financing.  Further, to the extent that Emergent's external agents caused misrepresentations to be made in life insurance applications from December 2006 to January 2009, Emergent failed to appropriately tailor controls to prevent potential fraudulent practices in this business.  In the course of the application process, Emergent and its external agents and brokers would mail, fax and/or email policy related forms in which Emergent facilitated and/or made misrepresentations regarding premium financing on life insurance applications for elderly individuals and failed to take appropriate precautions to prevent other misrepresentations that may have been made on the life insurance applications by employees, prospective insureds, and external agents and brokers.  *Id.*

55.    In connection with the NPA, the USAO also pursued criminal forfeiture proceedings against Jonathan Neuman and James Purdy.

56.    On or about December 31, 2015, a Verified Complaint for Forfeiture was filed against Neuman's interest in $5 million of his funds in the USAO's possession based on mail fraud committed by Neuman in violation of 18 U.S.C. § 1341,   A true and authentic copy of the Verified Complaint is designated as **Exhibit 23**.  The Verified Complaint mirrored the allegations and findings of the NPA against Emergent, including in relevant part, that:

- From late 2006 until late 2011, Jonathan Neuman was the president of Emergent headquartered in Boca Raton, Florida and that as president, Neuman ran Imperial's premium finance business;

- At Neuman's direction, Emergent's employees worked with external general agents and brokers ("deal sources") to apply for universal life insurance policies for individuals over 65 years of age from various insurance carriers which Emergent might finance;

- At Neuman's direction, Emergent's agents facilitated and/or made misrepresentations on insurance applications that the prospective insureds in the retail non-seminar business were not using premium financing to pay premiums when the insurance carrier was likely to deny the policy on the basis of premium financing; and

- Neuman profited from this fraudulent scheme by receiving compensation from Imperial in excess of $5,000,000.00.

*Id.*

57.    On January 8, 2016, a Final Order of Forfeiture was entered in which Neuman consented to the forfeiture of $5,000,000.00 for mail fraud in violation of 18 U.S.C. § 1341.  A true and authentic copy of the Final Order is designated as **Exhibit 24**.

58.    Also on December 31, 2015, a Verified Complaint for Forfeiture was filed against James Purdy's interest in $750,000 of his funds in the USAO's possession based on mail fraud committed by Purdy in violation of 18 U.S.C. § 1341.  A true and correct copy of the Verified Complaint is designated as **Exhibit 25**.  The Verified Complaint mirrored the allegations and findings of the NPA against Emergent, including in relevant part, that:

- From late 2006 until late 2011, James Purdy was an employee of Emergent headquartered in Boca Raton, Florida and that Purdy was an account executive in Emergent's premium finance business;

- Emergent's employees worked with external general agents and brokers ("deal sources") to apply for universal life insurance policies for individuals over 65 years of age from various insurance carriers which Emergent  might finance;

- Emergent's agents facilitated and/or made misrepresentations on insurance applications that the prospective insureds in the retail non-seminar business were not using premium financing to pay premiums when the insurance carrier was likely to deny the policy on the basis of premium financing; and

- Purdy profited from this fraudulent scheme by receiving compensation from Imperial in excess of $750,000.00.

*Id.*

59.    On January 8, 2016, a Final Order of Forfeiture was entered in which Purdy consented to

the forfeiture of $750,000.00 for mail fraud in violation of 18 U.S.C. § 1341. A true and authentic copy of the Final Order is designated as **Exhibit 26**.

**The Pohls Discovery The Debtors' Misconduct In 2016**

60.     The Pohls did not discover the Debtors' fraudulent and criminal misconduct, the misappropriation of the Pohl Policy or the resulting damages and injuries to the Pohls and the Pohl Trust until May 2016. *See* Pohl Dec; Sheris Dec. Following Phyllis Pohl's formal diagnosis of Alzheimer's in 2016, Kimberly visited her mother at her home in South Florida in May 2016 and discovered a letter in Phyllis' papers from a company named LexServ, which she subsequently learned was engaged by Imperial to periodically obtain and update Phyllis Pohl's contact and health information. Kimberly contacted LexServ to check on the status of the Pohl Policy and confirm that the Policy was in force and in good standing. She was shocked to discover for the first time that the Pohl Trust no longer owned the policy, that the Policy was held by a new owner (whose identity LexServ refused to disclose), and that the Pohl Trust was no longer named as the beneficiary of the Policy. A true and authentic copy of the LexServ letter is designated as **Exhibit 27**.

61.     On or about June 12, 2016, Allan Pohl sent a complaint letter to the Florida Department of Financial Services seeking assistance into Imperial's misappropriation of the Pohl Policy. A true and authentic copy of the complaint letter is designated as **Exhibit 28**.

62.     In February 2018, Lincoln Benefit Company filed an action in the Superior Court of the State of Delaware, in the action styled *Lincoln Benefit Life Company v. Wilmington Trust, N.A.*, Case No. N18C-02-168-MMJ-CCLD ("the Lincoln Benefit Action"), in which Lincoln Benefit asserted claims for declaratory relief that the Pohl Policy was procured by fraud and *void ab initio.*

63.    On May 22, 2019, Emergent and its affiliated White Eagle Asset Portfolio, L.P entered into a settlement with Lincoln Benefit and agreed to pay the insured the sum of ***$21.3 million*** in exchange for Lincoln Benefit's agreement not to contest the 55 life insurance policies (with death benefits totaling $39.1 million) owned by White Eagle, which included the Pohl Policy.  *See* Emergent SEC Form 10Q dated 2011, a true and authentic copy of which is designated as **Exhibit 29**.  The Pohls did not receive a single penny from Emergent in connection with the settlement with Lincoln Benefit.

