IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| RED REEF ALTERNATIVE INVESTMENTS, LLC and EMERGENT CAPITAL, INC.,[1] | ) Case No. 20-12602 (BLS) |
| | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) **Related to Docket Nos. 109, 114, 148** |

## MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF DEBTOR EMERGENT CAPITAL, INC.'S SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION

Dated:  December 18, 2020

PACHULSKI STANG ZIEHL & JONES LLP
Richard M. Pachulski (CA Bar No. 90073)
Maxim B. Litvak (CA Bar No. 215852)
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
Wilmington, DE  19899-8705 (Courier 19801)
Telephone: 302/652-4100
Facsimile:  302/652-4400
E-mail: rpachulski@pszjlaw.com
           mlitvak@pszjlaw.com
           crobinson@pszjlaw.com

Counsel for Emergent Capital, Inc.,
Debtor and Debtor-in-Possession

---

[1]  The last four digits of each Debtor's taxpayer identification number are:  Red Reef Alternative Investments, LLC (0302) and Emergent Capital, Inc. (3473).  The location of the Debtors' service address for purposes of these cases is 1200 North Federal Highway, Suite 200, Boca Raton, FL 33432.

For the avoidance of doubt, Debtor Red Reef Alternative Investments, LLC is not a proponent of the Plan.

# TABLE OF CONTENTS

**Page**

Preliminary Statement ................................................................................................ 1

RELEVANT BACKGROUND ................................................................................... 4

    **A.**    Filing of the Debtor's Chapter 11 Case ............................................... 4

    **B.**    The Restructuring Transactions ......................................................... 4

    **C.**    Pending Objection & Response Thereto ............................................ 6

The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code ............................ 8

    **A.**    The Plan Complies with the Applicable Provisions of the Bankruptcy
          Code (§ 1129(a)(1)). ....................................................................... 8

          **1.**    The Plan Satisfies the Classification Requirements of Section 1122
               of the Bankruptcy Code. ................................................... 8

          **2.**    The Plan Satisfies the Mandatory Plan Requirements of Section
               1123(a) of the Bankruptcy Code. ...................................... 10

               **a.**    Designation of Classes of Claims and Equity Interests
                    (§ 1123(a)(1)). .............................................. 10

               **b.**    Specification of Unimpaired Classes (§ 1123(a)(2)). ................. 10

               **c.**    Treatment of Impaired Classes (§ 1123(a)(3)) ........................... 11

               **d.**    Equal Treatment within Classes (§ 1123(a)(4)) .......................... 11

               **e.**    Means for Implementation (§ 1123(a)(5)). ................................ 11

               **f.**    Issuance of Non-Voting Securities (§ 1123(a)(6)) ...................... 11

               **g.**    Directors and Officers (§ 1123(a)(7)). ....................................... 12

           **3.**    The Plan Complies with the Discretionary Provisions of Section
               1123(b) of the Bankruptcy Code. ...................................... 12

           **4.**    The Plan Complies with Section 1123(d) of the Bankruptcy Code. ........ 13

          **5.**    The Plan's Release, Exculpation, and Injunction Provisions
               Comply with the Bankruptcy Code. .................................. 14

               **a.**    The Debtor Release is Appropriate and Complies with the
                    Bankruptcy Code. ........................................ 14

               **b.**    The Third Party Release is Appropriate and Complies with
                     the Bankruptcy Code ..................................... 17

               **c.**    The Exculpation Provision is Appropriate and Complies
                    with the Bankruptcy Code. ............................ 20

               **d.**    The Injunction Provision is Appropriate and Complies with
                     the Bankruptcy Code. .................................... 22

i

**B.**    The Debtor Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)). ........................................................................... 23

    **6.**    The Debtor Complied with Section 1125 of the Bankruptcy Code. ........ 23

    **7.**    The Debtor Complied with Section 1126 of the Bankruptcy Code. ........ 24

**C.**    The Plan was Proposed in Good Faith (§ 1129(a)(3)). ........................................ 24

**D.**    The Plan Provides that the Debtor's Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4)). ................................... 25

**E.**    The Debtor Disclosed All Necessary Information Regarding Directors, Officers, and Insiders (§ 1129(a)(5)). .................................................................. 26

**F.**    The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)). ........................................................................................................ 28

**G.**    The Best Interests of Creditors Test Does Not Apply to the Plan (§ 1129(a)(7)). ........................................................................................................ 29

**H.**    Each Class of Impaired Claims and Equity Interests Has Accepted the Plan  For Purposes of Section 1129(a)(8) of the Bankruptcy Code. .................. 30

**I.**    The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)). ........................................................................................................ 31

**J.**    There Is An Impaired Consenting Class of Claims Under the Plan (§ 1129(a)(10)). ...................................................................................................... 32

**K.**    The Plan Is Feasible (§ 1129(a)(11)). ................................................................. 32

**L.**    All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)). ......................... 34

**M.**    No Retiree Benefits Exist (§ 1129(a)(13)). ......................................................... 34

**N.**    Sections 1129(a)(14) through 1129(a)(16) Do Not Apply to the Plan. .............. 34

**O.**    The "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code Do Not Apply to the Plan. ........................................................................... 35

**P.**    Section 1129(c) of the Bankruptcy Code Is Satisfied. ........................................ 35

**Q.**    The Debtor Complied with Section 1129(d) of the Bankruptcy Code. ............... 35

**R.**    Modifications to the Plan. .................................................................................... 35

**S.**    The Confirmation Order Should Be Effective Immediately. ............................... 36

CONCLUSION ....................................................................................................................... 37

DOCS_SF:104636.2 23629/002

Emergent Capital, Inc., as a debtor and debtor-in-possession (the "Debtor"),

submits this memorandum of law in support of confirmation of the *Debtor Emergent Capital,*

*Inc.'s Second Amended Chapter 11 Plan of Reorganization* (as modified, amended, or

supplemented from time to time, the "Plan"),[2] pursuant to sections 1125, 1126, and 1129 of title

11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").  In support of

confirmation of the Plan, the Debtor concurrently filed the *Declaration of Miriam Martinez in*

*Support of Confirmation of Debtor Emergent Capital, Inc.'s Second Amended Chapter 11 Plan*

*of Reorganization* (the "Martinez Declaration").

## PRELIMINARY STATEMENT

1.      The Plan represents a significant achievement for the Debtor and should greatly

enhance the Debtor's ability to reorganize successfully and expeditiously.  The Plan also will

provide an efficient restructuring through the bankruptcy process, which is designed to minimize

cost and disruption to the Debtor and all parties in interest.  The Plan had the support of the

Debtor's principal noteholders pursuant to two Restructuring Support Agreements and now, as a

result of the solicitation process, the Plan has obtained the overwhelming support of all Impaired

Voting Classes, including noteholders and shareholders.

2.      The Debtor is a holding company with indirect minority interests in certain

valuable life settlement assets held through non-Debtor White Eagle Asset Portfolio, L.P., a

Delaware limited partnership ("White Eagle").  The ultimate goal of the Plan is to preserve and

maximize the value of these interests for the benefit of all the Debtor's constituents, while

---

[2]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan.

1

addressing Emergent's existing capital structure.  The Debtor's indirect minority share of the

equity interests in White Eagle total 27.5% and are held through an indirect subsidiary of the

Debtor called Lamington Road Designated Activity Company, an Irish Section 110 Company

("Lamington").

      3.      Pursuant to the Plan: (i) Lamington and a grantor trust to be formed under the

laws of the Cayman Islands (the "Grantor Trust"), the purpose of which will be to hold certain

securities of Lamington that will be issued as part of the restructuring, will dividend or issue

certain securities to the Debtor, (ii) the Debtor will distribute those securities to its noteholders

and shareholders on similar economic terms and priorities that exist today, (iii) the Debtor's

existing securities will be canceled, and (iv) the Debtor will continue its winding up.