## ARGUMENT

## I.    STATEMENT OF APPLICABLE LAW

Section 502(c) of the Bankruptcy Code provides in pertinent part that "[t]here shall be estimated for purpose of allowance under this section - (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. § 502(c).

### A.    The Pohl Litigation Claims Need To Be Assessed Realistically

Section 502(c) of the Bankruptcy Code serves two purposes.  First, it removes the necessity of waiting for pending lawsuits to resolve issues of liability and of amounts owed, by permitting anticipation, and corresponding estimation, of *likely* outcomes.  Second, and more importantly in the context of this case, it promotes fair distributions to creditors, by requiring that uncertain claims be *assessed realistically*.  *See Beaumont v. Durkay (In re Ford)*, 967 F.2d 1047, 1053 (5th Cir. 1992).

### B.    The Claim Estimation Procedure In This Case Should Utilize Live Testimony In Addition to Declaration and Deposition Testimony

Claim estimation is a pragmatic process.  *See In re Baldwin-United Corp.*, 55 B.R. 885,

898 (Bankr. S.D. Ohio 1985) ("[E]stimation does not require that a bankruptcy judge be clairvoyant. The court need only arrive at a reasonable estimate of the probable value of the claim . . . ."). In estimating a claim, a court should use whatever method is best suited to the circumstances and there is no requirement that a particular kind of procedure be employed in estimating the value of a claim." *See* Kool, Mann, Coffee & Co. v. Coffey, 300 F.3d 340, 356 (3d Cir. 2002); *In re Brints Cotton Marketing, Inc.*, 737 F.2d 1338, 1341 (5th Cir. 1984); *see also In re Armstrong World Indus., Inc.*, 348 B.R. 111, 123 (D. Del. 2006) ("The Code does not provide a roadmap for estimation. . . . The only requirement is that the value of the claim be determined in accordance with the legal rules that will govern the final amount of the claim, and there are no other limitations . . . save those general principles which should inform all decisions made pursuant to the Code.").

Moreover, courts have substantial discretion in making estimation determinations. *See Bittner v. Borne Chem. Co.*, 691 F.2d 134, 135 (3d Cir. 1982) (holding that estimation requires only "sufficient evidence on which to base a reasonable estimate of the claim"). While a court's methodology can be probabilistic, a court does not have to hew strictly to calculations of expected value. *In re Windsor Plumbing Supply Co.*, 170 B.R. 503, 521-22 (Bankr. E.D.N.Y. 1994) (advocating use of probabilities in estimation of claims rather than more simplistic all or nothing approach, and finding that "[t]he estimated value of a claim is then the amount of the claim diminished by the probability that it may be sustainable only in part or not at all.").

Bankruptcy courts thus have wide discretion in choosing the process for estimating a claim, including summary trials, a review of written submissions of proposed facts, and review of the pleadings and briefs. *See e.g., In re Lane*, 68 B.R. 609, 613 (Bankr. D. Hawaii 1986); *In re Zolner*, 173 629, 633 (Bankr. N.D. Ill. 1994) (estimation of union contract claims based upon

testimony and arguments, in addition to briefing and submission of affidavits); *In re Apex Oil Corp.*, 92 B.R. 843, 845  (Bankr. E.D. Mo. 1988) (applying summary trial brief on each claim subject to estimation).

In addition to the Court's consideration of this Response and the exhibits, declaration and deposition testimony relied upon herein, the Pohls respectfully submit that the Court should consider live testimony of a representative of the Pohls and a representative of the Debtors.  This will enable the Court to make determinations as to credibility. As is evident from the Debtors' behavior set forth above  which gave rise to and the nature of the Pohl Litigation Claims, such a determination is particularly relevant in this case.

### C.   The Court Can Use The Debtors' Motion To Estimate to Determine An Amount To Be Placed In A Reserve Fund

Although Bankruptcy Code section 502(c) provides that a court shall estimate claims for the purposes of "allowance," courts have routinely used the section for more-limited purposes, such as estimating amounts to be placed in reserve funds.  *See, e.g., In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 740 (Bankr. S.D.N.Y. 1992) (requiring that a trustee fund a claims reserve based on such amounts for disputed claims as the court would "estimate for reserve purposes").  The Court may wish to consider do this here, given the "compressed" nature of the hearing on the Motion.  To be sure, "[i]n enacting the Bankruptcy Code of 1978, Congress intended that all claims, including unliquidated and contingent claims, be 'dealt with' in the bankruptcy proceeding.  Further, it was intended that 'all claims against the debtor be converted into dollar amounts.'" *Addison v. Langston (In re Brints Cotton Mktg., Inc.)*, 737 F.2d 1338, 1340 (5th Cir. 1984) (citations omitted). In view of the facts set forth above, a claims reserve of $9,000,000.00 is appriate if the Court believes these Chapter 11 cases must otherwise be

confirmed before the end of this year, as the Debtors contend.