      4.      The Debtor believes that the Plan is the best restructuring alternative reasonably

available to its estate.  Notably, the Plan is comprised of the following key elements:

- Holders of Allowed General Unsecured Claims will receive a 100% recovery;

- Holders of existing Senior Secured Notes will receive one New Series A Note of Lamington for each $100.00 of augmented principal amount of Senior Secured Notes (which augmented principal amount shall equal 1.04x the total of, as of the exchange, the existing principal amount of, and all accrued but unpaid interest on, the Senior Secured Notes);

- Holders of existing Convertible Unsecured Notes will receive one New Series B Note of Lamington and Grantor Trust Certificates representing ten (10) New PPNs for, as of the exchange, each $100.00 of the total principal amount of, and all accrued but unpaid interest on, the Convertible Unsecured Notes;

- Holders of existing Equity Interests in the Debtor (other than Unvested Warrants), par value $0.01 per share, will receive Grantor Trust Certificates representing one (1) New PPN per share of common stock (subject to adjustment for a cashless exercise in respect of vested warrants to purchase Debtor's common stock), *provided that* (i) New Unvested Warrants to purchase Grantor Trust Certificates shall be distributed to Holders of Unvested Warrants, conformed to the extent possible to the Unvested

2

Warrants, and (ii) (x) equity awards of restricted stock under the Omnibus Plan shall be deemed vested as of the Effective Date and treated the same as the other Equity Interests in the Debtor and (y) New SARs exercisable for Grantor Trust Certificates will be distributed to Holders of Existing SARs, conformed to the extent possible to the Existing SARs. New PPN Warrants also will be issued in order to allow new PPNs to be issued to the Grantor Trust upon the exercise of the New Unvested Warrants; and

- all existing Senior Secured Notes, Convertible Unsecured Notes, and Equity Interests in the Debtor will be canceled and extinguished.

5.     Through the Plan, the Debtor will be in the best possible position under the circumstances to maximize the value of its estate for the benefit of all constituents. Having provided broad notice of the Plan and obtained the overwhelming support of all Impaired stakeholders, the Debtor is now in position to confirm the Plan and consummate a restructuring consistent therewith.

6.     The only pending objection to the Plan [Docket No. 148] is filed by Allan J. Pohl, individually, as Representative of Phyllis Pohl, and as Trustee of the Phyllis Pohl Irrevocable Trust, and Kimberly Sheris (together, the "Pohl Claimants"). The Pohl Claimants assert that they have been disenfranchised from voting on the Plan. As this Court is well aware, the Pohl Claimants have asserted a disputed $9 million claim that stands in the way of feasibility. The Debtor has sought to estimate such claim for distribution purposes at $0. Alternatively, the claim should be estimated at a substantial discount for feasibility purposes as appropriate under the law and the facts. As specifically contemplated by section 502(c) of the Bankruptcy Code and in order to avoid undue delay in the administration of this case, the Court has wide discretion to set an appropriate reserve amount for feasibility purposes. Whatever happens, the Pohl Claimants' objection to the Plan on voting grounds lacks merit and should be overruled for the reasons set forth below.

3

## RELEVANT BACKGROUND

### A.    Filing of the Debtor's Chapter 11 Case

7.    On October 15, 2020, the Debtor, along with an affiliate, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

8.    The Debtor continues to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or committee has been appointed in this Chapter 11 Case.

### B.    The Restructuring Transactions

9.    The Debtor commenced this Chapter 11 Case with the goal of maximizing value from its interests in a maturing life insurance portfolio held through White Eagle.  After over a year of active and arm's-length negotiations, the Debtor, in consultation with its advisors, reached agreement on the terms of the Plan with the Supporting Senior Secured Noteholders and the Supporting Convertible Unsecured Noteholders, representing a majority by principal amount of the Holders of Senior Secured Notes Claims and Convertible Unsecured Notes Claims, respectively, as reflected in the Restructuring Support Agreements.

10.    By order dated November 12, 2020 [Docket No. 99], this Court approved the Restructuring Support Agreements.

11.    On November 13, 2020, this Court entered its *Order (I) Approving Adequacy of Disclosure Statement, (II) Scheduling Hearing on Confirmation of Plan of Reorganization and the Assumption of Executory Contracts and Cure Amounts; (III) Fixing the Deadlines to Object to Plan and Proposed Assumption or Rejection of Executory Contracts and Cure Amounts; (IV)*

4

*Approving Solicitation Procedures and Form and Manner of Notice Related Thereto; and (V)*

*Granting Related Relief* [Docket No. 109] (the "Solicitation Procedures Order").

12.      Also on November 13, 2020, the Debtor filed a prior version of the Plan (the

"Solicitation Plan") and the *Disclosure Statement for the Debtor Emergent Capital Inc.'s First*

*Amended Chapter 11 Plan of Reorganization* [Docket No. 115] (the "Disclosure Statement").

The Solicitation Plan has now been amended with certain modifications filed concurrently

herewith.  Because Holders of Senior Secured Notes Claims, Convertible Unsecured Notes

Claims, and Equity Interests in the Debtor are the only Impaired Classes under the Solicitation

Plan and the current Plan, only such Holders were entitled to vote on the Solicitation Plan.

Notably, General Unsecured Claims are unimpaired.

13.      Also on November 13, 2020, the Debtor filed and served the *Notice of (I) Hearing*

*on Confirmation of Debtor Emergent Capital, Inc.'s First Amended Chapter 11 Plan and*

*Related Matters; and (II) Objection Deadlines, and Summary of the Plan* [Docket No. 117] (the

"Confirmation Hearing Notice"), which contained the date and time set for the hearing (the

"Confirmation Hearing") to consider confirmation of the Solicitation Plan ("Confirmation") and

the deadline for filing objections to the Solicitation Plan.

14.      Following entry of the Solicitation Procedures Order and in accordance with the

terms thereof, the Debtor commenced a solicitation of votes to accept or reject the Solicitation

Plan, and distributed therewith (i) the Disclosure Statement and (ii) ballots for voting on the

Solicitation Plan to Holders of Claims and Equity Interests entitled to vote on the Solicitation

Plan.

15.     On December 10, 2020, the Debtor filed the *Plan Supplement* [Docket No. 143] (as modified, amended, or supplemented from time to time, the "Plan Supplement" and which, for purposes of the Plan and herein, is included in the definition of the Plan).

16.     The Debtor proposes that the Court enter an order confirming the Plan in the form attached hereto as **Exhibit 1** (the "Proposed Confirmation Order").

## C.     Pending Objection & Response Thereto

17.     The Debtor has received informal comments to the Plan from the Office of the United States Trustee and the U.S. Securities & Exchange Commission, among others.  All such comments have been addressed.  The only remaining objection to the Plan is asserted by the Pohl Claimants [Docket No.148].

18.     The Pohl Claimants argue that that they have been disenfranchised from voting on the Plan as the Holder of a General Unsecured Claim.  The Pohl Claimants take the position that they are Impaired under the Plan even though the Plan provides that all Allowed General Unsecured Claims will be paid in full.  The Pohl Claimants confuse impairment with allowance. The Pohl Claimants' claim is not Impaired – the Debtor proposes to pay all Allowed Claims in full under the Plan.  The Debtor has sought to estimate the Pohl Claimants' claim for distribution purposes at $0.  If the Court is disinclined to do so, the Debtor would request, consistent with the purpose of section 502(c) of the Bankruptcy Code to avoid undue delay in the administration of this case, to estimate the claim for feasibility purposes at an amount substantially below $9 million as appropriate under the law and the facts.  Although the Court has wide discretion in estimating a claim or the process by which to do so, the court should consider the probability of

6

success on the merits. *In re POC Props., LLC*, 580 B.R. 504, 509 (E.D. Wis. 2017)

("probability" method "estimates the probability a claim will succeed and appl[ies] the

probability to the damages); *In re Windsor Plumbing Supply Co., Inc.*, 170 B.R. 503, 521 (Bankr.