II. **THE POHLS LITIGATION CLAIMS ARE MERITORIOUS AND SHOULD BE REALISTICALLY VALUED AT NO LESS THAN $9,000,000.00**

A. **The Debtors Engaged In Common Law Fraud and Civil Conspiracy**

As a purely practical matter, the Court need look no further than the Pohls' claims for common law fraud and civil conspiracy vis-à-vis Emergent's April 30, 2012 Non-Prosecution Agreement in order to reject the Debtors' Motion to Estimate out of hand.

As part and parcel of the Non-Prosecution Agreement, Emergent acknowledged and agreed that it had engaged in the exact same fraudulent and criminal premium financing scheme to which the Pohl's fell victim, and Emergent is estopped by the terms of the Agreement from denying that it engaged in such a fraudulent scheme with respect to the Pohl Policy and the underlying financing arrangement.

Indeed, the execution of Debtors' scheme with respect to the Pohl Policy is self-evident. Imperial's agent and co-conspirator made misrepresentations to the Pohls to induce them to apply for the policy, while concealing that Imperial's program utilized a non-recourse loan with a short two-year maturity that would actually require the Pohls to either repay the loan with substantial interest and fees or face default and foreclose on the Policy. The Pohl Trust was established at the direction of Imperial to own the Pohl Policy and as a requirement of its premium financing scheme in order to obfuscate Imperial's involvement in the procurement of the Pohl Policy.

Imperial hand-picked, compensated and controlled Thomas Mahoney and Bank of Utah from its network of professional trustees to serve as the co-trustees of the Pohl Trust in order to enable Imperial to exert and maintain control over the Pohl Trust and thus the Pohl Trust. In truth, the co-trustees were not acting at the direction of, on behalf of or for the benefit of the Pohls, but

instead at the direction of Imperial and its agents.

Most significantly, Imperial directed and caused its agent Madera to execute and submit the Premium Funding Intent Form to Lincoln Benefit which intentionally misrepresented and concealed that the Pohl Policy's premiums would be paid with premium financing from Imperial; that Imperial's loan terms allowed transfer of ownership of this policy as an alternative to continuing the loan in the future; that a collateral assignment would be placed on the Pohl Policy; and that funds other than Phyliss Pohl's and the Pohl Trust's would be used to pay the premiums for the Policy.  *See* **Exhibit 8**.

The exact same fraudulent misrepresentations contained on the Premium Funding Intent Form for the Pohl Policy served as the cornerstone for the criminal conduct that Emergent admitted engaging in pursuant to the Non-Prosecution Agreement.  To be sure, Emergent's failure and refusal to acknowledge that it employed the same exact fraudulent scheme in connection with the Pohl Policy is nothing less than an outright repudiation and violation of the Non-Prosecution in which Emergent admitted, accepted and acknowledged responsibility for misconduct and agreed not to make any public statement contradicting the findings.

The Debtors' fraudulent insurance scheme to which the Pohls fell victim was also documented and confirmed by the Eleventh Circuit Court of Appeal in *Sciarretta v. Lincoln National Life Ins.,* 778 F.3d 1205 (11th Cir. 2015), a true and correct copy of which is attached as **Exhibit 30**.  In *Sciarretta,* the Eleventh Circuit upheld that district court's imposition of a *$850,000 monetary sanction* against Imperial based on the court's finding that the company had in bad faith prepared its corporate representative to selectively testify in order to further its interest and to "prevent Imperial from obtaining attorney's fees and costs from the party harmed by its inequitable conduct."  *Id.* at 1207, 1212.  In affirming the sanction, the

Eleventh Circuit made several critical findings regarding Imperial's fraudulent scheme, including

that:

- Imperial sought to evade state regulations requiring that the purchasers of insurance have an insurable interest in the insured's life (including specifically Fla. Stat. § 627.404(1) by drafting its loan agreements to require that during the term of the loan the policy be held in irrevocable trust with a trustee chosen by Imperial – *i.e.*, the exact same fraudulent device utilized by Imperial with respect to the Pohls. *Id.* at 1208;

- The "ticket to the jackpot" by which Imperial stood to collect hundreds of thousands or even millions of dollars upon the death of the insured was the clause in the loan agreements allowing it to foreclose on the policies in the event of default, which Imperial knew from the outset was quite likely given the loans' oppressive terms. *Id.*;

- Imperial's carefully designed scheme to get around the insurable interest laws did not keep it out of trouble, as Imperial "facilitated and/or made misrepresentations on applications that the prospective insured was not seeking premium financing" because it knew that disclosure of its financing arrangements would harm the chances of having a policy issued. *Id.* at 1209;

- Imperial's fraudulent behavior came to the attention of the United States Attorney for the District of New Hampshire, resulting in the April 2012 Non-Prosecution Agreement with Imperial discussed above. *Id.* at 1209; and

- Imperial was "the driving force behind the litigation" and was "at the heart of" the conspiracy that the jury found, and that to address that misconduct the district court tailored its sanction to "prevent[] Imperial from obtaining attorney's fees and costs from the party harmed by its inequitable conduct". *Id.* at 1214.

Suffice it to say these judicial findings preclude any attempt by the Debtors to disavow

their fraudulent and criminal misconduct with respect to the Pohl Trust and Pohl Policy, and give

rise to an overwhelming likelihood of success by the Pohl's on their Litigation Claims against

Debtors for common law fraud, civil conspiracy and declaratory relief reinstating the Pohl Trust

as the rightful owner of the Pohl Policy.