E.D.N.Y. 1994) ("An estimator of claims must take into account the likelihood that each party's

version might or might not be accepted by a trier of fact. The estimated value of a claim is then

the amount of the claim diminished by [the] probability that it may be sustainable only in part or

not at all."); *In re Ralph Lauren Womenswear*, 197 B.R. 771, 775 (Bankr. S.D.N.Y. 1996)

("[P]arties' legal arguments must be evaluated ... for their correctness as a matter of governing

law."); *In re Chemtura Corp.*, 448 B.R. 635, 651 (Bankr. S.D.N.Y. 2011) ("[R]esponsible

estimation analysis at the bankruptcy court level should, while still evaluating the parties'

positions for their correctness as a matter of governing law, also recognize the possibility (and

try to estimate the *probability*) of different conclusions in the appellate process.") (internal

quotations omitted) (emphasis in original)).  Here, given the extent of the Debtor's defenses to

the Pohl Claimants' position, the Court should impose a substantial discount on their claim for

feasibility purposes.

19.    With respect to the Pohl Claimants' narrow objection to the Plan, the Pohl

Claimants have not been improperly deprived of the right to cast a ballot on the Plan.  All

legitimate General Unsecured Claims are Unimpaired and will be treated as such, including the

Pohl's claim to the extent ultimately Allowed.

## THE PLAN SATISFIES THE REQUIREMENTS
## OF SECTION 1129 OF THE BANKRUPTCY CODE

20.     In the following sections, the Debtor sets forth its arguments demonstrating that

the Plan satisfies section 1129 of the Bankruptcy Code and, accordingly, requests that the Court

confirm the Plan.[3]

### A.     The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)).

21.     Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the

applicable provisions of [the Bankruptcy Code]."  The legislative history of section 1129(a)(1) of

the Bankruptcy Code explains that this provision also encompasses the requirements of sections

1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the

contents of a plan of reorganization, respectively.[4]  As explained below, the Plan complies with

the requirements of sections 1122 and 1123 of the Bankruptcy Code, as well as other applicable

provisions.

### 1.   The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.

22.     The classification requirement of section 1122(a) of the Bankruptcy Code

provides, in pertinent part, as follows:

> Except as provided in subsection (b) of this section, a plan
> may place a claim or an interest in a particular class only if

---

[3]  *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 119–20 (D. Del. 2006) (stating that a court must determine whether a plan meets the requirements of section 1129 in order to confirm such plan).

[4]  31 S. Rep. No. 95-989, at 126, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912 (1978); H.R. Rep. No. 95-595, at 412, reprinted in 1978 U.S.C.C.A.N. 5963, 6368 (1977); *In re S&W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were [s]ections 1122 and 1123."); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008).

8

> such claim or interest is substantially similar to the other
> claims or interests of such class.

11 U.S.C. § 1122(a).

23.     For a classification structure to satisfy section 1122 of the Bankruptcy Code, not all substantially similar claims or interests need to be grouped in the same class.[5]  Instead, claims or interests designated to a particular class must be substantially similar to each other.[6]

24.     The Plan's classification of Claims and Equity Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Equity Interests into six (6) separate Classes, with each Class differing from the Claims and Equity Interests in each other Class in a legal or factual nature or based on other relevant criteria.[7]  Specifically, the Plan provides for the separate classification of Claims and Equity Interests into the following Classes:

| Class | Designation |
| --- | --- |
| 1 | Other Priority Claims |
| 2 | Other Secured Claims |
| 3 | Senior Secured Notes Claims |
| 4 | Convertible Unsecured Notes Claims |
| 5 | General Unsecured Claims |
| 6 | Equity Interests in the Debtor |

25.     Claims and Equity Interests assigned to each particular Class described above are substantially similar to the other Claims and Equity Interests in such Class.  In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims or Equity Interests into the Classes created under the Plan, and no unfair discrimination exists

---

[5]  *See Armstrong World Indus., Inc.*, 348 B.R. at 159.

[6]  *Id.*

[7]  *See* Plan at Article III.

9

between or among holders of Claims and Equity Interests.  Namely, the Plan separately classifies

the Claims because each holder of such Claims or Equity Interests may hold (or may have held)

rights in the Estate legally dissimilar to the Claims or Equity Interests in other Classes.  For

example, Claims (rights to payment) are classified separately from Equity Interests (representing

ownership in the business).  Secured Claims are classified separately from unsecured Claims

because the Debtor's obligations with respect to the former are secured by collateral.

Accordingly, the Plan satisfies section 1122(a) of the Bankruptcy Code.

**2.  The Plan Satisfies the Mandatory Plan
      Requirements of Section 1123(a) of the Bankruptcy Code.**

26.     Section 1123(a) of the Bankruptcy Code sets forth seven criteria that every

chapter 11 plan filed by a corporate debtor must satisfy.  The Plan satisfies each of these

requirements.

**a.     Designation of Classes of Claims and Equity Interests (§ 1123(a)(1)).**

27.     Article III of the Plan properly designates classes of Claims and Equity Interests

and thus satisfies the requirement of section 1122 of the Bankruptcy Code, and no party has

asserted otherwise.

**b.     Specification of Unimpaired Classes (§ 1123(a)(2)).**

28.     Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any

class of claims or interests that is not impaired under the plan."  The Plan meets this requirement

by identifying each Class in Article III of the Plan that is Unimpaired.

10

### c.    Treatment of Impaired Classes (§ 1123(a)(3)).

29.    Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan."  The Plan meets this requirement by setting forth the treatment of each Class in Article III of the Plan that is Impaired.

### d.    Equal Treatment within Classes (§ 1123(a)(4)).

30.    Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  The Plan meets this requirement because Holders of Allowed Claims or Equity Interests will receive the same rights and treatment as other Holders of Allowed Claims or Equity Interests within such Holders' respective class.

### e.    Means for Implementation (§ 1123(a)(5)).

31.    Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation.  The Plan satisfies this requirement because Article V of the Plan, as well as other provisions thereof, provide for the means by which the Plan will be implemented, including consummation of the Restructuring Transactions.

### f.    Issuance of Non-Voting Securities (§ 1123(a)(6)).

32.    Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of non-voting equity securities.  By its own terms, section 1123(a)(6) applies only to corporations.  Because the Debtor is a corporation, the Plan provides that the Debtor's organizational documents will include, among other things, a provision prohibiting the issuance of non-voting equity securities to the extent required by

11

section 1123(a)(6) of the Bankruptcy Code.  As such, the Plan satisfies section 1123(a)(6) of the Bankruptcy Code, and no party has asserted otherwise.

>              g.        **Directors and Officers (§ 1123(a)(7)).**

33.        Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy."  Article V.J of the Plan outlines the manner of selecting the management of the Debtor and Lamington, which accords with applicable state law, the Bankruptcy Code, and the interests of creditors and equity security holders, and public policy.  Accordingly, the Plan satisfies section 1123(a)(7) of the Bankruptcy Code, and no party has asserted otherwise.