Madera's misrepresentations as Imperial's agent and co-conspirator also constitutes

constructive fraud under Florida law, since Madera owed the Pohls a fiduciary duty to honestly

advise them regarding the Pohl Policy and Imperial financing arrangement and he breached and abused that duty in order to take an improper advantage of his relationship at the Pohls' expense. *See, e.g., First Union Nat. Bank v. Turney*, 824 So. 2d 285 (Fla. 2002); *see also Winn & Lovett Grocery Co. v. Archer,* 171 So.2d 214, 219 (Fla. 1936) (noting that a "corporation is liable for all torts committed by its servants or agents the same as a natural person . . . for the acts of its agents done by its authority, express or implied").

Last but not least, the Pohls have asserted a valid claim for civil conspiracy against Emergent, pursuant to which it is jointly and severally liable for the underlying fraud and other misconduct committed by its co-conspirator Imperial and its agent Madera.  Under Florida law, a claim for civil conspiracy requires allegations of (1) each defendant's agreement with at least one other conspirator; (2) to commit unlawful acts or to use unlawful means; (3) through each defendant's commission of at least one overt act; and that (4) results in damages.  *Charles v. Fla. Foreclosure Placement Ctr.,* 988 So.2d 1157, 1159-60 (Fla. 3d DCA 2008).  Significantly, "[e]ach act done in pursuance of a conspiracy by one of several conspirators is an act for which each is jointly and severally liable".  *See Nicholson v. Kellin,* 481 So. 2d 931, 935 (Fla. 5th DCA 1985).

The evidence before the Court of the execution of Imperial's admittedly fraudulent and unlawful premium financing scheme directly in connection with the Pohl Policy is more than sufficient to impose co-conspirator liability upon Emergent.  In fact, the fingerprints of Jonathan Neuman and James Purdy – who were terminated as part of Emergent's Non-Prosecution Agreement and only evaded criminal prosecution individually by agreeing to forfeit $5 million and $750,000 of ill-gotten gains from the scheme, respectively –  are all over the Pohl Policy and Imperial premium financing arrangement underlying the Policy's purchase and funding.

B. **The Debtors Committed Fraudulent Misrepresentations and Fraudulent Inducement In Connection With the Pohl Policy**

It is likewise extremely likely that a jury would determine that Emergent and Imperial are liable for their fraudulent misrepresentations and omissions and fraudulent inducement of the Pohls in acquiring the Pohl Policy and entering into Imperial's illicit premium financing arrangement.

As established by Allan and Kimberly's deposition testimony and declarations, Imperial's agent and co-conspirator Ernest Madera materially misrepresented the terms and conditions of Imperial's financing program by representing to Harvey Pohl that Imperial would loan the monies required to pay the premiums until Mrs. Pohl's passing, that the loans and interest due to Imperial would be paid back and satisfied from the policy's death benefit, and that Mr. and Mrs. Pohl's children, Allan and Kimberly, would be the beneficiaries and split the remaining death benefit minus the loans and interest.

Allan testified explicitly as to this misrepresentation in his deposition by Emergent as follows:

> I remember he told me that he had to pay a big fee up front and then it was going to be -- he would make a payment and then they were going to pay the premium payments either like Imperial Financial or Wealth Modes Imperial Financial were going to make their premium payments. And then what happens is when the policy -- how he explained it to me was when the policy would come due upon my mother's demise, that the premium payments and the interest would be paid back -- I mean wouldn't be paid back, it would be taken out of the policy and then the remainder would go to my sister and I.

*See* Pohl Dep., pp. 15-16.

Kimberly similarly testified to the exact same conversation with her father Harvey Pohl when he stated his intent and plan to purchase the Pohl Policy with financing from Imperial, as

follows:

> Basically, my parents purchased a life insurance policy for my mother, and that was to be payable upon her death, and she had to undergo rigorous testing for it to qualify, and she did qualify, and the idea was that my parents would pay a certain amount of money up front, and then Imperial Financing would take over and pay the rest of the payments, and then my mother would – in the unhappy event of my mother passing away, my brother and I would receive the monies that were left from the policy, and we would be -- my brother and I would be splitting it 50/50, you know, the difference of the money once the loan had been paid back.

*See* Sheris Dep., pp.

In fact, at his recent deposition Madera explained Imperial's premium financing arrangement ***exactly*** as Harvey Pohl relayed his conversation with Madera, as follows:

> And basically in a nutshell you told a client that if you wanted to do premium finance and not use your premiums, not pay for the premiums, you can include that into the death benefit, borrow the money. ***And when you die the premiums are repaid through the death benefit***. And that's about as basic as it was.

Madera Dep., at 22:9-15 (emphasis added).[2]  In making these statements, Madera materially misrepresented the loan arrangement and concealed that the Imperial loan in fact matured within two years and further concealed that as part and parcel of its scheme Imperial would seek to foreclose upon the Pohl Policy.

These misrepresentations and omissions by Madera are admissible and binding upon Imperial and Emergent.  First, Madera's misrepresentation to Mr. Pohl constitutes an admission by an agent and co-conspirator of an opposing party in furtherance of the conspiracy, and thus does not constitute hearing pursuant to Federal Rule of Evidence 801(d).  Second, Harvey Pohl's statements to his children Allan and Kimberly relating to the financing of the Pohl Policy are subject to an exception to the hearsay rule arising under Federal Rule of Evidence 803(3), as the

---

[2]  At his deposition, Madera implausibly denied having ever met or spoken to Mr. and Mrs. Pohl despite the fact that he was the contracting agent-of-record for the Pohl Policy.  Madera's false, self-serving denials are not credible, as Harvey Pohl identified Madera as the agent and source of the misrepresentations concerning the policy.

statements plainly constitute a statement of Harvey Pohl's then-existing state of mind relating to his and Phyllis Pohl's intent and plan to acquire the Pohl Policy with premium financing provided by Imperial.