**3.        The Plan Complies with the Discretionary
             Provisions of Section 1123(b) of the Bankruptcy Code.**

34.        Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.  Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may:  (a) impair or leave unimpaired any class of claims or interests; (b) provide for the assumption or rejection of executory contracts and unexpired leases; (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estate; and (d) include any other appropriate provision not inconsistent with the applicable provisions of chapter 11.[8]

35.        The Plan is consistent with section 1123(b) of the Bankruptcy Code.  Specifically, under Article III of the Plan, all Classes of Claims and Equity Interests are Unimpaired because

---

[8]  11 U.S.C. § 1123(b)(1)–(3), (6).

the Plan leaves unaltered the legal, equitable, and contractual rights of the holders of Claims and

Equity Interests within such Classes.  In addition and under section 1123(b)(2) of the Bankruptcy

Code, Article VI of the Plan provides for the rejection of all Executory Contracts, other than

those relating to insurance coverage.  Courts approve a debtor's assumption or rejection of

executory contracts where such decision is made in the exercise of the debtor's sound business

judgment and benefits the estate.[9]  The Debtor's decision regarding the rejection of its executory

contracts is the result of the exercise of the Debtor's sound business judgment.  Finally, for the

reasons set forth below, the Plan's release, exculpation, and injunction provisions are consistent

with section 1123(b) of the Bankruptcy Code.  No party has asserted that the Plan does not

comply with section 1123(b).

### 4. The Plan Complies with Section 1123(d) of the Bankruptcy Code.

36.    Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan

to cure a default the amount necessary to cure the default shall be determined in accordance with

the underlying agreement and nonbankruptcy law."

37.    The Plan complies with section 1123(d) of the Bankruptcy Code.  The Plan

provides for the satisfaction of cure amounts under each Executory Contract identified to be

assumed under the Plan by payment of the cure amount, if any, on the Effective Date, or as soon

as reasonably practicable thereafter, subject to the limitations described in Article VI of the Plan.

No party has asserted that the Plan does not comply with section 1123(d).

---

[9] *See, e.g., In re Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36 (3d Cir. 1989).

DOCS_SF:104636.2 23629/002

5.      **The Plan's Release, Exculpation, and Injunction
        Provisions Comply with the Bankruptcy Code.**

38.    The Plan includes certain Debtor and third party releases, an exculpation

provision, and an injunction provision.  These provisions comply with the Bankruptcy Code and

prevailing law because, among other things, they are the product of extensive good faith and

arm's-length negotiations.  No Holder of a Claim against, or Equity Interest in, any Debtor has

objected to the Plan's release, exculpation, and injunction provisions.

a.      **The Debtor Release is Appropriate and Complies with the
        Bankruptcy Code.**

39.    Article X.B of the Plan provides for releases by the Debtor of any and all Claims

and Causes of Action, including any derivative claims, the Debtor could assert against the

Released Parties (the "Debtor Release").  The Released Parties are, collectively, the following

parties each in its capacity as such:  (a) the Debtor, (b) the Debtor's current and former directors

and officers, (c) the Senior Secured Notes Trustee, (d) the Convertible Unsecured Notes Trustee,

(e) the Supporting Senior Secured Noteholders, (f) the Supporting Convertible Unsecured

Noteholders, (g) the Holders of Claims and Equity Interests who vote in favor of the Plan; and

(h) the Related Persons of each of (a) through (g) of the foregoing.[10]

40.    The Released Parties were instrumental to the settlements and resolutions

incorporated into the Plan, including the terms of the Restructuring Support Agreements.  No

---

[10]  The term "Related Persons" means, with respect to any Person, such Person's predecessors, successors, assigns
and present and former Affiliates (whether by operation of law or otherwise) and subsidiaries, and each of their
respective current and former officers, directors, principals, employees, employers, shareholders, members
(including *ex officio* members), general partners, limited partners, agents, managers, managing members, financial
advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other
professionals, in each case acting in such capacity at any time, and any Person claiming by or through any of them.

14

Holders of General Unsecured Claims are affected by the releases in the Plan because all such Claims are Unimpaired under the Plan.

41.     Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  Accordingly, pursuant to section 1123(b)(3)(A), the Debtor may release estate causes of action as consideration for concessions made by their various stakeholders pursuant to the Plan.  In considering the appropriateness of such releases, courts in the Third Circuit generally consider "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[11]  The "fair and equitable" prong is generally interpreted, consistent with that term's usage in section 1129(b) of the Bankruptcy Code, to require compliance with the Bankruptcy Code's absolute priority rule,[12] while courts generally determine whether a release is proper by reference to the following factors:

> a.     whether the non-debtor has made a substantial contribution to the debtor's reorganization;
>
> b.     whether the release is essential to the debtor's reorganization;
>
> c.     agreement by a substantial majority of creditors to support the release;
>
> d.     identity of interest between the debtor and the third party; and

---

[11] *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.") (internal citations omitted).

[12]  *See In re Mirant Corp.*, 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006).

DOCS_SF:104636.2 23629/002

e.      whether a plan provides for payment of all or substantially all of

the claims in the class or classes affected by the release.[13]

Not all of the above factors need to be satisfied for a court to approve a debtor release.[14]

42.      The Debtor Release at issue here easily meets the controlling standard.

43.      *First*, the Debtor Release is a consensual and non-prejudicial release from the

perspective of all Holders of General Unsecured Claims because they are Unimpaired under the

Plan.

44.      *Second*, an identity of interest exists between the Debtor and the parties to be

released.  Most of the Released Parties are stakeholders and critical participants in the Plan

process and share a common goal with the Debtor in seeing that the Plan and the terms of the

Restructuring Support Agreements succeed.  Like the Debtor, these parties seek to confirm the

Plan and implement the transactions contemplated thereunder.  *See In re Tribune Co*., 464 B.R.

126, 187 (Bankr. D. Del. 2011), *modified*, 464 B.R. 208 (Bankr. D. Del. 2011) (noting that an

identity of interest between the debtors and the settling parties where such parties "share[d] the

common goal of confirming the [plan] and implementing [a settlement]"); *see also Zenith*, 241

B.R. at 110 (concluding that certain releasees who "were instrumental in formulating the Plan"

shared an identity of interest with the debtor "in seeing that the Plan succeed and the company

reorganize").  As to the Debtor's present and former directors, officers and managers who are

---

[13] *See e.g.*, *In re Zenith Elecs.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (citing *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)); *Spansion*, 426 B.R. at 143 n.47 (citing the *Zenith* factors); *Wash. Mut.*, 442 B.R. at 346 (same).

[14] *See e.g.*, *Wash. Mut.*, 442 B.R. at 346 ("These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the [c]ourt's determination of fairness."); *In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (finding that *Zenith* factors are not exclusive or conjunctive requirements).

being released, there is an identity of interest between the Debtor and these parties as they would

have indemnity obligations against the Debtor to the extent of any liability.  All such

indemnification obligations would be Unimpaired under the Plan.

45.     ***Third***, no one has objected to the Debtor Release.  The lack of objection provides

clear evidence that the Plan, including the releases that are an indispensable feature of the Plan,

maximizes the value of the Debtor's estate.

46.     ***Fourth***, the Debtor Release is predicated on substantial contributions by many of

the parties benefitting from that release.  The Debtor Release includes the Supporting Senior

Secured Noteholders and the Supporting Convertible Unsecured Noteholders.  Without the

support of these parties, there would be no Plan and no ability by the Debtor to successfully

reorganize.  As to the Debtor's Related Persons, these parties have provided direct benefits to the

Debtor's estate by diligently discharging their duties and contributing to the overall success of

the Plan and this Chapter 11 Case.  Further, the terms of the Plan, including the Debtor Release,

were vigorously negotiated amongst the Released Parties, including the Supporting Senior

Secured Noteholders and the Supporting Convertible Unsecured Noteholders.  The result is a

compromise that reflects a true arm's-length negotiation process.

47.     Accordingly, the Debtor Release is fair, equitable, and in the best interest of the

estate, is justified under the controlling Third Circuit standard, and should be approved.