The Debtors' misrepresentations are also admissible under the residual hearsay exception set forth in Federal Rule of Evidence 807, which provides that a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or 804 where:

(1) the statement is supported by sufficient guarantees of trustworthiness – after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and

(2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

The proffered statements satisfy the requirements of Rule 807,[3] as there is evidence collaborating the statement sufficient to guarantee its trustworthiness and is more probative that other evidence the Pohls' can offer through reasonable efforts.[4]  Here, the testimony of Allan and Kimberly with respect to the misrepresentations made by Madera to their father is substantially identical.   Madera likewise testified to the substance of these misrepresentations relating to Imperial's premium financing program is a manner entirely consistent with the statements made to the Pohls by their father Harvey Pohl.

---

[3]  The Pohls have provided the Debtors with fair and adequate notice of their intent to rely upon this statement as required by Rule 807(b).

[4]  As noted, Harvey Pohl passed in April, 2020.  As a result of the progression of Phyllis Pohl's Alzheimer's Disease, she has been determined incompetent to testify at the present time and is therefore unavailable to independently collaborate these statements.

In addition, Phyllis Pohl sent to reference letters in which she expressed her intent to "buy an insurance policy with me as the insured by [Imperial] lending [her] money to pay the premium on the Policy." *See* **Exhibit 5** (which statement is independently admissible under Rule 801(d)). Mrs. Pohl's intent to purchase and hold the Pohl Policy through maturity is also reflected in her hand-written notes from February 2008, a mere month after the Policy was issued.

Moreover, Phyllis Pohl's plan and intent to acquire and hold the Pohl Policy through maturity with premium financing is further confirmed by her February 28, 2008 notes from a meeting with Mr. and Mrs. Pohl's financial advisors – held one month after the Pohl Policy was issued – in which Phyllis identified the $9 million Lincoln Benefit life insurance policy as part of her assets. A true and authentic copy of Phyllis Pohl's notes is designated as **Exhibit 30** to the Pohl Response.

### C.    The Loan Agreement and Ancillary Agreements – including the Release Agreement – Are Unlawful, Unenforceable and Void *Ab Initio*

The Debtors' reliance upon the Loan Application and Agreement between the Pohl Trust and Imperial and the subsequent Release Agreement – upon which all of Emergent's alleged rights to ownership of the Pohl Trust are grounded – is thoroughly unavailing.

As evidenced by the Loan Application and Agreement attached to its Motion to Estimate, Imperial Premium was engaged the business of premium financing from its Headquarters in Boca Raton, Florida in connection with the Pohl Policy. Indeed, Emergent's CFO and corporate representative Miriam Martinez conceded as much during her deposition. *See* Martinez Dep..

Section 627.828, Florida Statute ("License Required") explicitly provides that "[e]xcept as provided in ss. 627.901 and 627.902 [which do not apply], no person shall engage in the business of a premium finance company unless licensed by the office." In turn, Section 627.826 ("Premium

finance company" defined) provides that an "insurance premium finance company" is "[a] person engaged, in whole or in part, in the business of entering into premium finance agreements with insureds, or [a] person engaged, in whole or in part, in the business of acquiring premium finance agreements from other premium finance companies."   Similarly, Section 627.827 ("Premium finance agreement" defined"), a premium finance agreement "means a promissory note or other written agreement by which an insured promises or agrees to pay to, or to the order of, a premium finance company the amount advanced or to be advanced under the agreement to an insurer or to an insurance agent, in payment of premiums on an insurance contract, together with a service charge as authorized and limited by law."

Significantly, each of these statutory requirements is directed to the *lender* where the lender engages in the business of premium financing or premium finance agreements from within the State of Florida.   Under the plain and unambiguous terms of these status, the situs or residency of the *borrower* is immaterial; rather, it is the *lender's* corporate citizenship and engagement in the regulated activities from within the State of Florida that trigger's the licensure requirements.   As such, Emergent and Imperial's calculated, admitted effort to evade the licensure requirements of Section 627.828 by changing the situs of the Pohl Trust to Utah the *very day* prior to entering into a premium financing agreement with the Pohl Trust is of no consequence.   Here, it is undisputed and indeed conceded by the Debtors that Imperial was not licensed as a premium financing company and thus the Debtors' actions in procuring the Loan Agreement violated Florida law.

It is hornbook law that such contracts in violation of licensure statutes are void, illegal *ab initio* and unenforceable.   *See, e.g., Meteor Motors, Inc. v. Thompson Halbach & Assoc.*, 914, So. 2d 479 (Fla. 4th DCA 2005) (holding that defendants' brokerage contract was unenforceable as a result of its failure to comply with the state's licensing requirements); *Moorings Development*

*Co. v. Porpoise Bay Co.*, 487 So. 2d 60 (Fla. 4th DCA 1986 (affirming trial court's finding that a real estate contract was void and unenforceable because plaintiff was not duly licensed to engage in such activities); *D&L Harrod, Inc. v. U.S. Precast Corp*, 322 So. 2d 630 (Fla. 3d DCA 1975) (holding that when a statute declares it unlawful to perform certain acts without first obtaining a license, contracts made for the performance of such acts without appropriate licensure are unenforceable); *Cooper v. Paris*, 413 So. 2d 772 (Fla. 1st DCA 1982) (holding that contracts made in violation of licensure statutes are void and illegal *ab initio*).