> **b.     The Third Party Release is Appropriate and Complies with the Bankruptcy Code.**

48.     Article XI.A of the Plan contains a Third Party release provision (the "<u>Third Party

Release</u>") that should be approved pursuant to Third Circuit law.  The Third Party Release

provides that the Released Parties shall be released and discharged from any and all Claims and

Causes of Action as set forth in the Plan by the following releasing parties:  (a) Holders of all

Claims and Equity Interests who vote to accept the Plan, (b) Holders of Claims that are

Unimpaired under the plan, (c) Holders of Claims or Equity Interests whose vote to accept or

reject the Plan is solicited but who do not vote either to accept or to reject the Plan, (d) Holders

of Claims or Equity Interests who vote to reject the Plan but do not opt out of granting the

releases set forth in the Plan, (e) the Senior Secured Notes Trustee, and (f) the Convertible

Unsecured Notes Trustee.[15]

49.    Courts in this jurisdiction routinely approve such release provisions if they are

consensual, and even non-voting creditors may be deemed to consent to provide releases of non-

debtor third parties in the context of a chapter 11 plan, particularly where the creditor-releasors'

claims are Unimpaired by the Plan.[16]  Courts have also held that third party releases may be

binding upon unimpaired holders of claims without their affirmative consent.[17]

---

[15]  The Released Parties are the same as those identified above as the beneficiaries of the Debtor Release.

[16]  *See Wash. Mut.*, 442 B.R. at 352 (observing that consensual Third Party releases are permissible); *Zenith*, 241 B.R. at 111 (approving non-debtor releases for creditors that voted in favor of the plan); *see also In re Indianapolis Downs, LLC*, 486 B.R. 286, 304-05 (Bankr. D. Del. 2013) (approving as consensual Third Party release that applied to unimpaired holders of claims deemed to accept the plan because the releasing creditors received consideration in full and did not object to the releases); *In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) (finding "the silence of the unimpaired classes . . . was persuasive" in determining that releases of third parties by unimpaired creditors who did not object to the releases were permissible).

[17]  In *In re Indianapolis Downs, LLC*, the court confirmed a plan whereby creditors who either: (i) voted to reject or accept the plan and failed to "opt-out"; (ii) failed to return their ballots; or (iii) whose claims were unimpaired, and therefore, were not entitled to vote consented to the plan's Third Party release provision.  486 B.R. 286, 305 (Bankr. D. Del. 2013); *see also In re Conseco Inc.*, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003) (finding a release provision binding unimpaired creditors who abstained from voting on the plan and did not otherwise opt out to be consensual); *In re Local Insight Media Holdings, Inc.*, Case No. 10-13677 (KG) (Bankr. D. Del. Nov. 3, 2011) (confirming plan that treated holders of claims and interest that did not vote to reject plan or were not members of a class deemed to reject plan as releasing parties); *In re Majestic Star Casino, LLC*, No. 09-14136 (KG) (Bankr. D. Del. Mar. 10, 2011) (confirming plan that treated holders of claims and interests that did not vote to accept plan as releasing parties).

50.     The Third Party Release satisfies this standard.  *First*, certain Holders of Claims under the Plan are Unimpaired and therefore deemed to consent to the Plan.  By contrast, Impaired Holders of Claims and Equity Interests were given the opportunity to opt out of the Third Party Release as part of the voting process on the Plan.  The Debtor provided extensive notice of these chapter 11 proceedings, the Plan, and the deadline to object to confirmation of the Plan to all parties in interest.  There was specific mention of such Third Party Release and the requirement to object to such release in the Confirmation Hearing Notice sent by the Debtor to all parties in interest in this Chapter 11 Case.  No one has objected to the Third Party Release. Impaired Holders of Claims and Equity Interest also had the ability to opt out of the Third Party Release by voting against the Plan and choosing to opt out of the Third Party Release by checking a box on their ballots.

51.     *Second*, the Third Party Release is integral to the Plan and the Restructuring Support Agreements – the provisions of which were vigorously negotiated amongst the Debtor, the Supporting Senior Secured Noteholders, and the Supporting Convertible Unsecured Noteholders.

52.     *Third*, the Third Party Release was given for good and valuable consideration, including the efforts of the Released Parties to facilitate the Debtor's reorganization and the implementation of the restructuring and the Restructuring Transactions.  All parties in interest benefit from the Restructuring Transactions contemplated by the Plan, which will enable the Debtor to maximize the value of its interests in a valuable life insurance portfolio.  The alternative is the potential for a value-destructive, fire-sale liquidation.

53.     Accordingly, the Third Party Release is justified under Third Circuit law and the circumstances here, and should be approved.

### c.      The Exculpation Provision is Appropriate and Complies with the Bankruptcy Code.

54.     Article XI.C of the Plan provides that the Exculpated Parties[18] will neither have nor incur any liability to any Entity for any claims or Causes of Action arising before, on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or Postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtor, the approval of the Disclosure Statement or confirmation or Consummation of the Plan; *provided, however*, that the foregoing provisions will have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted actual fraud, gross negligence or willful misconduct; *provided, further*, that each Exculpated Party will be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above-referenced documents, actions or inactions; *provided, further*, however that the foregoing provisions will not apply to any acts,

---

[18]  The Exculpated Parties are, collectively:  (a) the Debtor, (b) the Plan Agent, (c) the Debtor's directors, officers, and managers who served in such capacity during the Chapter 11 Case, and (d) the Debtors' professionals retained in the Chapter 11 Case.

DOCS_SF:104636.2 23629/002

omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by

the Plan or the Plan Supplement (the "Exculpation Provision").

55.     At the outset, it is important to underscore the difference between the Third Party

Release and the Exculpation Provision.  Unlike the Third Party Release, the Exculpation

Provision is limited to estate fiduciaries (*i.e.*, the Debtor and its representatives and professionals

who are serving in such capacity during the Chapter 11 Case) and does not affect the liability of

third parties *per se*, but rather sets a standard of care of gross negligence or actual fraud in

hypothetical future litigation against an Exculpated Party for acts arising out of the Debtor's

restructuring.[19]  A bankruptcy court has the power to approve an exculpation provision in a

chapter 11 plan because a bankruptcy court cannot confirm a chapter 11 plan unless it finds that

the plan has been proposed in good faith.[20]  As such, an exculpation provision represents a legal

conclusion that flows inevitably from several different findings a bankruptcy court must reach in

confirming a plan.[21]  Once the court makes its good faith finding, it is appropriate to set the

standard of care of the parties involved in the formulation of that chapter 11 plan.[22]  Exculpation

provisions, therefore, appropriately prevent future collateral attacks.  Here, the Exculpation

Provision is likewise appropriate and vital because it provides protection to those estate

---

[19]  *See, e.g., In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000) (holding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code.").

[20]  *See* 11 U.S.C. § 1129(a)(3).

[21]  *See* 28 U.S.C. § 157(b)(2)(L).

[22]  *See PWS*, 228 F.3d at 246-247 (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity . . . for actions within the scope of their duties . . . .").

21

fiduciaries who served to further the restructuring process and falls squarely within the "fresh start" principles underlying the Bankruptcy Code.

56.     Further, the Exculpation Provision represents an integral piece of the overall settlement embodied by the Plan and the Restructuring Support Agreements and is narrowly tailored to exclude acts of actual fraud, gross negligence, or willful misconduct, and relates only to acts or omissions in connection with, or arising out of the administration of the Debtor's Chapter 11 Case and its restructuring.  Accordingly, the Exculpation Provision should be approved.