As such, the Loan Agreement and related financing documents relied upon by Imperial for its loans as well as its assertion of ownership over the Pohl Policy pursuant to the Release Agreement are all void *ab initio* and did not provide Emergent or Imperial with any lawful basis for asserting or obtaining ownership over the Pohl Policy.

In addition, the loan documents required by the Debtors materially violated other regulations imposed under Florida law on premium financing agreements. Section 627.839, Florida Statutes ("Form and content of premium finance agreements") provides in relevant part that a premium finance agreement shall (a) contain the entire agreement of the parties with respect to the insurance contract, the premiums for which are advanced or to be advanced under it; (b) contain at its top, the words "PREMIUM FINANCE AGREEMENT" in at least 10-point bold type; and (c) contain the name and place of business of the insurance agent negotiating the related insurance contract; the name and residence or place of business of the insured as specified by her or him; the name and place of business of the premium finance company to which installment or other payments are to be made; a description of the insurance contract, the premiums for which are advanced or to be advanced under the agreement; and the amounts of the premiums for such insurance contract.

A cursory review of Imperial's Loan Agreement reveals that it fails these requirements, and further that Imperial prepared and utilized numerous other documents relating to the premium financing loans with terms and conditions that are not encompassed in the actual Loan Agreement.

Even more problematic for Debtors, the Loan Agreement and related financing documents materially violated Section 627.842, Florida Statutes ("Restrictions on premium finance agreements") which provides that no premium finance agreement *or contract ancillary thereto* shall contain any provision by which (a) a power of attorney is given to confer any authority to perform any act other than to request cancellation for nonpayment of premium; or (b) the insured relieves the insurance agent or the premium finance company holding the agreement from liability for any legal rights or remedies which the insured may otherwise have against her or him.

Here, Imperial demanded and required that Allan and Kimberly execute a Security Agreement – *i.e.*, a contract ancillary to the premium finance Loan Agreement – in which they were forced to appoint Imperial as their attorney-in-fact and grant Imperial a broad Power of Attorney to execute any assignments, releases and other documents and agreements regarding ownership of the Pohl Policy, in clear violation of Fla. Stat. § 627.842.  *See* Security Agreement, §9(b) and 10(h), Exhibit 16.  These powers of attorney far exceed the limited right to request cancellation of the agreement for nonpayment of premium, and are therefore invalid and unenforceable under Florida law.

Similarly, Imperial also required that the Pohl Trust execute another Power of Attorney in favor of its affiliated entity, Portfolio Financial Servicing Company, which authorized it to take any actions necessary for carrying out the financing arrangement and loan documents.  *See*

Exhibit 17.  The ancillary agreement also violated § 627.842.

### III.   Emergent's Challenges and Defenses to the Pohl Litigation Claims Are Meritless and Should Be Rejected

In stark contrast to the overwhelming evidence supporting the Pohls' Litigation Claims – not the least of which being the Debtors' admission that it engaged in the exact fraud and other misconduct underlying the procurement and financing of the Pohl Policy – none of the challenges or defenses to those claims asserted by the Debtors have any valid basis in fact or law.

### A.   Emergent Is Directly and Vicariously Liable For The Pohls' Claims

As an initial matter, Emergent's contention that it is merely a holding company and did not commit the alleged wrongs giving rise to the Pohl Claims is patently untrue.  In reality, Imperial was at all material times controlled by its managing member, Emergent, and acted as an agent, representative and instrumentality of Emergent with respect to the fraudulent scheme inflicted upon the Pohls.

Indeed, the Court need only look to Emergent's Non-Prosecutorial Agreement with the U.S. Attorney's Office to summary reject Emergent's specious denial of wrongdoing.  The U.S. Attorney's Office only agreed not to criminally prosecute "Imperial Holdings, Inc. or any of its present or former subsidiaries or affiliates" – which was collectively defined in the Non-Prosecutorial Agreement as "Imperial" or the "Company") – for crimes related to its premium finance business based on Emergent's acceptance for and acknowledgement of responsibility for the misconduct. *See* NPA, Exhibit 22.

More to the point, Emergent's CFO and corporate representative, Mrs. Martinez, admitted at her deposition that as the managing member of Imperial at all relevant times, Emergent controlled and directed the activities of Imperial.  Martinez Dep.  Tellingly, Mrs. Martinez conceded that

Imperial's premium financing business was considered and treated as a business "segment" of Emergent. *Id.*

As previously noted, Emergent is also liable for Imperial's fraudulent premium finance scheme as a co-conspirator. *See Nicholson,* 481 So. 2d at 935 ("[e]ach act done in pursuance of a conspiracy by one of several conspirators is an act for which each is jointly and severally liable").

Lastly, the Pohl Litigation Claims assert a claim for vicarious liability against Emergent, which provides yet another independent and meritorious basis for holding Emergent liable for the gross misconduct engaged in by Emergent's wholly owned affiliate Imperial. *See, e.g., Honig v. Kornfeld,* 2019 U.S. Dist. LEXIS 63401 at *14 (S.D. Fla. Mar. 8, 2019) (finding that plaintiffs' amended complaint stated a proper claim for vicarious liability against the corporate defendants based on adequately plead claims against the individual defendants contained in separate counts for which the corporate defendants could be vicariously liable).