> **d.      The Injunction Provision is Appropriate and Complies with the Bankruptcy Code.**

57.     The injunction provision set forth in Article XI.D of the Plan (the "Injunction Provision") merely implements the Plan's discharge, release, and exculpation provisions, in part, by permanently enjoining all entities from commencing or continuing in any manner, any suit, action or other proceeding, or creating, perfecting or enforcing any lien of any kind, on account of or respecting any claim, demand, liability, obligation, debt, right, cause of action, equity interest, or remedy released or to be released, exculpated or to be exculpated, or discharged or to be discharged pursuant to the Plan or the Confirmation Order.  The Injunction Provision is thus a key provision of the Plan because it enforces the discharge, release, and exculpation provisions that are centrally important to the Plan.  Further, the Injunction Provision is consensual to the

extent that it is not the subject of a pending objection.  As such, the Court should approve the Injunction Provision.[23]

## B.    The Debtor Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)).

58.    The Debtor has satisfied section 1129(a)(2) of the Bankruptcy Code, which requires that the plan proponent comply with the applicable provisions of the Bankruptcy Code. The legislative history to section 1129(a)(2) reflects that this provision is intended to encompass the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.[24]  As discussed below, the Debtor has complied with sections 1125 and 1126 of the Bankruptcy Code regarding disclosure of the Plan.

## 6.    The Debtor Complied with Section 1125 of the Bankruptcy Code.

59.    In accordance with the Disclosure Statement Order, the Debtor has complied with the notice requirements of section 1125 of the Bankruptcy Code, and no party has asserted otherwise.

---

[23]  *See, e.g.*, *In re Physiotherapy Holdings, Inc.*, Case No. 13-12965 (KG) (Bankr. Dec. 23, 2013) (stating that injunctions in the plan were necessary to preserve and enforce the releases and exculpations granted by the plan and were narrowly tailored to achieve that purpose); *In re Dex One Corp.*, Case No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013) (same); *In re Chi. Newspaper Liquidation Corp.*, Case No. 09-11092 (CSS) (Bankr. D. Del. Aug. 17, 2011) (same); *In re Premier Int'l Holdings, Inc.*, Case No. 09-12019 (CSS), 2010 WL 2745964, at *10 (Bankr. D. Del. Apr. 29, 2010) (same).

[24]  *See In re Lapworth*, No. 97-34529 (DWS), 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2)."); *In re Worldcom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at *49 (Bankr. S.D.N.Y. Oct. 31, 2003) (stating that section 1129(a)(2) requires plan proponents to comply with applicable provisions of the Bankruptcy Code, including "disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code").

**7.      The Debtor Complied with Section 1126 of the Bankruptcy Code.**

60.      Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a plan of reorganization.  Specifically, under section 1126 of the Bankruptcy Code, only holders of allowed claims and allowed interests in impaired classes of claims or interests that will receive or retain property under a plan on account of such claims or interests may vote to accept or reject such plan.  Here, Holders of Claims in Classes 3 and 4 and Equity Interests in Class 6 are Impaired and entitled to vote to accept or reject the Plan under section 1126 of the Bankruptcy Code.

61.      Based upon the foregoing, the Debtor submits that it satisfies the requirements of section 1129(a)(2) of the Bankruptcy Code, and no party has asserted otherwise.

**C.      The Plan was Proposed in Good Faith (§ 1129(a)(3)).**

62.      Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."  Where a plan satisfies the purposes of the Bankruptcy Code and has a good chance of succeeding, the good faith requirement of section 1129(a)(3) of the Bankruptcy Code is satisfied.[25]  To determine whether a plan seeks relief consistent with the Bankruptcy Code, courts consider the totality of the circumstances surrounding the development of the plan.[26]

---

[25] *See, e.g., PWS Holding Corp.*, 228 F.3d at 242 (*quoting In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986)); *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 802 (5th Cir. 1997 (*quoting Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*, 764 F.2d 406, 408 (5th Cir. 1985)); *In re Century Glove*, Cir. A. Nos. 90-400 and 90-401, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993) ; *In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002).

[26] *See, e.g., T-H New Orleans*, 116 F.3d at 802 (*quoting In re Sun Country Dev., Inc.*, 764 F.2d at 408); *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012); *Century Glove*, 1993 WL 239489, at *4.

63.      The Plan satisfies section 1129(a)(3) of the Bankruptcy Code.  The fundamental

purpose of chapter 11 is to enable a distressed business to reorganize its affairs to prevent job

losses and the adverse economic effects associated with disposing of assets at liquidation value.[27]

Here, the Plan was proposed in good faith in order to enable the Debtor to implement the

provisions of the Restructuring Support Agreements and maximize the value of the Debtor's

estate for the benefit of all stakeholders.  Moreover, the Plan is the product of extensive arm's-

length negotiations among the Debtor, the Supporting Senior Secured Noteholders, and the

Supporting Convertible Unsecured Noteholders and is entirely consistent with the terms of the

Restructuring Support Agreements.  Finally, as set forth herein, the Plan complies with

bankruptcy and applicable nonbankruptcy law.  No party has asserted that the Plan does not

comply with section 1129(a)(3) of the Bankruptcy Code.

**D.      The Plan Provides that the Debtor's Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4)).**

64.      Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses

paid by the plan proponent, by the debtor, or by a person receiving distributions of property

under the plan, be subject to approval by the Court as reasonable.  Courts have construed this

---

[27] *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984); *B.D. Int'l Disc. Corp. v. Chase Manhattan Bank, N.A. (In re B.D. Int'l Disc. Corp.)*, 701 F.2d 1071, 1075 n.8 (2d Cir. 1983) (stating that "the two major purposes of bankruptcy [are] achieving equality among creditors and giving the debtor a fresh start").

section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the Court as to their reasonableness.[28]

65.     The Plan satisfies section 1129(a)(4) of the Bankruptcy Code.  The Debtor submits that payments of Professional Fee Claims arising prior to the Effective Date are the only category of payments that fall within the ambit of section 1129(a)(4) of the Bankruptcy Code in this Chapter 11 Case, and the Debtor may not pay such Professional Fee Claims absent Court approval.  Further, all Professional Fee Claims arising prior to the Effective Date and corresponding payments are subject to prior Court approval and the reasonableness requirements under sections 328 and/or 330 of the Bankruptcy Code.  Article II of the Plan, moreover, provides that Professionals shall file all final requests for payment of Professional Fee Claims no later than thirty (30) days after the Effective Date, thereby providing an adequate period of time for interested parties to review such Professional Fee Claims.  No party has asserted that the Plan does not comply with section 1129(a)(4) of the Bankruptcy Code.

E.     **The Debtor Disclosed All Necessary Information Regarding Directors, Officers, and Insiders (§ 1129(a)(5)).**

66.     Section 1129(a)(5)(A)(i) of the Bankruptcy Code requires that the proponent of a plan disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors.  Section 1129(a)(5)(B) of the Bankruptcy Code requires a plan proponent to disclose the identity of an "insider" (as defined by section 101(31) of the Bankruptcy Code) to be employed

---

[28] *See In re Lisanti Foods, Inc.*, 329 B.R. 491, 503 (Bankr. D.N.J. 2005) ("Pursuant to § 1129(a)(4), a [p]lan should not be confirmed unless fees and expenses related to the [p]lan have been approved, or are subject to the approval, of the Bankruptcy Court"), *aff'd*, 241 F. App'x 1 (3d Cir. 2007); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988); *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

or retained by the reorganized debtor and the nature of any compensation for such insider.

Additionally, the Bankruptcy Code provides that the appointment or continuance of such officers

and directors be consistent with the interests of creditors and equity security holders and with

public policy.[29]  The "public policy requirement would enable [the court] to disapprove plans in

which demonstrated incompetence or malevolence is a hallmark of the proposed management."[30]

67.      As set forth in the Plan Supplement, Miriam Martinez, the Debtor's current Chief

Financial Officer, has been designated as the Plan Agent for the Debtor and U.S. Bank National

Association has been designated as the New Indenture Trustee.  In her future role as Plan Agent,

Ms. Martinez will be compensated at the rate of $5,000 per month.