### B.        The Release Agreement Is Not Valid or Unenforceable

As noted above, the Debtors' reliance upon the Release Agreement as a bar to the Pohls' claims is specious in light of the fact that Imperial was illegally engaged in the business of premium financing in connection with the Pohl Policy without the requisite licensure and thus its actions in procuring the Loan Agreement violated Florida law.  In the absence of such licensure, Imperial had no right to collect its loans from the Pohl Trust and it provided no lawful consideration to the Pohl Trust for relinquishing it legal right to the Pohl Policy death benefit in exchange for Imperial's purported waiver and release of the Trust's (non-existent) indebtedness. For this reason, the Debtors' contention that "in exchange for a discharge of their obligations under the Loan Agreement, Promissory Note, and Guaranty," the Pohls relinquished all of their rights to and interests in the Policy is specious since there was no lawful consideration for any

such release.

Moreover, Imperial had no rights or claims arising under the Loan Agreement at the time the Release Agreement was allegedly executed in March 2010.   Rather, on January 19, 2009, Imperial executed the Insurance Premium Loan Sale and Assignment Agreement in which it sold, transferred and assigned all of Imperial's right, title and interest in the financing agreements with the Pohl Trust to Imperial PFC.  *See* Exhibit 18.  The face of the Release Agreement, however, reveals that Imperial PFC is not a party to the agreement and thus the Release is invalid and unenforceable by Imperial.

The most fundamental problem for the Debtors, however, is that the Pohls have challenged the authenticity of their signatures on the Release Agreement and asserted that the Release was part and parcel of the Debtors' fraud.  The Pohls have thus attested that they had no knowledge of, and never consented to, the alleged relinquishment of the Pohl Trust's ownership of the Policy or any of their rights as a beneficiary, and never consented or authorized the co-trustees of the Pohl Trust – who were appointed and controlled by Emergent and Imperial at all material times – to execute and sign the Release or to consent to the Trust's relinquishment of its ownership of the Policy.  *See* Pohl Dec.; Pohl Dep; Sheris Dec.; Sheris Dep.

Allan and Kimberly have both testified under oath and in their sworn Declarations that the alleged signatures of Allan Pohl, Kimberly Pohl and Harvey Pohl on the Release not their true or authentic signatures.  In fact, a simple comparison of the Pohls' notarized and/or witnessed signatures on the various loan documents vis-à-vis the Release plainly confirms that Allan, Kimberly and Harvey's signatures are not authentic.

In stark contrast, the Debtors have not proffered a single witness or any other evidence to contradict the Pohls' sworn testimony that they signatures on the Release are not authentic.

Notably, Debtors disclosed to the Pohls in the underlying State Court Litigation that they had utilized the services of a handwriting expert to analyze and opine upon the authenticity of the signatures, yet Debtors have not proffered any expert opinion in support of the validity of the Release.  The Debtors' wholesale failure to present or proffer any evidence or testimony refuting or rebutting the Pohls' sworn testimony that their signatures on the Release are not authentic is fatal to the Debtors' reliance upon the Release.

Recognizing as it must that the lack of a true and authentic signature by Allan and Kimberly nullifies and negates Debtors' reliance on the Release, Emergent apparently seeks to rely upon the powers of attorney granted to Imperial in the Security Agreement – which Imperial required them to execute in the connection Emergent's fraudulent scheme – for their contention that Allan and Kimberly's execution of the Release was unnecessary and that their challenge to the authenticity of the Release Agreement is irrelevant.  This is yet another red-herring by the Debtors because, as demonstrated above, the purported powers of attorney violated Section 627.842, Florida Statutes, and thus are invalid and may not be utilized or relied upon by the Debtors.

### C.    The Pohls' Claims are Not Time-Barred

The Debtors contention that the Pohls claims are time-barred is another falsehood and is a hotly contested factual dispute in the State Court Litigation.

As a result of the Debtors' fraud and concealment, as well as Phyllis Pohl's condition resulting from Alzheimer's, the Pohls did not discover the Defendants' fraudulent scheme and theft of the Policy until 2016.  *See* Affidavit of Allan Pohl, ¶ 7.  The unauthorized and fraudulent Release Agreement was likewise unknown to the Pohls until it was produced in the State Court Litigation for the very first time by Emergent.

Specifically, and as Kimberly Pohl has testified to under oath, the Pohls did not discover the Debtors' fraudulent and criminal misconduct, the misappropriation of the Pohl Policy or the resulting damages and injuries to the Pohls and the Pohl Trust until May 2016 when she discovered a letter in Phyllis' papers from a company named LexServ. *See* Sheris Dec.; see Exhibit 27. Kimberly contacted LexServ to check on the status of the Pohl Policy and confirm that the Policy was in force and in good standing, and was shocked to discover for the first time that the Pohl Trust no longer owned the policy and that the Pohl Trust was no longer the owner or beneficiary of the Policy.