68.      The directors of the New Board of Lamington and their present affiliations are as

follows:

| Board of Directors | Current Affiliations |
| --- | --- |
| Matthew Epstein | Evermore Global Advisors, LLC, Current Director of the Debtor |
| Patrick Brennan | Brennan Asset Management, LLC, Current Director of the Debtor |
| Robert Knapp | Ironsides Partners, Current Director of the Debtor |
| Roy Patterson | River City Management, Current Director of the Debtor |
| Michael Barry Brennan, Irish Director | CapF9 Ventures Ltd, No prior affiliation to the Debtor or Lamington |

69.      The New Board will be compensated as follows:  €50,000 per annum for Mr.

Patrick Brennan; €25,000 per annum for Messrs. Epstein, Knapp, and Patterson; and €40,000 per

annum for Mr. Michael Barry Brennan (Irish director).[31]  Travel expenses will be reimbursed.

---

[29]  *See* 11 U.S.C. § 1129(a)(5)(A)(ii).

[30]  *See* 7 Collier on Bankruptcy ¶ 1129.02[5][b] (16th ed. 2012).

[31]  Messrs. Patrick Brennan and Michael Barry Brennan are not related to each other.

27

70.     The Debtor's appointment of officers, directors and managers is "consistent with the interests of creditors and equity security holders and with public policy."[32]  The proposed officers, directors and managers of the Debtor and Lamington have significant knowledge and business and industry experience, are competent and well qualified.[33]  The Debtor believes that control of the Debtor and Lamington by the proposed individuals will be beneficial, and no party in interest has objected to the Plan on these grounds.  Therefore, the requirements under section 1129(a)(5)(A)(ii) of the Bankruptcy Code are satisfied.

71.     Finally, the Debtor satisfied section 1129(a)(5)(B) of the Bankruptcy Code because the Debtor sufficiently disclosed the identity of all insiders that the Debtor will employ or retain and the nature of any compensation for such insiders in compliance with the Bankruptcy Code.[34]  No party has asserted that the Plan does not comply with section 1129(a)(5) of the Bankruptcy Code.

**F.     The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)).**

72.     Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan.  Section 1129(a)(6) of the Bankruptcy Code is inapplicable to this Chapter 11 Case.

---

[32]  11 U.S.C. § 1129(a)(5)(A)(ii).

[33]  *See In re Rusty Jones, Inc.,* 110 B.R. 362, 372, 375 (Bankr. N.D. Ill. 1990) (stating that 1129(a)(5) not satisfied where management had no experience in the debtor's line of business); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149–50 (Bankr. S.D.N.Y. 1984) (continuation of debtors' president and founder, who had many years of experience in the debtors' businesses, satisfied section 1129(a)(5)).

[34]  *See Armstrong World Indus.*, 348 B.R. at 165 (finding disclosure of identities and nature of compensation of persons to serve as directors and officers on the effective date sufficient for section 1129(a)(5) of the Bankruptcy Code).

**G.      The Best Interests of Creditors Test Does Not Apply to the Plan (§ 1129(a)(7)).**

73.      Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," provides, in relevant part:

> With respect to each impaired class of claims or interests—
>
> (A)      each holder of a claim or interest of such class—
>
> (i)      has accepted the plan; or
>
> (ii)      will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date . . . .

11 U.S.C. § 1129(a)(7).

74.      The best interests test applies to individual dissenting holders of impaired claims and interests rather than classes, and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan of reorganization.[35]  As noted elsewhere, Classes 1, 2, and 5 are Unimpaired under the Plan, and thus none of the Holders of Claims or Equity Interests in those Classes can invoke section 1129(a)(7).  The only impaired classes are Classes 3, 4 and 6, which are comprised of Senior Secured Notes Claims, Convertible Unsecured Notes Claims, and Equity Interests in the Debtor, respectively.

---

[35] *See Bank of Amer. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Adelphia Commc'ns. Corp.*, 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (stating that section 1129(a)(7) is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation").

75.     As set forth in the Disclosure Statement[36] and as will be established at the Confirmation Hearing, the Debtor, with the assistance of its advisors, prepared a liquidation analysis that estimates recoveries for members of each class under the Plan.  The projected recoveries under the Plan are equal to or in excess of the recoveries estimated in a hypothetical chapter 7 liquidation.[37]  The liquidation analysis prepared by the Debtor estimates that creditors will realize approximately $53.7 million to $109.8 million in a chapter 7 liquidation, which is substantially less than the projected reorganization value of the Debtor under the Plan.  The Debtor's advisors estimate, in the context of a reorganization under the Plan, that the total value of the Debtor's minority interests in White Eagle are approximately $141.4 million to $156.8 million as of September 30, 2020, with a mid-point of $148.8 million.  Hence, under the Plan, Holders of Impaired Claims and Equity Interests are projected to realize a substantially greater recovery than liquidation value, thereby satisfying the "best interests test" under section 1129(a)(7) of the Bankruptcy Code.

**H.      Each Class of Impaired Claims and Equity Interests Has Accepted the Plan For Purposes of Section 1129(a)(8) of the Bankruptcy Code.**

76.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.

77.     Here, each Class of Impaired Claims and Equity Interests under the Plan voted in favor of the Plan.  Accordingly, the requirements of section 1129(a)(8) of the Bankruptcy Code have been satisfied.

---

[36] *See* Disclosure Statement at Ex. C.

[37] *Id.*

30

## I.    The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)).

78.    Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.  In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative expense claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.  Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally domestic support obligations, wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).  Finally, section 1129(a)(9)(C) provides that holders of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority tax claims—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim.

79.    The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.  First, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each holder of an Allowed Administrative Expense Claim, unless otherwise agreed, will be paid in full on account of such Allowed Administrative Expense Claim.  Second, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no holders of the types of Claims

31

specified by 1129(a)(9)(B) are Impaired under the Plan.  Finally, Article II.B of the Plan satisfies

section 1129(a)(9)(C) of the Bankruptcy Code because it specifically provides that each holder

of an Allowed Priority Tax Claim, unless otherwise agreed, will be paid in full on account of

such Allowed Priority Tax Claim.  Thus, the Debtor submits that the Plan satisfies each of the

requirements set forth in section 1129(a)(9) of the Bankruptcy Code.

**J.**     **There Is An Impaired Consenting Class of Claims Under the Plan (§ 1129(a)(10)).**

80.     Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is

an impaired class of claims, at least one impaired class of claims must accept the plan as an

alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of

claims or interests must either accept the plan or be unimpaired under the plan.

81.     As noted above, each Impaired Class of Claims or Equity Interests under the Plan

has voted to accept the Plan.

**K.**     **The Plan Is Feasible (§ 1129(a)(11)).**

82.     Section 1129(a)(11) of the Bankruptcy Code requires that the Court find that a

plan is feasible as a condition precedent to confirmation.  To demonstrate that a plan is feasible,

it is not necessary for a debtor to guarantee success.[38]  Rather, a debtor must provide only a

---

[38] *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed."); *In re Flintkote Co.*, 486 B.R. 99, 139 (Bankr. D. Del. 2012); *In re W.R. Grace & Co.*, 475 B.R. 34, 115 (D. Del. 2012); *In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985) ("'Feasibility' does not, nor can it, require the certainty that a reorganized company will succeed."), *aff'd,* 800 F.2d 581 (6th Cir. 1986).

DOCS_SF:104636.2 23629/002

reasonable assurance of success.[39]  There is a relatively low threshold of proof necessary to

satisfy the feasibility requirement.[40]  As demonstrated below, the Plan is feasible within the

meaning of section 1129(a)(11) of the Bankruptcy Code.