Further, while Debtors complain that the Pohls did not pay any of the premiums for the Pohl Policy (which itself is untrue, as the Pohls advanced the initial premium payment on the Policy, *see* Exhibits 10 and 11), they disregard that the Pohls were misled to believe that Emergent would pay the premiums due on the Policy until Mrs. Pohl passed and the death benefit was paid to the Pohl Trust, minus all outstanding loans due to Imperial Premium. Furthermore, the Pohls have attested that during the period January 2008 to May of 2016, they never received any notice of any issues or problems with the Pohl Trust or the Pohl Policy and instead believed that the Imperial premium financing program was working in the manner represented by Imperial, that all required premiums on the Pohl Policy were being paid, the Pohl Trust still owned the Pohl Policy, and that Allan and Kimberly were still the beneficiaries to the Policy. The Pohls likewise never received any bills or invoices from Imperial or Emergent demanding the payment or repayment of any premium payments required or made on the Pohl Policy.

**D.**      <u>**The Debtors are Not Entitled to Any Offset of Premium Payments**</u>

Finally, the Debtors' alternative attempt to diminish or offset the value of the Pohls' Litigation Claims as a result it the Debtors' alleged financing and payment of premium payments toward the Pohl Policy fails for a multitude of reasons.

First and foremost, the Debtors' purported claim against the Pohls to recover or offset such premiums payments is unquestionably barred by the doctrine of illegality. As demonstrated above, it is undisputed that the Debtors' financing arrangement violated Fla. Stat. 627.828 and consequently the Debtors' payment of premiums pursuant to the Loan Agreement is void and unenforceable as a matter of law. Since Debtors had no legal right to loan the monies or finance the premium payments in the first place, they likewise have no right to recover or offset those payments from the damages sustained by the Pohls.

Second, the Debtors' purported claim against the Pohls to recover or offset such premiums payments are unquestionably barred by the doctrine of unclean hands and illegality. In order for a party to successfully avail itself of the doctrine of unclean hands, it must satisfy two requirements. First, the defendant must demonstrate that the plaintiff's wrongdoing is directly related to the claim against which it is asserted. Calloway v. Partners National Health Plans, 986 F.2d 446, 451-452 (11th Cir. 1993) (*citing Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245, 54 S.Ct. 146, 147–48, 78 L.Ed. 293 (1933). Second, the defendant must show that it was injured by the plaintiff's wrongdoing. Id. at 452 (*citing Mitchell Bros. Film Group v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir.1979), cert. denied, 445 U.S. 917, 100 S.Ct. 1277, 63 L.Ed.2d 601 (1980).

Last but not least, as the NPA determined, and as the Debtor's corporate representative acknowledged during her deposition, Imperial itself obtained financing for its premium financing

loans (including specifically the Pohl Trust loans) and its lenders required that Imperial obtain lender protection insurance coverage for premium loans to ensure that the credit facilities would be repaid in the event a loan defaulted.  In the instant case, it is undisputed that the Pohl Trust never defaulted on the Loan Agreement and no notice of default or other related legal action.  Indeed, Imperial never sent any demand for repayment of the loans or for payment of the premiums arising post-March 2010 to any of the Pohls (who had no knowledge that anything was amiss with the Pohl Policy).  Instead, Imperial procured the Release in exchange for the waiver/forgiveness of the loans advanced to pay the premiums  and relinquishment.  Imperial, however, nevertheless filed a claim under its lender protection policy based on assertions that the Pohl Trust had defaulted on the loan.  As a consequence, Imperial received approximately **$238,609.55** in insurance proceeds to reimburse it for premium payments that it purportedly made on behalf of the Pohl Trust, all under the guise that the Pohl Trust had defaulted and despite the fact that Imperial and Emergent misappropriated ownership of the Pohl Policy.  A true and authentic copy of the insurance checks to Imperial are designated as **Exhibit 31**. The breath of the Debtors' fraud and unclean hands with respect to the Pohl Trust and Pohl Policy is truly staggering.

## CONCLUSION

In sum, in light of the foregoing facts and evidence supporting the Pohl's State Court Claims, the claims must be realistically estimated at $9 million, i.e., the face value of the policy that the Debtors misappropriated from the Pohls as a result of the Debtors' admitted illegal premium financing scheme.  Here, there the probability that the Pohls' State Court Litigation Claims may be sustainable only in part or not at all before a Palm Beach County jury is virtually non-existent, and thus there is no proper basis or foundation for the Motion.  *See In re Windsor Plumbing Supply Co.*, 170 B.R. at  521-22 (finding that "[t]he estimated value of a claim is then

the amount of the claim diminished by the probability that it may be sustainable only in part or not at all.")

In view of the foregoing, the Pohls' respectfully request that the Motion be denied, that the Pohl claims be estimated at $9,000,000.00, and that the Court award the Pohls such further and additional relief as it deems just and appropriate.

Respectfully submitted,

**THE ROSNER LAW GROUP LLC**
*/s/ Jason A. Gibson*
Frederick B. Rosner (DE 3995)
Jason A. Gibson (DE 6091)
824 Market Street, Suite 810
Wilmington, DE 19801
Telephone: (302) 777-1111
E-mail: gibson@teamrosner.com

**-  a n d  -**

**FOWLER WHITE BURNETT, P.A.**
Eric A. Rosen (FL 36426)
Northbridge Center
515 North Flagler Drive, Suite 2100
West Palm Beach, Florida 33401
Telephone: (561) 802-9044
E-mail: ERosen@fowler-white.com

**-  a n d  -**

**CIKLIN LUBITZ**
Jonathan Brennan Butler, Esq.
515 N. Flagler Drive – 20th Floor
West Palm Beach, Florida 33401
Tel:  (561) 832-5900
E-mail:jbutler@ciklinlubitz.com

*Counsel for Pohl Litigation Claimants*