83.    As will be established at the Confirmation Hearing, the Plan is feasible, subject

only to addressing the disputed claim of the Pohl Claimants in a satisfactory manner.  The

financial projections encompassed within the Disclosure Statement:  (a) are reasonable,

persuasive, and credible as of the dates such analysis or evidence was prepared, presented, or

proffered; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not

been controverted by other evidence; (d) establish that the Plan is feasible and confirmation of

the Plan is not likely to be followed by the liquidation, or the need for further financial

reorganization of the Debtor or any successor to the Debtor under the Plan; and (e) establish that

the Debtor and Lamington will have sufficient funds available to meet their obligations under the

Plan.  The only hurdle to overcome is the $9 million disputed claim asserted by the Pohl

Claimants.  Assuming such claim is estimated at an appropriate amount consistent with the law

and the facts, the Plan is feasible.  Thus, the Plan satisfies section 1129(a)(11) of the Bankruptcy

Code, and no party has asserted otherwise.

---

[39]  *See Kane*, 843 F.2d at 649; *Flintkote Co.*, 486 B.R. 99, 139 (Bankr. D. Del. 2012); *W.R. Grace & Co.*, 475 B.R. at 115; *see also Pizza of Hawaii, Inc. v. Shakey's, Inc.* (*In re Pizza of Hawaii, Inc.*), 761 F.2d 1374, 1382 (9th Cir. 1985) (citations omitted) (holding that "[t]he purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation"); *accord In re Capmark Fin. Grp. Inc.*, No. 09-13684 (CSS), 2011 WL 6013718, at *61 (Bankr. D. Del. Oct. 5, 2011) (same).

[40]  *See, e.g.*, *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (quoting approvingly that "[t]he Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility") (internal citations omitted); *In re Sea Garden Motel & Apartments*, 195 B.R. 294, 305 (D.N.J. 1996); *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011), *on reconsideration,* 464 B.R. 208 (Bankr. D. Del. 2011).

**L.     All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)).**

84.     Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."  Section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority status.

85.     The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article XIV.B of the Plan provides for the payment of all fees payable by the Debtor under 28 U.S.C. § 1930(a).

**M.     No Retiree Benefits Exist (§ 1129(a)(13)).**

86.     Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits continue post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code.  The requirements of section 1129(a)(13) of the Bankruptcy Code do not apply to the Plan because the Debtor is not liable for any "retiree benefits," as such term is defined in section 1114 of the Bankruptcy Code.

**N.     Sections 1129(a)(14) through 1129(a)(16) Do Not Apply to the Plan.**

87.     The requirements of sections 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to the Plan because the Debtor owes no domestic support obligations, is not an individual, and is not a nonprofit corporation, respectively.

DOCS_SF:104636.2 23629/002

**O.**     **The "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code Do Not Apply to the Plan.**

88.     Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.

89.     The requirements of section 1129(b) of the Bankruptcy Code do not apply to the Plan because the requirements of section 1129(a(8) of the Bankruptcy Code have been met, as set forth above.

**P.**     **Section 1129(c) of the Bankruptcy Code Is Satisfied.**

90.     Section 1129(c) of the Bankruptcy Code provides that the only one plan can be confirmed.  Because the Plan is the only plan before the Court, section 1129(c) is satisfied.

**Q.**     **The Debtor Complied with Section 1129(d) of the Bankruptcy Code.**

91.     The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.  Moreover, no governmental unit or any other party has requested that the Court decline to confirm the Plan on such grounds.  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code, and no party has asserted otherwise.

**R.**     **Modifications to the Plan.**

92.     Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.  Further, when the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan.

Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed

accepted by all creditors and equity security holders who have previously accepted the plan if the

court finds that the proposed modifications do not adversely change the treatment of the claim of

any creditor or the interest of any equity security holder.[41]

93.    The modifications to the Solicitation Plan filed concurrently herewith, and as

reflected in the current Plan, do not adversely change the treatment of the claim of any Holder of

a Claim or Equity Interest and, as such, should be deemed accepted by all Holders who have

previously accepted the Solicitation Plan.

**S.    The Confirmation Order Should Be Effective Immediately.**

94.    Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed

until the expiration of 14 days after the entry of the order, unless the Court orders otherwise."

Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale

or lease of property (other than cash collateral) and orders authorizing a debtor to assign an

executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.  These

Bankruptcy Rules also permit modification of the imposed stay upon court order.

95.    The Debtor submits that good cause exists for waiving and eliminating any stay of

the Proposed Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the

---

[41] *See, e.g.*, *In re Global Safety Textiles Holdings LLC*, Case No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (finding that nonmaterial modifications to plan do not require additional disclosure or resolicitation); *In re Burns & Roe Enters., Inc.*, Case No. 08-4191 (GEB), 2009 WL 438694, at *23 (D.N.J. Feb. 23, 2009) (confirming plan as modified without additional solicitation or disclosure because modifications did "not adversely affect creditors").

DOCS_SF:104636.2 23629/002

Proposed Confirmation Order will be effective immediately upon its entry.[42]  As addressed above, the Chapter 11 Case and the related transactions have been negotiated and implemented in good faith and with a high degree of transparency and public dissemination of information. Moreover, Holders of Impaired Claims and Equity Interests have voted to accept the Plan.  The sooner the transactions contemplated by the Plan are implemented, the less cost the Debtor's estate will be forced to incur, which is in the best interests of the Debtor, its estate, and all parties in interest.  Under the circumstances, there is no reason for further delay if the Debtor, with the consent of the Supporting Senior Secured Noteholders and Supporting Convertible Unsecured Noteholders, determine that declaring the effectiveness of the Plan should occur immediately. The Debtor believes that good cause exists to waive any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry.

## <u>CONCLUSION</u>

For all of the reasons set forth herein, the Debtor respectfully requests that the Court enter the Proposed Confirmation Order (i) confirming the Plan, (ii) waiving the fourteen (14) day stay of the Proposed Confirmation Order, and (iii) granting such other and further relief as is just and proper.

---

[42]  *See, e.g., In re Article Sentinel, Inc.*, Case No. 15-12465 (CSS) (Bankr. D. Del. Nov. 30, 2016) (waiving stay of confirmation order and causing it to be effective and enforceable immediately upon its entry by the court*) In re Variant Holding Company, LLC*, Case No. 14-12021 (BLS) (Bankr. D. Del. May 10, 2016) (same);
*In re Physiotherapy Holdings, Inc.*, Case No. 13-12965 (KG) (Bankr. D. Del. Dec. 23, 2013) (same);
*In re Gatehouse Media, Inc.*, Case No. 13-12503 (MFW) (Bankr. D. Del. Nov. 6, 2013) (same); *In re Dex One Corp.*, Case No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013) (same); *In re Geokinetics Inc.*, Case No. 13-10472 (KJC) (Bankr. D. Del. Apr. 25, 2013) (same); *In re CHL, Ltd.*, Case No. 12-12437 (KJC) (Bankr. D. Del. Oct. 4, 2012) (same).

Dated:  December 18, 2020          PACHULSKI STANG ZIEHL & JONES LLP


                                   */s/ Colin R. Robinson*
                                   Richard M. Pachulski (CA Bar No. 90073)
                                   Maxim B. Litvak (CA Bar No. 215852)
                                   Colin R. Robinson (DE Bar No. 5524)
                                   919 N. Market Street, 17th Floor
                                   P.O. Box 8705
                                   Wilmington, DE 19899-8705 (Courier 19801)
                                   Tel:  (302) 652-4100
                                   Fax:  (302) 652-4400
                                   E-mail:  rpachulski@pszjlaw.com
                                            mlitvak@pszjlaw.com
                                            crobinson@pszjlaw.com

                                   Counsel for Emergent Capital, Inc.,
                                   Debtor and Debtor-in-Possession